UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

CITY OF WESTLAND POLICE AND FIRE       :
RETIREMENT SYSTEM, On Behalf of Itself  :
and All Others Similarly Situated,      :
                                        :
                        Plaintiff,      :
                                        :
            vs.                         :
                                        :
SAIC, INC., GERARD DENAULT,             :
KENNETH C. DAHLBERG, and MARK W.        :
SOPP,                                   :
                                        :
                        Defendants.     :
                                        :
———————————————————————— x

Civil Action No. 12-cv-01353-DAB

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS



Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by SAIC, Inc. ("SAIC" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

In addition, certain of the allegations herein are predicated upon the facts asserted in the Superseding Indictment filed by the United States Attorney's Office ("USAO") for the Southern District of New York against Gerard Denault ("Denault"), a former executive of SAIC, and others (the "Superseding Indictment") charging them with a criminal conspiracy to defraud the City of New York ("NYC"). *See United States of America v. Mazer*, et al., No.: 1:11-cr-00121-GBD (S.D.N.Y.)

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of SAIC between April 11, 2007 and September 1, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

6.      Plaintiff City of Westland Police and Fire Retirement System, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of SAIC during the Class Period and has been damaged thereby.

7.      Defendant SAIC focuses its business on providing defense, intelligence, homeland security, logistics, energy, environment and heath solutions and services to federal, state and local government agencies, foreign governments and customers in select commercial markets. Defendant SAIC maintains its corporate headquarters in McLean, Virginia.

8.      Defendant Kenneth C. Dahlberg ("Dahlberg") served as SAIC's Chief Executive Officer ("CEO") until September 20, 2009 and Chairman of its Board of Directors (the "Board") until June 18, 2010.

9.      Defendant Mark W. Sopp ("Sopp"), at all relevant times, served as SAIC's Chief Financial Officer.

10.     Defendant Denault ("Denault") served as SAIC's Vice President and Operations Manager until December 21, 2010, at which time Defendant SAIC placed him on "administrative leave." On May 27, 2011, Defendant Denault was arrested after the USAO alleged he received millions of dollars in illegal kickbacks.

11.     Defendants Dahlberg, Sopp, and Denault are collectively referred to herein as the "Individual Defendants."

12.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of SAIC, were privy to confidential and proprietary information concerning SAIC, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning SAIC, as discussed in detail below. Because of their positions with SAIC, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of SAIC's business.

14.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to SAIC's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of SAIC common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of SAIC common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. During the Class Period, the scheme: (i) deceived the investing public regarding SAIC's business, operations and management and the intrinsic value of SAIC common stock; (ii) allowed the Individual Defendants and certain Company insiders to collectively sell their personally-held SAIC common stock for proceeds of approximately $33.9 million; and (iii) caused Plaintiff and members of the Class to purchase SAIC common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of SAIC between April 11, 2007 and September 1, 2011, inclusive, and who were damaged

thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SAIC common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by SAIC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of SAIC;

(c)     whether the price of SAIC common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Shortly after its formation in 1969, Science Applications International Corporation, in connection with becoming a publicly-traded company, entered into a merger agreement with SAIC whereby Science Applications International Corporation became a 100%-owned subsidiary of SAIC. Thereafter, SAIC completed an initial public offering of its common stock, which resulted in net proceeds to SAIC of approximately $1.245 billion.

24.     The Company represents that its business is focused on solving issues of national and global importance in the areas of defense, intelligence, homeland security, logistics and product support, energy, environment and health to the U.S. military, agencies of the U.S. Department of Defense, the intelligence community, the U.S. Department of Homeland Security and other U.S. Government civil agencies, state and local government agencies, foreign governments and customers in select commercial markets.

**The Superseding Indictment**

25.     For over ten years, NYC has been developing and attempting to implement an initiative, called the CityTime Project ("CityTime"), associated with the modernization of its employee payroll system. CityTime was originally budgeted to cost NYC $63 million. To date, however, CityTime has cost NYC nearly $700 million, with SAIC, the primary contractor retained by NYC to develop and implement CityTime, receiving over $600 million of such amount.

26.     From 2003 through 2010, Defendant Denault, a former SAIC executive, served as the Company's Program Manager on CityTime and was responsible for selecting and overseeing the subcontractors SAIC hired on CityTime. In addition, Defendant Denault was responsible for: (i) submitting bills to NYC seeking payment for work purportedly performed by SAIC employees and subcontractors on CityTime; (ii) developing proposed CityTime work orders; and (iii) contract amendments seeking approval for SAIC to perform additional work on CityTime.

27.     Another SAIC employee, Carl Bell ("Bell"), the Chief Systems Engineer in the Company's New York office, was responsibility for the development of the software for CityTime and oversaw certain technical aspects performed by SAIC on CityTime.

28.     From at least 2003 through 2010, there existed a massive and elaborate scheme to defraud NYC in connection with CityTime. As a result, virtually all of the approximate $600 million paid by NYC to SAIC for CityTime was tainted, directly or indirectly, by fraud.

29.     Specifically, Defendant Denault and Bell, and others, conspired to defraud NYC, and did so, by:

(a)     making material misrepresentations and material omissions to NYC, which caused NYC to spend significantly more money than necessary on CityTime. Among other things, Defendant Denault and Bell defrauded NYC into: (1) hiring consultants not needed to complete the

project; (2) inflating the rates charged for work performed by certain consultants; and (3) inflating the hours worked by certain consultants;

(b)     agreeing to the payment of millions of dollars of kickbacks to individuals whose participation was critical to the success of the fraudulent scheme.  To ensure the continued success of the fraudulent scheme, Defendant Denault and Bell were respectively paid at least $9 million and $5 million in kickbacks; and

(c)     agreeing to launder their respective corrupt proceeds using, among other means, shell companies and bank accounts located in the U.S. and abroad.

30.     The scheme commenced in 2003 when Defendant Denault and Bell recommended that SAIC retain Technodyne LLC ("Technodyne"), a private consulting company based in New Jersey, to provide staffing services on CityTime.  SAIC retained Technodyne as a "sole source" contractor, *i.e.*, Technodyne did not have to engage in a competitive bidding process to win the contract with SAIC, nor did Technodyne have to engage in future competitive bidding processes to be awarded additional CityTime business by SAIC.  Technodyne functioned as SAIC's primary subcontractor on CityTime and received at least $450 million from SAIC between 2003 and 2010 in connection with CityTime.

31.     At or around the time that SAIC hired Technodyne, its executive officers agreed to pay kickbacks to Defendant Denault and Bell.  Specifically, Technodyne agreed to pay both Defendant Denault and Bell $5 for each hour worked by every consultant hired by or through Technodyne on the CityTime Project.  This kickback arrangement provided Defendant Denault and Bell with significant personal financial incentives to inflate the billing for consultants on CityTime.

32.     In addition, in 2005, Technodyne agreed to pay Defendant Denault an additional $2 for every hour billed by a certain consultant.  This kickback arrangement provided Defendant Denault another personal financial incentive to inflate the billing for consultants on CityTime.

33.     In or about 2005 and 2006, after NYC had already paid SAIC approximately $85 million on CityTime, Defendant Denault and others advocated for an amendment to SAIC's CityTime contract.  Specifically, they recommended that NYC change SAIC's contract from a "fixed price" contract, in which SAIC bore the responsibility of absorbing cost overruns, to a "fixed price level of effort" contract, so that NYC, and not SAIC, would largely become responsible for future cost overruns.  NYC amended SAIC's contract as Defendant Denault and others recommended.

34.     Following this contract amendment, staffing on the CityTime project expanded dramatically and SAIC paid Technodyne hundreds of millions of dollars, notwithstanding SAIC's receipt of a whistle-blower complaint and an internal investigation in 2005 associated with CityTime contract mismanagement, and suspicions of kickbacks to Defendant Denault and overuse of Technodyne.

35.     For example, at the end of 2005, fewer than 150 consultants worked on CityTime. An internal 2005 SAIC report prepared by Defendant Denault stated that the program at that time was staffed adequately to meet both current and projected contract needs.  By the end of 2007, however, the number of consultants on CityTime had more than doubled, to more than 300 – the vast majority of whom were hired and paid through SAIC's subcontract with Technodyne.  NYC was billed at rates that exceeded $160 per hour, or more than $300,000 per year, for many of these consultants.

36.     By April 2010, NYC had agreed to pay SAIC approximately $628 million for CityTime.  According to SAIC internal reports, Technodyne had been or was to receive a total of

$464 million, or 74% of the total amount paid to SAIC, as compensation for providing "staff augmentation" to SAIC on CityTime. This amount represented approximately 80% of Technodyne's income between 2003 and 2010. All other SAIC subcontractors and vendors combined were to receive less than 14% of the total amount paid to SAIC for work on CityTime.

37.     In an effort to defraud NYC and increase the amount of kickbacks they would receive, Defendant Denault, Bell, and others made and agreed to make a series of material misrepresentations and material omissions that caused NYC to overpay SAIC on CityTime. Among these material misrepresentations and material omissions were the following:

(a)     Defendant Denault recommended that the 2006 contract amendment described above – which caused NYC, not SAIC, to absorb the cost of overruns on CityTime – was necessary for the successful completion of CityTime and was in NYC's interest; and

(b)     Defendant Denault used his position of authority at SAIC to, among other things: (1) approve contract amendments and work orders calling for large increases in expenditures devoted to the hiring of additional consultants on CityTime, even though many of the staffing increases were not necessary for the successful completion of the project; (2) cause the vast majority of new consultants to be hired through Technodyne; (3) cause the hiring of consultants at billing rates that were too high for their levels of skill and experience; and (4) artificially slow and delay the deployment and implementation of the project.

## Materially False and Misleading Statements
## Made During the Class Period

38.     The Class Period begins on April 11, 2007. On that date, SAIC issued a press release announcing its financial results for its 2007 fourth quarter and year end, the periods ended January 31, 2007. The press release announced that the Company's revenues for the 2007 fourth quarter and

year end respectively totaled $2.1 billion and $8.3 billion and that its operating income for such periods respectively totaled $144 million and $585 million.

39.     On April 12, 2007, SAIC filed its Form 10-K for the year ended January 31, 2007 (the "2007 Form 10-K") with the SEC, which was signed by Defendants Dahlberg and Sopp.  The 2007 Form 10-K included the following representations about the Company's disclosure and internal controls and Defendants Dahlberg's and Sopp's certifications thereon:

Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our principal executive officer (our Chairman and Chief Executive Officer) and principal financial officer (our Executive Vice President and Chief Financial Officer), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of January 31, 2007, and our principal executive officer and principal financial officer have concluded that our controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission.  These disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and our principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

*     *     *

I, [Defendants Dahlberg and Sopp], certify that:

1.     I have reviewed this Annual Report on Form 10-K of SAIC, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

- 11 -

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

40.     These representations about the Company's internal and disclosure controls, and Defendants Dahlberg's and Sopp's certifications thereon, were repeated in all material respects in Forms 10-K and 10-Q that SAIC subsequently filed with the SEC during the Class Period.

41.     In addition, the 2007 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2007, were presented in conformity with generally accepted accounting principles in the United States ("GAAP"), and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting period. Management evaluates these estimates and assumptions on an on-going basis.  Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

42.     On June 6, 2007, SAIC announced its financial results for its 2008 first quarter, the period ended April 30, 2007.  The Company reported revenue for the quarter of $2.1 billion and operating income of $140 million.

43.     On June 7, 2007, SAIC filed its Form 10-Q for the quarter ended April 30, 2007 (the "2008 Q1 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2008 Q1 Form 10-Q included SAIC's financial statements for the quarter ended April 30, 2007, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

- 13 -

44.     On September 6, 2007, SAIC announced its financial results for its 2008 second quarter, the period ended July 31, 2007.  The Company reported revenue for the quarter of $2.2 billion and operating income of $173 million.

45.     On September 7, 2007, SAIC filed its Form 10-Q for the quarter ended July 31, 2007 (the "2008 Q2 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2008 Q2 Form 10-Q included SAIC's financial statements for the quarter ended July 31, 2007, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

46.     On December 10, 2007, SAIC announced its financial results for its 2008 third quarter, the period ended October 31, 2007.  The Company reported revenue for the quarter of $2.37 billion and operating income of $186 million.

47.     On December 11, 2007, SAIC filed its Form 10-Q for the quarter ended October 31, 2007 (the "2008 Q3 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2008 Q3 Form 10-Q included SAIC's financial statements for the quarter ended October 31, 2007, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

48.     On March 25, 2008, SAIC issued a press release announcing its financial results for its 2008 fourth quarter and year end, the periods ended January 31, 2008.  The press release

announced that the Company's revenues for the 2008 fourth quarter and year end respectively totaled $2.34 billion and $8.94 billion and that its operating income for such periods respectively totaled $171 million and $666 million.

49.     On March 28, 2008, SAIC filed its Form 10-K for the year ended January 31, 2008 (the "2008 Form 10-K") with the SEC, which was signed by Defendants Dahlberg and Sopp.  The 2008 Form 10-K included representations about the Company's disclosure and internal controls and Defendants Dahlberg's and Sopp's certifications thereon.

50.     In addition, the 2008 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2008, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting period. Management evaluates these estimates and assumptions on an on-going basis.  Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

51.     On June 3, 2008, SAIC announced its financial results for its 2009 first quarter, the period ended April 30, 2008.  The Company reported revenue for the quarter of $2.37 billion and operating income of $173 million.

52.     On June 4, 2008, SAIC filed its Form 10-Q for the quarter ended April 30, 2008 (the "2009 Q1 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2009 Q1 Form 10-Q included SAIC's financial statements for the quarter ended April 30, 2008, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods.

Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

53.     On September 3, 2008, SAIC announced its financial results for its 2009 second quarter, the period ended July 31, 2008.  The Company reported revenue for the quarter of $2.56 billion and operating income of $186 million.

54.     On September 4, 2008, SAIC filed its Form 10-Q for the quarter ended July 31, 2008 (the "2009 Q2 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2009 Q2 Form 10-Q included SAIC's financial statements for the quarter ended July 31, 2008, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

55.     On December 9, 2008, SAIC announced its financial results for its 2009 third quarter, the period ended October 31, 2008.  The Company reported revenue for the quarter of $2.63 billion and operating income of $205 million.

56.     On December 10, 2008, SAIC filed its Form 10-Q for the quarter ended October 31, 2008 (the "2009 Q3 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2009 Q3 Form 10-Q included SAIC's financial statements for the quarter ended October 31, 2008, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

57.     On March 25, 2009, SAIC issued a press release announcing its financial results for its 2009 fourth quarter and year end, the periods ended January 31, 2009.  The press release announced that the Company's revenues for the 2009 fourth quarter and year end respectively totaled $2.52 billion and $10.07 billion and that its operating income for such periods respectively totaled $208 million and $776 million.

58.     On March 30, 2009, SAIC filed its Form 10-K for the year ended January 31, 2009 (the "2009 Form 10-K") with the SEC, which was signed by Defendants Dahlberg and Sopp.  The 2009 Form 10-K included representations about the Company's disclosure and internal controls and Defendants Dahlberg's and Sopp's certifications thereon.

59.     In addition, the 2009 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2009, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting periods. Management evaluates these estimates and assumptions on an on-going basis.  Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

60.     On June 3, 2009, SAIC announced its financial results for its 2010 first quarter, the period ended April 30, 2009.  The Company reported revenue for the quarter of $2.65 billion and operating income of $204 million.

61.     On June 4, 2009, SAIC filed its Form 10-Q for the quarter ended April 30, 2009 (the "2010 Q1 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2010 Q1 Form 10-Q included SAIC's financial statements for the quarter ended April 30, 2009, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

62.     On June 23, 2009, the Company announced that Defendant Dahlberg, in a manner that was consistent with the Company's mandatory retirement policy for executive officers, had advised SAIC'S Board that he would step down from his position as the Company's CEO on September 20, 2009 (but that he would continue to act as Chairman of the Company's Board though June 2010).  In addition, SAIC's Board announced that, effective September 21, 2009, Walter P. Havenstein, former President and CEO of BAE Systems Inc., would become the Company's CEO and a member of its Board.

63.     On September 2, 2009, SAIC announced its financial results for its 2010 second quarter, the period ended July 31, 2009.  The Company reported revenue for the quarter of $2.75 billion and operating income of $221 million.

64.     On September 3, 2009, SAIC filed its Form 10-Q for the quarter ended July 31, 2009 (the "2010 Q2 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2010 Q2 Form 10-Q included SAIC's financial statements for the quarter ended July 31, 2009, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

65.     On December 8, 2009, SAIC announced its financial results for its 2010 third quarter, the period ended October 31, 2009.  The Company reported revenue for the quarter of $2.77 billion and operating income of $233 million.

66.     On December 9, 2009, SAIC filed its Form 10-Q for the quarter ended October 31, 2009 (the "2010 Q3 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2010 Q3 Form 10-Q included SAIC's financial statements for the quarter ended October 31, 2009, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements, in conformity with GAAP, requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

67.     On March 30, 2010, SAIC issued a press release announcing its financial results for its 2010 fourth quarter and year end, the periods ended January 31, 2010.  The press release announced that the Company's revenues for the 2010 fourth quarter and year end respectively totaled $2.68 billion and $10.85 billion and that its operating income for such periods respectively totaled $209 million and $867 million.

68.     On April 1, 2010, SAIC filed its Form 10-K for the year ended January 31, 2010 (the "2010 Form 10-K") with the SEC, which was signed by Defendants Dahlberg Sopp. The 2010 Form 10-K included representations about the Company's disclosure and internal controls and Defendant Sopp's certification thereon.

69.     In addition, the 2010 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2010, were presented in conformity with GAAP, and stated:

The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting periods. Management evaluates these estimates and assumptions on an on-going basis. Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

70.     On June 3, 2010, SAIC announced its financial results for its 2011 first quarter, the period ended April 30, 2010. The Company reported revenue for the quarter of $2.69 billion and operating income of $207 million.

71.     On June 4, 2010, SAIC filed its Form 10-Q for the quarter ended April 30, 2010 (the "2011 Q1 Form 10-Q") with the SEC, which was signed by Defendant Sopp. The 2011 Q1 Form 10-Q included SAIC's financial statements for the quarter ended April 30, 2010, which were represented to have been presented in conformity with GAAP, and stated:

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

72.     On September 1, 2010, SAIC announced its financial results for its 2011 second quarter, the period ended July 31, 2010. The Company reported revenue for the quarter of $2.79 billion and operating income of $273 million.

73.     On September 3, 2010, SAIC filed its Form 10-Q for the quarter ended July 31, 2010 (the "2011 Q2 Form 10-Q") with the SEC, which was signed by Defendant Sopp. The 2011 Q2 Form 10-Q included SAIC's financial statements for the quarter ended July 31, 2010, which were represented to have been presented in conformity with GAAP, and stated:

The preparation of financial statements in conformity GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements,

- 20 -

as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

74.     On December 8, 2010, SAIC announced its financial results for its 2011 third quarter, the period ended October 31, 2010. The Company reported revenue for the quarter of $2.87 billion and operating income of $258 million.

75.     On December 9, 2010, SAIC filed its Form 10-Q for the quarter ended October 31, 2010 (the "2011 Q3 Form 10-Q") with the SEC, which was signed by Defendant Sopp. The 2011 Q3 Form 10-Q included SAIC's financial statements for the quarter ended October 31, 2010, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

76.     On March 23, 2011, SAIC issued a press release announcing its financial results for its 2011 fourth quarter and year end, the periods ended January 31, 2011. The press release announced that the Company's revenues for the 2011 fourth quarter and year end respectively totaled $2.77 billion and $11.1 billion and that its operating income for such periods respectively totaled $220 million and $958 million.

77.     On March 25, 2011, SAIC filed its Form 10-K for the year ended January 31, 2011 (the "2011 Form 10-K") with the SEC, which was signed by Defendant Sopp. The 2011 Form 10-K included representations about the Company's disclosure and internal controls and Defendant Sopp's certification thereon.

78.     In addition, the 2011 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2011, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting periods. Management evaluates these estimates and assumptions on an on-going basis.  Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

79.     On June 2, 2011, SAIC announced its financial results for its 2012 first quarter, the period ended April 30, 2011.  The Company reported revenue for the quarter of $2.69 billion and operating income of $230 million.

80.     On June 3, 2011, SAIC filed its Form 10-Q for the quarter ended April 30, 2011 (the "2012 Q1 Form 10-Q") with the SEC, which was signed by Defendant Sopp.  The 2011 Q1 Form 10-Q included SAIC's financial statements for the quarter ended April 30, 2011, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

81.     The statements referenced above in ¶¶39-61 and 63-80 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that SAIC had overbilled NYC hundreds of millions of dollars on CityTime over a multi-year period;

(b)     that, as a result of SAIC's known, but undisclosed, overbilling practices, its operating results during the Class Period were materially misstated;

(c)     that SAIC's overbilling practices subjected the Company to numerous undisclosed risks, including monetary risks and reputational risks, particularly because government agencies are SAIC's primary customers and any harm to its reputation and/or relationships with such agencies would adversely affect its future revenues and growth prospects;

(d)     that, as a result of the foregoing circumstances, SAIC violated applicable accounting standards associated with the recognition of revenue and the disclosure and accounting for loss contingencies;

(e)     that the Company's financial statements were not fairly presented in conformity with GAAP and were materially false and misleading;

(f)     that certifications issued by Defendants Dahlberg and Sopp associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)     that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its business and prospects.

82.     On August 31, 2011, SAIC issued a press release announcing its financial results for its 2012 second quarter, the period ended July 31, 2011.  For the quarter, SAIC reported an approximate 6% decline in revenue and a 23% decline in operating margin.

83.     Following the Company's 2012 fiscal second quarter earnings announcement, Defendants held a conference call with analysts and investors wherein Defendants disclosed that the Company's revenues were, in part, adversely impacted by the "wind[ing] down" of the CityTime contract and that, while the Company could not quantify the amount, it believed that it was "probable" that it would have to make restitution to NYC for wrongful conduct on CityTime.

- 23 -

84.     The revelation that SAIC would incur a probable loss on CityTime was significant because, pursuant to applicable accounting rules, it served as an acknowledgement that, once it could reasonably estimate the amount, SAIC would incur a charge against its earnings for the wrongful conduct alleged herein on CityTime.

85.     In response to this revelation, shares of SAIC common stock plummeted nearly *14%*, from $15.00 per share on August 31, 2011 to $12.97 on September 1, 2012, as the artificial inflation came out of the Company's stock price.

86.     The market for SAIC common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, SAIC common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired SAIC common stock, relying upon the integrity of the market price of SAIC common stock and market information relating to SAIC, and have been damaged thereby.

87.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SAIC common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

88.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading

statements about SAIC's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of SAIC and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

89.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding SAIC, their control over, and/or receipt and/or modification of SAIC's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

90.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

91.    The Individual Defendants, because of their positions with SAIC, controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided

with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these Defendants is responsible for the accuracy of SAIC's corporate statements and are therefore responsible and liable for the representations contained therein.

92.     The scienter of Defendants is underscored by the Sarbanes-Oxley mandated certifications of Defendants Dahlberg and Sopp, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about SAIC was made known to them and that the Company's disclosure related controls were operating effectively.

93.     Defendants were further motivated to engage in this fraudulent course of conduct in order to allow high-level Company officers to sell shares of their personally-held SAIC common stock at inflated prices that yielded them proceeds of approximately $33.9 million during the Class Period:

| Filer Name | Title | Direct/ Indirect | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Alderson (Deborah Harrell) | Officer | D | 13-Sep-2010 | 103,297 | $15.16 | $1,565,983 |
| Alderson (Deborah Harrell) | Officer | D | 28-Dec-2010 | 111,121 | $15.81 | $1,756,823 |
|  |  |  |  | 214,418 |  | $3,322,806 |
|  |  |  |  |  |  |  |
| Craver Joseph W III | Officer | D | 16-Jun-2008 | 1,500 | $20.80 | $31,200 |
| Craver Joseph W III | Officer | D | 16-Jun-2008 | 1,900 | $20.81 | $39,539 |
| Craver Joseph W III | Officer | D | 16-Jun-2008 | 3,000 | $20.76 | $62,280 |
| Craver Joseph W III | Officer | D | 16-Jun-2008 | 5,300 | $20.77 | $110,081 |
| Craver Joseph W III | Officer | D | 16-Jun-2008 | 9,500 | $20.75 | $197,125 |
| Craver Joseph W III | Officer | D | 16-Jun-2008 | 5,300 | $20.78 | $110,134 |
| Craver Joseph W III | Officer | D | 16-Jun-2008 | 2,135 | $20.82 | $44,451 |
| Craver Joseph W III | Officer | D | 16-Jun-2008 | 1,700 | $20.79 | $35,343 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Craver Joseph W III | Officer | D | 09-Jun-2009 | 1,600 | $18.24 | $29,184 |
| Craver Joseph W III | Officer | D | 09-Jun-2009 | 2,000 | $18.29 | $36,580 |
| Craver Joseph W III | Officer | D | 09-Jun-2009 | 1,500 | $18.21 | $27,315 |
| Craver Joseph W III | Officer | D | 09-Jun-2009 | 1,100 | $18.27 | $20,097 |
| Craver Joseph W III | Officer | D | 09-Jun-2009 | 2,000 | $18.23 | $36,460 |
| Craver Joseph W III | Officer | D | 09-Jun-2009 | 6,800 | $18.26 | $124,168 |
| Craver Joseph W III | Officer | D | 09-Jun-2009 | 21,800 | $18.25 | $397,850 |
| Craver Joseph W III | Officer | D | 09-Jun-2009 | 3,200 | $18.28 | $58,496 |
| Craver Joseph W III | Officer | D | 17-Dec-2009 | 41,694 | $19.45 | $810,948 |
| Craver Joseph W III | Officer | D | 22-Sep-2010 | 11,000 | $15.91 | $175,010 |
| Craver Joseph W III | Officer | D | 30-Dec-2010 | 41,280 | $15.96 | $658,829 |
| | | | | 164,309 | | $3,005,090 |
| | | | | | | |
| Demisch (Wolfgang H) | Director | D | 25-Jun-2007 | 32,000 | $17.80 | $569,600 |
| Demisch (Wolfgang H) | Director | D | 25-Jun-2007 | 2,700 | $17.83 | $48,141 |
| Demisch (Wolfgang H) | Director | D | 25-Jun-2007 | 1,200 | $17.85 | $21,420 |
| Demisch (Wolfgang H) | Director | D | 25-Jun-2007 | 100 | $17.84 | $1,784 |
| Demisch (Wolfgang H) | Director | D | 25-Jun-2007 | 600 | $17.82 | $10,692 |
| Demisch (Wolfgang H) | Director | D | 25-Jun-2007 | 3,400 | $17.81 | $60,554 |
| Demisch (Wolfgang H) | Director | D | 26-Jun-2007 | 400 | $17.51 | $7,004 |
| Demisch (Wolfgang H) | Director | D | 26-Jun-2007 | 1,200 | $17.54 | $21,048 |
| Demisch (Wolfgang H) | Director | D | 26-Jun-2007 | 1,418 | $17.56 | $24,900 |
| Demisch (Wolfgang H) | Director | D | 26-Jun-2007 | 2,600 | $17.55 | $45,630 |
| Demisch (Wolfgang H) | Director | D | 26-Jun-2007 | 400 | $17.53 | $7,012 |
| Demisch (Wolfgang H) | Director | D | 26-Jun-2007 | 7,100 | $17.52 | $124,392 |
| Demisch (Wolfgang H) | Director | D | 26-Jun-2007 | 1,500 | $17.50 | $26,250 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 600 | $20.98 | $12,588 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 700 | $21.08 | $14,756 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 1,100 | $21.01 | $23,111 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 1,700 | $21.09 | $35,853 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 2,200 | $21.07 | $46,354 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 13,600 | $21.00 | $285,600 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 6,500 | $21.12 | $137,280 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 5,900 | $21.06 | $124,254 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 4,800 | $20.99 | $100,752 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 3,400 | $21.02 | $71,468 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 3,000 | $21.04 | $63,120 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 2,400 | $21.05 | $50,520 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 2,100 | $21.11 | $44,331 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 1,200 | $21.03 | $25,236 |
| Demisch (Wolfgang H) | Director | D | 12-Jun-2008 | 800 | $20.97 | $16,776 |
| Demisch (Wolfgang H) | Director | D | 22-Dec-2008 | 200 | $18.85 | $3,770 |
| Demisch (Wolfgang H) | Director | D | 22-Dec-2008 | 23,345 | $18.80 | $438,886 |
| Demisch (Wolfgang H) | Director | D | 22-Dec-2008 | 3,000 | $18.81 | $56,430 |
| Demisch (Wolfgang H) | Director | D | 22-Dec-2008 | 1,200 | $18.84 | $22,608 |
| Demisch (Wolfgang H) | Director | D | 22-Dec-2008 | 1,600 | $18.87 | $30,192 |
| Demisch (Wolfgang H) | Director | D | 22-Dec-2008 | 1,600 | $18.83 | $30,128 |
| Demisch (Wolfgang H) | Director | D | 22-Dec-2008 | 1,900 | $18.82 | $35,758 |
| Demisch (Wolfgang H) | Director | D | 22-Dec-2008 | 1,300 | $19.00 | $24,700 |
| | | | | 138,763 | | $2,662,898 |

- 27 -

| | | | | | | |
|---|---|---|---|---|---|---|
| Drummond (Jere A) | Director | D | 01-Oct-2008 | 35,999 | $20.05 | $721,780 |
| Drummond (Jere A) | Director | D | 07-Jan-2010 | 26,627 | $19.08 | $508,043 |
| Drummond (Jere A) | Director | D | 13-Jan-2010 | 9,373 | $18.91 | $177,243 |
| Drummond (Jere A) | Director | D | 07-Jan-2011 | 30,084 | $16.06 | $483,149 |
| Drummond (Jere A) | Director | D | 11-Jan-2011 | 2,916 | $16.14 | $47,064 |
| | | | | 104,999 | | $1,937,280 |
| | | | | | | |
| Fisher Steven P | Officer and Treasurer | D | 18-Jun-2007 | 9,660 | $17.99 | $173,783 |
| Fisher Steven P | Officer and Treasurer | I | 18-Jun-2007 | 11,692 | $17.99 | $210,339 |
| Fisher Steven P | Officer and Treasurer | D | 28-Sep-2007 | 1,000 | $19.18 | $19,180 |
| Fisher Steven P | Officer and Treasurer | I | 28-Sep-2007 | 3,600 | $19.20 | $69,120 |
| Fisher Steven P | Officer and Treasurer | D | 28-Sep-2007 | 550 | $19.16 | $10,538 |
| Fisher Steven P | Officer and Treasurer | I | 28-Sep-2007 | 650 | $19.19 | $12,474 |
| Fisher Steven P | Officer and Treasurer | I | 28-Sep-2007 | 1,200 | $19.15 | $22,980 |
| Fisher Steven P | Officer and Treasurer | D | 28-Sep-2007 | 3,600 | $19.20 | $69,120 |
| Fisher Steven P | Officer and Treasurer | I | 28-Sep-2007 | 550 | $19.16 | $10,538 |
| Fisher Steven P | Officer and Treasurer | I | 28-Sep-2007 | 1,000 | $19.18 | $19,180 |
| Fisher Steven P | Officer and Treasurer | D | 28-Sep-2007 | 650 | $19.19 | $12,474 |
| Fisher Steven P | Officer and Treasurer | D | 28-Sep-2007 | 1,200 | $19.15 | $22,980 |
| Fisher Steven P | Officer and Treasurer | I | 21-Dec-2007 | 7,688 | $20.19 | $155,221 |
| Fisher Steven P | Officer and Treasurer | I | 21-Dec-2007 | 300 | $20.18 | $6,054 |
| Fisher Steven P | Officer and Treasurer | I | 21-Dec-2007 | 300 | $20.20 | $6,060 |
| Fisher Steven P | Officer and Treasurer | D | 21-Dec-2007 | 1,000 | $20.18 | $20,180 |
| Fisher Steven P | Officer and Treasurer | D | 21-Dec-2007 | 6,490 | $20.19 | $131,033 |
| | | | | 51,130 | | $971,253 |
| | | | | | | |
| Hamre (John J) | Director | D | 10-Jan-2011 | 30,084 | $16.06 | $483,149 |
| | | | | | | |
| Hartley John Robert | Officer | D | 15-Jun-2007 | 8,900 | $18.24 | $162,336 |
| Hartley John Robert | Officer | D | 11-Oct-2007 | 100 | $19.99 | $1,999 |
| Hartley John Robert | Officer | D | 11-Oct-2007 | 700 | $19.98 | $13,986 |
| Hartley John Robert | Officer | D | 11-Oct-2007 | 5,123 | $20.00 | $102,460 |
| Hartley John Robert | Officer | D | 05-Jan-2010 | 12,730 | $19.11 | $243,270 |
| Hartley John Robert | Officer | D | 04-Oct-2010 | 33,834 | $16.03 | $542,359 |
| Hartley John Robert | Officer | D | 04-Jan-2011 | 36,967 | $16.04 | $592,951 |
| | | | | 98,354 | | $1,659,361 |
| | | | | | | |
| James Deborah L | Officer | D | 04-Jan-2011 | 27,383 | $16.04 | $439,223 |
| | | | | | | |
| Jones (Anita K) | Director | D | 26-Jun-2007 | 5,500 | $17.50 | $96,250 |
| Jones (Anita K) | Director | D | 26-Jun-2007 | 11,400 | $17.80 | $202,920 |
| Jones (Anita K) | Director | D | 26-Jun-2007 | 200 | $17.81 | $3,562 |
| Jones (Anita K) | Director | D | 26-Jun-2007 | 200 | $17.82 | $3,564 |
| Jones (Anita K) | Director | D | 26-Jun-2007 | 200 | $17.84 | $3,568 |
| Jones (Anita K) | Director | D | 26-Jun-2007 | 1,145 | $17.85 | $20,438 |
| Jones (Anita K) | Director | D | 26-Jun-2007 | 16,807 | $18.00 | $302,526 |
| Jones (Anita K) | Director | D | 02-Oct-2007 | 11,534 | $19.15 | $220,876 |
| Jones (Anita K) | Director | D | 11-Jun-2008 | 2,200 | $21.11 | $46,442 |
| Jones (Anita K) | Director | D | 11-Jun-2008 | 3,000 | $21.10 | $63,300 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Jones (Anita K) | Director | D | 07-Oct-2008 | 100 | $19.13 | $1,913 |
| Jones (Anita K) | Director | D | 07-Oct-2008 | 300 | $19.11 | $5,733 |
| Jones (Anita K) | Director | D | 07-Oct-2008 | 900 | $19.14 | $17,226 |
| Jones (Anita K) | Director | D | 07-Oct-2008 | 3,700 | $19.10 | $70,670 |
| Jones (Anita K) | Director | D | 08-Jan-2010 | 26,570 | $19.09 | $507,221 |
| Jones (Anita K) | Director | D | 13-Jan-2010 | 5,270 | $18.75 | $98,813 |
| Jones (Anita K) | Director | D | 12-Jul-2010 | 6,070 | $16.87 | $102,401 |
| Jones (Anita K) | Director | D | 06-Jan-2011 | 6,250 | $16.06 | $100,375 |
| Jones (Anita K) | Director | D | 06-Jan-2011 | 30,084 | $16.06 | $483,149 |
| | | | | 95,978 | | $1,718,119 |
| | | | | | | |
| Keenan Brian F | Officer | D | 22-Dec-2010 | 27,905 | $15.74 | $439,225 |
| | | | | | | |
| Koontz Charles F | Officer | D | 30-Dec-2009 | 10,228 | $19.03 | $194,639 |
| | | | | | | |
| Kraemer (Harry M J Jr) | Director | D | 07-Jan-2011 | 30,084 | $16.06 | $483,149 |
| | | | | | | |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 500 | $20.91 | $10,455 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 900 | $20.93 | $18,837 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 1,400 | $20.90 | $29,260 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 2,200 | $20.89 | $45,958 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 2,700 | $20.96 | $56,592 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 6,500 | $20.97 | $136,305 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 5,600 | $20.87 | $116,872 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 5,600 | $20.92 | $117,152 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 4,500 | $20.94 | $94,230 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 4,400 | $20.88 | $91,872 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 3,500 | $20.82 | $72,870 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 3,500 | $20.83 | $72,905 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 2,800 | $20.86 | $58,408 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 2,600 | $20.95 | $54,470 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 1,600 | $20.81 | $33,296 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 1,200 | $20.85 | $25,020 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 300 | $20.84 | $6,252 |
| Punaro (Arnold L) | Officer | I | 06-Jun-2008 | 200 | $20.80 | $4,160 |
| Punaro (Arnold L) | Officer | D | 14-Oct-2009 | 10,000 | $18.25 | $182,500 |
| Punaro (Arnold L) | Officer | D | 15-Dec-2009 | 76,520 | $19.25 | $1,473,010 |
| Punaro (Arnold L) | Officer | D | 16-Dec-2009 | 19,000 | $19.44 | $369,360 |
| Punaro (Arnold L) | Officer | D | 14-Jan-2010 | 20,000 | $19.00 | $380,000 |
| | | | | 175,520 | | $3,449,784 |
| | | | | | | |
| Sanderson Edward J Jr | Director | D | 11-Jan-2010 | 26,612 | $19.06 | $507,225 |
| Sanderson Edward J Jr | Director | D | 07-Jan-2011 | 30,084 | $16.06 | $483,149 |
| | | | | 56,696 | | $990,374 |
| | | | | | | |
| Scott (Douglas E) | General Counsel | D | 14-Jul-2008 | 200 | $20.51 | $4,102 |
| Scott (Douglas E) | General Counsel | D | 14-Jul-2008 | 8,000 | $20.52 | $164,160 |
| Scott (Douglas E) | General Counsel | D | 14-Jul-2008 | 8,000 | $20.56 | $164,480 |
| Scott (Douglas E) | General Counsel | D | 14-Jul-2008 | 7,000 | $20.55 | $143,850 |
| Scott (Douglas E) | General Counsel | D | 14-Jul-2008 | 5,600 | $20.50 | $114,800 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Scott (Douglas E) | General Counsel | D | 14-Jul-2008 | 21,200 | $20.50 | $434,600 |
| Scott (Douglas E) | General Counsel | D | 21-Dec-2009 | 86,043 | $18.85 | $1,621,911 |
| Scott (Douglas E) | General Counsel | D | 11-Jan-2010 | 50,000 | $19.00 | $950,000 |
| | | | | 186,043 | | $3,597,903 |
| | | | | | | |
| Shea (K Stuart) | Officer | D | 07-Jan-2009 | 500 | $19.69 | $9,845 |
| Shea (K Stuart) | Officer | D | 07-Jan-2009 | 3,000 | $19.71 | $59,130 |
| Shea (K Stuart) | Officer | D | 20-Sep-2010 | 11,113 | $15.62 | $173,585 |
| Shea (K Stuart) | Officer | D | 05-Jan-2011 | 33,024 | $15.96 | $527,063 |
| | | | | 47,637 | | $769,623 |
| | | | | | | |
| Sopp (Mark W) | Chief Financial Officer | D | 17-Sep-2010 | 90,328 | $15.69 | $1,417,246 |
| | | | | | | |
| Walkush (J P) | Officer | D | 28-Sep-2007 | 1,508 | $19.04 | $28,712 |
| Walkush (J P) | Officer | D | 28-Sep-2007 | 3,300 | $19.03 | $62,799 |
| Walkush (J P) | Officer | D | 28-Sep-2007 | 1,000 | $19.02 | $19,020 |
| Walkush (J P) | Officer | D | 28-Sep-2007 | 600 | $19.01 | $11,406 |
| Walkush (J P) | Officer | D | 28-Sep-2007 | 69,000 | $19.00 | $1,311,000 |
| Walkush (J P) | Officer | D | 28-Sep-2007 | 300 | $19.07 | $5,721 |
| Walkush (J P) | Officer | D | 28-Sep-2007 | 500 | $19.06 | $9,530 |
| Walkush (J P) | Officer | D | 28-Sep-2007 | 6,100 | $19.05 | $116,205 |
| Walkush (J P) | Officer | I | 05-Oct-2007 | 2,504 | $19.29 | $48,302 |
| Walkush (J P) | Officer | I | 05-Oct-2007 | 1,000 | $19.28 | $19,280 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 4,700 | $19.04 | $89,488 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 13,800 | $19.00 | $262,200 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 13,700 | $19.03 | $260,711 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 10,143 | $19.01 | $192,818 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 4,800 | $19.02 | $91,296 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 4,700 | $19.10 | $89,770 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 300 | $19.12 | $5,736 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 1,000 | $19.06 | $19,060 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 1,400 | $19.07 | $26,698 |
| Walkush (J P) | Officer | D | 18-Dec-2008 | 3,800 | $19.11 | $72,618 |
| Walkush (J P) | Officer | D | 29-Dec-2009 | 56,319 | $19.20 | $1,081,325 |
| Walkush (J P) | Officer | D | 05-Jan-2010 | 28,287 | $19.11 | $540,565 |
| Walkush (J P) | Officer | I | 13-Jan-2010 | 22,007 | $18.97 | $417,473 |
| | | | | 250,768 | | $4,781,733 |
| | | | | | | |
| Young A Thomas | Director | D | 08-Oct-2007 | 5,700 | $19.28 | $109,896 |
| Young A Thomas | Director | D | 08-Oct-2007 | 400 | $19.26 | $7,704 |
| Young A Thomas | Director | D | 08-Oct-2007 | 1,300 | $19.23 | $24,999 |
| Young A Thomas | Director | D | 08-Oct-2007 | 3,000 | $19.20 | $57,600 |
| Young A Thomas | Director | D | 08-Oct-2007 | 2,900 | $19.18 | $55,622 |
| Young A Thomas | Director | D | 08-Oct-2007 | 5,700 | $19.15 | $109,155 |
| Young A Thomas | Director | D | 08-Oct-2007 | 300 | $19.27 | $5,781 |
| Young A Thomas | Director | D | 08-Oct-2007 | 100 | $19.17 | $1,917 |
| Young A Thomas | Director | D | 08-Oct-2007 | 200 | $19.19 | $3,838 |
| Young A Thomas | Director | D | 08-Oct-2007 | 200 | $19.21 | $3,842 |
| Young A Thomas | Director | D | 08-Oct-2007 | 200 | $19.24 | $3,848 |
| Young A Thomas | Director | D | 11-Jan-2010 | 26,612 | $19.06 | $507,225 |

| Young A Thomas | Director | D | 11-Jan-2010 | 10,000 | $19.04 | $190,400 |
|---|---|---|---|---|---|---|
| Young A Thomas | Director | D | 03-Jan-2011 | 30,461 | $15.86 | $483,111 |
| | | | | 87,073 | | $1,564,938 |
| | | | Total: | 1,887,700 | | $33,887,792 |

## Loss Causation/Economic Loss

94.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SAIC common stock and operated as a fraud or deceit on Class Period purchasers of SAIC common stock by failing to disclose and misrepresenting the adverse facts detailed herein.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of SAIC common stock fell precipitously as the prior artificial inflation came out.

95.     As a result of their purchases of SAIC common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements had the intended effect and caused SAIC common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $21.90 per share on June 5, 2008.

96.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of SAIC's business and prospects.   When the truth about the Company was revealed to the market, the price of SAIC common stock fell precipitously.   These declines removed the inflation from the price of SAIC common stock, causing real economic loss to investors who had purchased SAIC common stock during the Class Period.

97.     The decline in the price of SAIC common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price declines in SAIC common stock negate any inference that the loss suffered by Plaintiff and the other Class members

- 31 -

was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of SAIC common stock and the subsequent significant decline in the value of SAIC common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

98.     At all relevant times, the market for SAIC common stock was an efficient market for the following reasons, among others:

(a)     SAIC common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, SAIC filed periodic public reports with the SEC and the NYSE;

(c)     SAIC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     SAIC was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

99.     As a result of the foregoing, the market for SAIC common stock promptly digested current information regarding SAIC from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of SAIC common

stock during the Class Period suffered similar injury through their purchase of SAIC common stock at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

100.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of SAIC who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

101.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 33 -

103.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

104.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SAIC common stock.  Plaintiff and the Class would not have purchased SAIC common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

105.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of SAIC common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

106.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107.    The Individual Defendants acted as controlling persons of SAIC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of SAIC, and their ownership of SAIC common stock, the Individual Defendants had the power and authority to cause SAIC to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

- 34 -

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  February 22, 2012              ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD


                                       DAVID A. ROSENFELD

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)
                                       srudman@rgrdlaw.com
                                       drosenfeld@rgrdlaw.com

                                       VANOVERBEKE MICHAUD & TIMMONY P.C.
                                       THOMAS C. MICHAUD
                                       79 Alfred Street
                                       Detroit, Michigan 48201
                                       Telephone:  313/578-1200
                                       313/578-1201 (fax)
                                       tmichaud@vmtlaw.com

                                       Attorneys for Plaintiff

- 35 -

## CERTIFICATION OF NAMED PLAINTIFF
<u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.　　Plaintiff has reviewed a complaint and authorized its filing.

2.　　Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.　　Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.　　Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.　　Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Frederick v. Mechel OAO, et al.*, No. 09-cv-03617 (S.D.N.Y.)
*NECA-IBEW Pension Fund (The Decatur Plan) v. Northern Trust Corporation, et al.*, No. 1:10-cv-05339 (N.D. Ill.)
*City of Westland Police & Fire Ret. Sys. v. Metlife Inc., et al.*, No. 12-cv-00256 (S.D.N.Y.)

6.　　The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

SAIC

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of _____, 2012.

CITY OF WESTLAND POLICE AND
FIRE RETIREMENT SYSTEM

By: _____

Its: _____

- 2 -

SAIC

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 04/15/2010 | 3,857 | $18.01 |
| 10/15/2010 | 1,948 | $16.03 |
| 10/18/2010 | 1,091 | $16.09 |