UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x
CITY OF WESTLAND POLICE AND FIRE    :   Civil Action No. 12-cv-01353-DAB
RETIREMENT SYSTEM, On Behalf of Itself :
and All Others Similarly Situated,  :
                                    :   **MEMORANDUM OF LAW IN**
                                    :   **SUPPORT OF MOTION FOR**
            Plaintiff,              :   **APPOINTMENT AS LEAD**
                                    :   **PLAINTIFF AND APPROVAL OF**
    vs.                             :   **LEAD PLAINTIFF'S SELECTION OF**
                                    :   **COUNSEL**
SAIC, INC., GERARD DENAULT,         :
KENNETH C. DAHLBERG, and MARK W.    :
SOPP,                               :
                                    :
            Defendants.             :
_____ x

**TABLE OF CONTENTS**


**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii  
I.    INTRODUCTION ................................................................................................ 1  
II.    FACTUAL BACKGROUND ............................................................................... 2  
III.    ARGUMENT ........................................................................................................ 5  
    A.    The Institutional Investors Should Be Appointed As Lead Plaintiff ...... 5  
        1.    The Institutional Investors' Motion Is Timely ........................... 6  
        2.    The Institutional Investors Have the Largest Financial Interest in the Relief Sought by the Class ........................................... 6  
        3.    The Institutional Investors Satisfy Rule 23 of the Federal Rules of Civil Procedure at This Stage ............................................ 6  
    B.    The Court Should Approve the Institutional Investors' Selection of Counsel ....... 8  
CERTIFICATE OF SERVICE ............................................................................................... 10

## TABLE OF AUTHORITIES

**CASES**

*Sgalambo v. McKenzie*,
   268 F.R.D. 170, 173 (S.D.N.Y. 2010) .................................................................................... 7

*Williams v. SAIC, Inc.*,
   No. 12-cv-412-TSE (E.D. Va. filed Apr. 16, 2012) ................................................................ 1

**STATUTES**

15 U.S.C. § 77z-1 ............................................................................................................................ 1

15 U.S.C. § 78u-4 ........................................................................................................................... 1

15 U.S.C. § 78u-4(a)(1) .................................................................................................................. 5

15 U.S.C. § 78u-4(a)(3)(A)(i) ......................................................................................................... 5

15 U.S.C. § 78u-4(a)(3)(B)(i) ..................................................................................................... 1, 5

15 U.S.C. § 78u-4(a)(3)(B)(iii) ................................................................................................... 1, 6

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc) ............................................................................................. 6

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa) ........................................................................................... 8

15 U.S.C. § 78u-4(a)(3)(B)(v) .................................................................................................... 1, 8

KBC Asset Management NV ("KBC"), LRI Invest S.A. ("LRI"), and the Sheet Metal Workers' National Pension Fund (the "Pension Fund") (together, the "Institutional Investors") respectfully submit this memorandum of law in support of their motion for: (1) appointment as lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"); and (2) approval of their selection of Motley Rice LLC ("Motley Rice") as lead counsel for the class.

## I.   INTRODUCTION

Presently pending in this District is a securities class action lawsuit (the "Action") on behalf of purchasers of SAIC, Inc. ("SAIC" or the "Company") common stock between April 11, 2007, and September 1, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities and Exchange Act of 1934 (the "Exchange Act").[1]

In securities class actions, the PSLRA requires district courts to appoint as lead plaintiff the "member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i).  The Institutional Investors should be appointed as lead plaintiff because they: (1) timely filed this motion; (2) to their counsel's knowledge, have the largest financial interest in the relief sought by the class; and (3) will fairly and adequately represent the interests of the class.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii).  In addition, the Institutional Investors' selection of Motley Rice as lead counsel for the class should be approved.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(v).

---

[1] In addition to the Action pending in this District, a substantially similar lawsuit was filed against SAIC and certain of its officers and directors in the United States District Court for the Eastern District of Virginia: *Williams v. SAIC, Inc.*, No. 12-cv-412-TSE (E.D. Va. filed Apr. 16, 2012).  The Institutional Investors are concurrently filing a motion for appointment as Lead Plaintiff in the Eastern District of Virginia as well.  The case is a securities class action involving similar claims and allegations, with overlapping defendants, as in the case pending in this Court. As such, the Court should defer ruling on the motions until the appropriate venue is decided.

## II.     FACTUAL BACKGROUND

SAIC, headquartered in McLean, Virginia, provides a variety of defense, intelligence, homeland security, logistics, energy, environmental, and health services to federal, state, and local government agencies, foreign governments, and customers in select commercial markets. Over ten years ago, the City of New York (the "City") began developing and attempting to implement CityTime, in an attempt to modernize its employee payroll system.  SAIC was the primary contractor retained by the City to develop and implement CityTime. Originally budgeted to cost $63 million, to date it has cost the City nearly $700 million, of which SAIC has received over $600 million.

Between at least 2003 and 2010, however, the Defendants operated a large scale and elaborate scheme to defraud the City in connection with CityTime.  As a result of this scheme, virtually all of the approximate $600 million paid by the City to SAIC was the result, directly or indirectly, of fraud.  Defendants' fraudulent scheme induced the City to hire consultants not needed to complete the project, inflated the rates charged by work performed by certain consultants, and inflated the hours worked by certain consultants.  To facilitate the fraudulent scheme, millions of dollars in kickbacks were paid to individuals whose participation was critical to the success of the scheme.  Defendant Denault was paid at least $9 million in kickbacks and Carl Bell ("Bell"), the Company's Chief System Engineer in SAIC's New York office, was paid at least $5 million.

The scheme commenced in 2003 when Defendant Denault and Bell recommended that SAIC retain Technodyne LLC ("Technodyne"), a private consulting company based in New Jersey, to provide staffing services on CityTime.  SAIC retained Technodyne as a "sole source" contractor, which meant that Technodyne did not have to engage in a competitive bidding process to win the contract with SAIC, nor did Technodyne have to engage in future competitive

bidding processes to be awarded additional CityTime business by SAIC. Technodyne functioned as SAIC's primary subcontractor on CityTime and received at least $450 million from SAIC between 2003 and 2010 in connection with CityTime. At or around the time that SAIC hired Technodyne, its executive officers agreed to pay kickbacks to Defendant Denault and Bell. Specifically, Technodyne agreed to pay both Defendant Denault and Bell $5 for each hour worked by every consultant hired by or through Technodyne on the CityTime Project. In addition, in 2005, Technodyne agreed to pay Defendant Denault an additional $2 for every hour billed by a certain consultant.

        In or about 2005 and 2006, and after the City had already paid SAIC approximately $85 million for its work on CityTime, Defendant Denault and others advocated for an amendment to SAIC's CityTime contract. Specifically, they recommended that the City change SAIC's contract from a "fixed price" contract, in which SAIC bore the responsibility of absorbing cost overruns, to a "fixed price level of effort" contract, so that the City, and not SAIC, would largely become responsible for future cost overruns. The City amended SAIC's contract as Defendant Denault and others recommended. At the end of 2005, fewer than 150 consultants worked on CityTime. An internal 2005 SAIC report prepared by Defendant Denault stated that the program at that time was staffed adequately to meet both current and projected contract needs. Following this contract amendment, however, staffing on the CityTime project expanded dramatically and SAIC paid Technodyne hundreds of millions of dollars, notwithstanding SAIC's receipt of a whistle-blower complaint and an internal investigation in 2005 associated with CityTime contract mismanagement, and suspicions of kickbacks to Defendant Denault and overuse of Technodyne. By the end of 2007, the number of consultants on CityTime had more than doubled, to more than 300, the vast majority of whom were hired and paid through SAIC's

subcontract with Technodyne. During this period, the City was billed at rates that exceeded $160 per hour, or more than $300,000 per year, for many of these consultants. By April 2010, the City had agreed to pay SAIC approximately $628 million for CityTime. According to SAIC's internal reports, Technodyne had been or was to receive a total of $464 million, or 74% of the total amount paid to SAIC, as compensation for providing "staff augmentation" to SAIC on CityTime. This amount represented approximately 80% of Technodyne's income between 2003 and 2010. All other SAIC subcontractors and vendors combined were to receive less than 14% of the total amount paid to SAIC for work on CityTime.

On May 23, 2011, SAIC terminated Defendant Denault and admitted in a letter to the City that Denault "routinely recorded set hours each day rather than the actual hours he worked," in violation of the Company's ethical standards and that, "[b]ecause [Denault] did not precisely record the hours he worked we cannot accurately calculate the amount that should have been billed to the city for his work." Notably, SAIC did not initially disclose either its suspension of Denault in December 2010 or his subsequent termination for his role in the CityTime fraud. On May 27, 2011, Defendant Denault was arrested and charged with receiving more than $5 million in kickbacks as well as wire fraud, conspiracy, and money laundering by federal prosecutors. After Denault's arrest, New York City Mayor Bloomberg declared that an ongoing investigation had revealed that there "may well have been widespread fraud and gross negligence within SAIC" and vowed to seek recovery from all responsible parties.

In a Form 8-K filed with the SEC after the market closed on June 2, 2011, SAIC finally addressed the CityTime scandal. It acknowledged that it may have "incorrectly" billed the City and, for the first time, warned investors that the ongoing investigation of the CityTime project could impact the Company's financial results. However, the Company continued to conceal the

- 4 -

scope and magnitude of the fraud as well as its knowledge of or participation in any illegal conduct, merely reporting that it "could not validate all the time recorded to the contract by its CityTime program manager." SAIC told investors that it had offered to "voluntarily refund" approximately $2.5 million, which it said "represent[ed] all of this employee's time directly billed to the City," since it could not determine how much "may have been incorrectly overbilled to the City for this employee." The Company further noted that the City had "not filed any claim against the Company or otherwise requested reimbursement or return of payments," though it cautioned that it might yet do so.

Throughout the Class Period, the Company's SEC filings were devoid of any reference to problems or delays on the CityTime project and also failed to disclose either the City's extreme dissatisfaction with its handling of the project, or that there had been allegations of fraud or wrongdoing against those hired by SAIC to work on the CityTime project. As a result of Defendants' alleged wrongful acts, and the precipitous decline in the market value of the Company's stock, SAIC investors have suffered significant losses.

### III. ARGUMENT

#### A. The Institutional Investors Should Be Appointed As Lead Plaintiff

The PSLRA establishes the procedure for the appointment of a lead plaintiff in "each private action arising under [the Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1); *see also* 15 U.S.C. § 78u-4(a)(3)(B)(i). First, the pendency of the action must be publicized in a widely circulated national business-oriented publication or wire service not later than 20 days after filing of the first complaint. 15 U.S.C. § 78u-4(a)(3)(A)(i). Next, the PSLRA provides that the Court shall adopt a presumption that the most adequate plaintiff is the person or group of persons that:

(aa) has either filed the complaint or made a motion in response to a notice . . .;

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii).  The Institutional Investors meet these requirements and should therefore be appointed as Lead Plaintiff.

### 1. The Institutional Investors' Motion Is Timely

The notice published in this Action on April 18, 2012 advised class members of:  (1) the pendency of the action; (2) the claims asserted therein; (3) the proposed class period; and (4) the right to move the Court to be appointed as lead plaintiff by April 23, 2012.  *See* Declaration of William S. Norton in Support of Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Counsel ("Norton Decl."), Ex. A.  Because the Institutional Investors' motion is timely filed, they are entitled to be considered for appointment as lead plaintiff.

### 2. The Institutional Investors Have the Largest Financial Interest in the Relief Sought by the Class

During the Class Period, the Institutional Investors expended $12.67 million purchasing 770,958 shares of SAIC common stock at artificially inflated prices and suffered losses of approximately $1.38 million.  *See*  Norton Decl., Ex. C.  To the best of their counsel's knowledge, there are no other plaintiffs with a larger financial interest than the Institutional Investors.  Therefore, the Institutional Investors satisfy the PSLRA's prerequisite of having the largest financial interest in the relief sought by the class.

### 3. The Institutional Investors Satisfy Rule 23 of the Federal Rules of Civil Procedure at This Stage

In addition to possessing a significant financial interest, a lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).  "At the lead plaintiff stage of the litigation, in contrast to the

class certification stage, 'a proposed lead plaintiff need only make a "preliminary showing" that it will satisfy the typicality and adequacy requirements of Rule 23.'" *Sgalambo v. McKenzie*, 268 F.R.D. 170, 173 (S.D.N.Y. 2010) (Scheindlin, J.) (citation omitted). "'Typicality' 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Id.* at 173-74 (citation omitted). "'The adequacy requirement is satisfied where the proposed Lead Plaintiff does not have interests that are antagonistic to the class that he seeks to represent and has retained counsel that is capable and qualified to vigorously represent the interests of the class . . . .'" *Id.* at 174 (citation omitted).

The Institutional Investors purchased a substantial amount of SAIC stock during the Class Period at prices artificially inflated by Defendants' materially false and misleading statements and suffered damages when the truth leaked into the market. The Institutional Investors' claims therefore arise from the same factual predicate as those in the complaints. *See id.* at 174.

KBC, based in Belgium, is a large institutional investor that provides financial and insurance services and is responsible for managing mutual funds, private funds, and institutional funds and has approximately €160 billion ($205 billion) of asset under management. LRI, based in Luxembourg, administers 14 of its own funds and more than 75 partner funds with a total assets of over €4 billion (approximately $5.3 billion). The Pension Fund is a defined-benefit plan based in Alexandria, Virginia holding assets totaling approximately $3 billion for the benefit of over 130,000 participants. KBC, LRI, and the Pension Fund each have prior experience serving as a lead plaintiff in securities class actions and are familiar with the

obligations and fiduciary responsibilities owed to a class.  In addition, the Institutional Investors are not subject to unique defenses and there is no evidence that they seek anything other than the greatest recovery for the class consistent with the merits of the claims.  In fact, prior to filing their Motion, the Institutional Investors conferred and held a joint conference call in which they discussed the merits of the action, the benefits of working together jointly to prosecute the litigation, as well as the procedures and mechanisms they adopted to ensure that the class will benefit from their supervision of counsel.  As such, the Institutional Investors satisfy the typicality and adequacy requirements at this stage.

### B. The Court Should Approve the Institutional Investors' Selection of Counsel

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to this Court's approval.  *See* 15 U.S.C. §78u-4(a)(3)(B)(v).  This Court should not disturb the lead plaintiff's choice of counsel unless it is necessary to "protect the interests of the class."  15 U.S.C. §78u-4(a)(3)(B)(iii)(II)(aa).

The Institutional Investors have selected Motley Rice LLC to serve as lead counsel. Motley Rice has extensive experience in the areas of securities and complex litigation and has successfully prosecuted securities fraud class actions on behalf of injured investors.  *See* Norton Decl. Ex. D.  Thus, the Court may be assured that the Class will receive the highest caliber of legal representation available.

### IV. CONCLUSION

The Institutional Investors have satisfied each of the PSLRA's requirements for appointment as lead plaintiff.  Therefore, the Institutional Investors respectfully request that the Court grant their Motion for appointment as lead plaintiff, approve their selection of lead counsel and grant such other relief as the Court may deem just and proper.

- 9 -

DATED: April 23, 2012            *Respectfully submitted*,

           MOTLEY RICE LLC

           *s/ William S. Norton*
           William S. Norton

MOTLEY RICE LLC
Joseph F. Rice
James M. Hughes
William S. Norton
David P. Abel
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)

*[Proposed] Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 23, 2012.

*s/ William S. Norton*
William S. Norton