# Robbins Geller
# Rudman & Dowd LLP

| Atlanta | Melville | San Diego |
| Boca Raton | New York | San Francisco |
| Chicago | Philadelphia | Washington, DC |

Joseph Russello
jrussello@rgrdlaw.com

June 4, 2014

VIA ECF AND OVERNIGHT DELIVERY

The Honorable Deborah A. Batts, U.S.D.J.
U.S. District Court for the
    Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 2510
New York, New York 10007

Re:    *In re SAIC, Inc. Securities Litigation,* No. 12 Civ. 01353 (DAB)

Dear Judge Batts:

On behalf of Lead Plaintiffs, we write to respectfully submit the June 3, 2014 decision in *United States v. Technodyne LLC*, No. 12-4498 ("Decision"), as supplemental authority in further support of the pending motion to vacate and/or obtain relief from the Judgment and for leave to amend and file the proposed Second Amended Complaint ("SAC," Dkt. #126-1, cited as "¶__"). As explained herein, the Decision supports a finding that SAIC, Inc. ("SAIC") knew or should have known it was a target of the criminal investigation by late December 2010 and, in any event, no later than March 2011.

In *Technodyne*, the Second Circuit Court of Appeals affirmed a decision to strike, pursuant to the fugitive disentitlement statute, claims asserted by Technodyne LLC ("Technodyne") and its two principals, Reddy and Padma Allen, to funds and properties they allegedly owned. *See* Decision at 2-3. Technodyne was the "primary subcontractor" to SAIC on the CityTime project. *Id.* at 4.

As recited in the Decision, Technodyne and its principals fled the United States in mid-February and early March 2011, respectively. *Id.* Before they fled, however, the following events took place:

- ▪ "On or about December 15, 2010, Padma, Reddy, and Technodyne were served with grand jury subpoenas requiring them to testify and produce documents relating to CityTime and several individuals and entities, including Technodyne, Padma, and Reddy themselves." *Id.*

- ▪ "Also on or about December 15, 2010, six persons, not including the Allens, were arrested in connection with the CityTime scheme." *Id.*

- ▪ "On January 27, 2011, Padma had an informal meeting with federal and local law enforcement officials" in which she "answered questions about certain companies affiliated with the Allens and Technodyne" but "did not answer questions about Technodyne's work on CityTime." *Id.*

A core issue in deciding the Government's motion to strike was whether these events apprised Technodyne and its principals that they were a "focus" of the investigation before they left the United States. If so, the district court properly concluded that these claimants lost the right to dispute forfeiture of the property under the fugitive disentitlement statute.



**Robbins Geller**
**Rudman & Dowd** LLP

The Honorable Deborah A. Batts, U.S.D.J.
June 4, 2014
Page 2

In opposing the motion to strike, the claimants submitted "'testimony through their declarations that they did not know that th[e government's] investigation was focused on them in particular at the time they left.'" *Id.* at 30 (quoting claimants' counsel). In fact, counsel argued "'[t]hey received no evidence, no indication when they left that they were in fact a target of the investigation.'" *Id.* (same).

Finding that the above events *were* sufficient to apprise Technodyne and its principals that they were a focus of the investigation, the Second Circuit rejected these arguments, reasoning as follows:

> [T]he very first grand jury subpoenas, served on Claimants in December 2010, requested information about "Padma Allen," "Reddy Allen," and "Technodyne LLC," *not just about others connected with the CityTime project*. And in her January 2011 meeting with government prosecutors, Padma was asked questions about Technodyne's work on CityTime (which she refused to answer). *These facts belied the Allens' representations that they left* the United States in February and March of 2011 *with no idea that the focus of the government's investigation included them.*

*Id.* (emphasis added).

These events are substantially similar to those facing SAIC in December 2010, from which the SAIC defendants knew or should have known that SAIC and its employees were targeted in the *very same* criminal investigation and proceeding. In fact, the events confronting SAIC and its employees are even more compelling in exposing them as targets of the investigation conducted by the United States Attorney's Office and the New York City Department of Investigation ("DOI"), and establishing that they knew or should have known they were targets. As the SAC alleges:

- The DOI served a federal grand jury subpoena on SAIC employee Gerard Denault no later than December 15, 2010. ¶341. The subpoena sought records and testimony involving the CityTime project. *Id.* SAIC subsequently received the subpoena served on Denault. *Id.*; *see also* ¶342 (testimony confirming receipt of Denault's subpoena).

- Denault "was interviewed by the DOI" (¶343), and "[t]he interview focused on aspects of the illicit overbilling and kickback scheme that involved Denault." ¶344.

- "[A]t or about the same time, SAIC received a federal grand jury subpoena calling for [its] production of information concerning the project." ¶341; *see also* ¶342 (testimony confirming receipt of the SAIC subpoena).

- As SAIC's counsel testified, the subpoena contained "'a very comprehensive request for production of documents . . . .'" ¶350 (quoting counsel). Accordingly, SAIC engaged outside counsel at Cooley LLP to conduct an investigation concerning the fraud described in the criminal complaint that was unsealed on December 15, 2010. *Id.*

- As SAIC's counsel further testified, she "'became involved to really assist in handling the day-to-day responsibilities of the CityTime investigation once a criminal complaint was filed in December of 2010.'" ¶351 (quoting counsel).

## Robbins Geller
## Rudman & Dowd LLP

The Honorable Deborah A. Batts, U.S.D.J.
June 4, 2014
Page 3

- After receiving the subpoenas, SAIC agreed to advance Denault's legal fees for the criminal proceeding – despite the fact that he was not named as a criminal defendant and the case was pending against *non*-SAIC personnel. ¶363.

- "[O]n December 21, 2010, shortly after receiving the subpoenas, SAIC removed Denault from the [CityTime] project and placed him on 'administrative leave.'" ¶349.

- At the same time, the State Comptroller rejected an award to SAIC of a contract worth $118 million *specifically* because of allegations asserted in the criminal case. ¶356.

- "[O]n December 22, 2010, the Mayor's Office rejected the award to SAIC of a contract with the NYC Department of Sanitation valued at $40 million." ¶362.

- In late December 2010, Mayor Bloomberg stated: "[W]e're determining what future role SAIC can have on the project" and "reviewing potential options for a forensic auditor to evaluate all payments made . . . in relation to this project, with a goal of recouping any funds that are outside of the DOJ-DOI investigation." ¶371. At that time, SAIC and its employees were not named in the criminal proceeding and not *publicly* implicated in the criminal investigation. *See* ¶¶372-75.

Additionally, the SAC contains numerous other allegations concerning the circumstances that apprised, or should have apprised, SAIC and its employees that they were targets of the criminal case in late 2010 and early 2011. *See* ¶¶340-81 (describing developments in late 2010 and early 2011); ¶¶382-92 (describing developments in early 2011). These developments included the receipt of subpoenas by SAIC employee Carl Bell, interviews of him by the DOI and SAIC, SAIC's agreement to advance his legal fees for the criminal case, and his resignation amidst charges related to the project. ¶¶376-81, 383, 390-92. And, as if that were not enough, the criminal charges revealed in December 2010 and February 2011 described a long-running overbilling scheme *with SAIC at its center*. ¶¶322-39, 384-87.

These developments, together with the Second Circuit's holding in *Technodyne*, undermine the Court's finding, in granting SAIC's reconsideration motion, that no facts "suggest [SAIC] was made aware that it was a focus of the criminal investigation prior to the March 2011 [Form 10-K] filing." *See In re SAIC, Inc. Secs. Litig.*, No. 12 Civ. 1353 (DAB), 2014 U.S. Dist. LEXIS 13629, at *11 (S.D.N.Y. Jan. 30, 2014). For this reason, and those reasons previously expressed, Lead Plaintiffs respectfully submit that SAIC knew or should have known that it was a target of the criminal investigation by late December 2010 and, in any event, no later than the filing of its Form 10-K in March 2011.

Respectfully submitted,

JOSEPH RUSSELLO

cc:   All Counsel (via ECF)