14-4140-cv
Ind. Pub. Ret. Sys. v. SAIC, Inc.

N.Y.S.D. Case #
12-cv-1353(DAB)

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: October 6, 2015          Decided: March 29, 2016)

Docket No. 14-4140-cv

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 29, 2016

INDIANA PUBLIC RETIREMENT SYSTEM, Indiana State
Teachers' Retirement Fund, Indiana Public
Employees' Retirement Fund,

*Plaintiffs-Appellants,*

City of Westland Police and Fire Retirement
System, on Behalf of Itself and All Others Similarly Situated,
Locals 302 and 612 of the International Union of
Operating Engineers-Employers Construction
Industry Retirement Fund, on Behalf of Themselves and
All Others Similarly Situated, IBEW Local Union No. 58
Annuity Fund and the Electrical Workers Pension
Trust Fund of IBEW Local Union No. 58,

*Plaintiffs,*

v.

SAIC, INC., Mark W. Sopp, Walter P. Havenstein,

*Defendants-Appellees,*

Gerard Denault, Kenneth C. Dahlberg, Deborah H. Alderson,

*Defendants.*

_____

1    Before:
2
3                          LYNCH, LOHIER, and CARNEY, *Circuit Judges*.
4
5           Plaintiffs-appellants Indiana Public Retirement System, on behalf of
6    themselves and a class of other similarly situated investors, appeal from an
7    order of the District Court (Batts, *J.*) denying their motions to vacate the
8    judgment and to amend their complaint.  Plaintiffs brought a securities fraud
9    suit pursuant to Section 10(b), 15 U.S.C. § 78j(b), and Section 20(a), 15 U.S.C.
10   § 78t(a), of the Securities Exchange Act of 1934 against SAIC, Inc., Walter P.
11   Havenstein, Mark W. Sopp, and others, alleging material misstatements and
12   omissions in SAIC's public filings regarding its exposure to liability for
13   employee fraud in connection with SAIC's contract work for New York City's
14   CityTime project.  Because amendment of Plaintiffs' FAS 5 and Item 303
15   claims based on SAIC's March 2011 Form 10-K would not be futile, we
16   **VACATE** the order denying the postjudgment motion with respect to those
17   claims and **REMAND** for further proceedings consistent with this opinion.
18   We **AFFIRM** the decision of the District Court with respect to Plaintiffs' other
19   claims.
20
21                                    DOUGLAS WILENS, Robbins Geller
22                                    Rudman & Dowd LLP, Boca Raton, FL;
23                                    Samuel H. Rudman, Joseph Russello,
24                                    Sean T. Masson, Robbins Geller
25                                    Rudman & Dowd LLP, Melville, NY, *for*
26                                    *Plaintiffs-Appellants*.
27
28                                    ANDREW S. TULUMELLO (Jason J.
29                                    Mendro, *on the brief*), Gibson, Dunn &
30                                    Crutcher LLP, Washington, DC; Eric
31                                    Robert Delinsky, Zuckerman Spaeder
32                                    LLP, Washington, DC *for Defendants-*
33                                    *Appellees* SAIC, Inc. and Mark W. Sopp.
34
35                                    Mark Filip, P.C., Vikas Didwania,
36                                    Kirkland & Ellis LLP, Chicago, IL; Beth
37                                    A. Williams, Emily P. Hughes, Kirkland
38                                    & Ellis LLP, Washington, DC *for*
39                                    *Defendant-Appellee* Walter P. Havenstein.
40

2

1    LOHIER, *Circuit Judge*:

2        The Indiana Public Retirement System, the Indiana State Teachers'

3    Retirement Fund, and the Indiana State Public Employees' Retirement Fund,

4    on behalf of themselves and a class of other similarly situated investors

5    ("Plaintiffs"), appeal from an order of the United States District Court for the

6    Southern District of New York (Batts, <u>J.</u>) denying their motions to vacate the

7    judgment and to amend their complaint.  Plaintiffs sued SAIC, Inc.;[1] Walter P.

8    Havenstein, its Chief Executive Officer; Mark W. Sopp, its Chief Financial

9    Officer; and others (collectively, "Defendants") for securities fraud in

10   violation of Section 10(b) of the Securities Exchange Act of 1934 (the

11   "Exchange Act"), 15 U.S.C. § 78j(b), Section 20(a) of the Exchange Act, 15

12   U.S.C. § 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5,

13   17 C.F.R. § 240.10b-5.  Their lawsuit arose from a series of alleged material

14   misstatements and omissions in SAIC's public filings regarding its exposure

15   to liability for employee fraud in connection with SAIC's contract work for

16   New York City's CityTime project.  On appeal, we address principally four

17   issues arising from Plaintiffs' motion to file a Proposed Second Amended

---

[1] SAIC is now known as Leidos Holdings, Inc.

3

1   Complaint ("PSAC"):  (1) SAIC's alleged failure to comply with Generally

2   Accepted Accounting Principles ("GAAP") by failing to disclose appropriate

3   loss contingencies associated with the CityTime project, in violation of

4   Financial Accounting Standard No. 5 ("FAS 5"); (2) SAIC's alleged failure to

5   disclose a known trend or uncertainty reasonably expected to have a material

6   impact on its financial condition, in violation of Item 303 of SEC Regulation S–

7   K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303");[2] (3) SAIC's scienter; and

8   (4) among other remaining issues, SAIC's allegedly misleading statements

9   regarding its commitment to ethics and integrity contained in its 2011 Annual

10  Report to shareholders.

11      We conclude that the District Court improperly denied Plaintiffs'

12  postjudgment motion to amend their FAS 5 and Item 303 claims based on

13  SAIC's March 2011 Form 10-K.  We therefore vacate the District Court's order

14  denying the motion with respect to those claims and remand for further

---

[2] Regulation S-K required SAIC's periodic reports to the SEC, including its reports on Forms 10–K and 10-Q, to contain a section devoted to "management's discussion and analysis of the financial condition and results of operations."  17 C.F.R. § 229.303(a)-(b).

1    proceedings consistent with this opinion.  We affirm the judgment of the

2    District Court with respect to Plaintiffs' remaining claims.

3                              **BACKGROUND**

4         We accept as true the facts alleged in the PSAC because Plaintiffs

5    appeal from the denial of leave to amend on the ground of futility.  See In re

6    Advanced Battery Techs., Inc., 781 F.3d 638, 641-42 (2d Cir. 2015).

7         1.  Facts

8         SAIC provided defense, intelligence, homeland security, logistics, and

9    other services primarily to government agencies.  In 2000 SAIC became the

10   prime government contractor on a project with New York City to develop and

11   implement an automated timekeeping program known as CityTime for

12   employees of various City agencies.  SAIC anticipated that the project, if

13   successful, would attract business from municipalities across the United

14   States with similar timekeeping requirements and would lead to contracts

15   unrelated to timekeeping in the City.  As a result, SAIC kept a close eye on the

16   project's progress.

17        In 2002 SAIC hired Gerard Denault as Deputy Program Manager in

18   charge of the CityTime project.  In 2003 Denault enlisted Technodyne, a small,

5

1   relatively unknown company, to provide staffing services on the project, but

2   the relationship soon gave rise to an elaborate kickback scheme in which

3   Technodyne illegally paid Denault and Carl Bell (SAIC's Chief Systems

4   Engineer) for each hour a Technodyne consultant or subcontractor worked on

5   CityTime.  The scheme encouraged Denault and Bell to hire more

6   Technodyne workers than the project required and to inflate billable hours

7   and hourly rates.

8           Although SAIC initially suffered large losses under the CityTime

9   contract, the contract became profitable in 2006 after Denault negotiated an

10  amendment to the contract that transferred the risk of any cost overruns to

11  the City.  As a result of the amendment and the cost overruns associated with

12  the kickback scheme, SAIC billed the City approximately $635 million for

13  CityTime through May 2011, well over the $63 million that the City initially

14  budgeted for the contract.

15          By late 2010, when the scheme began to unravel, SAIC had removed

16  Denault from the CityTime project, placed him on administrative leave, and

17  hired an outside law firm to conduct an internal investigation of possible

18  fraud with the help of SAIC's internal auditors, who were tasked with

1    reviewing Denault's timekeeping practices.  At the same time, then-Mayor

2    Michael Bloomberg announced that he was reevaluating SAIC's role in the

3    CityTime project and reviewing whether to seek recovery of the City's

4    payments to SAIC in connection with that project.  On March 9, 2011, SAIC's

5    audit team reported the results of its findings regarding Denault's improper

6    timekeeping practices to SAIC.

7           Notwithstanding the audit team's findings, SAIC's Form 10-K, filed on

8    March 25, 2011, and certified by Sopp and Havenstein, did not disclose

9    SAIC's potential liability related to the CityTime project.  To the contrary, in a

10   separate Annual Report to shareholders that same month, SAIC touted its

11   commitment to high standards of "ethical performance and integrity."  Joint

12   App'x 252.  By the end of May 2011, though, Denault, Bell, the Technodyne

13   principals, and others were charged in a federal criminal complaint with

14   defrauding the City.[3]  The charges, together with the results of the internal

15   investigation from March 2011, prompted SAIC to fire Denault in May 2011

_____

[3] Bell was interviewed about the CityTime project by SAIC's in-house and
outside counsel on January 24, 2011, resigned from SAIC that same day, and
pleaded guilty in June 2011, while Denault was arrested in May 2011 and was
ultimately convicted.  The indicted Technodyne principals fled to India.

1    and offer to repay the City the amount he had billed after the 2006

2    amendment of the CityTime contract—a total of $2.5 million.

3           Thereafter, in a Form 8-K filed with the SEC on June 2, 2011, SAIC

4    finally disclosed that the United States Attorney's Office for the Southern

5    District of New York (the "Government") and the New York City Department

6    of Investigation ("DOI") were conducting a joint criminal investigation into

7    the CityTime contract.  The 8-K further disclosed that SAIC had billed a total

8    of $635 million for the CityTime project, that it had $40 million in outstanding

9    receivables, that Denault had been arrested for fraud, and that SAIC had

10   offered to refund the City the $2.5 million that Denault billed as part of the

11   kickback scheme with Technodyne.  Finally, the 8-K explained that Mayor

12   Bloomberg had

13           indicated that the City intends to pursue the recovery of costs
14           associated with the CityTime program that the City's investigation
15           reveals were improperly charged to the City.  The City has not filed any
16           claim against the Company or otherwise requested reimbursement or
17           return of payments previously made to the Company and the
18           Company has not recorded any liabilities relating to this contract other
19           than the approximately $2.5 million it offered to refund.  However,
20           there is a reasonable possibility of additional exposure to loss that is not
21           currently estimable if there is an adverse outcome.  An adverse
22           outcome of any of these investigations may result in non-payment of
23           amounts owed to the Company, a demand for reimbursement of other
24           amounts previously received by the Company under the contract,

1                 claims for additional damages, and/or fines and penalties, which could
2                 have a material adverse effect on the Company's consolidated financial
3                 position, results of operations and cash flows.

4

5 Joint App'x 254-55.

6         In addition to filing the 8-K on June 2, 2011, SAIC held a conference call

7 with analysts and investors to discuss SAIC's earnings. During the call,

8 Havenstein referred investors to the 8-K for detailed information about the

9 CityTime project and the ongoing criminal investigation. Similarly, on June 3,

10 2011, SAIC filed a Form 10-Q that repeated the representations made in the 8-

11 K about the project.

12         On July 1, 2011, SAIC filed a second 8-K that included a letter from

13 Mayor Bloomberg formally demanding that SAIC reimburse the City in the

14 approximate amount of $600 million. On August 31, 2011, SAIC issued a

15 press release announcing losses for the fiscal period ending July 31, 2011, due

16 in part to the winding down of the CityTime contract and "probable"

17 restitution to the City for wrongful conduct. Joint App'x 260. From June 2,

18 2011, when SAIC first disclosed the existence of a criminal investigation and

19 the possible magnitude of its reimbursement to the City, to September 1, 2011,

1   the day after it announced the termination of the CityTime contract, SAIC's

2   stock price fell from $17.21 to $12.97 per share.

3        In March 2012 SAIC entered into a deferred prosecution agreement

4   with the Government and the DOI, pursuant to which SAIC agreed to

5   reimburse the City approximately $500.4 million and to forfeit $40 million in

6   unpaid receivables.  SAIC also agreed to cooperate with the Government's

7   investigation of the CityTime fraud and to issue a "Statement of

8   Responsibility" in which it acknowledged that it had defrauded the City

9   through its managerial employees.  SAIC admitted, among other things, that

10  it should have supervised Denault's activities, controlled the cost of the

11  project, addressed concerns about its relationship with Technodyne, and

12  properly investigated an early anonymous internal complaint about Denault's

13  relationship with Technodyne on the project.

14       2.  <u>Procedural History</u>

15       Plaintiffs filed this lawsuit against SAIC and the individual defendants

16  under Section 10(b) and Section 20(a) of the Exchange Act.  As relevant here,

17  they claimed that SAIC's March and June 2011 SEC filings on Forms 10-K, 10-

18  Q, and 8-K failed to disclose SAIC's potential liability arising out of the

1    CityTime fraud or known trends or uncertainties associated with the fraud, as

2    required by FAS 5 and Item 303.  Plaintiffs also claimed that the March 2011

3    Form 10-K contained misstatements regarding the efficacy of SAIC's internal

4    controls, that SAIC's 2011 Annual Report contained misleading statements

5    regarding SAIC's commitment to ethics and integrity, and that in its June 2011

6    conference call, SAIC misrepresented its potential liability for the CityTime

7    project.

8        By order dated September 30, 2013 (the "September 2013 Order"), the

9    District Court denied Defendants' motions to dismiss Plaintiffs' claims

10   alleging violations of FAS 5 and Item 303 on the March 2011 Form 10-K, but

11   granted Defendants' motions to dismiss with respect to most of Plaintiffs'

12   other claims for failure to state a claim.  In re SAIC, Inc. Sec. Litig. (SAIC I),

13   No. 12-CV-1353 (DAB), 2013 WL 5462289, at *16 (S.D.N.Y. Sept. 30, 2013).  It

14   granted Plaintiffs leave to amend, within forty-five days, a subset of the

15   dismissed claims, specifically (1) the internal control claim based on the

16   March 2011 Form 10-K and (2) the claims against all of the individual

17   defendants except Denault.  Id. at 17.  Plaintiffs elected to forgo amending

18   their complaint to replead those claims within the forty-five-day window,

11

1    deciding instead to proceed with the surviving FAS 5 and Item 303 claims

2    relating to SAIC's March 2011 Form 10-K.

3         SAIC, by contrast, moved the District Court to reconsider its decision

4    not to dismiss Plaintiffs' FAS 5 and Item 303 claims based on the March 2011

5    Form 10-K.  On January 30, 2014, the District Court granted SAIC's motion

6    and immediately entered judgment dismissing Plaintiffs' remaining claims

7    with prejudice (the "January 2014 Order").  In re SAIC, Inc. Sec. Litig. (SAIC

8    II), No. 12-CV-1353 (DAB), 2014 WL 407050, at *1 (S.D.N.Y. Jan. 30, 2014).

9         On March 4, 2014, Plaintiffs moved to vacate or to obtain relief from the

10   judgment pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil

11   Procedure and moved under Rule 15(a) for leave to file a proposed amended

12   complaint in the form of the PSAC.  As relevant here, the PSAC alleged the

13   following additional facts: (1) SAIC was aware of the Government's criminal

14   investigation of Denault by the end of December 2010 and had agreed to

15   advance Denault's legal fees in connection with the investigation and any

16   criminal proceeding that emerged; (2) the December 2010 criminal complaint

17   suggested that SAIC had engaged in improper conduct; (3) by December 19,

18   2010, SAIC had initiated an internal investigation of Denault's timekeeping

12

1    practices; (4) Mayor Bloomberg announced in a press release (December 16,

2    2010) and in a <u>Daily News</u> article (December 20, 2010) that he was

3    reevaluating SAIC's role in the CityTime project and reviewing all payments

4    the City made with a goal of recovering funds from SAIC; (5) SAIC removed

5    Denault from the CityTime project and placed him on administrative leave on

6    December 21, 2010; (6) the New York State Comptroller's Office and the City

7    Mayor's Office each rejected contract awards to SAIC in December 2010 based

8    partly on the brewing controversy surrounding the CityTime project; (7) SAIC

9    interviewed Bell about the fraud allegations on January 24, 2011, the day Bell

10   resigned from SAIC; (8) on February 10, 2011, the Government and the DOI

11   announced the filing of an indictment in connection with a fraud scheme

12   involving CityTime; (9) Bell was subpoenaed concerning CityTime, and SAIC

13   agreed to advance his legal fees in connection with the criminal matter on

14   February 11, 2011; and (10) SAIC's audit team issued a memorandum

15   regarding Denault's improper timekeeping practices on March 9, 2011.

16          On September 30, 2014, the District Court denied Plaintiffs' motions for

17   relief from judgment, concluding that any amendment as reflected in the

1   PSAC would be futile.[4]  In re SAIC, Inc. Sec. Litig. (SAIC III), No. 12-CV-1353

2   (DAB), 2014 WL 4953614, at *4 (S.D.N.Y. Sept. 30, 2014).

3          This appeal followed.

4                              **DISCUSSION**

5          "[A] party seeking to file an amended complaint postjudgment must

6   first have the judgment vacated or set aside pursuant to Rules 59(e) or 60(b)."[5]

7   Williams v. Citigroup Inc., 659 F.3d 208, 213 (2d Cir. 2011).  Rule 60(b)(6)

8   authorizes a court to grant relief from a final judgment for "any . . . reason

9   that justifies relief."  Fed. R. Civ. P. 60(b)(6).  We have explained that "in view

10  of the provision in [R]ule 15(a) that leave to amend shall be freely given when

---

[4] The District Court also rejected Plaintiffs' arguments that the judgment should be set aside because of the discovery of new evidence adduced in Denault's criminal trial.  Because we conclude that the District Court erred in not granting leave to amend, we do not reach this issue.

[5] The District Court analyzed Plaintiffs' motion under Rule 60(b) only, explaining in a footnote that their Rule 59(e) motion was untimely because it "was filed 32 days after entry of Judgment."  SAIC III, 2014 WL 4953614, at *2 n.5.  As an initial matter, the District Court was mistaken when it held that Plaintiffs' Rule 59(e) motion was untimely.  Although the judgment was signed on January 31, 2014, it was not entered on the docket until February 4, 2014.  Plaintiffs filed their motion 28 days later, on March 4, 2014, and their request to amend the judgment under Rule 59(e) was therefore timely.  See Fed. R. Civ. P. 59(e) ("A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.").

1    justice so requires, it might be appropriate in a proper case to take into

2    account the nature of the proposed amendment in deciding whether to vacate

3    the previously entered judgment." Williams, 659 F.3d at 213 (quotation

4    marks omitted).

5           Here, the District Court denied leave to amend under Rule 60(b)(6)

6    solely on the ground that amendment (in the form of the PSAC) would be

7    futile,[6] a determination that we review de novo. City of Pontiac Policemen's

8    & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 188 (2d Cir. 2014). We assess

9    futility as we would a motion to dismiss, determining whether the proposed

10   complaint contains "enough facts to state a claim to relief that is plausible on

11   its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In this case,

12   because the PSAC alleges securities fraud, it must also satisfy the heightened

13   pleading requirements of the Private Securities Litigation Reform Act

14   ("PSLRA"), 15 U.S.C. § 78u–4(b)(1)-(2), and Rule 9(b) of the Federal Rules of

---

[6] Plaintiffs also argue that the District Court erred by dismissing the remaining claims in its January 2014 Order and closing the case without granting Plaintiffs leave to replead sua sponte. We have described a similar argument in another case as frivolous, see Williams, 659 F.3d at 212, and, accordingly, we conclude that the District Court did not abuse its discretion in refusing to grant leave to replead sua sponte.

1    Civil Procedure.  <u>ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan</u>

2    <u>Chase Co.</u>, 553 F.3d 187, 196 (2d Cir. 2009).  The PSAC therefore must allege

3    with particularity facts that give rise to "a strong inference" that SAIC acted

4    consciously and recklessly in omitting or misrepresenting financial

5    information.  <u>Id.</u> at 198.

6          On appeal, Plaintiffs elected to substantially shorten the class period

7    and affirmatively waived any challenge to the District Court's dismissal of

8    claims arising out of alleged false statements, omissions, or other violations of

9    the securities laws that occurred prior to March 2011.  <u>See</u> Oral Argument Tr.

10   at 4.  We therefore affirm the District Court's dismissal of those claims, and in

11   the remainder of this opinion we focus only on claims arising from

12   misstatements and omissions during the shorter class period from March 23,

13   2011 to September 1, 2011.

14        1.  <u>Plaintiffs' FAS 5 Claim Based on the March 2011 Form 10-K</u>

15        To succeed on a claim under Section 10(b) of the Exchange Act and

16   Rule 10b-5, "a plaintiff must allege that [each] defendant (1) made

17   misstatements or omissions of material fact, (2) with scienter, (3) in

18   connection with the purchase or sale of securities, (4) upon which the plaintiff

1   relied, and (5) that the plaintiff's reliance was the proximate cause of its

2   injury." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir.

3   2007). And while "[f]inancial statements . . . which are not prepared in

4   accordance with [GAAP are] presum[ptively] . . . misleading or inaccurate,"

5   17 C.F.R. § 210.4-01(a)(1), "allegations of GAAP violations or accounting

6   irregularities, standing alone, are insufficient to state a securities fraud claim."

7   Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). "Only where such

8   allegations are coupled with evidence of corresponding fraudulent intent

9   might they be sufficient." Id. (quotation marks omitted).

10      Plaintiffs allege that SAIC violated GAAP by failing to comply with

11   FAS 5, which requires the issuer to disclose a loss contingency when a loss is a

12   "reasonable possibility," meaning that it is "more than remote but less than

13   likely." Financial Accounting Standards Board, Statement of Financial

14   Accounting Standards No. 5, Accounting for Contingencies ¶¶ 3, 10 (1975)

15   (hereinafter FAS Board, Statement of FAS 5). Here, Plaintiffs assert that SAIC

16   failed to disclose the loss contingency related to the CityTime fraud in SAIC's

17   March 2011 Form 10-K.

1       At the outset, we note that the District Court appears to have

2  misunderstood the standard applicable to claims under FAS 5 when it held

3  that FAS 5 does not require disclosure "unless it is considered <u>probable</u> that a

4  claim will be asserted." <u>SAIC II</u>, 2014 WL 407050, at *3 (emphasis added)

5  (quotation marks omitted). The "probability" standard applies in lieu of the

6  "reasonable possibility" standard only if the loss contingency arises from "an

7  unasserted claim or assessment when there has been <u>no</u> manifestation by a

8  potential claimant of an awareness of a possible claim or assessment." FAS

9  Board, Statement of FAS 5 ¶ 10 (emphasis added). But in this case, the

10  "reasonable possibility" standard applies in view of the PSAC's allegation

11  that by March 2011 the City <u>had</u> manifested an awareness of a possible,

12  sizeable claim against SAIC. With that standard in mind, we turn to the

13  allegations in the PSAC relevant to the March 2011 Form 10-K.

14       By the time SAIC filed that 10-K, the PSAC alleges, the CityTime

15  criminal investigation was as focused on SAIC as it was on SAIC's individual

16  employees; the December 2010 criminal complaint against individuals

17  involved in the CityTime project alluded to SAIC's improper actions; Denault

18  had been interviewed by prosecutors, and both SAIC and Denault received a

1    grand jury subpoena for the production of documents related to the CityTime

2    project; Mayor Bloomberg announced a reevaluation of SAIC's role in the

3    CityTime project, including a full review of all payments the City had made

4    to SAIC; and SAIC agreed to pay Denault's and Bell's legal fees associated

5    with any criminal proceedings.  Moreover, the PSAC alleged that by March 9,

6    2011, when SAIC received the results of its internal investigation about

7    possible fraud, SAIC was aware not only of Denault's wrongdoing but also its

8    own potential liability to the City.

9        For these reasons we hold that the PSAC adequately alleged that SAIC

10   violated FAS 5 by failing to disclose a loss contingency in its March 2011 10-K

11   arising from the City's manifest awareness of a possible material claim

12   against SAIC.

13       2.  Plaintiffs' Item 303 Claim Based on the March 2011 Form 10-K

14       We next consider whether the PSAC adequately pleaded a violation of

15   Item 303, which imposes specific "disclosure requirements on companies

16   filing" reports on SEC Forms 10-K and 10-Q.  Stratte-McClure v. Morgan

17   Stanley, 776 F.3d 94, 101 (2d Cir. 2015).  As relevant here, Item 303 requires

18   that SAIC's 10-K "[d]escribe any known trends or uncertainties that have had

19

1    or that the registrant reasonably expects will have a material favorable or

2    unfavorable impact on net sales or revenues or income from continuing

3    operations."  17 C.F.R. § 229.303(a)(3)(ii).[7]  According to the SEC's interpretive

4    release regarding Item 303, "disclosure [under Item 303] is necessary 'where a

5    trend, demand, commitment, event or uncertainty is both presently known to

6    management and reasonably likely to have material effects on the registrant's

7    financial conditions or results of operations.'"  Stratte-McClure, 776 F.3d at

8    101 (quoting Management's Discussion and Analysis of Financial Condition

9    and Results of Operations, Securities Act Release No. 6835, Exchange Act

10   Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC

11   Docket 1330 (May 18, 1989) (hereinafter SEC's Interpretive Release)).

12        The PSAC alleges that SAIC violated Item 303 by failing to disclose: "(i)

13   that SAIC had overbilled [the City] hundreds of millions of dollars on

14   CityTime over a multi-year period; and (ii) that SAIC's overbilling practices

---

[7] In Stratte-McClure, we held that Item 303 imposes an "affirmative duty to disclose . . . [that] can serve as the basis for a securities fraud claim under Section 10(b)."  776 F.3d at 101.  We explained that "failure to comply with Item 303 . . . can give rise to liability under Rule 10b–5 so long as the omission is material under Basic [Inc. v. Levinson, 485 U.S. 224 (1988)], and the other elements of Rule 10b–5 have been established."  Stratte-McClure, 776 F.3d at 103-04 (emphases added).

1    subjected it to numerous undisclosed risks, including monetary risks and

2    reputational risks, particularly because government agencies are SAIC 's

3    primary customers and any harm to its reputation and/or relationships with

4    such agencies would adversely affect its current business, as well as its future

5    revenues and growth prospects."  Joint App'x 230.

6         SAIC makes two principal arguments in defense of the District Court's

7    conclusion that Plaintiffs' Item 303 claim was inadequately pleaded.  First, it

8    argues that it must actually have known of the relevant uncertainty at the

9    time of the March 2011 filing, but that Plaintiffs failed to plead that SAIC

10   actually knew then about the scheme.  Second, it insists that the loss of the

11   CityTime contract was not material to SAIC's operations as a whole.

12        We have never directly addressed whether Item 303 requires that a

13   company actually know or merely should have known of the relevant trend,

14   event, or uncertainty in order to be liable for failing to disclose it.  Instead, we

15   appear to have assumed, without deciding, that Item 303 required an

16   allegation or showing of actual knowledge rather than a lesser standard of

17   recklessness or negligence.  In Panther Partners, for example, we held that the

18   complaint adequately alleged that defects in the defendant corporation's

21

1    semiconductor chips "constituted a known trend or uncertainty that [the

2    defendant] reasonably expected would have a material unfavorable impact on

3    revenues or income." Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681

4    F.3d 114, 121 (2d Cir. 2012). We did not separately consider whether the

5    defendant actually had to know about the existing financial uncertainty

6    associated with the defect. Id.; see also Litwin v. Blackstone Grp., L.P., 634

7    F.3d 706, 716 (2d Cir. 2011) (concluding that, where it was undisputed that

8    "the downward trend in the real estate market was already known and

9    existing at the time of the [initial public offering], . . . the sole remaining issue

10   [was] whether the effect of the 'known' information was 'reasonably likely' to

11   be material").

12           The plain language of Item 303 confirms our previous assumption that

13   it requires the registrant's actual knowledge of the relevant trend or

14   uncertainty. Item 303 demands that the registrant "[d]escribe any known

15   trends or uncertainties" and also requires disclosure where "the registrant

16   knows of events that will cause a material change in the relationship between

17   costs and revenues," such as a "known future increase[] in costs of labor." 17

18   C.F.R. § 229.303(a)(3)(ii) (emphases added). The SEC's interpretation of Item

22

1    303 further confirms this plain-language reading of Item 303, insofar as it

2    advises that the trends or uncertainties must be "presently <u>known to</u>

3    <u>management</u>." SEC's Interpretive Release (emphasis added). We therefore

4    hold that Item 303 requires the registrant to disclose only those trends, events,

5    or uncertainties that it actually knows of when it files the relevant report with

6    the SEC. It is not enough that it should have known of the existing trend,

7    event, or uncertainty.

8          Here, the PSAC's allegations support a strong inference that SAIC

9    actually knew (1) about the CityTime fraud before filing its Form 10-K on

10   March 25, 2011, and (2) that it could be implicated in the fraud and required

11   to repay the City the revenue generated by the CityTime contract.[8] Moreover,

12   the PSAC plausibly alleges that, in December 2010, as a result of the CityTime

13   fraud, both the City and New York State rejected pending contract awards to

14   SAIC valued at more than $150 million. Exposure of the fraud also

---

[8] This was not an "uncertainty" arising out of a run-of-the-mill civil
enforcement investigation by the SEC. <u>See</u> <u>In re Lions Gate Entm't Corp. Sec.</u>
<u>Litig.</u>, No. 14-CV-5197 (JGK), 2016 WL 297722, at *14 (S.D.N.Y. Jan. 22, 2016).
Rather, as alleged in the PSAC, by early March 2011 SAIC was aware that it
faced serious, ongoing criminal and civil investigations that exposed it to
potential criminal and civil liability and that ultimately did result in criminal
charges and substantial liability.

1    jeopardized SAIC's existing or future relationships with other governmental

2    entities that accounted for a significant amount of its revenue.  See Panther

3    Partners Inc., 681 F.3d at 121.  Indeed, the PSAC alleges, SAIC anticipated that

4    the potential sale of CityTime's timekeeping software to other municipalities

5    presented a "market opportunity valued [internally] at approximately $2

6    billion."  Joint App'x 134.  SAIC was aware of the fraud by late March 2011

7    but was uncertain about its likely effect on SAIC's current and future

8    revenues.  Under those alleged circumstances, SAIC was required under Item

9    303 to "disclose the manner in which th[at] then-known trend[ ], event[ ], or

10   uncertaint[y] might reasonably be expected to materially impact" SAIC's

11   future revenues.  Litwin, 634 F.3d at 719.

12        We next consider SAIC's argument that the loss of the CityTime

13   contract was ultimately not material in view of the fact that it was a single

14   contract out of SAIC's more than 10,000 ongoing contracts and that it was

15   worth a fraction of SAIC's yearly revenues ($635 million compared to $10

16   billion).  We reject SAIC's materiality argument, which asks us to consider

17   quantitative factors only in the narrowest light in determining the financial

1    impact of losing the CityTime project due to the fraud, and to otherwise

2    ignore qualitative factors.  See id. at 717-18.

3            When a district court is in effect faced with a motion to dismiss a

4    complaint, we have cautioned that "[b]ecause materiality is a mixed question

5    of law and fact, in the context of a [Rule] 12(b)(6) motion, '[the] complaint

6    may not properly be dismissed . . . on the ground that the alleged

7    misstatements or omissions are not material unless they are so obviously

8    unimportant to a reasonable investor that reasonable minds could not differ

9    on the question of their importance.'"  ECA, 553 F.3d at 197 (quoting Ganino

10   v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000)).  Here, as we have just

11   observed, the PSAC alleges that SAIC anticipated that the potential sale of

12   CityTime's timekeeping software to other municipalities presented a "market

13   opportunity valued [internally] at approximately $2 billion"—twenty percent

14   of its yearly revenue.  The PSAC also points to SAIC's possible exposure to

15   significant civil and even criminal liability arising from the submission of

16   fraudulent time and billing records to the City and the resulting risk of loss of

17   revenue from future contracts for CityTime projects or debarment from other

18   government contracts altogether.  The seriousness of the CityTime fraud and

1    the alleged importance of the CityTime project to SAIC's future presence in

2    the City and its ability to sell similar services to other municipalities around

3    the United States makes us reluctant to conclude at this stage that the alleged

4    misstatements were "so obviously unimportant" either quantitatively or

5    qualitatively that they could not be material.

6        3.  Scienter

7        Next, we consider whether the plaintiffs have plausibly alleged that

8    SAIC acted with the requisite scienter when it violated FAS 5 and Item 303 in

9    connection with its March 2011 Form 10-K.  In other words, does the PSAC

10   allege "facts to show . . . strong circumstantial evidence of conscious

11   misbehavior or recklessness" on SAIC's part?  ECA, 553 F.3d at 198.  It does.

12   If credited, the allegations in the PSAC strongly suggest that by March 9,

13   2011, when SAIC received the results of its internal investigation but before it

14   filed its 10-K, SAIC knew about Denault's kickback scheme, the extent of the

15   CityTime fraud, and, as we have already explained, that it risked civil and

16   criminal fines and penalties, let alone losing a significant number of current

17   and future government contracts.  We conclude that the allegations support

18   the inference that SAIC acted with at least a reckless disregard of a known or

1   obvious duty to disclose when, as alleged, it omitted this material information

2   from its March 2011 10-K in violation of FAS 5 and Item 303.

3        SAIC responds that it is simply implausible that it (or, for that matter,

4   any of the defendants) would deliberately conceal the "misconduct of rogue

5   employees for just over two months, from the filing of the 10-K on March 25

6   until [SAIC's] disclosures on June 2, 2011," because the benefits of a brief

7   concealment would be low.  Appellee's Br. 53.  But this "argument confuses

8   expected with realized benefits."  <u>Makor Issues & Rights, Ltd. v. Tellabs Inc.</u>,

9   513 F.3d 702, 710 (7th Cir. 2008).  For it is "cogent and at least as compelling as

10  any opposing inference of nonfraudulent intent," <u>Tellabs, Inc. v. Makor Issues</u>

11  <u>& Rights, Ltd.</u>, 551 U.S. 308, 314 (2007), to infer that at the time it filed its 10-K

12  in March 2011, SAIC believed it had more time before prosecutors would

13  reveal its role in the scheme and before the City formally requested

14  reimbursement; and if SAIC believed that it had more time, then "the benefits

15  of concealment might [have] exceed[ed] the costs" as of March 2011.  <u>Tellabs</u>,

16  513 F.3d at 710.  In fact, at that time, it was unclear when and to what degree

17  SAIC's role in the fraud would be made public.  The PSAC's theory, then—

18  that the Government and the City uncovered SAIC's role in the fraud sooner

1    than SAIC expected and compelled an earlier-than-expected disclosure in

2    June 2011—is hardly implausible.

3        In sum, we disagree with the District Court's conclusion that amending

4    the complaint to include the FAS 5 and Item 303 claims based on the March

5    2011 10-K would be futile.

6        4.  Plaintiffs' Remaining Claims

7        We briefly address Plaintiffs' remaining claims on appeal.

8        First, the District Court dismissed with prejudice the FAS 5 claim based

9    on SAIC's June 2011 Form 8-K and then refused to grant leave to amend the

10   claim in the PSAC.  See SAIC I, 2013 WL 5462289, at *10-11; SAIC III, 2014 WL

11   4953614, at *4.  We agree with the District Court that amendment of this claim

12   would be futile, notwithstanding the new facts alleged in the PSAC.  SAIC's

13   June 2011 Form 8-K adequately disclosed the total amount that SAIC billed

14   the City under the CityTime project, the $40 million in outstanding

15   receivables, Denault's arrest for fraud, SAIC's subsequent $2.5 million

16   reimbursement offer to the City, and the "reasonable possibility" of

17   additional exposure to loss from "a demand for reimbursement of other

18   amounts."  Joint App'x 254-55.  Plaintiffs failed to identify in their complaint

28

1    any additional disclosures SAIC should have made in the 8-K to more

2    accurately portray the extent of SAIC's exposure to liability from the project.

3         Second, Plaintiffs challenge the District Court's dismissal of their claims

4    that SAIC's 2011 Annual Report contained materially false statements about

5    SAIC's commitment to ethics and integrity.  In particular, the PSAC points to

6    representations in the Annual Report regarding SAIC's "culture of high

7    ethical standards, integrity, operational excellence, and customer satisfaction"

8    and its "reputation for upholding the highest standards of personal integrity

9    and business conduct."  Joint App'x 252.  We affirm the District Court's

10   dismissal of the claims based on these representations for substantially the

11   reasons provided by the District Court.  See SAIC I, 2013 WL 5462289, at *13.

12   On appeal, Plaintiffs argue that these general statements, while typically not

13   actionable, are actionable in this context because Defendants were aware of

14   facts undermining the positive statements about SAIC's commitment to ethics

15   and integrity.  But "Plaintiffs' claim that these statements were knowingly

16   and verifiably false when made does not cure their generality, which is what

17   prevents them from rising to the level of materiality required to form the

18   basis for assessing a potential investment."  City of Pontiac Policemen's &

29

1  <u>Firemen's Ret. Sys.</u>, 752 F.3d at 183; <u>see also</u> <u>ECA</u>, 553 F.3d at 206 ("No

2  investor would take such statements seriously in assessing a potential

3  investment, for the simple fact that almost every investment bank makes

4  these statements.").  We cannot distinguish the statements in the Annual

5  Report from the statements at issue in <u>ECA</u>, for example, in which we

6  referred to representations in an SEC filing about a bank's reputation for

7  integrity as "no more than 'puffery' which does not give rise to securities

8  violations," and suggested that  such statements are typically "too general to

9  cause a reasonable investor to rely upon them," in part because an investor

10 "would not depend on [the statements] as a guarantee that [the company]

11 would never take a step that might adversely affect its reputation."  <u>ECA</u>, 553

12 F.3d at 206.  This is not to say that statements about a company's reputation

13 for integrity or ethical conduct can never give rise to a securities violation.

14 Some statements, in context, may amount to more than "puffery" and may in

15 some circumstances violate the securities laws:  for example, a company's

16 specific statements that emphasize its reputation for integrity or ethical

17 conduct as central to its financial condition or that are clearly designed to

1    distinguish the company from other specified companies in the same

2    industry.

3        Finally, we affirm the District Court's dismissal of Plaintiffs' internal

4    control claim based on the March 2011 Form 10-K and their claims against

5    Sopp and Havenstein.  In initially dismissing these claims without prejudice

6    in its September 2013 Order, the District Court granted Plaintiffs an

7    opportunity to amend their complaint within forty-five days, but Plaintiffs,

8    without explanation, failed to do so.  Under the circumstances, Plaintiffs'

9    failure to comply with the District Court's reasonable schedule was a

10   legitimate reason to dismiss those claims with prejudice.[9]

11                        **CONCLUSION**

12       For the foregoing reasons, we **VACATE** the judgment of the District

13   Court with respect to Plaintiffs' FAS 5 and Item 303 claims based on SAIC's

14   March 2011 Form 10-K and **REMAND** for further proceedings consistent with

---

[9] Because Plaintiffs have made no specific arguments with respect to the
District Court's dismissal of their claims against the individual defendants,
we alternatively affirm the dismissal of these claims on the ground that they
have been abandoned.  See Norton v. Sam's Club, 145 F.3d 114, 117-18 (2d Cir.
1998).

1 this opinion.  We **AFFIRM** the judgment of District Court with respect to

2 Plaintiffs' other claims.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit