UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re SAIC, INC. SECURITIES LITIGATION    :    Master File No. 1:12-cv-01353-DAB
————————————————————    :
    :    CLASS ACTION
    :
This Document Relates To:    :
    :    SECOND AMENDED CLASS ACTION
    ALL ACTIONS.    :    COMPLAINT FOR VIOLATIONS OF THE
    :    FEDERAL SECURITIES LAWS
————————————————————    :
    x

## TABLE OF CONTENTS

**Page**

LIST OF RELEVANT INDIVIDUALS ............................................................................ iv

I.     NATURE OF THE ACTION ................................................................................1

II.    JURISDICTION AND VENUE ..........................................................................8

III.   PARTIES ............................................................................................................9

IV.   RELEVANT SENIOR-LEVEL EXECUTIVES OF SAIC ................................9

V.    RELEVANT EVIDENTIARY SOURCES ......................................................14

VI.   OTHER EVIDENTIARY SOURCES ..............................................................23

VII.  SUBSTANTIVE ALLEGATIONS ..................................................................26

      A.    The Company and its Business ..............................................................26

      B.    For Nearly a Decade, SAIC Engaged in a Billing Scheme in Connection with the CityTime Project that Defrauded NYC Out of Hundreds of Millions of Dollars ..............................................................27

      C.    The CityTime Project Was Critically Important to SAIC's Business, and SAIC Closely Monitored the Status of the Contract and Associated Billings ..............................................................30

            1.    SAIC's Procurement Personnel had Oversight of Subcontractors and SAIC was Required to Follow Competitive-Bidding Policies ...........30

            2.    Federal Regulations Required the Company to Maintain a Code of Conduct and Adequate Internal Controls ...................................................33

            3.    It Was Critically Important for SAIC to Qualify as a Responsible Contractor for the Company to Receive Contract Awards ......................37

            4.    The CityTime Project Was of the Utmost Importance to SAIC, and SAIC Exercised an Unprecedented Level of Scrutiny of it ...............41

            5.    SAIC Employed Extensive Internal Procedures, and Established Specialized Procedures, to Monitor Performance of the Project ..............45

      D.    Numerous Red Flags, Manifested Before 2011, Exposed Fraud on the CityTime Project Internally at SAIC and Alerted Management to SAIC's Involvement ..............................................................52

**Page**

1.      SAIC Used Amendment No. 6 to Transfer the Cost of Completing the
        Project to NYC, and the Project Instantly Became Profitable ..................52

2.      SAIC's Subcontract with Technodyne Violated SAIC's Policies
        and SAIC Failed to Competitively Bid Technodyne's Subcontract ..........57

3.      Unnecessary Project Staffing and Unreasonable Rates Billed to NYC
        Violated SAIC's Procurement and Pricing Policies ................................61

4.      SAIC Personnel Complained About Technodyne's Role, Raised
        Overstaffing Concerns and Claimed Denault Accepted Kickbacks ..........72

5.      From Virtually the Inception of Denault's Involvement in the Project,
        SAIC Received Complaints About Ballooning Costs ..............................91

6.      Using D.A. Solutions and PrimeView to Provide Staffing Services
        on the Project Violated SAIC's Procurement Policies ............................97

E.      Developments Occurring Immediately Before Filing the March 2011
        Form 10-K also Implicated SAIC in the CityTime Fraud ..................................100

1.      The December 2010 Criminal Complaint Implicated Denault,
        SAIC, and Staffing Contractors in the Overbilling Scheme ..................100

2.      In December 2010, the Government Subpoenaed Denault and SAIC
        and SAIC Placed Denault on Administrative Leave..............................108

3.      By late December 2010, SAIC Began Formally Investigating
        the Fraud and Had Lost Contract Awards Arising from the Fallout........111

4.      By January 2011, SAIC had Agreed to Advance Defense Costs
        to Denault and Mayor Bloomberg Linked SAIC to the Fraud................116

5.      In January 2011, Bell Resigned During SAIC's Investigation into
        Corporate Timekeeping and Billing Practices on CityTime..................119

6.      Developments in February 2011 Also Implicated SAIC, Denault,
        Technodyne, and Other Staffing Contractors in the Fraud ....................120

F.      Developments Occurring between March and June 2011 Explicitly Confirmed
        SAIC's Involvement in the Fraudulent Kickback and Overbilling Scheme........126

1.      By March 2011, SAIC had Confirmed that Denault had Engaged in
        Timekeeping Misconduct and Overbilling ..............................................126

2. The May 2011 Criminal Complaint Against Denault Confirmed Information that SAIC Already Knew by March 2011 ..........................129

3. The June 2011 Indictment Confirmed that the Charges Against Mazer, Denault and Others Were Inextricably Intertwined ...............................132

G. In Exchange for SAIC's Acceptance of Responsibility for its Role in the Fraud, the USAO Deferred the Prosecution of a Charge of Conspiracy to Defraud NYC ....................................................................134

H. CEO Havenstein, Who Brokered the DPA, Acknowledged that Management Knew of SAIC's Involvement in the CityTime Fraud by January 2011 .............138

I. The Evidence Confirms that SAIC Knew it Was Implicated in the CityTime Fraud by March 25, 2011.............................................................140

J. SAIC Was Required to Disclose Not Only that It Was Defrauding NYC, But Also the Impact of the Scheme on the Company's Business.......................141

K. SAIC's Fraudulent Financial Reporting ...........................................................143

L. The Filing of the 2011 March Form 10-K and Subsequent Developments.........149

M. Additional Scienter Allegations ........................................................................156

N. Loss Causation/Economic Loss ........................................................................166

O. Applicability of Presumption of Reliance and Fraud on the Market Doctrine ....168

P. No Safe Harbor ..................................................................................................169

VIII. CLASS ACTION ALLEGATIONS ...............................................................................169

IX. COUNT ........................................................................................................................171

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 .......................171

X. JURY TRIAL DEMAND ..............................................................................................172

EXHIBIT A – TIMELINE OF RELEVANT EVENTS ............................................................173

## LIST OF RELEVANT INDIVIDUALS

| | Name | Description[1] |
|---|---|---|
| 1. | Alderson, Deborah | Group President of SAIC, Inc., now known as Leidos Holdings, Inc. ("SAIC"), since 2005; reported directly to SAIC's Chief Executive Officer ("CEO"); supervised Gerard Denault ("Denault"); terminated by SAIC in October 2011 in connection with efforts to address CityTime. |
| 2. | Allen, Padma | Principal of Technodyne LLC ("Technodyne"); wife of Reddy Allen; direct perpetrator of fraud; criminal defendant in *Mazer*; currently at large. |
| 3. | Allen, Reddy | Principal of Technodyne and consultant on the CityTime project; previously worked for Denault and Carl Bell ("Bell"); shared office space with Bell in SAIC's New York office; direct perpetrator of fraud; criminal defendant in *Mazer*; currently at large. |
| 4. | Aronshtein, Dmitry | Mazer's uncle; principal of staffing firm D.A. Solutions, which provided staffing for CityTime; direct perpetrator of fraud and criminal defendant in *Mazer*; found guilty at trial of various crimes relating to CityTime. |
| 5. | Bell, Carl* | Chief Systems Engineer in SAIC's New York office; direct perpetrator of fraud; criminal defendant in *Mazer*; pled guilty to various crimes relating to CityTime. |
| 6. | Berger, Scott | Spherion consultant to New York City ("NYC") Office of Payroll Administration ("OPA"); alleged direct perpetrator of fraud; died in or about December 2010. |
| 7. | Birdsong, Robert | Head of SAIC's internal audit group who conducted portion of SAIC's internal investigation of Denault's timekeeping practices; prepared report in early-March 2010 regarding findings. |
| 8. | Blunt, Patricia* | OPA personnel officer on CityTime. |
| 9. | Bondy, Joel | Mazer's friend; former Spherion consultant; Executive Director of OPA from 2004; was placed on leave without pay in December 2010 after filing of criminal complaint, and resigned shortly thereafter. |
| 10. | Brown, Michele Mintz | SAIC's in-house counsel who, among other things, supervised and participated in SAIC's internal investigation, engaged counsel for the Company, and prepared letter agreements for Denault and Bell regarding advancement of their legal fees. |
| 11. | Dahlberg, Kenneth | SAIC CEO from November 3, 2003 through September 20, 2009; Chairman of SAIC's Board of Directors from July 1, 2004 through June 18, 2010. |
| 12. | Denault, Gerard | Held various positions for SAIC in connection with CityTime, beginning in 2002 and concluding with his removal from project and placement on administrative leave in December 2010; was terminated on May 23, 2011; reported to Alderson and Lord; direct perpetrator of fraud; criminal defendant in *Mazer*; found guilty at trial of various crimes relating to CityTime. |
| 13. | Doria, Elaine* | OPA Budget Officer, Assistant Director of Administration, and Director of Administration. |
| 14. | Drake, Deborah* | SAIC Vice President and Business Unit Human Resources Director; reported to Mark Hughes' group. |

---

[1] An asterisk denotes that the individual testified during the criminal trial in *United States of America v. Mazer, et al.*, No. 1:11-cr-00121-GBD (S.D.N.Y.) (referred to in this chart as "*Mazer*").

| | Name | Description[1] |
|---|---|---|
| 15. | Dube, Peter | SAIC General Manager of Enterprise and Mission Solution Business Unit; terminated by SAIC in October 2011 in connection with efforts to address CityTime. |
| 16. | Fallon, Brian | SAIC Deputy Program Manager for CityTime; reported to Denault. |
| 17. | Fayerman, Michael | Former SAIC Director of Product Development who became consultant for Technodyne during the CityTime project. |
| 18. | Gurjal, Sarah | OPA Program Director and manager for CityTime; reported to Bondy. |
| 19. | Hatfield, Robert | SAIC Business Unit Procurement Director. |
| 20. | Havenstein, Walter | SAIC CEO from September 21, 2009 through March 1, 2012. |
| 21. | Herzog, John | SAIC Subcontract administrator in Procurement Department. |
| 22. | Hsiung, Hayden | SAIC Application Support Analyst who worked on CityTime from 2003 through July 2011; assisted in SAIC's internal investigation. |
| 23. | Hughes, Mark | SAIC Group President responsible for CityTime. |
| 24. | James, Letitia | NYC Councilwoman. |
| 25. | Kearney, Benet | Deputy General Counsel at NYC Department of Investigation ("DOI"). |
| 26. | Khurana, Vinod | Spherion consultant who performed load testing on CityTime software, cooperated with the DOI, and filed an action as a relator seeking to recover a portion of NYC's recovery from SAIC related to CityTime. |
| 27. | Lacombe, Phil | SAIC Business Unit General Manager. |
| 28. | Lay II, Theodore* | SAIC Account Manager and Operations Manager; member and then director of SAIC's Employee Ethics Committee and Chair of Employee Ethics Council. |
| 29. | Leon, Marco* | SAIC Quality Assistance Manager for Sibley "Sam" Ward's ("Ward") operation, which included CityTime; submitted anonymous ethics complaint to SAIC in 2005 regarding Technodyne and prospect that Denault was accepting kickbacks. |
| 30. | Lord, John | SAIC Deputy Group President; terminated by SAIC in October 2011 in connection with efforts to address CityTime. |
| 31. | Mazer, Mark | Spherion consultant to OPA; direct perpetrator of fraud; criminal defendant in *Mazer*; found guilty at trial of various crimes relating to CityTime. |
| 32. | Mazer, Svetlana | Mazer's wife; assisted Mazer in money laundering; accomplice to fraud; criminal defendant in *Mazer*; pled guilty to crime(s) relating to CityTime. |
| 33. | Makovetskaya, Anna | Mazer's cousin; assisted Mazer in money laundering; criminal defendant in *Mazer*; pled guilty to crime(s) relating to CityTime. |
| 34. | McConnell, Caroline* | SAIC Vice President and Human Resources Director for CityTime business unit in 2005; successor to Deborah Drake. |
| 35. | Medzon, Larisa | Mazer's mother; assisted Mazer in money laundering; accomplice to fraud; criminal defendant in *Mazer*; pled guilty to crime(s) relating to CityTime. |
| 36. | Natanzon, Victor* | Principal of staffing firm PrimeView, which provided staffing for CityTime; direct perpetrator of fraud and criminal defendant in *Mazer*; pled guilty to various crimes relating to CityTime. |
| 37. | Parker, Kate | SAIC Head of Employee Relations. |

| | Name | Description[1] |
|---|---|---|
| 38. | Parkins, Tammy* | SAIC Procurement Director for Alderson's group. |
| 39. | Petka, Kristine | SAIC Corporate Procurement Director. |
| 40. | Phillips, Jane | SAIC head of operation managing CityTime; Ward's successor. |
| 41. | Preucil, Darren* | SAIC senior buyer in contract procurement department staffed to CityTime from May 2006 to January 2010; supervised by Shangle; reported to Parkins. |
| 42. | Salamone, Salvatore | SAIC's liaison with NYC on CityTime. |
| 43. | Shangle, James* | SAIC Contracts Manager; joined CityTime in 2004. |
| 44. | Sopp, Mark | SAIC Chief Financial Officer. |
| 45. | Taylor, Richard* | SAIC Vice President and Controller of Dube business unit, then responsible for CityTime project. |
| 46. | Valcich, Richard | OPA Executive Director until 2004; Bondy's predecessor. |
| 47. | Velazquez, Elisa* | General Counsel in NYC Mayor's Office of Contract Services. |
| 48. | Ward, Sibley "Sam" | SAIC Operations Division Manager and Program Manager for CityTime from 2003 to 2005. |
| 49. | Yu, Laila* | Deputy Inspector General for DOI's investigative audit unit. |
| 50. | Zanolin, Peter* | Inspector General at DOI; interviewed Denault in December 2010; served grand jury subpoena on Denault. |

Lead Plaintiffs Indiana Public Retirement System, Indiana State Teachers' Retirement Fund and Indiana Public Employees' Retirement Fund (collectively, "Lead Plaintiffs" or "Plaintiffs") allege the following based upon the investigation of their counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by SAIC, Inc., now known as Leidos Holdings, Inc. ("SAIC" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, the filings and indictments filed in *United States of America v. Mazer, et al.*, No. 1:11-cr-00121-GBD (S.D.N.Y.) (referred to variously as "*Mazer*," the "criminal proceedings," or similar terms), as well as testimony and exhibits introduced at the criminal trial associated with that matter, and media reports about the Company.   As detailed below, Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and that they will develop additional support for these allegations after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the common stock of SAIC between March 25, 2011 and June 2, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").[2]

---

[2]     The Second Circuit Court of Appeals vacated the denial of Plaintiffs' post-judgment motion to amend two claims asserted during a revised class period of March 23, 2011 to September 1, 2011. The Class Period alleged herein begins on March 25, 2011, however, because SAIC filed its Form 10-K for the fiscal year ended January 31, 2011 (the "March 2011 Form 10-K"), on which those claims are based, on that date.  By contrast, the Class Period ends on June 2, 2011 due to the Court's September 23, 2016 Order, which provides: "Based on the findings of the Second Circuit affirming dismissal of all claims based on SAIC's June 2011 filings, the class period shall be from March 23, 2011 to June 2, 2011, the date on which the Court and Second Circuit held that SAIC made an adequate disclosure for the purposes of FAS 5 and Item 303."  Although Plaintiffs disagree with this ruling and have moved for reconsideration and/or certification of an interlocutory appeal, they use the Class Period imposed by the September 23, 2016 Order because it requires this pleading to be filed by October 31, 2016 and the motion will not likely be resolved by then.

2.     During the Class Period, defendant SAIC provided defense, intelligence, homeland security, logistics, energy, environment and heath solutions and services to federal, state and local government agencies, foreign governments and customers in select commercial markets.  This case concerns SAIC's contract with the City of New York ("NYC") to design, develop and implement an automated time, attendance and workforce management system for certain NYC agencies: the CityTime project (referred to herein variously as "CityTime," the "contract," or the "project").

3.     In 1998, when CityTime commenced, the contract was budgeted to cost $63 million, and, shortly after SAIC joined the project as the prime contractor in 2000, SAIC was losing millions of dollars on the contract and was forced to write-it down by approximately $27 million.  In fact, because the contract was so far into the "red" for SAIC, SAIC dramatically increased its level of review – perhaps more so than for any other contract – during the performance of the project.

4.     By April 2010, the contract was deep into the "black" for SAIC and NYC had paid nearly $700 million for SAIC's work on CityTime.  As SAIC has since admitted and a criminal trial has established, the ballooning contract costs were due to a lengthy and massive overbilling fraud perpetrated by SAIC and its co-conspirators, using Technodyne LLC ("Technodyne") – a private consulting company based in New Jersey that served as SAIC's primary subcontractor on the project, in violation of SAIC's competitive bidding policies – as the vehicle to effectuate the fraud. As detailed herein, CityTime will be remembered as one of the most egregious frauds, if not the largest fraud, ever perpetrated on NYC.

5.     During the Class Period, however, SAIC did not disclose the known uncertainty presented by the fact that the Company was engaged in a massive fraudulent billing scheme and was bilking NYC out of hundreds of millions of dollars.  Notwithstanding that the CityTime contract had ballooned to over $600 million by the end of the Class Period, SAIC did not timely disclose the

possibility – indeed, the likelihood – that it would have to disgorge all, or even a substantial portion, of the revenue it generated on the project.  Nor did SAIC timely disclose the reasonable possibility that it had sustained a loss associated with the CityTime project.  Such nondisclosure violated Item 303 of SEC Regulation S-K and Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC" or the "Codification") Topic 450 ("ASC 450").[3]

6.      Instead, SAIC issued financial statements which failed to disclose that the Company was recognizing revenues obtained through its fraudulent and illegal activities, and did not disclose that the Company was engaging in a massive billing fraud – information required to be disclosed therein to render its representations non-misleading.  As the truth about the CityTime fraud started to come to light and criminal charges were filed, senior executives at SAIC downplayed the Company's exposure for the fraud – and the likelihood that the Company would have to pay back hundreds of millions of dollars to NYC as a result of it.

7.      On December 15, 2010, the U.S. Attorney's Office for the Southern District of New York ("USAO") and the NYC Department of Investigation ("DOI") jointly issued a press release announcing the filing of a criminal complaint against certain individuals who were alleged to have perpetrated an overbilling and kickback scheme related to CityTime.  The press release reported that the USAO had filed a criminal complaint against six individuals – including two consultants to the NYC Office of Payroll Administration ("OPA") – who were accused of perpetrating the CityTime fraud: Mark Mazer ("Mazer") and Scott Berger ("Berger"), who were OPA consultants; Mazer's uncle Dmitry Aronshtein ("Aronshtein") and Victor Natanzon ("Natanzon"), the principals of staffing firms that did business with Technodyne on CityTime, SAIC's primary subcontractor on the

---

[3]      ASC 450 is the provision of U.S. Generally Accepted Accounting Principles ("GAAP") and is a codification of Statement of Financial Accounting Standards ("SFAS") No. 5.  Because the Class Period no longer encompasses any period before ASC 450's codification in June 2009, the relevant provisions of ASC 450 – not SFAS No. 5 – are referenced herein.

project; and Svetlana Mazer ("S. Mazer") and Larisa Medzon ("Medzon"), Mazer's wife and mother, respectively, who were alleged to have assisted Mazer in laundering proceeds of the fraud.

8.    Additionally, the December 2010 criminal complaint alleged that SAIC – which was not mentioned by name or charged therein – submitted false timesheets for payment by NYC in connection with the scheme. Yet, the criminal complaint – and even the press release announcing the unsealing of the complaint – disclosed that the investigation was ongoing, which left the door open to the development of evidence and assertion of charges against others. As such, the worst was yet to come, as the full scope of SAIC's involvement in the fraudulent billing practices was not yet public and SAIC took no steps to advise investors of what it knew: that the Company had assisted in defrauding NYC of hundreds of millions of dollars, was the vehicle by which the fraud took place, and handsomely profited from the fraud virtually since the inception of its involvement on the project. Indeed, SAIC remained silent as the investigation focused on its role in the fraud and the misconduct of its employees.

9.    In fact, also in December 2010, SAIC and its Vice President/Project Manager on the contract, Gerard Denault ("Denault"), who was responsible for running the project in New York on SAIC's behalf, had privately received subpoenas from federal authorities in connection with grand jury proceedings regarding the fraud; and SAIC commenced an internal investigation of the conduct, including timekeeping improprieties allegedly committed by Denault in connection with the project. SAIC was aware of the subpoena that Denault had received virtually as soon as he had received it, because he forwarded a copy to SAIC and requested SAIC to advance his legal fees in connection with the investigation and, most critically, *the criminal proceeding* – despite the fact that he was not then named as a defendant therein. SAIC advanced Denault's legal fees through at least the period ending April 30, 2011.

10.     Other developments, detailed further herein, also occurred in December 2010.  For example, the New York State Comptroller's Office ("State Comptroller") and NYC Mayor's Office rejected contract awards to SAIC as a result of the CityTime scandal, with the State Comptroller outlining particular questions and concerns regarding SAIC's potential role in the illicit kickback and overbilling scheme – including that SAIC was responsible for submitting the false timesheets for payment to NYC, as described in the December 2010 criminal complaint.  In fact, on December 20, 2010, NYC Mayor Michael R. Bloomberg ("Mayor Bloomberg") commented that NYC was in the process of "determining what future role SAIC can have on the project and which SAIC employees can have a role in it."  More importantly, because the criminal investigation was publicly focused on kickbacks that *non*-SAIC employees had received, Mayor Bloomberg represented that NYC was conducting a forensic audit of the project "*with a goal of recouping any funds that are outside of the DOJ-DOI investigation*."

11.     Additionally, on January 24, 2011, Carl Bell ("Bell"), Chief Systems Engineer in SAIC's New York Office (and a direct perpetrator of the fraud), abruptly resigned from SAIC as the Company's internal investigation and the criminal investigation were underway.  Reportedly, Bell was also engaged in improprieties associated with the approval of falsified time records for at least one consultant on the project.

12.     On February 10, 2011, the USAO and DOI jointly issued a press release announcing the filing of an Indictment in connection with fraud, kickback, and money laundering schemes involving CityTime.  In addition, they announced that Natanzon had pled guilty on February 8, 2010 to a criminal Information arising out of his role in the criminal conduct on the CityTime project.  On February 11, 2011, Bell received two grand jury subpoenas seeking information regarding various individuals and conduct concerning CityTime.  At the same time, SAIC agreed to advance Bell's

legal fees in connection with the *criminal matter* – notwithstanding the fact that he, like Denault, was not then identified as a defendant therein.  Furthermore, at least one significant aspect of the Company's internal investigation – involving Denault's improper timekeeping practices – concluded in March 2011.

13.    On March 25, 2011, SAIC filed the March 2011 Form 10-K.  Despite the events preceding this filing (detailed further herein), SAIC did not mention CityTime, much less make the disclosures required by Item 303 and ASC 450 as a result of SAIC's exposure to the fraud.

14.    On June 2, 2011, SAIC issued a press release announcing its financial results for the 2012 first quarter, the period ended April 30, 2011.  At that time, SAIC disclosed Denault's misconduct in improperly billing NYC for $2.5 million of time to the project, and further disclosed that it had approximately $40 million in outstanding receivables on the project as of May 31, 2011.  However, the Company also represented that NYC had not yet filed a claim against SAIC or requested reimbursement of payments made on the project.

15.    In response to this news, the Company's stock price declined on June 3, 2011 on volume of more than 3.4 million shares traded – more than double the volume on the previous day.

16.    Then, on June 20, 2011, the USAO and DOI jointly issued a press release announcing the unsealing of a superseding indictment, which added two more individual defendants and a corporate defendant.  At that time, the USAO also charged Denault, who was previously named in a criminal complaint in May 2011.  The press release announced the unsealing of Bell's guilty plea to multiple charges based on his participation in the fraud, and quoted Preet Bharara, the U.S. Attorney for the Southern District of New York, who stated: "[S]ince the first announcement of arrests and seizures, we have developed evidence that the corruption on the CityTime project was epic in

duration, magnitude, and scope.  As alleged, CityTime served as a vehicle for an unprecedented fraud, which appears to have metastasized over time."

17.    On June 29, 2011, Mayor Bloomberg wrote to SAIC, formally demanding the return of $600 million paid in connection with the project.  SAIC attached a copy of the letter to its July 1, 2011 Form 8-K, without elaboration.  As noted, however, SAIC had approximately $40 million in outstanding receivables, with little likelihood that NYC – which had seen the cost of the project rise from $63 million to nearly $700 million, and had long associated the Company with the fraudulent scheme – would satisfy such receivables.

18.    On August 31, 2011, the Company belatedly came to grips with its involvement in the CityTime fraud.  On that date, the Company issued a press release announcing its financial results for the 2012 second quarter, the period ended July 31, 2011.  For the quarter, SAIC reported an approximate 6% decline in revenue and a 23% decline in operating margin.  Following the issuance of the earnings announcement, SAIC held a conference call with analysts and investors wherein the Company disclosed that its revenues were, in part, adversely impacted by the "wind[ing] down" of the CityTime contract and that, while the Company could not quantify the amount, it believed that it was "probable" that it would have to make restitution to NYC in connection with the scandal.

19.    In response to this adverse information, the price of SAIC's common stock declined from $15.00 to $12.97 per share on extremely heavy trading volume.

20.    Finally, on March 14, 2012, SAIC announced that it had entered into a Deferred Prosecution Agreement ("DPA") with the USAO.  Under the DPA, SAIC agreed to pay nearly $500.4 million to the U.S. Government, with $370.4 million earmarked as restitution for NYC and $130 million constituting a penalty.  SAIC also agreed to forfeit $40 million in accounts receivable that remained outstanding and unpaid by NYC.

21.     Moreover, under the DPA, SAIC agreed, among other things, to retain an independent monitor, selected by the USAO after consultation with the Company, who would periodically report to the USAO and have broad authority to monitor and make recommendations on a number of the Company's policies and practices.  The DPA provided that the monitor would serve for a period of three years, subject to adjustment under certain conditions.

22.     In connection with the DPA, SAIC also agreed to a Statement of Responsibility ("SOR") in which it admitted that, through the conduct of managerial employees and others, it defrauded NYC by inducing it to significantly overpay for the CityTime project.

23.     Subsequently, three defendants who had refused to plead guilty to criminal charges associated with the CityTime fraud – including former SAIC employee Denault – went on trial in the *Mazer* case.  During the trial, the prosecution systematically demonstrated the existence of the fraud and introduced documentary and testimonial evidence that confirmed SAIC's knowledge and/or awareness of the fraud as it unfolded for nearly a decade.  The trial concluded on November 22, 2013 with various guilty verdicts against the three defendants, each of whom were sentenced to 20 years in prison in May 2014.  In commenting on the fraud, Judge George B. Daniels, who presided over the criminal matter, called CityTime "the largest city corruption scandal in decades."

## II.      JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant to Sections 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 promulgated by the SEC [17 C.F.R. §240.10b-5].

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

26.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

27.     In connection with the acts alleged herein, SAIC, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

### III.     PARTIES

28.     Lead Plaintiffs purchased the common stock of SAIC during the Class Period, as set forth in the certifications previously filed in this action and incorporated by reference herein, and have been damaged thereby.

29.     During the Class Period, Defendant SAIC provided defense, intelligence, homeland security, logistics, energy, environment and heath solutions and services to federal, state and local government agencies, foreign governments and customers in select commercial markets.  Yet, more than 90% of SAIC's business was generated by government contracts.

### IV.     RELEVANT SENIOR-LEVEL EXECUTIVES OF SAIC

30.     In crucial periods before, during and even after the Class Period, SAIC's CityTime operations were managed and/or monitored by the following senior-level executives, some of whom were also responsible for preparing the March 2011 Form 10-K.

31.     Kenneth C. Dahlberg ("Dahlberg") was SAIC's Chief Executive Officer ("CEO") from November 3, 2003 until September 20, 2009 and Chairman of its Board of Directors ("Board") from July 16, 2004 until June 18, 2010.  Dahlberg regularly made public statements on behalf of SAIC, including as a presenter at its Institutional Investor Conferences (the "Investor Conferences") on October 9, 2007, October 15, 2008 and October 14, 2009, at which senior-level executives provided an overview of the Company and its growth strategy, competitive environment and financial results.  He also participated in and presented at the William Blair Annual Growth Stock Conferences on June 18, 2008 and June 11, 2009.

32.     Walt Havenstein ("Havenstein") served as SAIC's CEO from September 21, 2009 through March 1, 2012.  SAIC's Form 10-K for the fiscal year ended January 31, 2010, filed with the SEC, states that Havenstein is a "key" officer of the Company.  As detailed below, on October 3, 2011, SAIC announced that Havenstein would retire as CEO effective June 15, 2012, citing unidentified "personal reasons."  Yet, on February 21, 2012, SAIC announced that Havenstein would step down as CEO on March 1, 2012.  Havenstein made public statements on behalf of SAIC, including as a presenter at Investor Conferences on or about October 14, 2009 and October 13, 2010. Immediately before the Class Period, he also participated in and presented at the Cowen and Company Aerospace/Defense Conference on February 9, 2011.  After the Class Period, Havenstein and his constituents admitted that he was aware – no later than mid-2010 – that SAIC had significant, longstanding exposure to the CityTime fraud.

33.     Mark W. Sopp ("Sopp") served as SAIC's Chief Financial Officer ("CFO"), in which capacity he reported directly to the CEO in the organizational hierarchy, since November 2005 and continued to occupy that position throughout the Class Period.  SAIC's Form 10-K for the fiscal year ended January 31, 2010, filed with the SEC, states that Sopp is a "key" officer of the Company. Sopp regularly made public statements on behalf of SAIC, including as a presenter at the Investor Conferences on October 9, 2007, October 15, 2008, October 14, 2009 and October 13, 2010.  He also participated in and presented at the Morgan Stanley Technology Conference on March 3, 2008 and the Wells Fargo Securities Technology, Media and Telecom Conference on November 9, 2010.

34.     Deborah H. Alderson ("Alderson") served as SAIC Group President since 2005 and, in that capacity, reported directly to the CEO in the organizational hierarchy.  Prior to that time, Alderson served as Deputy Group President from August 2005 to October 2005. SAIC's Form 10-K for the fiscal year ended January 31, 2010, filed with the SEC, states that Alderson is a "key" officer

of the Company.  As detailed below, in October 2011, SAIC terminated Alderson, as well as John

Lord ("Lord"), Deputy Group President, and Peter Dube ("Dube"), General Manager of the

Enterprise and Mission Solutions Business Unit, as a result of what SAIC characterized as "failures

of management with respect to the CityTime program."  Alderson made public statements on behalf

of SAIC, including as a presenter at the Investor Conferences on October 9, 2007, October 15, 2008,

October 14, 2009 and October 13, 2010.  She also participated in and presented at the Jefferies

Technology Conference on October 1, 2007, the Wachovia/Wells Fargo Mid-Year Annual Equity

Conference on June 23, 2009, and the Wells Fargo Securities Technology, Media and Telecom

Conference on November 9, 2010.

35.     Denault was: hired as SAIC's Deputy Program Manager for the CityTime project on

or about October 14, 2002; promoted to Program Manager for the project on September 1, 2004, and

appointed as an Assistant Vice President; promoted to Senior Program Manager for the project, and

appointed as a Vice President, on or about January 15, 2005; promoted to Operations Manager for

the project in or about January 2009, retaining his title as Vice President; and, with the approval of

Alderson and Dube, became Vice President for Operations in May 2009.  Additionally:

(a)     Denault served as Vice President and Operations Manager until December 21,

2010, at which time SAIC placed him on "administrative leave."  SAIC subsequently terminated his

employment on May 23, 2011.

(b)     On or about May 26, 2011, Denault was arrested after the USAO alleged that

he had received millions of dollars in illegal kickbacks.  In late-2013, Denault and two of his

criminal co-defendants went to trial, and a jury found them guilty of various charges, detailed further

herein.  Specifically, the jury found Denault guilty of conspiracy to defraud NYC, fraud against

NYC, conspiracy to defraud SAIC by depriving it of the intangible right to his honest services, fraud

against SAIC by depriving it of the intangible right to his honest services, conspiracy to violate the Travel Act, and conspiracy to commit money laundering.

(c)     As the evidence at the criminal trial showed, Denault had previously worked closely with Joel Bondy ("Bondy"),  a former Spherion consultant on the project (and friend of Mazer's) who assumed the position of Executive Director of OPA in or about 2004.  Specifically, Denault supervised Bondy and Bell when they worked together at KPMG, several years before their involvement with the CityTime project.

(d)     As the evidence at the criminal trial also showed, Denault and Bell had a previous relationship with Reddy Allen ("Allen"), a principal of Technodyne.  When Denault and Bell worked for Reed Exhibitions Company, they recruited Allen to perform discrete projects there. Allen then formed Technodyne, and Denault recruited Technodyne as a staffing subcontractor on CityTime.  During Technodyne's tenure on the project, Allen was a paid consultant on the project (hired *through* Technodyne) and often shared an office with Bell in SAIC's New York City office.

(e)     As the evidence at the criminal trial further showed, Denault and Bell had an extensive working history.  Among the other places of employment referenced above, they worked together at Andersen Consulting, where Denault supervised Bell.

(f)     Denault was authorized to speak on behalf of the Company.  For example, in a June 13, 2010 *Crain's New York Business* ("*Crain's*") article, entitled "Clocking CityTime, the craziest contract ever," he conveyed SAIC's position regarding the performance and progress of the CityTime project.  As represented in the article, "SAIC, angered over the way it has been portrayed in the media, broke its silence by speaking with *Crain's*."  In the article, Denault represented that the cost of the project skyrocketed as a result of its "complexity," when the true cause was the illicit overbilling scheme

- 12 -

36.     During the Class Period, these executive officers and/or directors of SAIC, as well as others discussed below, were privy to confidential and proprietary information concerning SAIC, its operations, finances, financial condition, and present and future business prospects.  They also had access to material adverse non-public information concerning SAIC, as discussed in detail below. Because of their positions with SAIC, they had access to non-public information about its business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.   Because of their possession of such information, they – and, by extension, SAIC – knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were concealed from, the investing public.

37.     These executives controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and the investing public.  Certain of these executives were also involved in preparing the March 2011 Form 10-K, which Havenstein and Sopp signed and certified.  As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, these executives had a duty to promptly disseminate accurate and truthful information with respect to SAIC's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of SAIC common stock would be based upon truthful and accurate information.

38.     The fraudulent scheme and course of conduct described herein, perpetrated by SAIC, operated as a fraud or deceit on purchasers of SAIC common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  During the Class Period, the scheme: (i) deceived the investing public regarding SAIC's business, operations and management, and the intrinsic value of SAIC common stock; (ii) allowed certain senior executives and other insiders to collectively sell their personally-held SAIC common stock for proceeds of approximately $33.9 million; and (iii) caused Plaintiffs and members of the Class to purchase SAIC common stock at artificially inflated prices.

## V.     RELEVANT EVIDENTIARY SOURCES

39.     In the *Mazer* case, five individuals pled guilty to criminal charges associated with the CityTime fraud: (i) Bell, SAIC's Chief Systems Engineer for CityTime, who pled guilty to charges described below; (ii) Natanzon, the principal of PrimeView, a purported recruiting firm that direct perpetrators of the fraud used as a vehicle for the hiring of consultants to overstaff the project and overcharge NYC, who pled guilty to charges described below; (iii) Medzon, Mazer's mother, who pled guilty to structuring transactions to evade applicable currency reporting requirements; (iv) Anna Makovetskaya ("Makovetskaya"), Mazer's cousin, who pled guilty to conspiracy to make false statements to a bank; and (v) S. Mazer, Mazer's wife, who pled guilty to obstruction of justice. Denault, Mazer and Aronshtein entered not guilty pleas and went to trial in 2013.

40.     At the trial, which took place from October 15, 2013 through November 22, 2013, the Government introduced evidence that established the existence of the nearly decade-long CityTime scheme and the criminal defendants' role in perpetrating the fraud.  Specifically, the trial involved nearly 40 witnesses and thousands of pages of documentary exhibits, largely comprised of materials obtained during the course of the investigation of the CityTime fraud.

41.     At the conclusion of the trial, the jury returned verdicts on all but one charge asserted against those defendants, as follows:

(a)     Denault: guilty of conspiracy to defraud NYC, fraud against NYC, conspiracy to defraud SAIC by depriving it of the intangible right to his honest services, fraud against SAIC by depriving it of the intangible right to his honest services, conspiracy to violate the Travel Act, and conspiracy to commit money laundering;

(b)     Mazer: guilty of conspiracy to defraud NYC, fraud against NYC, conspiracy to commit bribery, soliciting and accepting bribes and illegal kickbacks, conspiracy to violate the Travel Act, and conspiracy to commit money laundering; and

(c)     Aronshtein: guilty of conspiracy to commit bribery, paying bribes and illegal kickbacks, conspiracy to violate the Travel Act, and conspiracy to commit money laundering.

42.     In contrast, because the DPA resolved civil and criminal charges involving SAIC's role in the CityTime fraud, the Government did not attempt to establish SAIC's culpability at trial. Nevertheless, the evidence introduced at trial confirmed not only that SAIC profited from the fraud, but also that it knew or reasonably should have known about the fraud – yet allowed the scheme to take place, even after receiving multiple internal complaints that Denault was receiving kickbacks to overstaff the project.

43.     Among the witnesses who testified at the trial are the following individuals, each of whom gave testimony that implicated SAIC in the fraud, as detailed further herein.  The testimony recited is current as of the date on which it was given, and all such testimony is derived from trial transcripts.

(a)     Carl Bell ("Bell," introduced above): Bell worked at SAIC as the Chief Systems Engineer for CityTime, resident in the New York City office, from December 7, 2002 until

February 1, 2011, when his January 24, 2011 resignation became effective.  As detailed herein, Bell testified concerning, among other things, the origin and commission of the overbilling and kickback schemes involving CityTime, the investigation of the CityTime fraud (including SAIC's internal investigation), and the manner in which SAIC profited from the fraud.  Bell pled guilty to various charges stemming from his receipt of kickbacks from Technodyne, and participated in the CityTime fraud with Denault, with whom he split such kickbacks.  Specifically, Bell agreed to cooperate with the Government and testify against the criminal defendants in connection with his guilty plea to charges of conspiracy to commit wire fraud, conspiracy to commit honest services fraud, honest services fraud, conspiracy to violate the Travel Act, and conspiracy to commit money laundering.

> (b)     Victor Natanzon ("Natanzon," introduced above): Natanzon was the principal of PrimeView, a staffing firm involved in CityTime.  As the evidence confirms: PrimeView referred consultants to Technodyne, which referred them onward to SAIC; SAIC then invoiced and received payment from NYC and subsequently paid Technodyne; Technodyne then funneled kickbacks, based on inflated rates charged for the consultants, to PrimeView, which later funneled kickbacks to Mazer and others.  The evidence also confirms that PrimeView occasionally provided project staff directly to SAIC.  Natanzon testified concerning, among other things, the margins on business that PrimeView did on the project, as compared to the margins on other projects.  Natanzon agreed to cooperate with the Government and testify against the criminal defendants in connection with his guilty plea to charges of bribery, conspiracy to commit bribery and money laundering, and interstate transportation in aid of racketeering.

> (c)     James Shangle ("Shangle"): Shangle has worked at SAIC for more than 17 years.  As a contracts manager, he was responsible for "cradle-to-the-grave" contract administration, including evaluating and negotiating the terms and conditions of the various contracts that SAIC

procured.  Shangle joined the CityTime project in May 2004.  As detailed herein, Shangle testified

concerning, among other things, SAIC's procurement policies, SAIC's failure to comply with its

procurement policies in connection with the CityTime project, the review protocols that SAIC had

instituted for the project, and the impact that the fraud had on each of SAIC and NYC.

    (d)  Darren Preucil ("Preucil"): In 2006, Preucil was hired as a senior buyer in

SAIC's contract procurement department, and has worked in the contract procurement field for more

than 15 years.  As a senior buyer staffed to the CityTime project, he was responsible for performing

pricing analyses to ensure that the billing rates charged by subcontractors and consultants, such as

Technodyne, were reasonable.  During all or part of Preucil's tenure on the project, from May 2006

through January 2010, Shangle supervised him and he reported to Tammy Parkins ("Parkins"),

procurement director for Alderson's group.  Preucil testified concerning, among other things, SAIC's

procurement policies, the unusual lack of competition for Technodyne's consultant recruiting

contract with SAIC for the CityTime project, the exorbitant rates charged by Technodyne for

recruiting consultants for the project, and complaints to various executives at SAIC concerning

Denault's efforts to increase the hiring of consultants via Technodyne.  At the time of the trial, he

worked for SAIC's successor in the procurement department.

    (e)  Marco Leon ("Leon"): Leon has worked at SAIC for more than 10 years and

has been employed in the information technology field for 20 years.  When he joined SAIC in 2003,

he was hired as quality assurance manager for Sibley "Sam" Ward's ("Ward") operation, the largest

project of which was CityTime.  Resident in SAIC's New York City office, Leon was responsible

for performing quality assurance testing for the CityTime software.  As detailed herein, Leon

testified concerning, among other things, the level of review that the CityTime project garnered

within SAIC, an ethics complaint he made internally at SAIC in February 2005 regarding his belief

that Denault was receiving kickbacks, and the way in which SAIC earned revenue from the project. At the time of the trial, Leon served as the quality assurance director at SAIC's corporate level, which is the "top level".

(f)     Richard Taylor ("Taylor"): Taylor has worked at SAIC since November 2000 in various positions.  In 2009 and 2010, he served as a Vice President and Controller of the business unit responsible for the CityTime project (Dube's unit).  In that capacity, Taylor tracked records of invoices and payments and performed accounting functions.  He testified concerning, among other things, SAIC's invoicing practices and the funds paid by NYC to SAIC and by SAIC to Technodyne.

(g)     Theodore Lay II ("Lay"): Lay joined SAIC in 2005 as an account manager and operations manager, and he served as an operations manager until 2010.  In 2008, he joined the Company's Employee Ethics Committee and, in January 2011, he became Director of Employee Ethics Committee and Chair of the Employee Ethics Council.  Lay testified concerning, among other things, SAIC's ethics policies and code of conduct, federal regulations that require contractors like SAIC to maintain written ethics policies and procedures, the Company's ethics investigations, and other similar matters.  At the time of the trial, he worked for SAIC's successor as its Chief Ethics and Compliance Officer.

(h)     Deborah Drake ("Drake"): Drake worked at SAIC for more than 10 years.  In 2003, Drake was a Vice President and business unit human resources director at SAIC, in which capacity she had responsibility for employee training, development, compensation and hiring.  Drake performed these functions for the CityTime project for approximately two years, until January 2005. When she was involved in performing recruitment work for CityTime, her unit reported to a group headed by Mark Hughes ("Hughes").  Drake testified concerning, among other things, the employee recruitment and hiring policies at SAIC and for the CityTime project, her interactions with Denault

regarding consultant hiring and Technodyne's prominent role in staffing the project, and her complaints to executives at SAIC concerning Denault's efforts to increase the hiring of consultants via Technodyne.

(i)     Caroline McConnell ("McConnell"): McConnell worked for SAIC for more than 10 years, having been hired in 2003.  She was Vice President and human resources director for the business unit responsible for the CityTime project in or around 2005 (occupying that role after Drake's tenure in handling the project ended), and served in that capacity on the project again from 2008 until the project ended in 2011.  McConnell testified concerning, among other things, the employee recruitment and hiring policies at SAIC and for the CityTime project, efforts to increase SAIC headcount on the project, and complaints to various executives at SAIC concerning Denault's efforts to increase the hiring of consultants via Technodyne.  At the time of the trial, she continued to work at SAIC as a Vice President and human resources director.

(j)     Elaine Doria ("Doria"): Doria was employed by the OPA in various positions, including as a budget officer, Assistant Director of Administration, and Director of Administration. She testified concerning, among other things, her involvement in investigating certain discrepancies in late-2006 and early-2007 with respect to timesheets submitted by or on behalf of consultants on the CityTime project, SAIC's submission of those timesheets to NYC in requesting payment, and the result of her investigation of the timekeeping discrepancies.

(k)     Patricia Blunt ("Blunt"): Blunt worked on the CityTime project as a personnel officer for the OPA.  In that capacity, she had the responsibility to schedule and conduct interviews of consultants in connection with hiring for the project.  Blunt testified concerning, among other things, her involvement in managing the consultant recruiting process at OPA, and her interaction with Denault regarding the hiring of consultants, for the CityTime project.

- 19 -

(l)     Elisa Velazquez ("Velazquez"): Velazquez was employed as General Counsel in the NYC Mayor's Office of Contract Services, which is responsible for assisting NYC agencies in connection with contract procurement matters, performs contract procurement oversight functions, and processes documentation submitted by vendors and subcontractors that seek to do business with NYC agencies.  She testified concerning, among other things, NYC's vendor information exchange system ("VENDEX"), the criteria by which NYC determined whether contractors and subcontractors were reliable and thus qualified to receive municipal contracts, the importance for NYC agencies of doing business with responsible and reliable contractors and subcontractors, and the prevalence of concerns regarding CityTime and SAIC's performance on the project in 2010.

(m)     Peter Zanolin ("Zanolin"): Zanolin was employed as Inspector General by the DOI, the NYC agency tasked with investigating allegations of misconduct involving NYC-funded contracts, projects or other matters.  In that capacity, he oversaw investigators and attorneys working in his squad.  His squad was comprised of the investigative office of the inspectors general for the contracting, engineering and environmental agencies of NYC.  Zanolin testified concerning, among other things, his role in investigating the CityTime project, his participation in interviewing Denault on December 15, 2010, and the information that Denault provided during the December 2010 interview.

(n)     Benet Kearney ("Kearney"): Kearney was employed by the DOI as Deputy General Counsel.  She testified concerning, among other things, her review of records regarding the time billed and rates charged by consultants working on the CityTime project, her preparation of a chart reflecting documentary, testimonial and other evidence concerning the consultant time and rates about which she testified, and the conclusions she drew concerning information she reviewed and presented in the chart.

(o)     Laila Yu ("Yu"): Yu is Deputy Inspector General for the investigative audit unit of the DOI.  In that capacity, she conducts investigative audits of financial records to assist in uncovering financial frauds.  Yu testified concerning, among other things, the DOI's forensic audit commenced in the fall of 2010, the DOI's review and analysis of financial information regarding the billing rates charged by SAIC and the project staffing subcontractors (Technodyne, PrimeView and D.A. Solutions), the mark-ups these entities passed on to NYC, and the flow of funds between these entities.

44.     Other individuals, who did not testify at the criminal trial, have come forward whose accounts confirm that SAIC knew or reasonably should have known about the CityTime fraud before the filing of the March 2011 Form 10-K.  For example:

(a)     Vinod Khurana ("Khurana"): Khurana worked on the CityTime project as a consultant for Spherion between mid-2005 and mid-2007.  As a senior load tester, he evaluated the performance of the CityTime software and its ability to service NYC agencies.  In that capacity, he interacted with Michael Fayerman ("Fayerman"), a senior product development executive at SAIC from 2004 to 2006, and a Technodyne consultant from 2006 to 2011, who participated in supervising the CityTime software development team in New York.  In late 2004, Khurana advised Fayerman and others that the CityTime software was incapable of supporting more than 20 simultaneous users – a mere fraction of the 2,000 users the program was supposed to support at that time.  By mid-2005, the software could barely handle 50 simultaneous users.  Khurana ultimately concluded that SAIC and others were engaged in an overbilling scheme to bilk NYC out of millions of dollars associated with implementing CityTime, and anonymously posted information online regarding his conclusions in January 2009.  Thereafter, from March to December 2010, he posted comments further detailing his conclusions online in response to various articles regarding CityTime.  Khurana was responsible

for posting a CNN iReport in January 2009, in which he anonymously provided information about fraud on the CityTime project.

(b)      Hayden Hsiung ("Hsiung"): Hsiung was hired by SAIC in 2003 to work on the CityTime project as an application support analyst, a position he held through July 2011.  During his tenure, he worked for six different managers, including Bell.  In a sworn declaration he submitted in another matter, Hsiung indicated that he "saw firsthand the growing and on-going corruption by consultants on the project."  As he explained: "From 2004 to 2009, it became increasing[ly] apparent to me that certain well-connected people were benefiting disproportionately from this project, in ways that were unrelated to their abilities or contributions."  During that period, however, he learned that those who complained about these issues experienced retaliation, including, for example, in or around 2004 or 2005, when he "heard that an SAIC employee complained internally within SAIC, and he was retaliated against."  Hsiung also indicated that the "CNN iReport [anonymously posted by Khurana] was well known amongst almost everyone at the CityTime project."  In or about late February 2011, Hsiung "was reporting internally to SAIC's audit committee about the problems with the CityTime project."

45.     Additionally, documentary evidence introduced during the criminal trial confirms that SAIC profited from the overbilling fraud, tacitly participated in the overbilling fraud by submitting inaccurate time records prepared by consultants on the project, and knew or reasonably should have known about the fraud by December 2010, at the latest.  This evidence is comprised of, among other things: timesheets that witnesses testified about; organizational charts evidencing the management hierarchy at SAIC and the levels of review it employed for the CityTime project; SAIC's agreement to advance Denault's legal fees in connection with the criminal investigation and prosecution of the CityTime fraud; subpoenas that SAIC and Denault received in December 2010; and other materials.

46.     Evidence developed in a proceeding that Denault brought against SAIC in the Court of Chancery of the State of Delaware, entitled *Denault v. SAIC, Inc.*, C.A. No. 6872-VCG, also supports the claims alleged herein.  In that case, which Denault pursued to compel SAIC to continue advancing his legal fees in connection with the *Mazer* case, evidence confirms that SAIC knew or reasonably should have known that Denault was implicated in the CityTime fraud.

## VI.   OTHER EVIDENTIARY SOURCES

47.     Numerous other evidentiary sources exist that are unavailable or inaccessible to Plaintiffs, but which if available given an opportunity for discovery, upon information and belief, would provide further support for the allegations and claims set forth herein.

48.     For example, in connection with the criminal case, the Government established an online repository of more than 11 million documents produced by various sources, including SAIC and Technodyne.  Specifically, on May 13, 2013, counsel for Denault represented as follows in a declaration submitted in that case:

> Documents produced by the government are hosted in two databases, the "CityTime Database" and the "Technodyne Database." The document count identified by the CityTime Database is 5,962,962 and the document count identified by the Technodyne Database is 5,352,375.

49.     Also in that declaration, counsel for Denault represented as follows regarding the substance of certain of the materials produced in discovery in the criminal case:

> A review of this discovery . . . has revealed at least eleven amendments to the contract governing the production of CityTime, over one hundred work orders relating to work done as part of the CityTime project, and the identity of more than a hundred consultants who worked on the CityTime project.

50.     As counsel for Denault further represented, the Government extensively produced "documents generated during the production of the CityTime project, including correspondence, draft and final versions of various contractual documents (including work orders and contractual amendments), invoices, spreadsheets, and draft and final versions of presentations."

- 23 -

51.     Separately, the Government confirmed in correspondence in the criminal case that it had produced the contents of email accounts for, at a minimum, the following individuals who worked on the project or were otherwise relevant to the criminal prosecution or defense, including certain witnesses who later testified during the trial:

Olga Aronshtein, Mous Ashjian, Scott Berger, Joel Bondy, Antigona Gashi, Mitchell Goldstein, Mohammed Hafeez, Valerie Himelewski, Mark Mazer, Joe Ruza, Robert Schweikert, Michael Small, Yan Uster, and David Zaltsman, George Blanchard, Patricia Blunt, Tim Dunphy, Elaine Doria, Sarah Gurjal, Diana Herrera, Harold Hornstein, Mehran Kohanghadosh, Farhana Lokhandwala, Maria Palmieri, Mark Page, Roy Mogilanski.

52.     The Government also made available approximately 75 boxes of documents stored by or otherwise obtained from the office of Richard Valcich ("Valcich"), Executive Director of OPA until 2004 (Bondy succeeded him).  Valcich was a vocal critic of the Company's performance on the project.  For example, in a February 19, 2003 letter to Hughes, Group President of SAIC then responsible for the project, Valcich made extensive complaints (detailed below) regarding SAIC's performance on the CityTime project and the delays and costs associated with the work.

53.     Moreover, in connection with executing search warrants on the criminal defendants, Technodyne, and possibly others, the Government seized electronic and hard copy documents that were subsequently made available in the online document repository for the criminal proceeding or otherwise maintained by the Government.  Materials associated with grand jury proceedings also exist, some of which may have been produced to the criminal defendants.

54.     In the criminal case, Denault and others made productions, and the Government made available notes of interviews of Alderson and numerous other persons of interest, including, among others: Dube and Lord, executives with oversight responsibility for CityTime under Alderson in the chain-of-command, who were eventually fired along with her after the public exposure of the fraud;

- 24 -

Fayerman and Brian Fallon, SAIC employees who worked on the CityTime project; and Sarah

Gurjal, an OPA employee integrally involved in the project.

55.     Additionally, the Government produced presentations and other materials that SAIC

used in connection with settlement discussions with the Government and presumably NYC.  As the

Government represented in correspondence in that case: "we intend to produce the Powerpoint

presentations and other supporting documentation provided by SAIC to the Government in

connection with . . . settlement negotiations . . . ."  As the Government further represented, in other

correspondence in that case, these documents consist of:

> (a) Powerpoint presentation titled "SAIC Hallmarks"; (b) Powerpoint presentation
> titled "CityTime Investigation, SAIC's Presentation to the United States Attorney's
> Office for the Southern District of New York"; (c) document titled "Submission of
> SAIC to the United States Attorney's Office Regarding the Effect of a Deferred
> Prosecution Agreement on the Company's Business"; (d) document titled
> "Submission of SAIC to the United States Department of Justice Relating to
> Strengthening and Enhancing SAIC's Controls"; (e) materials titled "SAIC Ethics
> and Compliance Program"; (f) document titled "Submission of SAIC to the United
> States Attorney's Office Relating to the Contractual History of CityTime"; and (g)
> the deferred prosecution agreement between SAIC and our Office, and
> accompanying exhibits.

56.     Furthermore, certain additional documentary and testimonial evidence developed in

discovery and/or introduced at trial in Denault's Delaware proceeding against SAIC is unavailable to

Plaintiffs, but, upon information and belief, would provide further support for the allegations and

claims set forth herein.  Certain evidence from the proceeding is described in filings made with the

Delaware court (and described herein), but other evidence was redacted and/or filed under seal and is

thus not presently accessible to Plaintiffs.

57.     Upon information and belief, the additional evidence described above would provide

further support for the allegations and claims set forth herein.

## VII.    SUBSTANTIVE ALLEGATIONS

### A.    The Company and its Business

58.    Shortly after its formation in 1969, Science Applications International Corporation, in connection with becoming a publicly-traded company, entered into a merger agreement with SAIC whereby Science Applications International Corporation became a 100%-owned subsidiary of SAIC. On or about October 12, 2006, SAIC completed an initial public offering of its common stock. During the Class Period, SAIC's common stock was publicly traded on the NYSE under the ticker symbol "SAI."

59.    During the relevant period, SAIC represented that its business was focused on solving issues of national and global importance in the areas of defense, intelligence, homeland security, logistics and product support, energy, environment and health to the U.S. military, agencies of the U.S. Department of Defense, the intelligence community, the U.S. Department of Homeland Security and other U.S. Government civil agencies, state and local government agencies, foreign governments and customers in select commercial markets.

60.    In August 2012, SAIC announced that its Board had approved a plan to separate the Company into two independent, publicly traded companies: (i) a newly-formed company focused on technical, engineering and enterprise information technology services to the U.S. Government and other public agencies, operating under the Science Applications International Corporation name; and (ii) a company focused on delivering science and technology solutions primarily in the areas of national security, engineering and health, named Leidos Holdings, Inc. (the successor to SAIC).  The transaction closed on September 27, 2013 and SAIC, now known as Leidos Holdings, Inc., began publicly trading on the NYSE on September 30, 2013 under the ticker symbol "LDOS."

**B.  For Nearly a Decade, SAIC Engaged in a Billing Scheme in Connection with the CityTime Project that Defrauded NYC Out of Hundreds of Millions of Dollars**

61.  SAIC has admitted that it defrauded NYC out of hundreds of millions of dollars and has paid the money back in order to avoid criminal prosecution.

62.  From 2003 through 2010, Denault served as the Company's Program Manager on CityTime and was responsible for selecting and overseeing the subcontractors that SAIC hired on CityTime.  In addition, Denault was responsible for: (i) submitting bills to NYC seeking payment for work purportedly performed by SAIC employees and subcontractors on CityTime; (ii) developing proposed CityTime work orders; and (iii) contract amendments seeking approval for SAIC to perform additional work on CityTime.

63.  Another SAIC employee, Bell, the Chief Systems Engineer in the Company's New York office, was responsible for developing software for CityTime and oversaw certain technical aspects performed by SAIC on CityTime.

64.  From at least 2003 through 2010, there existed a massive scheme to defraud NYC in connection with CityTime.  As a result, virtually all of the $600-plus million paid by NYC to SAIC for CityTime was tainted, directly or indirectly, by fraud.

65.  Specifically, Denault, Bell and others conspired to defraud NYC, and did so, by:

(a)  making material misrepresentations and omitting to disclose material facts to NYC, which caused NYC to spend significantly more money than necessary on CityTime.  Among other things, Denault and Bell defrauded NYC into: (i) hiring consultants not needed to complete the project; (ii) inflating the rates charged for work performed by certain consultants; and (iii) inflating the hours worked by certain consultants;

(b)  agreeing to the payment of millions of dollars of kickbacks to individuals whose participation was critical to the success of the fraudulent scheme.  To ensure the continued

success of the scheme, Denault and Bell were respectively paid at least $9 million and $5 million in kickbacks; and

(c)     agreeing to launder their respective corrupt proceeds using, among other means, shell companies and bank accounts located in the U.S. and abroad.

66.     The scheme began in 2003 when Denault recommended that SAIC retain Technodyne "to provide staffing services" on CityTime.  In mid-2003, SAIC hired Technodyne as a "sole source" subcontractor, which exempted Technodyne from having to engage in a competitive bidding process to win the contract with SAIC or to receive additional CityTime business by SAIC.  Subsequently, SAIC regularly renewed Technodyne's sole-source subcontract, considering virtually each time whether to place the subcontract out for competitive bidding but declining to do so.  Technodyne functioned as SAIC's primary subcontractor on CityTime and received at least $450 million from SAIC between 2003 and 2010 in connection with CityTime.

67.     At or around the time that SAIC hired Technodyne, Technodyne's executive officers agreed to pay kickbacks to Denault and Bell.  Specifically, Technodyne agreed to pay both Denault and Bell $5 for each hour worked by every consultant hired by or through Technodyne on the CityTime Project.  This kickback arrangement provided Denault and Bell with significant personal financial incentives to inflate billing for consultants on CityTime.

68.     In addition, in 2005, Technodyne agreed to pay Denault an additional $2 for every hour billed by a certain consultant.  This kickback arrangement provided Denault with another personal financial incentive to inflate billing for consultants on CityTime.

69.     In or about 2005 and 2006, after NYC had already paid SAIC approximately $85 million on CityTime, Denault and others advocated for an amendment to SAIC's CityTime contract.  Specifically, as alleged above, they recommended NYC to adopt Amendment No. 6, which would

change SAIC's contract from a "fixed price" contract, in which SAIC bore the responsibility of absorbing cost overruns, to a "fixed price level of effort" contract, so that NYC, and not SAIC, would largely become responsible for future cost overruns. After nearly a two-year period of review and vetting by NYC and SAIC, involving the approval of Amendment No. 6 by SAIC's CEO on two occasions, NYC amended SAIC's contract as Denault and others recommended.

70.     Following this amendment, staffing on the CityTime project expanded dramatically and SAIC paid Technodyne hundreds of millions of dollars, notwithstanding SAIC's receipt of a whistleblower complaint and an internal investigation in 2005 associated with CityTime contract mismanagement, and suspicions of kickbacks to Denault and overuse of Technodyne.

71.     For example, at the end of 2005, fewer than 150 consultants worked on CityTime. An internal 2005 SAIC report prepared by Denault stated that the program at that time was staffed adequately to meet both current and projected contract needs. By the end of 2007, however, the number of consultants on CityTime had more than doubled, to more than 300 – the vast majority of whom were hired and paid via SAIC's subcontract with Technodyne. NYC was billed at rates that exceeded $160 per hour, or more than $300,000 per year, for many of these consultants.

72.     By April 2010, NYC had agreed to pay SAIC approximately $628 million for CityTime. According to SAIC internal reports, including the business model chart discussed herein, Technodyne had received or stood to receive a total of $464 million – or 74% of the total amount paid to SAIC – as compensation for providing "staff augmentation" to SAIC on CityTime. This amount represented approximately 80% of Technodyne's income between 2003 and 2010. All other SAIC subcontractors and vendors combined were to receive less than 14% of the total amount paid to SAIC for work on CityTime.

73.     In an effort to defraud NYC and increase the amount of kickbacks they would receive, Denault, Bell, and others made and agreed to make a series of material misrepresentations and material omissions that caused NYC to overpay SAIC on CityTime.  Among these material misrepresentations and material omissions were the following:

(a)     Denault represented that Amendment No. 6 – which caused NYC, not SAIC, to absorb the cost of overruns on CityTime – was necessary for the successful completion of CityTime and was in NYC's interest; and

(b)     Denault used his position of authority at SAIC to, among other things: (i) approve contract amendments and work orders calling for large increases in expenditures devoted to the hiring of additional consultants on CityTime, even though many of the staffing increases were not necessary for the successful completion of the project; (ii) cause the vast majority of new consultants to be hired through Technodyne; (iii) cause the hiring of consultants at billing rates that were too high for their levels of skill and experience; and (iv) artificially delay deployment and implementation of the project.

74.     Accordingly, Denault and Bell were instrumental in perpetrating the CityTime fraud in a brazen staffing scheme that took place during the course of their employment by SAIC, which served as the instrumentality by which the fraud occurred.  As alleged herein, SAIC and Technodyne profited enormously from the fraud, which SAIC itself facilitated by serving as the vehicle by which Denault submitted grossly inflated time records and invoices for payment by NYC.

**C.     The CityTime Project Was Critically Important to SAIC's Business, and SAIC Closely Monitored the Status of the Contract and Associated Billings**

**1.     SAIC's Procurement Personnel had Oversight of Subcontractors and SAIC was Required to Follow Competitive-Bidding Policies**

75.     At the criminal trial, Shangle testified extensively on the role and responsibilities of the Company's contracts procurement department.  As a contracts manager who joined CityTime in

May 2004, Shangle was primarily responsible for administering various aspects of the contract and negotiating and preparing contract amendments, when necessary. During his tenure on the project, he was resident in the Company's New York office.

76. Typically, Shangle and other contracts managers engaged in "cradle-to-grave contract administration," which he described as follows:

> From the time a customer sends the company a request for a proposal, I work in developing the contracts and cost volume for our response. Then during negotiations I handle the negotiations with the customer. And then upon contract award I administer the contract that is insuring that the company is complying with the terms of the contract, the submission of deliverables, submission of services. And then at the conclusion of the contract we go through what we call a closeout of the contract which is making sure that all of the documentation is completed.

77. To place these responsibilities in context, he explained his involvement in preparing and submitting work proposals to customers, as well as the involvement of other departments and personnel:

> I'm responsible for the contract's evaluation and negotiation of the terms and conditions. The technical input to the proposal is provided by our program office department. Pricing is provided by a pricing department. And procurement provides me with inputs from subcontractors and vendors. And I bring all those pieces together into the proposal.

78. Because SAIC is normally the prime contractor, the Company hires subcontractors to provide specialized services in support of its contracts. Shangle explained that SAIC policy requires the procurement department "to do a price analysis on all bids from subcontractors and vendors to ensure that the prices we're getting from them are fair and reasonable."

79. Likewise, "SAIC's pricing policy . . . is to achieve the lowest rates possible for our customers and pass those on to our customers with a fee or profit." Consequently, to ensure that the customer is receiving fair and reasonable prices from SAIC, corporate policy requires the pricing department to perform "a price realism [analysis] using salary survey data of [a] national and

regional [nature] . . . ."  Further, to determine the pricing itself, the Company follows a fairly regimented procedure.  As Shangle explained:

> Our program office and technical needs will provide our pricing department with the type of employees, type of engineers that we need for the project, the number of hours that they'll need them to complete the project. And then our pricing department will do their job of developing a price.

80.     When the price of the labor is determined, the pricing department adds "an overhead factor of a general administration factor and then a fee [*i.e.*, profit]," which results in the price to the customer.  Accordingly, as Shangle confirmed, if SAIC's labor cost is lower, the customer's price "would be lower also."

81.     Additionally, SAIC's pricing policies prohibit the Company from adding "overhead or fringe benefits" to subcontractor rates in formulating a price for the customer.  Rather, SAIC adds "a general and administrative fee" and fee/profit.  As Shangle confirmed, if the subcontract's cost to SAIC declines, "[t]he cost to the customer would also go down."  Likewise, Shangle testified that the customer's cost would also decline if SAIC uses a blended rate comprised of its labor costs and those of the subcontractor, which may occur where the resources used to complete a project are comprised of SAIC's and the subcontractor's.

82.     Moreover, Shangle testified that after Amendment No. 6 was passed, SAIC engaged in a pricing exercise relative to each work order on CityTime, whereby the program office provided the labor hours and categories, the pricing department generated the price based on inputs from the procurement department regarding subcontractor labor, and the procurement department – and Shangle himself – would present a proposal for the work order.

83.     As Shangle confirmed, contracts managers are trained to "escalate any issues . . . with the pricing or the rates up to [Company] management."  They are also trained to inform management if there is a conflict between the Company's interests and a program manager's interests or conduct.

84.     According to Shangle, SAIC procurement policy requires the Company to put up for competitive bidding any contract in excess of $25,000, "unless there is a sole-source justification for no competition." A sole-source justification "provides a rationale for why the company is not going out to compete the work with other subcontractors or vendors."

85.     To justify awarding a sole-source subcontract, SAIC requires the project management office to complete a sole-source justification form and, as for other subcontracts, the procurement department must complete a pricing analysis to ensure that the rates charged by the subcontractor are reasonable.

86.     The Company also follows the process and procedure associated with awarding a sole-source subcontract when considering whether to extend or extending a sole-source subcontract beyond its specified expiration date. Further, as Shangle explained, SAIC must "execute subcontract extensions" – which require sole-source justifications, if applicable – in order to continue funding an expiring subcontract.

87.     As detailed herein, SAIC consistently failed to follow its procurement policies in awarding and extending Technodyne's subcontract on the CityTime project and placing consultants provided by D.A. Solutions and PrimeView. Additionally, in accordance with SAIC's policies, Shangle and other employees elevated their concerns to mid-level and senior management regarding the performance of the project, the extent of Technodyne's highly unusual involvement, the amount of total revenue that Technodyne received from the project, and other similar matters of concern.

### 2.     Federal Regulations Required the Company to Maintain a Code of Conduct and Adequate Internal Controls

88.     Because SAIC performed the vast majority of its work for governmental entities, it was required to implement, maintain and employ stringent ethical standards designed to ensure that the Company exhibited the highest level of ethics and integrity in performing contract work. As a

large government contractor, SAIC was also required to implement and maintain effective internal controls to detect misconduct and illegal activity and ensure that such conduct was timely reported to appropriate law enforcement authorities.

89.     As Lay testified, "the federal acquisition regulations" require – and, during the relevant period, required – SAIC and other major government contractors to maintain a code of conduct that applies to every employee.  Moreover, SAIC's code of conduct – previously known as standards of business ethics and conduct – applies regardless of whether the contract at issue is commercial or federal in nature.

90.     Federal Acquisition Regulations ("FAR"), as they existed for all or part of the Class Period, support this testimony.  Specifically, subpart 52.203-13 of FAR, entitled "Contractor Code of Business Ethics and Conduct," requires contractors to adopt a code of business ethics, officially report any misconduct that could be construed to violate the code or federal law, and cooperate with law enforcement to investigate the conduct.

91.     For example, subpart 52.203-13(b)(1)-(2) of FAR provides that "[w]ithin 30 days after contract award . . . the Contractor shall," among other things: "[h]ave a written code of business ethics and conduct"; "[m]ake a copy of the code available to each employee engaged in performance of the contract"; "[e]xercise due diligence to prevent and detect criminal conduct"; and "[o]therwise promote an organizational culture that encourages ethical compliance and a commitment to compliance with the law."

92.     Likewise, subpart 52.203-13(c)(1)-(2) of FAR provides that "[t]he Contractor shall establish . . . within 90 days of contract award . . . [a]n ongoing business ethics awareness and compliance program" and "[a]n internal control system."  As subpart 52.203-13(c)(2)(ii) of FAR

- 34 -

further indicates, "[a]t a minimum, the Contractor's internal control system shall provide," in part, the following:

> (A)    Assignment of responsibility at a sufficiently high level and adequate resources to ensure effectiveness of the business ethics awareness and compliance program and internal control system.
>
> (B)    Reasonable efforts not to include an individual as a principal, whom due diligence would have exposed as having engaged in conduct that is in conflict with the Contractor's code of business ethics and conduct.
>
> (C)    Periodic reviews of company business practices, procedures, policies, and internal controls for compliance with the Contractor's code of business ethics and conduct and the special requirements of Government contracting, including –
>
> > (1)    Monitoring and auditing to detect criminal conduct;
> >
> > (2)    Periodic evaluation of the effectiveness of the business ethics awareness and compliance program and internal control system, especially if criminal conduct has been detected; and
> >
> > (3)    Periodic assessment of the risk of criminal conduct, with appropriate steps to design, implement, or modify the business ethics awareness and compliance program and the internal control system as necessary to reduce the risk of criminal conduct identified through this process.

93.    Subpart 52.203-13(a)(1) of FAR requires contractors to provide "full cooperation" to law enforcement, defining the term as "disclosure to the Government of the information sufficient for law enforcement to identify the nature and extent of the offence and the individuals responsible for the conduct," including "providing timely and complete response to Government auditors' and investigators' request for documents and access to employees with information . . . ."

94.    And, subpart 52.203-13(b)(3)(i)(A) of FAR requires contractors to report, to the Office of the Inspector General and federal contracting agency involved, any "violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations," among other things.

95.    Critically, Lay testified that if SAIC does not maintain a code of conduct, it could be removed from a contract and/or be debarred, which, according to Lay, means "suspension of the

ability to either propose or even . . . possibly run a contract with the United States government."

Likewise, he confirmed that if SAIC does not enforce its code of conduct, it faces the possibility of

suspension or debarment.

96.     Supporting such testimony, subpart 9.406-2(a)(1), (3) and (5) of FAR, which

prescribes causes for debarment, provides, in part, that debarment may occur where a contractor: is

convicted, or subject to a civil judgment, "of fraud or a criminal offense" in obtaining, attempting to

obtain, or performing a public contract or subcontract; has committed "theft, forgery, bribery,

falsification . . . of records, [and] making false statements"; or has committed "any other offense

indicating a lack of business integrity or business honesty . . . ."  In turn, subpart 9.405(a) of FAR

provides that contractors that are "debarred, suspended, or proposed for debarment are excluded

from receiving contracts" or working on subcontracts for federal contracting work.

97.     Additionally, subpart 9.104-1(c) and (d) of FAR provides, in pertinent part, that "a

prospective contractor must . . . [h]ave a satisfactory performance record" and "record of integrity

and business ethics" in order to be found responsible for federal contracting purposes.  Subpart 9.402

of FAR, as well as similar regulations, allow federal agencies to award contracts or approve

subcontracts to "responsible contractors only."

98.     Furthermore, as Lay explained, "[e]very employee is required annually to read and

certify that they understand the code of conduct."  Additionally, since SAIC went public in 2006, the

Company has made available a copy of its code of ethics on its website.  Lay testified that the code

of conduct is normally updated on an annual basis, and that employees receive "ethics awareness

training every two years."

99.     As Lay's description of the code of ethics confirms, the conduct that Denault and Bell

committed violated SAIC's code of ethics, including the provisions prohibiting the acceptance of

kickbacks and undisclosed conflicts of interest and, at least in Denault's case, accurately recording time worked on a project.

100.    Moreover, Denault and others violated the provision of the code of conduct that requires managers and supervisors to monitor their employees and ensure compliance with the code. For example, the 2005 version of the code provides that "SAIC managers and supervisors have a particular responsibility to set an example in their behavior, provide guidance and leadership to their employees, and monitor and act on any behavior by their employees that violates these standards."

101.    Furthermore, the code indicates that "SAIC managers and supervisors at all levels have a special responsibility to create and maintain an ethical work environment in which the free, open, timely, and good faith reporting of concerns or suspected violations of these standards are the responsibility of every employee." Thus, the code requires employees who have any suspicion of code violations – especially managers and supervisors, who are purportedly held to a higher standard at the Company – to report such suspicions.

102.    Upon information and belief, no senior or mid-level executive to whom employees complained regarding SAIC's and Denault's relationship with Technodyne and potential violations of the Company's code of ethics pursued or otherwise adequately investigated the complaint. The failure to do so itself constitutes a violation of the code of conduct by such executives.

### 3.    It Was Critically Important for SAIC to Qualify as a Responsible Contractor for the Company to Receive Contract Awards

103.    Notwithstanding the fact that the CityTime project was commissioned by an NYC agency, as opposed to a federal agency, SAIC still had to qualify as a "responsible" contractor in all respects. As Velazquez testified, "[t]he vendors [*i.e.*, contractors] that the city does business with are required by law and by rule to be responsible."

104.     As she explained, responsibility "encompasses capacity in all aspects to perform the contract requirements and the requisite business integrity to justify the award of public tax dollars." To satisfactorily demonstrate capacity, a contractor (vendor) must have the financing and expertise to perform the contract.  To satisfactorily demonstrate business integrity, a contractor must display conduct indicative of a law-abiding, responsible and reliable corporate citizen.

105.     To facilitate the contracting agency's vendor responsibility assessment, NYC requires contractors to provide VENDEX information.  According to Velazquez, VENDEX is the "vendor information exchange system."  It consists of a database "that contains information about contractors and subcontractors" and "is the primary tool that the city agencies use in finding vendors [that are deemed to be] responsible . . . ."  Pursuant to Section 6-116.2 of the NYC Administrative Code, the NYC Comptroller and Mayor jointly maintain the database at the Financial Information Services Agency ("FISA") and provide public access to VENDEX information, both on-site and online.

106.     As Velazquez explained, to obtain VENDEX information, "the city requires that the vendors complete two forms, a vendor questionnaire and a principal questionnaire . . . ."  The forms are signed and certified under penalty of perjury, and expressly provide that the willful or fraudulent misstatement of any information contained therein "may result in rendering the submitting vendor non-responsible  . . . and, in addition, may subject the person making the false statement to criminal charges."

107.     As indicated in NYC's Vendor's Guide to VENDEX (revised July 31, 2012) (the "VENDEX Guide"), the vendor and principal questionnaires are valid for three years from the date of signature on their certification pages.  If during that period the vendor is awarded another contract and any information has changed with respect to itself or any of its principals, the vendor must update its answers.  By contrast, if the information remains the same after the expiration of the three-

year period, the vendor must submit a Certification of No Change.  Like the questionnaires, the Certification of No Change also provides that "[a] materially false statement willfully or fraudulently made in connection with this certification may subject the person making the false statement to criminal charges."  Adverse information remains on the VENDEX system for 10 years.

108.    As Shangle and Velazquez explained, contractors must also undergo a detailed review process by NYC before being deemed responsible.  This process entails due diligence conducted by the contracting agencies, and the level of information gathered and evaluated is sometimes more extensive for prime contractors than subcontractors.  Yet, the prime contractor must also ensure that subcontractors complete satisfactory VENDEX paperwork.  As Velazquez explained:

> Because the agencies have to register prime contracts with the city comptroller, they actually have to provide documentation and forms that show that the VENDEX has been completed, that – depending on if they're a construction contractor, service contractor, their performance evaluation history, other due diligence that the agencies perform, other databases. And that's all formalized in a document.

> For subcontractor approval, because subcontracts are not registered with the comptroller, there's not the same kind of paperwork requirement. The prime vendor still needs to submit, make sure the vendor has submitted – the sub has submitted VENDEX and also has to provide to the agency any other indicia of performance or business integrity the agency would require of the prime.

109.    Additionally, Velazquez explained the importance of contracting with a responsible vendor, testifying that "if you don't do business with a responsible vendor, what happens at the end is we do not get the performance we paid for and we end up paying more of the taxpayer dollars." As she summarized: "the goal is for us to get the best product for the best price, and if we don't do business with responsible vendors, we undercut our goal."

110.    Moreover, ensuring that a contractor is responsible is so important to NYC that it reserves the right to disapprove of the prime contractor's use of particular subcontractors.  Indeed, as Velazquez explained, "because the city, through the prime, is giving taxpayer dollars to a vendor that the prime is going to use to complete work on our contracts . . . we reserve the right to approve or

disapprove those subcontractors even though the contract is between the prime contractor and the subcontractor."

111.    In fact, an agency's determination of reliability based on VENDEX information is so important that the Comptroller and Mayor may refuse to register an *awarded* contract, and an agency may suspend a contractor's performance and/or recover amounts already paid on the contract, if the contractor provided false, misleading or inaccurate VENDEX information.  As detailed below, not only did the Mayor's Office reject a contract awarded to SAIC as details were exposed concerning the illicit kickback and overbilling scheme in December 2010, but the State Comptroller also did so – at least in part because SAIC was not a responsible contractor, and had not submitted updated vendor information, as a result of the Company's involvement in CityTime.

112.    Accordingly, it was exceedingly important for SAIC to demonstrate and maintain its qualification as a responsible contractor not only to obtain work from federal agencies, but also to obtain work from NYC and retain the CityTime project.  It was also important for SAIC to ensure that its subcontractors on the CityTime project qualified as responsible contractors, because the Company's association with non-responsible subcontractors could materially and adversely affect its own current or future contracting prospects.

113.    Consequently, SAIC had a legal obligation and a business interest in ensuring that it maintained its qualification as a responsible contractor, and that its subcontractors did also.  Yet, as detailed herein, the Company consciously and/or recklessly disregarded the extensive fraud or other misconduct of its employees and subcontractors on the CityTime project and, in fact, profited from such illicit activities.  By doing so, the Company jeopardized its responsible contractor qualification.

### 4.    The CityTime Project Was of the Utmost Importance to SAIC, and SAIC Exercised an Unprecedented Level of Scrutiny of it

114.    In 1998, NYC sought to develop and implement CityTime.  At the inception of the project, the contract governing the performance of the work was "fixed price" in nature, which meant that the prime subcontractor would receive a set amount of funds to finish the project and that the subcontractor would bear the added expense of any cost overruns.  The project was initially budgeted to cost $63 million.

115.    In 2000, SAIC assumed the project from the previous prime contractor, and the cost of the project remained budgeted at $63 million.  In 2002, however, NYC and SAIC entered into Amendment No. 4 to the CityTime contract, and the budgeted cost was increased to approximately $100 million. Incidentally, Denault joined the project in 2002.

116.    In early 2003, SAIC was so far in the "red" on the contract that it wrote down nearly $28 million in losses, which, at the time, represented an approximately 25% loss for the Company on the contract.  At the same time, SAIC had committed itself to invest approximately $30 million *more* in connection with redesigning the project.  As Shangle testified, the losses on the project drew the attention of people all the way up the line at SAIC, and prompted the Company to bring in Ward – a former submarine captain – to lead the project.

117.    As Shangle confirmed, SAIC made money on virtually every contract.  Consequently, it was unusual for SAIC to lose money on a contract, and even more unusual for the Company to subsequently invest millions of additional dollars in a project in the face of such losses.  In Shangle's experience, SAIC gave greater scrutiny to money-losing contracts, and not every contract at SAIC received the level of scrutiny that the CityTime project did.

118.    In fact, according to Shangle, Amendment No. 6 to the CityTime contract – which, in 2006, converted the project to a "fixed price level-of-effort contract," pursuant to which NYC would

- 41 -

bear cost overruns (as described herein) – received scrutiny and sign-off by SAIC's CEO *twice* during the approval process.  In this way, the CityTime project received an unprecedented level of scrutiny, as the following excerpt from Shangle's testimony further confirms:

> Q.      Okay. So regardless of what percentage of SAIC's revenues CityTime might have represented, this contract got the maximum attention possible, up to the very top of SAIC, didn't it?
>
> A.      Yes, sir, it did.

119.    Other witnesses, including Drake and McConnell, likewise confirmed that the project received a high level of scrutiny within the Company.

120.    Moreover, Taylor – the Controller of the business unit responsible for CityTime – confirmed that it was his job to monitor invoices and payments on the project, including payments to subcontractors, such as Technodyne.  Accordingly, SAIC not only monitored the flow of funds and revenue generated on the CityTime project at the macro level (broadly over the entire Company), but it also monitored financial metrics, including invoicing, at the business unit and project level.  SAIC was aware at all times of the revenue generated on the project from NYC, as well as the expenditures it made on the project to pay its subcontractors.

121.    Further, in Amendment No. 5 to its Form S-1, filed with the SEC on October 2, 2006, the Company identified CityTime as one of its "10 largest non-IDIQ [indefinite delivery/indefinite quantity] contracts based on total contract value to us, including funded backlog and negotiated unfunded backlog as of July 31, 2006."  The project, which was purportedly then scheduled to expire on August 12, 2009, ranked seventh on the list at an estimated value of $375 million.  At that time, CityTime also represented approximately 5.8% of the $6.48 billion in aggregate value of SAIC's ten largest non-IDIQ contracts (including CityTime).

122.    Yet, CityTime was not merely important to SAIC from a financial perspective due to the revenue associated with completing the project.  Rather, CityTime was especially important to SAIC from a "productization" perspective.

123.    As Shangle explained, "productization" refers to taking a product to market with more than one customer, and involves maximizing a product's potential, its effect on future business, and future customers of the product.  As he testified, SAIC had the non-exclusive, royalty-free right to license the timekeeping software program (or a variation of it) to others, including governmental and municipal entities around the country – if not the world.  This meant that SAIC could profit from rolling out the CityTime program elsewhere, without having to pay royalties to NYC in connection with doing so.

124.    Specifically, as Shangle confirmed, Article 35 of the CityTime contract provides that at the conclusion of the project, NYC owns the CityTime software but SAIC has a nonexclusive, nontransferable, royalty-free license to use, modify, and sublicense it.  Article 35.1 expressly provides: "Contractor [SAIC] retains the right to develop, use and distribute works that perform the same or similar functions as the Custom Software [defined as the CityTime program]."  Article 35.2, in turn, provides: "The City grants to Contractor a non-exclusive, non-transferable, royalty-free, perpetual license to use, modify and sublicense the Custom Software."  Amendment No. 4 to the contract augmented these provisions and expanded the license referenced in Article 35.2 to cover the "Technology," which was defined to include the software, data and design, among other things.

125.    Additionally, to confirm the viability of its plans to productize CityTime, SAIC commissioned a report which indicated that the rollout of the timekeeping program to other clients involved a market opportunity valued at approximately $2 billion.  In connection with evaluating this

market opportunity and engaging in productization, Shangle also attended a pre-bidders meeting in

Chicago based on a request for proposals pertaining to the adoption of a similar software system.

126.    As Shangle reiterated during his testimony, it became obvious to everyone within

SAIC that there was a great deal of potential in rolling out CityTime elsewhere.  This sentiment is

reflected in the June 13, 2010 article published by *Crain's* (referenced above), which reported that

SAIC sought to productize CityTime even as of 2010:

> SAIC is desperate to complete the project, in part to sell the system to other
> municipalities under a proposed revenue-sharing deal with the city. CityTime, it says,
> is the only software of its kind that can manage the complexities of tracking a big,
> unionized government work force.

127.    Accordingly, the CityTime project was far more significant to SAIC than a typical

project for a typical governmental or municipal client, because the prospect of rolling out the project

for other customers, in other applications, had virtually unlimited potential.

128.    Further, as Drake testified, the CityTime project was SAIC's only project in New

York in or about 2003 and 2004, and Leon confirmed that CityTime was its only project in New

York in 2005.  As Drake confirmed, SAIC had acquired the project at least in part because it sought

to grow its presence in New York – notwithstanding the fact that the contract was in the "red" for

SAIC at or shortly after its hiring as the prime contractor.  Yet, the contract was scheduled to expire

in 2006 when SAIC assumed it, which meant that SAIC would have to terminate or redeploy its New

York-based employees if the project failed.

129.    Moreover, Leon believed that SAIC could capitalize on its experience in designing,

developing and implementing CityTime to win new business.  Regarding a proposal in August 2007,

for example, Leon wrote the following in an internal email: "I think what should be stressed is our

team's experience in analyzing, developing, and deploying the CityTime system to a government

entity with similar requirements . . . ."   In that email, he confirmed that the Company's experience

with CityTime was "mentioned throughout" the proposal materials, but emphasized that it was "not stressed and the experience is something no one else can bring to the table . . . ."

130.    Thus, CityTime was also important to SAIC because of the business development opportunities it presented, as well as the risk that an unsuccessful project would require staffing changes and could adversely affect the Company's prospects of developing business in New York.

131.    As a result, SAIC gave the CityTime project an unprecedented level of scrutiny – not only because the contract was in the "red," but also because the prospect of rolling out the contract elsewhere could be extremely lucrative and the contract provided the Company with an opportunity to cultivate business in New York.

### 5.    SAIC Employed Extensive Internal Procedures, and Established Specialized Procedures, to Monitor Performance of the Project

132.    To closely monitor the CityTime project on an ongoing basis, SAIC used extensive internal review processes, and established specialized procedures, that required the involvement of the Company's senior executives.  In addition to the unprecedented level of scrutiny that SAIC gave the project due to its importance (detailed herein), SAIC intensively monitored the project to staunch massive losses and to address increasingly critical complaints regarding the Company's performance on the project.

133.    As Shangle testified, SAIC had written corporate policies – including policies "A-20" and "SG-20" – that prescribed regimented and particularized review of any project, and such policies were followed on the CityTime project.

134.    For example, as Shangle confirmed, SAIC's A20 and SG20 required internal status meetings regarding the progress of the project, and expressly prescribed the various layers of review that each contract/project underwent, depicted and generally summarized as follows (starting at the lowest level and proceeding to the highest):

Pre-FPRB → Red Team → Business Unit FPRB →
Group FPRB → Corporate FPRB → CEO

135.    According to Shangle, an initial level of internal review employed by SAIC was a preparation meeting by a "proposal team" that preceded a meeting by the fixed price review board ("FPRB"), described below.  The objective of the meeting was for the proposal team, which would present to the FPRB, to develop ways in which to familiarize the FPRB with the contract under consideration and ensure a successful review thereof.  The "pre-FPRB," as it was known internally at SAIC, was also responsible for selecting the members of the "red team," described below, which provided an additional layer of review.

136.    Shangle testified that another level of internal review employed by SAIC was the red team, comprised of a group of individuals who are responsible for reviewing the content of contract proposals that they are not involved in originating, developing or proposing.  Although the number of members varied, Shangle testified that the red team typically reviewed "the cost proposal, the technical proposal, [and] any past performance references that may have been used," with "two or three reviewers" – who were high-level employees – that concentrated on each of those matters.  The red team also engaged in efforts to assess the overall risk of a project proposal by considering various factors, and assigning a risk rating of "low, moderate or high."

137.    Yet another layer of review employed internally at SAIC was the business unit FPRB, followed by still another layer of review by the group-level FPRB – which Shangle testified were *each* comprised of between 6 and 12 employees responsible for reviewing and approving contracts.  As Shangle confirmed, the business unit and group-level FPRB meetings involved a more searching review of the prospects of a given project.  The group-level FPRB could involve the group president, group director of programs (SG20 officer), group director of contracts, group controller, group procurement director, group project control manager, and others in similar positions.

- 46 -

138.     Shangle also confirmed that an even higher level of review was conducted by the Corporate FPRB, which was comprised of six higher-ranking senior executives.

139.     Finally, although uncommon, the last level of internal review employed by SAIC for certain projects involved the CEO-level review.  As Shangle testified, the CityTime project required CEO-level review.  Indeed, as detailed herein, SAIC's CEO reviewed and approved Amendment No. 6 to the CityTime contract – not once, but *twice*: first, in January 2005; and next, in April 2005 (with Amendment No. 6 registered by the Comptroller's Office, which made it effective, on February 3, 2006).  As Shangle testified, the CEO's involvement was necessary because of the project's size (including the amount of money involved), as well as the project's history and status.

140.     Additionally, SAIC convened numerous informal and formal meetings regarding the performance and status of its projects, and increased the frequency of such meetings as concerns or problems arose on a given project.

141.     For example, Shangle testified that SAIC typically held "in-process review" ("IPR") meetings for the CityTime project on a monthly basis (and, at a time, on a quarterly basis), attended by operations and management personnel and conducted by conference call involving the respective offices involved, to monitor, evaluate and discuss the performance and management of projects. Drake also confirmed that IPR meetings took place on a monthly basis, and that the project received a significant amount of attention from executives in the business unit and at the group level of SAIC as a result of efforts to regularly track the project's progress.

142.     Additionally, Leon confirmed that the IPR was "a review by the upper management [of SAIC] of specific projects" and further explained that "on a periodic basis . . . project [personnel] would report to management on aspects of the project, how much it was costing, the schedule, if they're on schedule, how the technology was, how things were going on a general basis."

- 47 -

143.    For the CityTime project, however, Shangle testified that SAIC held IPR meetings on a monthly basis in or about 2003 and during the earlier phases of SAIC's involvement in the project because problems regarding the performance of the project invoked more internal scrutiny.  At that time, Denault led the IPR meetings, which Shangle and Leon variously attended, and management and others voiced concerns that the vast majority of project staffing originated from Technodyne, discussed below.

144.    Additionally, SAIC executives in attendance at the IPR meetings knew that the vast majority of revenue from the project flowed from the Company to Technodyne.  As Preucil testified, the "business unit lead" – at one point, Alderson – attended IPR meetings.  In fact, upon information and belief, Alderson, Dube, Lord, Jane Phillips ("Phillips"), and other executives attended and/or participated in IPR meetings (or otherwise received information discussed at them), and knew or reasonably should have known that the flow of revenue to Technodyne, and the dramatic increase in hiring of consultants sourced from Technodyne, was reaching epidemic proportions and was extraordinarily unusual for a project managed by the Company.

145.    For example, in April 8, 2010 presentation materials prepared for an IPR meeting, the business model chart (on page 5 of the materials) – which was typically included in such materials – showed that SAIC by then had earned or stood to receive a total of $628 million from the project, *with Technodyne receiving $464 million (or 74%) of that revenue*.  By contrast, Ariel Partners, the only other formal staffing subcontractor, had received or stood to receive $18 million (or only 3%) of total project revenue.  Incidentally, Dube, who was later terminated by SAIC for placing profit above ethics and integrity, was listed in the materials as "review chair" and served as the head of the business unit managing CityTime.

- 48 -

146.    Moreover, as Leon testified, each of the IPR presentation materials contained similar information, including, among other things, a breakdown of how much revenue each subcontractor was receiving on the project.  Consequently, as Leon confirmed, senior Company executives who attended the IPR meetings (and/or received the presentation materials) – such as Phillips – saw how Technodyne's receipt of project revenue grew exponentially as the program progressed.  Indeed, neither Leon nor any other witness testified that Denault – or anyone else, for that matter – falsified information concerning the flow of project funds to or from SAIC, or to the subcontractors on the project.

147.    In fact, two years before the April 2010 IPR meeting (at which it was revealed that Technodyne had received 74% of total project revenue), Company executives knew that Technodyne had received the lion's share of revenue on the project.  In an email exchange that took place on or about April 7, 2008, Gary Shankman, CFO of the Defense Solutions Group managing CityTime, asked Denault "whether it was possible to defer payment to our sub until the city pays us in order to help mitigate the negative cash flow impact."  In response, Denault represented: "they [Technodyne and presumably Ariel Partners] are both small businesses that have to make payroll or the staff quits.  This would bankrupt them both in one month."  In recognition of the significant flow of project funds to Technodyne, Lord wrote: "Based upon the revenue Technodyne gets from us, they could be hard-pressed to be considered small anymore."  Indeed, as Yu testified during the criminal trial, records reviewed in connection with the DOI's forensic audit revealed that in 2007 alone, Technodyne had received 88% of its income from SAIC.

148.    Additionally, the unusual reporting hierarchy of the project further differentiated it from other projects and implemented a tighter degree of control and monitoring by the Company's senior executives.  In or about late-2005, SAIC reorganized the project's reporting hierarchy and it

began reporting directly to a group instead of a business unit.  As Shangle explained: "[i]t was the only project I've ever experienced that reported directly to a group."

149.     As Shangle further explained, the reorganized project reporting structure meant that Denault reported directly to the Group President: first, Hughes; then, Alderson (who took over for Hughes in 2006) and Lord (her project liaison).  Importantly, as alleged herein, Amendment No. 6 to the contract – which was critical to the operation of the kickback and overbilling scheme – was approved in 2006.  CityTime's original reporting structure was restored in 2009 and 2010, at which point the project again began reporting to a business unit – this time, the Dube business unit.

150.     Separately, McConnell confirmed that business unit meetings regularly took place in or about 2005, at which the issue of Technodyne's prominent role in staffing the project was raised.  Moreover, she confirmed that SAIC held quarterly "leadership meetings," comprised of a "corporate meeting," a "group meeting," and a "unit meeting" (in order of declining levels in the organizational hierarchy).  McConnell testified that senior managers always attended leadership weeks, and that Denault had occasionally attended certain meetings.

151.     However, SAIC's relationship with Technodyne received scrutiny from management not only because of the sheer volume of staff Technodyne placed on the project, but also because of the value of the subcontract.  As Shangle explained, because of the "size" and "high dollar value of the [Technodyne] subcontract extension," approval of the extension "needed approval of both the group procurement director and the corporate director of procurement."

152.     In preparation for obtaining such approval, Lord met with Shangle in SAIC's New York City office to review the procurement file and pricing analysis for the Technodyne subcontract.  As Shangle testified: "I was going over the file with Mr. Lord and showing him the difficulty we had in justifying the Technodyne rates."  At that time, Parkins was the group procurement director and

Kristine Petka ("Petka") was the corporate procurement director.  Notwithstanding the attention that SAIC's unusual relationship with Technodyne received at the Company, Technodyne's subcontract was never put up for competitive bidding, as detailed below.

153.    Finally, as Shangle stated, the CityTime contract required SAIC to run background checks on all consultants hired for the project.  To perform the background check, the consultant first had to authorize the check and provide various personal information, such as his or her full legal name, date of birth, address, social security number, and employer/company he or she represented. Shangle then provided that information to "SAIC corporate security," which conducted the check.

154.    As detailed herein, this procedure revealed that two consultant candidates listed D.A. Solutions as their employer after SAIC's procurement department had decided not to hire the firm as a staffing subcontractor.  Accordingly, this procedure afforded SAIC with the ability to identify consultant candidates referred by entities that were not approved to do business with the Company or on the CityTime project.

155.    Nevertheless, D.A. Solutions and PrimeView – two previously unknown staffing firms – supplied numerous consultants for the project and collectively received nearly $100 million in revenue from Technodyne.  Specifically, as Yu testified, from 2005 through 2010: (i) Technodyne made total payments of $65,016,786.77 to D.A. Solutions; (ii) Technodyne made total payments of $23,072,046.45 to PrimeView; and (iii) Technodyne paid a combined total of $88,088,833.22 to D.A. Solutions and PrimeView.  Incidentally, Natanzon confirmed that in 2005, before PrimeView was involved in the kickback scheme, the firm's net profit was only $14,000.

**D.**    **Numerous Red Flags, Manifested Before 2011, Exposed Fraud on the CityTime Project Internally at SAIC and Alerted Management to SAIC's Involvement**

**1.**    **SAIC Used Amendment No. 6 to Transfer the Cost of Completing the Project to NYC, and the Project Instantly Became Profitable**

156.    When SAIC assumed the role of prime contractor on the CityTime project in 2000, the contract was "fixed price" in nature. As Shangle explained, a fixed price contract requires the contractor to "deliver the services or the product [required by the contract] for a fixed, set dollar value." Thus, the contractor on a fixed price contract – in this case, SAIC – would receive only the amount provided for in the contract, regardless of the amount of time it takes to complete the specified work.

157.    CityTime was initially budgeted to cost $63 million. In November 2002, Amendment No. 4 to the contract increased the cost to approximately $100 million, and in December 2003, Amendment No. 5 further increased the cost to approximately $115 million. Yet, the contract was still fixed price in nature, and it remained that way until Amendment No. 6's final approval in 2006.

158.    Accordingly, for nearly six years after SAIC joined the project (in 2000), it was obligated to complete the project at the fixed cost specified in the contract, which meant that it would bear any additional costs – over and above the amount set forth in the contract – incurred to complete the project. And, although the contract price increased by nearly $52 million over the course of that six-year period, the increase was not enough to make the contract profitable for SAIC.

159.    Indeed, as alleged herein, SAIC was losing millions of dollars on CityTime from the inception of its involvement in the project. In fact, as noted above, SAIC had recorded a $28 million loss on the contract – which then represented a loss of 25% on the total value of the contract – shortly after assuming the role of prime contractor, and subsequently committed itself to invest an additional $30 million in connection with the project. As Preucil confirmed at the criminal trial, the project was known internally at SAIC as a "red" project because of its money-losing status.

- 52 -

160.    Amendment No. 6 converted CityTime to a fixed price level of effort contract.  As Shangle explained, under a fixed price level of effort contract, the contractor receives a fixed price to complete the project, but adjustments to the price are periodically made to compensate the contractor for further costs incurred to complete the work.  The adjustments are typically made after the number of hours worked by the contractor is known.

161.    As Shangle confirmed, however, a fixed price level of effort contract is virtually identical to a time and materials contract, whereby the contractor receives payment for the amount of time and cost of materials it incurs to perform the work.  The minor difference between the two types of contracts is that for a time and materials contract, the contractor is paid as hours and costs are incurred; as noted, additional costs are paid on a fixed price level of effort contract with periodic adjustments made after work is performed.  In either case, there is no specific obligation to deliver a product or service, which further differentiates these types of contracts from a fixed price contract.

162.    As Preucil testified, shortly after he joined the Company's procurement department, the project "went black" – which meant that it became profitable for SAIC – "and there was a big celebration" at the Company.  In the ensuing years, SAIC generated hundreds of millions of dollars in revenue on the project, as the number of project consultants working on the project skyrocketed and the Company took its cut of the exorbitant rates billed to NYC for them.

163.    For example, as the CityTime contract documents confirm, and Shangle corroborated at trial, the cost "ceiling" for the project dramatically increased after Amendment No. 6's approval, as shown in the following chart:

| Amendment No. | Approval Date | Contract Amount | Increase from Previous |
|---|---|---|---|
| 5 | December 3, 2003 | $114,617,045 | $14,429,079 (or 14.4%) |
| 6 | January 10, 2006 | $114,617,045 | No increase from Amendment No. 5. |
| 7 | February 13, 2006 | $224,746,785 | $110,129,740 (or 96.1%) |
| 8 | June 14, 2007 | $348,954,133 | $124,207,348 (or 55.3%) |
| 9 | May 29, 2008 | $489,238,434 | $140,284,301 (or 40.2%) |
| 10 | June 30, 2009 | $628,461,443 | $139,223,009 (or 28.5%) |

- 53 -

| Amendment No. | Approval Date | Contract Amount | Increase from Previous |
|:---:|:---:|:---:|:---:|
| 11 | October 28, 2010 | $660,461,443 | $32,000,000 (or 5.1%) |

164.     Thus, the contract price increased from $63 million at its inception to $660,461,443 as of Amendment No. 11 – an astounding increase of $597,461,443, or 948.4%.  The contract price at Amendment No. 11 represented a similarly extraordinary increase of $545,844,398 – or 476.2% – from the price of $114,617,045 as of Amendment Nos. 5 and 6, which were approved in December 2003 and January 2006, respectively.  The project reportedly cost a total of more than $700 million to complete by the time it was fully operational, in mid-2011.

165.     As the Government established at the criminal trial, Denault was a vocal proponent of Amendment No. 6 and was instrumental in negotiating its terms and ultimately securing its approval. In fact, Denault presented the "rationale" for Amendment No. 6 at an internal IPR meeting that Leon attended, which caused Leon to believe that the amendment "made sense" for SAIC – but not for NYC, necessarily.

166.     Of course, the benefit to Denault and the other direct perpetrators of the overbilling and kickback scheme that plagued CityTime was evident: by converting the CityTime project to essentially a time and materials contract, Denault and his co-conspirators could generate even more kickbacks from increasing the number of project consultants and submitting fraudulently inflated time records to SAIC for eventual processing and payment by NYC.

167.     Likewise, SAIC recognized the significant benefit inherent in securing Amendment No. 6: the Company would no longer be responsible for the exponentially increasing costs associated with completing the project, and it would generate revenue based on the hours worked and costs incurred on the project without regard for the cost limitations imposed by a fixed price contract. Accordingly, Amendment No. 6 was the vehicle by which SAIC could bring the CityTime contract into the "black."  And that is exactly what happened.

168.    In fact, Amendment No. 6 was so important to the Company that its approval required the direct involvement of the CEO – not once, but twice.  Consideration of Amendment No. 6 began in early 2004.  As alleged herein, Denault was the Deputy Program Manager for CityTime from October 2002 until September 2004, when he was promoted to Program Manager – a position he maintained until January 2005, when he became Senior Program Manager.  As such, Denault was intimately involved in the process associated with conceiving, proposing, shepherding and approving Amendment No. 6.  And, Shangle, who worked on Amendment No. 6 and participated in discussions internally at SAIC and with NYC regarding its terms, confirmed that Denault was the advocate for Amendment No. 6.

169.    According to Shangle, Amendment No. 6 was of such magnitude and importance to the Company that it required the review and approval of CEO Dahlberg, who was rarely involved in such matters.  Moreover, to vet the terms of the amendment, SAIC employed the extensive internal process outlined above with respect to monitoring project matters, which involved review by the pre-FPRB, the FPRB, and various other personnel.

170.    Initially, Dahlberg reviewed and signed a version of Amendment No. 6 in January 2005.  Yet, further discussions took place between SAIC and NYC concerning Amendment No. 6, and the Company employed the same review process it had completed previously for the earlier iteration of the amendment.  As Shangle confirmed, the corporate FPRB was now referenced to as the corporate "delta" FPRB, which signified that the FPRB was charged with the responsibility to consider the differences between the earlier and later iterations of Amendment No. 6.

171.    As Shangle further confirmed, Dahlberg ultimately signed the revised version of Amendment No. 6 in April 2005, and NYC completed its own approval processes in January 2006.

Amendment No. 6 was then registered with the NYC Comptroller's Office, after which it became operative and effective.

172.     As alleged herein, Amendment No. 6 served as the very foundation for the illegal overbilling and kickback scheme alleged in the USAO's December 14, 2010 criminal complaint, the February 10, 2011 Indictment and elsewhere, because Amendment No. 6 paved the way for SAIC to: lift the contract's price ceiling and receive payment for all hours supposedly worked by consultants; secure other contract amendments that exponentially increased the contract price; and ultimately submit hundreds of millions of dollars in invoices to NYC for payment.

173.     Accordingly, in contrast to its significant initial losses on CityTime – which occurred before the approval of Amendment No. 6 – the project instantly became profitable for SAIC after the approval of the amendment.  Because it was unusual for SAIC to have a money-losing contract, it was doubly unusual for the Company to turn around the CityTime project so dramatically in such a short period of time.

174.     Furthermore, the proposition that SAIC is at least partially culpable for the kickback and overbilling scheme is reflected by the Information that the USAO filed pursuant to the DPA, with the Company's consent.  In the single-count Information, the USAO alleged that the Company "willfully and knowingly" conspired with "others known and unknown" to defraud NYC – "[f]rom at least in or about 2003, up to and including in or about 2010" – "by means of false and fraudulent pretenses, representations and promises . . . ."

175.     Specifically, the USAO alleged that the overt act in furtherance of the conspiracy occurred "[i]n or about 2005 and 2006, [when] SAIC negotiated with the City a contract amendment that, among other things, had the effect of transferring the risk of future cost overruns and any expansion of the CityTime project from SAIC to the City."  Consequently, the Government claimed

that the negotiation and adoption of Amendment No. 6 constituted an overt act in furtherance of the conspiracy.

176.    The allegations of the Information, which pertain to events that occurred from 2003 through 2010 and include the ratification of Amendment No. 6, underscore the manner in which the Company has culpability for having profited from and even facilitated the illicit conduct that resulted in criminal charges – and, most recently, guilty verdicts – against the direct perpetrators of the fraud.

> **2.    SAIC's Subcontract with Technodyne Violated SAIC's Policies and SAIC Failed to Competitively Bid Technodyne's Subcontract**

177.    SAIC's subcontract with Technodyne violated the Company's policy to competitively bid subcontracts valued in excess of $25,000 in the absence of a legitimate sole-source justification. Further, notwithstanding the fact that SAIC employees consistently raised these issues internally with mid-level and senior executives and others, the Company continued to extend Technodyne's subcontract on a sole-source basis without competitive bidding.

178.    As alleged above, Shangle testified that SAIC's procurement policy requires SAIC to put up for competitive bidding any contract in excess of $25,000, "unless there is a sole-source justification for no competition."  A sole-source justification specifically "provides a rationale for why the company is not going out to compete the work with other subcontractors or vendors."  The requester of the sole-source subcontract and the program manager of the project must approve and sign the sole-source justification.

179.    On July 30, 2003, Denault signed a sole-source justification form for Technodyne, which was approved by the procurement director.  It listed Technodyne's address as 6 Little Place, Wayne, New Jersey 07470 – a residential address – and stated that the total estimated commitment for the CityTime project was $2.5 million.

180.    Accordingly, when Shangle was staffed to the project in 2004, Technodyne already had received a sole-source subcontract to provide staffing services.  After he joined the project, he raised with Denault the prospect of "adding subcontractors to compete with Technodyne . . . a number of times . . . ."

181.    As Shangle explained at trial, he believed "[c]ompetition would allow [SAIC] to . . . potentially compete for lower prices which could be passed on to the customer and it would give us a broader field of staff to choose from" and "[b]roader capabilities, possibly."  Denault refused.

182.    Rather, when the Technodyne subcontract was scheduled to expire at the end of 2005, Denault told Shangle that "[h]e would write the sole source justification to justify not compet[ing]" the subcontract.  In response to Denault's intention to justify the subcontract extension, John Herzog ("Herzog"), a subcontract administrator of SAIC's procurement department, raised the prospect of competing the subcontract in an email to Denault:

> [T]his would be a good time to bring up any new competition for this work. Can you indicate if there are any plans to re-compete this work? If so, when? Why not? If not, why not? I have indicated – I have identified two additional companies that can provide the same services TD [Technodyne] and Ariel are providing, and are located in the New York area so we have plenty to compete with if that decision is made.

183.    Subsequently, Herzog identified the proposed subcontractors as "Apex System and Lawler and Associates," and noted that NYC had already received the necessary VENDEX forms to approve their involvement in staffing CityTime.  Additionally, he explained the rationale behind competing the Technodyne subcontract, as follows:

> I believe it's in the best interest of SAIC and our customer to go out for open competition for all of the labor categories identified under this contract, to compete between Technodyne, Ariel, Lawler, and Apex. Open competition would grant us lower rates to pass along to the customer, while meeting their needs. Based on the rates received, it would . . . probably be best to spread the wealth around all of these companies. So, any one company would have between ten to fifteen labor categories; *i.e.*, positions to fill, at any one time.

184.    According to Shangle, Denault still did not compete the Technodyne subcontract and, to his knowledge, the two staffing firms that Herzog proposed were never involved in the project. Instead, on December 29, 2005, Denault completed the sole-source justification for Technodyne, which then stated that the maximum value of the subcontract was $48 million – an increase of $45.5 million (or 1860%) from the $2.5 million value stated in the July 30, 2003 sole-source justification, only two years earlier.

185.    Within two weeks of joining CityTime, Preucil also recognized the need to compete the subcontract.  As he explained, Herzog was transitioning out of the position that Preucil was assuming and he and Herzog "wanted to have a competition for the extension or the follow-on work" by "bid[ding] the work out to multiple companies that could do the same work."

186.    As Preucil stated: "In procurement we're directed to compete anything possible." The only exception to that policy is when "a company has a monopoly or some sort of proprietary technology or if there's some extenuating circumstances where competition might be precluded, like maybe startup costs . . . ."  Technodyne did not fit into any of those categories.

187.    Yet, when Preucil raised the issue with Denault, he firmly rejected the idea.  Rather, Denault insisted that Technodyne receive payment far sooner than other contractors would.  Preucil explained that SAIC's "standard policy" was "net 45," which called for SAIC to cut a check to a vendor within 45 days of receiving the vendor's invoice.  When he started, the Company was paying Technodyne net 30; Denault pressured Preucil to further lower the term to net 20 – more favorable payment terms than Preucil had ever seen up until that point in his career.  As Preucil noted, Denault did not involve himself in changing the payment terms for other vendors.

188.    Meanwhile, the Technodyne subcontract was not competitively bid thereafter.  As Preucil testified, the subject of competitively bidding the subcontract arose during a meeting that he

attended with Lord, Shangle and Petka.  At that time, procurement was directed "to compete the work at the end of that then current contract period of performance."  Shangle testified that when he met with Petka in Virginia to obtain the requisite approval, she was even *more* explicit, stating that "[s]he would approve this one additional [subcontract] extension but under no conditions would we not [sic] continue without competing the subcontract with other vendors."  As Shangle explained: "we were instructed to prepare requests for proposals to go out to other vendors for bidding on the contract . . . ."

189.    Yet, the subcontract was never competed.  As Preucil testified, "many people [were] talk[ing] about competing the work and not competing the work" and it was expressed to him "that we were not going to compete the work."

190.    For example, when Technodyne's subcontract was close to expiring in the fall of 2008, Shangle again raised his concerns with Lord about SAIC's failure to competitively bid the subcontract.  Additionally, in an email on September 22, 2008, Shangle again voiced his concerns to Parkins (group procurement director) that the Company was "not re-competing the Technodyne subcontract."  According to Shangle, Lord and Parkins responded that the Company was "not going to re-compete this contract."

191.    Likewise, after Shangle voiced his concern to Lord and Parkins that the initial price analysis prepared in 2008 failed to establish that Technodyne's rates were reasonable – as required to justify sole-source justification for the subcontract – they instructed procurement to "find another avenue to get the rates justified."  As detailed below, Shangle and Preucil complied with that directive and ultimately found a way to justify the rates – by using billing rates they would never use for such a contract under ordinary circumstances.

192.    As Shangle testified, Petka ultimately approved another extension of the Technodyne subcontract – this time, through June 30, 2009 – despite the lack of competitive bidding. As a result, Shangle *again* raised the matter with both Lord and Denault. But the issue went nowhere.

193.    In fact, because Shangle was not authorized to go through the procurement channels to obtain another standard sole-source justification, Denault instructed Shangle to "find a way to justify the extension." Yet, as Shangle testified, the only way under SAIC's corporate policies to accomplish the extension was "to get a directed subcontract letter from the customer, directing us to subcontract to Technodyne" – something Shangle had never in his career been asked to do before.

194.    At Denault's direction, Shangle prepared a letter reflecting Bondy's concurrence in "[d]irecting SAIC to sole source to Technodyne and not compete the extension of their contract." The letter, dated May 18, 2009, was returned with Bondy's signature on May 26, 2009. Thus, the executives monitoring CityTime allowed the Company – at Denault's direction – to circumvent its procurement policies without regard for the fact that the Technodyne subcontract was never subject to competitive bidding, as those very same policies required.

**3.    Unnecessary Project Staffing and Unreasonable Rates Billed to NYC Violated SAIC's Procurement and Pricing Policies**

195.    As detailed herein, unnecessary project staffing and unreasonable rates billed to NYC not only violated SAIC's procurement and pricing policies, but also should have alerted SAIC's management to the highly suspicious activities that were regularly occurring on the project. In fact, the Company's pricing analyses *confirmed* that Technodyne's hourly rates for consultants it placed on the project were unreasonable and unjustifiably high, yet the Company engaged in efforts to justify those rates at all costs, anyway.

196.    As detailed above, Shangle testified that the Company's "procurement department is required to do a price analysis on all bids from subcontractors and vendors to ensure that the prices

we're getting from them are fair and reasonable." As Preucil confirmed, "[c]orporate policy dictates that any procurement file has a price analysis." Further, Shangle testified that the pricing department conducts a "price realism" analysis, "using national and regional salary survey" information, to ensure that the prices charged directly to the customer by SAIC are "reasonable."

197.    In early-2006, Shangle was involved in performing a pricing analysis in connection with a work order proposal for submission to NYC. Based on the outcome of the analysis, Shangle raised with Denault his "concerns about the pricing for this work order, that the rates . . . were high and the rates from Technodyne were high." Specifically, the Technodyne rates "made the rates that SAIC charged to the city higher." In response, Denault screamed at Shangle and ultimately stripped him of his responsibility over pricing.

198.    Yet, the 2006 pricing analysis was not the only unfavorable pricing analysis SAIC prepared on the project, nor did it mark the only time that the Company disregarded the result and found a way to produce a favorable analysis. In 2008, for example, Preucil prepared and presented to his supervisors two pricing analyses for the Technodyne subcontract – apparently out of necessity, because the first analysis failed.

199.    In preparing the first analysis, Preucil used salary information obtained "from [SAIC] corporate." For the second analysis, he used New York State Office of General Services ("OGS") labor rates, which Shangle explained are "considerably higher" and are customarily considered "not-to-exceed" rates – meaning that a subcontractor could not charge rates higher than those.

200.    As Preucil explained, there are "two sources" of labor rates typically used for a price analysis: the first is information regarding employment positions and rates from salary.com; the second is "a spread sheet [from corporate] with salary survey information for any position," which is

compiled from surveys of labor rates throughout the U.S. Information obtained from either source is then compared to the contract rates under consideration to determine whether they are reasonable.

201.     As Preucil noted, he used the corporate spreadsheet for the 2008 analysis – prepared for CityTime for use on the Technodyne price analysis – based on "the magnitude of the categories" of labor and the fact that he "couldn't find positions in the salary survey I was looking for on the Web site that would substantiate the rates that were being proposed." In addition, the spreadsheet's rates were upwardly adjusted "to reflect New York City salaries."

202.     Yet, concessions were necessary from the very inception of preparing the 2008 price analysis to justify Technodyne's rates. For example, Preucil would typically average the rates for a particular position and use the average rate for pricing comparison purposes. In this case, however, he "took the highest rate for each particular category." The minimum hourly rate in the spreadsheet was $80.26 and the maximum hourly rate was $100.51.

203.     In contrast, Technodyne's "proposed rate was $295 an hour." According to Preucil, if the pricing analysis demonstrated that Technodyne's rate was reasonable, "[t]here would be no other checks by me as long as the invoiced amount was less than what was analyzed and approved." In that scenario, any invoice for payment that reflected hourly rates below $295 would not invoke scrutiny by SAIC's procurement department.

204.     Because the maximum hourly rate of $100.51 reflects only the average hourly salary payable to the employee, Preucil next calculated the "burdened" rate, which includes "overhead, fringe benefits, profits" and other metrics that would naturally increase the rate. However, because Technodyne did not provide employees with workplace accommodations, the applicable burden would necessarily be lower to account for the *lack* of additional overhead incurred in providing the

labor.  Preucil calculated a burden (or loading factor) of 1.94, which he then multiplied by the hourly

amount calculated for each labor category.

205.     Using the burden of 1.94, Preucil calculated a maximum total hourly rate of $194.99

(*i.e.*, 1.94 x $100.51). This amount was $100.01 below Technodyne's proposed not-to-exceed rate.

As he testified: "we're basically paying $100 more than what we would expect to pay the highest

paid person for that labor category."  The disparity between rates was so severe that Preucil added a

"special column" on the price analysis chart solely to reflect the "delta" (or difference) between the

burdened rate and the Technodyne rate for each position.

206.     In fact, Preucil confirmed that out of the rates for approximately 62 labor categories,

over 40 (or 64.5%) were found to be unfair and unreasonable under the salary survey method used

for the first price analysis in 2008.  In his experience, Preucil had never encountered such a disparity

– "nothing to this extreme, ever."

207.     Subsequently, Preucil met with Denault to apprise him of the result of the analysis,

and Denault purported to justify that each failing labor category required "extraordinary or special"

employees – again, nothing Preucil had ever seen before.  Nonetheless, after completing the process,

Preucil submitted the price analysis for approval with the following summary conclusion:

> Based upon the comprehensive comparison of Technodyne labor categories and rates
> versus the like categories provided by corporate, it is determined that the rates
> proposed by Technodyne will be accepted based on business unit decisions made in
> [sic] the business manager [*i.e.*, Denault] in consultation of the customer at the
> individual level.

208.     Parkins – the procurement executive responsible for approving the rates – rejected the

proposal.  Specifically, Preucil was told: "It's procurement's job to ensure that any rate that we are

billing is considered fair and reasonable."  Accordingly, Preucil was told to develop an analysis that

would pass muster and receive approval.  As Shangle testified, Lord and Parkins instructed them to

- 64 -

"find another avenue to get the rates justified" – and the procurement department was "directed to use the OGS backdrop contract rates for justification."

209.    Accordingly, for the second Technodyne pricing analysis in 2008, SAIC used OGS rates in lieu of the standard method (which had failed). In Preucil's experience, SAIC's procurement department used OGS rates on project proposals that "fit into the OGS categories," thereby justifying their usage. And, rates used in such proposals typically come from various "sources, SAIC's staff and our subcontractors." As Preucil explained:

> There's always a pricing discussion. We would have daily or weekly meetings, and so there's always a pricing section to each meeting. And we would talk about the rates that we were receiving from the subs and other rates from SAIC and how we would discount them against the OGS schedule.

210.    Preucil testified that he had "[n]ever" attended a proposal meeting where SAIC was considering proposing the use of undiscounted OGS rates, and that the Company ordinarily "heavily discounted" them. Shangle also testified that SAIC "always discounted" the rates "substantially," with the standard discount ranging from 25% to 50%. Denault had attended some of those meetings.

211.    As Shangle explained, using the OGS rates "was the only way we thought we could get the rates [in the Technodyne subcontract] justified." Preucil echoed this sentiment, stating: "[w]e knew that OGS rates were so high that we could make it fit." In other words, because Technodyne's rates were below OGS rates, the pricing analysis would be approved. Yet, as Preucil testified, the rates that SAIC charged to clients were rarely, if ever, below those charged by a subcontractor.

212.    This time, the concessions made to the price analysis were ever greater in magnitude. For example, there was a discussion of reducing the OGS rates by $25 to account for a lack of travel, but procurement did not apply any percentage discount to the rates – in contravention of SAIC's usual policy. Accordingly, in one instance, the minimum hourly labor rate was $157.88 and the maximum was $393.84.

213.    After using the OGS labor rates to justify Technodyne's extraordinary rates, all of the labor rate categories passed the pricing analysis as reasonable in nature and procurement approved the Technodyne rates.  As alleged herein, however, the Technodyne contract was never competed.

214.    Notwithstanding the strained efforts by the Company's procurement department to substantiate Technodyne's labor rates, the rates charged by SAIC, Technodyne, D.A. Solutions and PrimeView were unreasonable and dramatically increased the cost of the project to NYC.  As detailed herein, SAIC knew or reasonably should have known, based on its customary contracting practices, that these rates were unusual and intended solely to increase the cost of the project – and, consequently, to facilitate the overbilling and kickback scheme – to NYC's detriment.

215.    For example, at trial, Yu – Deputy Inspector General for the DOI's investigative unit – testified that she led a forensic audit of CityTime commencing in the fall of 2010.  In conducting the audit, her team gathered financial records, project invoices and other materials.  Additionally, Yu and her team prepared summary charts for trial reflecting, and Yu testified at the trial concerning, the project billing rates and mark-ups for SAIC, Technodyne, D.A. Solutions and PrimeView.  The data incorporated into the charts were compiled from information obtained during the course of the forensic audit and criminal investigation of CityTime.

216.    Specifically, Yu testified concerning a chart that included information regarding SAIC invoice 117, which reflected billing rates for 230 consultants staffed to the project.  As she testified, the chart contained information regarding, among other things: (i) the hourly rate that D.A. Solutions or PrimeView paid to the project consultant considered; (ii) the hourly rate that D.A. Solutions or PrimeView then billed to Technodyne for that consultant, as well as the D.A. Solutions or PrimeView mark-up on such rate; (iii) the hourly rate that Technodyne subsequently billed to SAIC for that consultant, as well as the Technodyne mark-up on such rate; and (iv) the hourly rate

that SAIC finally billed to NYC for that consultant, as well as the SAIC mark-up and total mark-up on such rate. The following diagram reflects the sequence of billing and mark-ups:

D.A. Solutions / PrimeView → Technodyne → SAIC → NYC

217.    For example, as to project consultant Priya Venkatesan (who was included in SAIC invoice 117), Yu testified that: (i) D.A. Solutions paid this consultant $40 per hour; (ii) D.A. Solutions billed $80 per hour to Technodyne, reflecting a mark-up of 100%; (iii) Technodyne billed $117 per hour to SAIC, reflecting a mark-up of 46.25%; and (iv) SAIC billed $139.03 per hour to NYC, reflecting a mark-up of 18.83% and a total mark-up of 247.58%.

218.    Likewise, as to project consultant Marissa Desimone (who was also included in SAIC invoice 117), Yu testified that: (i) D.A. Solutions paid this consultant $25.38 per hour; (ii) D.A. Solutions billed $102.53 per hour to Technodyne, reflecting a mark-up of 303.98%; and (iii) the amount billed and mark-up applied by SAIC to this consultant further increased the cost to NYC.

219.    Moreover, Yu testified concerning the following with respect to the rates and mark-ups charged on consultants included in SAIC invoice 117:

(a)    With respect to project consultants placed by D.A. Solutions and included in SAIC invoice 117, Yu testified: (i) the average hourly rate paid by D.A. Solutions to its consultants was $56.15; (ii) the average hourly rate that D.A. Solutions billed to Technodyne for those consultants was $115.60, reflecting a mark-up of 122.18%; (iii) the average hourly rate that Technodyne billed to SAIC for those consultants was $125.94, reflecting a mark-up of 9.17%; and (iv) the average hourly rate that SAIC billed to NYC for those consultants was $156.57, reflecting a mark-up of 24.37%, a total mark-up of 35.76% from the D.A. Solutions rate, and a total mark-up of 197.26% from the hourly rate paid to those consultants.

(b)     With respect to project consultants placed by PrimeView and included in SAIC invoice 117, Yu testified: (i) the average hourly rate paid by PrimeView to its consultants was $51.18; (ii) the average hourly rate that PrimeView billed to Technodyne for those consultants was $114.51, reflecting a mark-up of 138.26%; and (iii) the average hourly rate that SAIC billed to NYC for those consultants (after Technodyne's mark-up) was $154.81, reflecting a total mark-up of 219.52% from the hourly rate paid to those consultants.

(c)     With respect to project consultants placed directly by Technodyne, Yu testified: (i) the average hourly rate paid by Technodyne to its consultants was $88.43; (ii) the average hourly rate that Technodyne billed to SAIC for those consultants was $140.42, reflecting a mark-up of 64.41%; and (iii) the average hourly rate that SAIC billed to NYC for those consultants was $184, reflecting a mark-up of 33.5% and a total mark-up of 119.25% from the hourly rate paid to those consultants.

220.     Additionally, the average hourly rate charged by SAIC for all consultants, considered on the chart with respect to a particular invoice, was $174.18, reflecting an average mark-up of 30.13% from the rate charged by Technodyne; the average mark-up charged to NYC, from the D.A. Solutions and PrimeView rates charged to Technodyne, was 35.58%; and the average mark-up for all consultants on the chart, from the pay rate to those consultants, was 152.57%.

221.     As Natanzon testified, he believed a good margin was a mark-up of between 15% and 30%, which he sometimes received when providing staff on other projects.  For consultants staffed on CityTime, however, he confirmed that PrimeView's margins were sometimes ten times larger than the margins he had received on other projects.

222.     The unreasonable labor rates charged to NYC directly resulted in escalating the cost of the project.  For example, Shangle testified that in early-February 2006, Denault participated in

drafting work order 67, which "was related to the deployment of the CityTime application and the hardware to run the application" to NYC agencies from April 1, 2006 through August 12, 2009. As Shangle stated, Denault assisted in preparing the work order and Mazer approved it. Yet, as Shangle explained, the work order was far different from others:

> SAIC's responsibility was a little different to where the city had the responsibility of directing the staff as far as their performance. SAIC's responsibility was simply time and attendance of the staff. So they had no supervisory responsibility for the staff on work order 67.

223.    Thus, Mazer was responsible for supervising the numerous staff members employed on work order 67; Shangle "had never experienced that type of relationship before." Mazer's direct involvement, coupled with Denault's facilitation of the fraud, resulted in the dramatic expenditure by NYC of more funds than it otherwise would have. Indeed, as Shangle testified, "[t]he total expected expenditure" of the work order was originally $108,987,506; after the eighth (and last) modification to the work order (on August 16, 2010), the total expected expenditure was $141,228,122.

224.    The nature of work order 67, together with the exorbitant increase in the cost of the contemplated work and the length of time to complete it, was unusual and departed from SAIC's customary practice of supervising staff on a project. And, the unreasonable labor rates charged to NYC (detailed herein) likely substantially increased the cost of work order 67.

225.    Furthermore, the project was rife with timekeeping improprieties, which facilitated the payment of kickbacks to the direct perpetrators of the fraudulent scheme afflicting CityTime. Doria, who worked for the OPA, testified that she was alerted to various timekeeping discrepancies in or about 2007. Specifically, an employee who reported to her brought to her attention "strange looking time sheets." As a result, she asked the employee to perform an audit of "six months['] worth of time sheets" to determine whether the discrepancies were isolated or ongoing in nature.

226.    As Doria testified, the audit revealed "a widespread problem across the board," where "[e]very time a consultant left we seemed to get altered time sheets after the date that we knew . . . they left."  As she further explained:

> After we would get an end date for a consultant we would get a time sheet that was handwritten, time sheets where people's names were spelled incorrectly, time sheets that looked like they had been whited out. They certainly didn't come out of the computer the way the other ones were printed. The person's supervisor on paper didn't sign; someone else signed. They were clearly not the same sheets. Something was wrong with them.

227.    Additionally, certain timesheets did not have job or work descriptions for the period to which they related, were signed in a manner inconsistent with the signatures of the employees who supposedly signed them, and were handwritten instead of computer generated.  According to Doria, Mazer signed many of these timesheets, including those submitted in the names of Stacey Carswell, William Coco, Diana Farkas and Sami Guo, after those employees had left the project.

228.    Accordingly, the audit confirmed that the timesheets had been fraudulently prepared. Yet, the falsified timesheets "were attached to invoices" *submitted by SAIC* to NYC "for payment." Thus, the Company could readily conclude that the timesheets were not prepared in accordance with the usual and ordinary timekeeping practices on the project, insofar as they were handwritten (not computer generated) or otherwise exhibited unusual characteristics (*e.g.*, misspelled names, whited-out entries, questionable employee signatures, and no job or work descriptions).

229.    Although the completed audit did not immediately result in any efforts to address the timesheet issues, Doria reported the result of her audit findings to the DOI in or about 2009.  As alleged herein, the DOI's investigation eventually confirmed Doria's concerns about the improper timekeeping practices about which she had complained internally at the Company.

230.    Kearney, who attended the criminal trial, analyzed records regarding the time billed and rates charged by consultants on the project, as well as other documentary and testimonial

evidence introduced at the trial – including evidence supplied by SAIC, such as various timesheets and similar documentation.  As she testified, during the course of the project, consultant timesheets were consistently submitted to NYC for payment that did not accurately reflect the time worked by those consultants.  She also testified that certain of the hourly billing rates, charged for time recorded by or on behalf of such consultants, were inflated and otherwise unreasonable.

231.    At the Government's request, Kearney prepared a chart – introduced at the criminal trial – reflecting the information she reviewed and exposing the fraudulent billing practices that plagued CityTime.  Specifically, Kearney prepared the chart from "[e]vidence . . . submitted in th[e criminal] case, so documents like e-mails, spreadsheets, invoices, things like that, as well as testimony that's been presented."  As she explained, she selected consultants for inclusion in the chart who "left the project in 2007," "had a verifiable end date" to their employment, and had timesheets in their names submitted for payment after their departure.

232.    For example, for the group of consultants included in the chart (Donik Ashurov through John Sloan), Kearney considered information for the period from January through August 2007, when such consultants were known to have left the project (*i.e.*, they had verifiable end dates).  For Antigona Gashi ("Gashi"), a friend of Mazer's and consultant on the project who was out of the country for certain stretches of time during her tenure on the project, Kearney considered a broader period of time that took into account Gashi's foreign travel.

233.    Kearney testified that the evidence confirmed that the consultants included in the chart had timesheets submitted in their name for hours worked on the project, despite the fact that they had left the project by then.  For Gashi, the evidence showed that timesheets were submitted in her name for hours worked while she was out of the country.  As Kearney confirmed, numerous

hours were submitted to NYC for the alleged hours that these consultants allegedly worked on the project, even while either no longer employed as a consultant or, in Gashi's case, out of the country.

234.    Incidentally, as detailed elsewhere herein, the Company – which evaded criminal prosecution by entering into the DPA – was the vehicle by which the fraud occurred, because the Company was responsible for submitting invoices for work performed (and also *not* performed) on the project to NYC for payment.  Indeed, the billing rates charged for the consultants included in Kearney's chart were marked-up first by the second-tier staffing subcontractors (D.A. Solutions and PrimeView), then by Technodyne, and lastly by SAIC, which then requisitioned NYC for payment of the drastically marked-up rates.  As detailed herein, these mark-ups were astronomical.

### 4.    SAIC Personnel Complained About Technodyne's Role, Raised Overstaffing Concerns and Claimed Denault Accepted Kickbacks

235.    From virtually the inception of Denault's hiring on CityTime, SAIC employees recognized the unusual nature of Technodyne's extensive involvement in staffing the project and complained directly to the Company's executive management.  In the wake of the public exposure of the CityTime fraud, SAIC fired two executives who personally fielded certain of these complaints – Dube and Lord – and terminated one of its most senior executives – Alderson, who was responsible for leading the corporate group that managed the CityTime project.

236.    In 2003, Leon was hired by SAIC to work on the CityTime project in the New York office as the quality assurance manager.  At that time, CityTime was the largest project in the Ward operation (named as such because Ward was then the operations manager), and Denault served as Deputy Project Manager.

237.    In 2004, Denault was promoted to Project Manager.  Leon, who interacted with the CityTime project staff on a daily basis, soon observed that the majority of individuals filling open positions on the project "were coming from Technodyne," including those who occupied a number

of "supervisory positions."  In fact, certain consultants hired through Technodyne even supervised "SAIC employees," *i.e.*, "the people who were not working for Technodyne but [were] actually working for SAIC."  During Leon's decade-plus long career in the information technology industry up until that point, he had "never seen" a subcontractor supervise a prime contractor's employees.

238.    In 2004, Leon was "actively participating" in IPR meetings with CityTime project management in the New York office, while SAIC management participated by telephone "primarily" from offices in San Diego and Virginia.  The project manager – at that time, Denault – led the meetings and used PowerPoint presentations to advise SAIC management of various project matters, including contract performance and scheduling; others, including Leon, would prepare and present particular slides.

239.    Concerns regarding SAIC's exclusive use of Technodyne to provide staffing services and the Company's failure to competitively bid Technodyne's subcontract were a frequent topic of discussion during these meetings.  In fact, Leon testified that in 2004, "[t]here were a number of concerns being brought up [at IPR meetings] that the majority of the staff were coming from just one vendor."  As he explained:

> They would ask him certain things like why are they all coming from Technodyne? Can't we get other vendors involved? Can't we – was it properly competed and so on.

240.    Further, according to Leon: "those types of concerns were brought up on a regular basis in the IPRs" and the concerns were frequently expressed directly to Denault.  As Leon testified, these concerns were raised because SAIC did not typically hire most of its consulting staff for large projects, with a lengthy duration, via third party recruiting firms:

> Well, traditionally on a big project like this, if you have a long project and you know your staff is going to be on there for years, you would hire them into the company. So you would have better control over them. And I'm not sure about the profitability of it but generally you know they would work from SAIC. So you want – if you had

a project that you knew was going to go on for a number of years you hire them as employees.

241.     As Leon confirmed (and Drake and others similarly testified): "[t]hese positions could have been filled by SAIC" because it "regularly fills these types of positions in other projects with similar capabilities." Yet, Leon could not recall a single instance in which Denault "recommend[ed] hiring through SAIC as opposed to Technodyne first."

242.     Moreover, Leon had observed that CityTime job listings posted on SAIC's internal website or the internet were already filled by Technodyne. As he explained, "there's a requirement to post these jobs," but "many times these jobs already had someone slated to fill that position" from Technodyne.

243.     In early-2005, Ward left the CityTime project and SAIC's New York office and Phillips, based in Maryland, became head of the operation managing CityTime. In mid-February 2005, Phillips had planned to visit the New York office to discuss the project with Leon and others. At that time, Leon "was trying to reconcile . . . how the project was being managed . . . and what I saw as misrepresentations of what actually was going on and the influx of more and more Technodyne people."

244.     In fact, as Shangle testified, the project was overwhelmingly staffed by Technodyne consultants even as of March 4, 2005. On that date, he reviewed a spreadsheet he requested from the project control department – the department "responsible for collecting all the costs incurred on the contract and reporting those costs to management" – which revealed that 70 consultants had been hired from Technodyne, as compared to 52 from SAIC and only seven from Ariel.

245.     Moreover, Leon testified that other SAIC employees expressed the same concerns he did, including, at a minimum, Shangle, Eric Kritzler and Sherif Sirageldin. As Leon confirmed,

others provided him with information based on their personal observations that supported his belief that Denault was intentionally mismanaging the project and accepting kickbacks from Technodyne.

246.    Prior to a scheduled meeting with Phillips, Leon shared with Phillips his concerns, as well as similar concerns that others had previously conveyed to him.  In fact, he discussed the SAIC Ethics Committee with Phillips, although he did not then divulge his interest in making an ethics complaint regarding Denault.

247.    According to Lay, the Ethics Committee "had representation from the ethics and compliance office and also an individual from each one of the business organizations and the functional areas of SAIC," such as, for example, human relations, finance, and contract procurement. Lay indicated that the Ethics Committee had approximately 32 members at all relevant times, and that it was charged with investigating and handling ethics-related complaints.

248.    On February 18, 2005, according to an internal SAIC Ethics Case Management Log, the Ethics Committee received an anonymous whistleblower complaint – later revealed to have been made by Leon.  Reflecting the seriousness of the allegations and the sincerity of his belief that Denault was engaging in misconduct, Leon testified that this was the first and only time he had made an ethics complaint.  As he explained:

> [I]f there indeed was [sic] kickbacks or anything happening, it's a very serious thing for our company because we're a government contractor. We deal with the federal government I'd say in the majority of our contracts, and if we're as a company caught involved in that, we can get what they call debarred from government contracts, meaning we can't bid on any more government contracts.

249.    Additionally, Leon explained that he specifically complained that he believed Denault was accepting kickbacks in exchange for increasing staffing on the project from Technodyne and otherwise delaying the performance of the project to facilitate and prolong the scheme.  As he further explained, the CityTime contract at that time was fixed price in nature and SAIC was "in the red by

- 75 -

quite a bit," which meant that Denault's conduct was flatly inconsistent with what "a good manager or a manger interested in a successful project would do . . . ."

250.   Specifically, Leon testified as follows regarding the nature and substance of his internal ethics complaint to the Company:

> [T]here were delays and there were just some management anomalies . . . [in addition to] the increase of the personnel coming from this one contractor, Technodyne, and these delays that were, what I thought were misinterpreted. These are all the data points at that time that I said, well, what, who is benefiting from this, what is, what's the end game here. And the only conclusion I could think of at that time was that it was a relationship with Technodyne and Gerard that was benefiting   . . . because those were the only two that were really benefiting from it. SAIC wasn't benefiting from it at that time because, remember, I believe at that time it was a fixed-price contract, fixed price meaning SAIC agrees with the city X amount of dollars and that's all they're going to get paid. So it's in SAIC's best interests to deliver it early because the longer it goes, the more SAIC pays and the less profit, and I think at that time we actually were in the red by quite a bit.

251.   Corroborating this testimony, the May 26, 2011 criminal complaint against Denault, under the heading "SAIC's 2005 Internal Investigation into Misconduct by Denault," quoted the following statements from Leon's anonymous "whistle-blower complaint" based on "[i]nternal SAIC records," which apparently included the Ethics Case Management Log referenced above:

(a)   "An extreme effort of mismanagement on my project seems to be related to the benefit of a particular subcontractor [*i.e.*, Technodyne]. The Sub is basically managed by one person [*i.e.*, DENAULT] and is not a long-established company that has dealt with SAIC on other contracts (as far as I can tell)."

(b)   "70% of our development team belong to this sub."

(c)   "One of the subs [sic] employees has the responsibility to recommend what resources we need."

(d)     "A number of employees of the Sub (yes, the Sub) have openly complained to others that they are not doing anything on the project for days/weeks at a time and yet are being paid very high rates."

(e)     "The program manager [*i.e.*, DENAULT] seems to be delaying the project (to the point where we are on the verge of a write-down) through gross mismanagement."

(f)     "Given all these facts, it is increasingly apparent to myself and to many people on this project that kickbacks to the program manager may be taking place as this is the only reason that can make sense out of all that is going on here. There appears to be a history of deception in the project."

252.     As the May 26, 2011 criminal complaint indicates, however, SAIC conducted only a "brief internal investigation" of Denault and inexplicably terminated it "after approximately five months" without having taken any "adverse action against [him]."  The Ethics Case Management Log – the source document for the December 2010 criminal complaint's description of Leon's whistle-blower complaint – confirms that an investigation was opened on March 14, 2005 and closed on August 17, 2005.

253.     Yet, as Leon explained at the criminal trial, he ensured that at least one member of the Ethics Committee knew he made the complaint, because he "wanted to guide" the Ethics Committee. According to SAIC protocol, the Ethics Committee was supposed to report potential conflicts of interest to the director of compliance and legal department; and, presumably, the ethics complaint was reported internally, as required.  Nevertheless, the investigation went nowhere, primarily as a result of management's concern about interfering with Denault's ability to squeeze as much profit out of the project as possible.

254.    For example, in an email circulated internally among human resources professionals at SAIC, including McConnell, Kate Parker, SAIC's head of employee relations, indicated that the Company was considering suspending the ethics investigation pending to allow Denault to continue working on the project, as follows:

> Playing phone tag with RS. Have discussed suspension pending completion of major testing event, when testing is complete Mark will work with Denault and hand off to me. We don't want to jeopardize the testing or the program and RS agrees.

255.    This statement is included in the Ethics Case Management Log, which also contained the following: "This troubled project has been in difficulty and changed management and leadership numerous times."  Indeed, a response from Steve Ayers, who served as SAIC's Chief Ethics Officer from 2002 to 2005 and retired in 2007 as the Senior Vice President for Contracts and Procurement, confirmed that the contract "gets lots of scrutiny from Corporate and the Board."

256.    According to McConnell, Leon's ethics complaint not only raised significant ethics issues, but it also raised significant human resources issues.  Yet, as Judge Daniels observed in the criminal proceeding when the defense sought to introduce in evidence the above email concerning Leon's complaint: "I don't think there's any mystery that . . . despite the ethics investigation . . . decisions were made to allow him [Denault] to continue on the project and to allow him to do all the proper or improper things that he was doing."

257.    Incidentally, Leon testified that in response to his ethics complaint, SAIC instructed Denault to staff more Company employees on the project without placing a limitation on the number of consultants sourced from Technodyne (or elsewhere).  This resulted in the hiring of a handful of SAIC people – "four or five," according to Leon.

258.    Denault also used the uneventful outcome of the purported "ethics investigation" to justify to Company management his propensity to continue sourcing consultants from Technodyne, as Leon explained:

> [L]ike I explained earlier, managers in IPR would say, You're hiring a lot of Technodyne people here, and he would say, on a couple times, Well, I was already investigated by the ethics committee, everything's fine. So it stuck to me because here was my complaint and he's using it to protect himself from further scrutiny because of the complaint. So it was kind of, you know, horrifying to me at that time. Like, wow, I just, here I am trying to raise a concern, and it winds up helping him to conceal this.

259.   In fact, Denault raised the result of the Ethics Committee investigation "[a]nytime anyone would raise concerns about . . . hiring a lot of Technodyne people . . . ." And, he continued to lead the IPR meetings until his suspension, in December 2010.

260.   Nevertheless, in late-2005, SAIC contemplated transferring the CityTime project to a group run by Larry Prior ("Prior"). Shangle testified that after the switch was announced, Prior "sent a memorandum asking quite a number of questions about Technodyne and also the contract in general." Although the switch never happened (as described elsewhere herein), Prior's inquiries underscored the unusual nature of Technodyne's involvement in the project and its subcontract with the Company.

261.   Following Leon's complaint in March 2005 regarding the likelihood that Denault was receiving kickbacks from Technodyne, and the attempted transfer of CityTime to a different business unit, Shangle complained to Lord in July 2006 about Denault. Specifically, at the criminal trial, Shangle testified that he raised the following concerns in a July 19, 2006 email message to Lord:

> There were a lot of decisions being made by the program office to, to proceed with work that was not currently under contract with the city. And I was concerned that the city was authorizing us to proceed with work that was not defined, a price that's not been set for those services. So I felt that put both the city and SAIC at risk, starting that work without knowing what the true scope of that work was and without knowing what the price of that work would be.

262.   As Shangle explained, he "started to be excluded from meetings and discussions with the city on work orders and contract actions," which was highly unusual because his role as contract manager required his involvement in such matters. Typically, Shangle was "very involved with both

the customer and/or internal program management office" and, accordingly, he "was a key member

of the SAIC management team on [those] other projects." Thus, Shangle also raised concerns with

Lord in this email that Denault was diminishing his involvement in the CityTime project. And, after

Shangle sent the email, Denault stripped him of even more responsibility (detailed below).

263.    At the same time, Shangle had concerns regarding the level of business that SAIC

was funneling to Technodyne. Yet, out of concern that his emails were being monitored by Bell –

Denault's right-hand man – Shangle verbally voiced his concerns to Lord regarding Technodyne. As

Shangle explained at trial:

> I felt there was an inappropriate relationship going on [with Technodyne] because of
> . . . Gerard's adamant behavior towards not competing the Technodyne contract . . . .
> [H]e [w]ould not be so adamant about that if he didn't have a personal stake in
> Technodyne's subcontract.

264.    As detailed above, Shangle also complained to Lord and others regarding SAIC's

failure to put the Technodyne subcontract up for competitive bidding, as SAIC's policies ordinarily

required. Yet, as Shangle and Preucil confirmed, those complaints went nowhere, and Lord and the

other executives who received the complaints simply rejected them. It was simply business as usual.

265.    In fact, the relationship between SAIC and Technodyne – a staffing subcontractor that

nobody had ever heard of before CityTime – seemingly *flourished*, despite Technodyne's unusual

monopoly on supplying staff for the project and consistent complaints regarding the issue. Indeed,

Preucil testified that Technodyne "had a huge portion of the work" associated with bids/proposals

that SAIC planned to pursue for work on entirely different projects. As McConnell stated: "there

were a number of bids, and they were all in the city and the state, out of Albany, and they all had

Technodyne as the primary subcontractor." According to McConnell, Denault had at that time made

a push to become an operations manager, and Dube – who "was very, very involved with the bidding

and proposal process of the business" – agreed.

266.     Moreover, notwithstanding the fact that Technodyne stood to receive work on any such awarded contracts, Technodyne received payment from SAIC for purportedly assisting in the bids/proposals on the same scale it was paid for supplying contractors on CityTime.  As Preucil stated: "[t]hey were paid the same salary they were paid if they were working under their subcontract for the city" – even though "[i]t was recommended policy not to . . . ever" compensate vendors for assisting in bids/proposals for which they might receive work.  Yet, Taylor –the CityTime business unit Controller – confirmed that Technodyne received "about $3 million for non-CityTime work," which included "bid and proposal support and other type[s] of projects like that."

267.     In contrast to Technodyne's increasing role in staffing the project, however, Denault made sure that Shangle's responsibilities correspondingly decreased.  In an August 8, 2006 email, Denault announced that "he was making changes to the procurement process and the work order and proposal process and the asset management process of the project," Shangle testified.  Specifically, he stripped Shangle of his procurement responsibilities on the project and transferred them to his Deputy Program Manager, Brian Fallon.

268.     Yet, this would not be the last time that Denault retaliated against Shangle; after Shangle articulated certain *non*-Technodyne concerns to Denault and Lord in early-February 2007, Denault further reduced Shangle's responsibilities and decision-making authority.  Consequently, SAIC executives who supervised Denault – such as Lord – allowed him to staunch valid concerns regarding Technodyne *and* non-Technodyne matters.

269.     Additionally, Drake, who handled staffing for the Company on the project for two years starting in or about 2003, when Technodyne became a sole-source subcontractor, consistently raised concerns regarding Technodyne's prominent role in recruiting consultants in violation of the Company's recruiting policies.

270.     Specifically, Drake testified that she "learned about Technodyne['s involvement in the project] when some of the employees on the program brought it to [her] attention."  As she explained, "[s]ome of the employees from Technodyne were having oversight of some of the SAIC employees at the time."  This arrangement, which was unusual, raised time-charging concerns and was otherwise of concern because "Technodyne employees were seemingly temporary type of employees versus what [she] would typically consider to be subcontractor employees" – "where they are reporting directly to their own people within Technodyne and not within SAIC."

271.     Due to her concerns, Drake raised the issue with Robert Hatfield ("Hatfield"), who was the business unit procurement director.  After speaking with Hatfield, she raised the issue with Denault.  As she noted: "Gerard was the program manager of the program and so I would want to speak with the program manager directly associated with any concerns that employees were bringing to my attention."

272.     In an email on December 31, 2003, Drake and Hatfield sought to schedule a meeting with Denault to raise the issue of SAIC's "working relationship" with Technodyne.  In response to Denault's request for clarity regarding the matter, Hatfield responded that the issue involved how staffing under Technodyne's subcontract was being utilized.  Additionally, Hatfield referenced Section 3.0 of Policy B-25, the Company's independent contractor policy.

273.     Ultimately, according to Drake, Denault did not make any change to project staffing in the wake of the concerns that she and Hatfield raised.  In fact, she discovered that her efforts to recruit staff for the project were being stymied by Technodyne's prolific hiring.  As she testified: "We were finding that we were not getting the number of postings that we thought we should be getting associated with the [project] . . . ."  Yet, for all job openings, the Company's corporate policy

required positions to be posted "internal[ly] first to make sure that any internal employees have the opportunity to apply."

274.    As Drake confirmed: "We always have the preference to hire first for SAIC."  As she explained, the interest in hiring internally on CityTime was intended not only to promote "direct labor" that "generates overhead for the company," but also to ensure that SAIC was "building our capabilities in the New York area" to improve "the skills and capabilities for the company when we have the openings for SAIC."  Nevertheless, Denault was dismissive of the concerns and unreceptive to Drake's offer to send an SAIC recruiter to New York "to learn more about the job openings" and "get a better understanding" of "the skills and capabilities" needed.

275.    Because Drake could not make progress with Denault, she "elevated [the issue] to the business unit."  In an April 29, 2004 email, she sought to schedule a meeting with Denault and several other individuals from the business unit: William McGarrett, Deputy General Manager; Ward, Denault's supervisor; William Keene, in finance; Simran Ratra, in project control; Beverly Hayes, in contracts; and Patricia Carter, the recruiter primarily staffed to CityTime.  As Drake wrote: "There are concerns on the program that many individuals are being brought in through Technodyne versus building an SAIC employee base in New York."  She testified that she "was trying to determine how a position was determined, if it was going to Technodyne as a subcontractor or to SAIC," and wanted to report "that employees were bringing up similar concerns through the HR department . . . ."

276.    In response to Drake's scheduling email, however, Denault responded with several explanations for increasing staff through Technodyne, none of which – according to her – were legitimate or consistent with her personal observations.  For example:

(a)      Denault claimed that "[t]he business model we employ here is being done to provide us [with] flexibility in accessing skills for short-term assignments."  Yet, Drake personally observed that "Technodyne employees were lasting for a year or more at times."

(b)      Denault claimed that "[i]f a position is validated in the EAC" – *i.e.*, estimate at completion, or contract requirements and dates for completion – "we post the position on [AJOBB]," SAIC's internal job-posting site.  He further claimed: "If we get a qualified candidate from within SAIC, we hire them.  If we get a qualified candidate from the outside, we hire them.  If we do not get a qualified candidate, then we go to either Technodyne or Ariel Partners for a qualified candidate." However, Drake "was observing with my recruiters that . . . on the CityTime program they were frequently bringing in Technodyne employees.  They weren't always posting positions through SAIC at the time."

(c)      Denault claimed that "[i]f the position is temporary, then we tend to lean towards Ariel or Technodyne first, as I am not interested in hiring and firing people for a few months of work."  Yet, as Drake testified, many consultants were not employed on a temporary basis, and SAIC corporate policy dictated the hiring of candidates placed through the Company first.  Further, for temporary employees, Drake testified that "[t]here is the requirement associated with temporary labor that the individual be 90 days or less, for temporary labor.  And we compete with different companies associated with temporary requirements."

(d)      Denault claimed that "as of the last EAC, almost the entire team is rolled off in January of '05 including PMO [project management office] staff," and, further, that "[i]f we do not have department of education in place, then there will be a significant roll off event then. The intention is to first deploy the permanent SAIC staff into agency rollout, where appropriate, but you will likely see the Technodyne and Ariel staff drop significantly starting in the early fall as is

planned in the EAC. In all cases, we look to roll off Technodyne/Ariel people first, naturally." As Drake testified, she understood that Denault meant to convey that: (i) "if the program was drawing down associated with certain requirements of people, that the Technodyne and other Ariel people would be the first to go versus the SAIC employees"; and (ii) he "was going to deploy the SAIC folks into the requirement first where appropriate" and "you would see the Technodyne and Ariel people come off first." Yet, as Drake observed, "Technodyne employee staff continued to be higher than the SAIC staff on the program" and he was not rolling off Technodyne and Ariel people first.

(e)    Denault claimed that "[i]f we get DOE [Department of Education] or other business in NYC that allows for mobility, then of course we will look to build the permanent staff here in NYC" and "the proportion should shift dramatically towards permanent staff." Yet, Drake observed no "additional business [growth] in the area" or dramatic shift towards permanent staff.

277.    Drake further testified that corporate policy required SAIC to compete open positions for temporary employees among those staffing vendors included on the "approved list," *i.e.*, "a set list established by our corporate offices of which vendors we can use for temporary labor." Neither Technodyne nor Ariel was included on that list.

278.    As Drake confirmed, she reminded Denault that Technodyne and Ariel were not on the approved list of staffing vendors, that vendors on the list could fill technical requirements in the New York area, and that corporate policy mandated that temporary labor would be competed. And, notwithstanding the fact that Denault represented to Drake through one of his staffers that he would follow up on the approved list of temporary labor, he never did.

279.    Accordingly, when Drake left the CityTime project in January 2005, she observed more Technodyne employees than SAIC employees staffed on the project and none of the concerns

she raised had been addressed.  Additionally, she raised these concerns with the group that took over recruiting for the project after she left.

280.    As Drake confirmed, she persistently raised these issues during her tenure working on the project and wanted to ensure that the Company executives in charge above Denault – who were senior executives at the unit and group levels – knew of her concerns, so they could make educated decisions.  Yet, the staffing improprieties persisted.

281.    In fact, during McConnell's tenure (from in or around 2005 and again from 2008 until 2011), there were approximately only 48 SAIC employees, as compared to nearly "double or triple" that number for temporary staffers.

282.    During the course of her involvement in CityTime, SAIC's human resources directors were asked by "HR leadership and the management of the Lacombe [business unit], Phil Lacombe and his boss," to "try to drive and grow [SAIC] headcount . . . ."  Moreover, McConnell "was asked to look at this particular program [CityTime] as an opportunity to do just that; to try to grow SAIC headcount."

283.    As McConnell noted, hiring SAIC personnel on a project adds value because it allows the business to grow "organically," helps to cover overhead, and improves the "technical acumen" of employees and, therefore, the "depth and breadth" of the Company's staff.  Moreover, McConnell had an incentive to place SAIC employees on the project because "at that time human resources directors were measured on how well [they] added value added labor [*i.e.*, SAIC headcount]," and that metric was used to determine her employment objectives, salary and bonus.

284.    In an attempt to increase the Company's headcount on the project, McConnell contacted Denault, who gave her job descriptions that she and her staff converted into requisitions

"to solicit candidates for those positions."  Yet, she "did not fill any of them."  Accordingly, she asked Denault why he was not using the Company's recruiters or filling positions through them.

285.    Like the reasons he had expressed to Drake, Denault told McConnell that "the way he utilized his labor on the program was in a surge capacity," which "mean[s] that people would come and go as he needed them."  As McConnell testified: "[w]hen you hire individuals to a company, like I would be doing to SAIC, I can't use my labor in that capacity.  I can't sen[d] them away and bring them back and send them away."

286.    Denault also indicated that "in the New York marketplace . . . they needed H-1B labor[,] meaning they could not find U.S. citizens who . . . could fulfill the needs of this program."  Yet, for H-1B labor, the human resources director had to confirm that the employee would "have three years of work," otherwise the employee would be "subject to deportation."  If labor was used in a surge capacity, McConnell could not provide such confirmation.

287.    And, Denault claimed that if non-H-1B employees were staffed to the project, SAIC would "be at risk for bringing in unions" which McConnell confirmed SAIC did not want to do.

288.    Yet, as McConnell confirmed (much like Drake had), "SAIC has a pretty strict policy about how we handle temporary labor.  We have a list of approved vendors.  It's maintained at the corporate level of which vendors we're allowed to use . . . [and] we also have a requisition we post to all of the temp agencies that bid on certain kinds of jobs."  As she further testified, "[Denault] only wanted to use Technodyne. It was very clear that we were not going to be using any of the other temp agencies to solicit applications."

289.    However, during the second time she was involved in CityTime staffing matters (from 2008 until 2011, when the project was in the Dube business unit), she learned "Technodyne was not a temp agency; it was a subcontractor."  Because she did not handle subcontracting, she

- 87 -

"didn't have anything to do with the selection or undoing of hiring more labor . . . ."  Nevertheless, Denault led McConnell to believe that he was hiring temporary labor on the project, and yet he failed to follow SAIC's internal policies.  Further, as McConnell confirmed, Technodyne's prominent role in staffing the project was consistently raised in meetings with her superiors and other SAIC personnel.

290.    For example, in 2005, McConnell and Denault attended regular status calls regarding projects within the business unit, during which the issue of Technodyne's involvement in the project arose.  As she explained:

> Phil Lacombe had weekly staff meetings where he would pull together all his direct reports, and Gerard Denault was a direct report, I was a direct report, a number of other individuals, and we had weekly status calls to go over the success of the business where we had challenges, that kind of thing, and Gerard and I were both participants.

291.    In fact, Denault "pretty much always mentioned Technodyne in some capacity" in his weekly updates during those meetings.  As she noted: "It was clear that they [Technodyne] were doing the majority of the work . . . and that was relevant to his discussion about how the project was going."

292.    According to McConnell, Technodyne's extensive involvement in project staffing caused meeting participants to regularly question Denault regarding the issue.  As she explained:

> That was a frequent topic in those meetings. There were a number of individuals who represented functions who would challenge Gerard on the use of Technodyne and ask when we were going to add value-added labor, and that might have been the finance person. There was a project control person, and there was a project execution person, the one who oversees projects, that's his job, to analyze projects, and he would ask almost every call, When are we going to add more SAIC head count. And Phil Lacombe would ask that, too, because I'm sure he was getting pressure from above.

293.    As she indicated, Denault would respond to the questions and criticism, and then the issue "would drop and it would come up [again] the next time."  And, nothing would change.

294.    Hsiung corroborated these accounts in his sworn declaration, submitted in another proceeding.  As he recounted: "From 2004 to 2009, it became increasing[ly] apparent to me that certain well-connected people were benefiting disproportionately from this project, in ways that were unrelated to their abilities or contributions.  Despite this perception, I also learned that it was best not [to] make waves about this."  Indeed, as Hsiung indicated, project personnel who had complained were frequently retaliated against – by Denault and others – in an attempt to silence them, including in or around 2004 and 2005.

295.    According to Hsiung, by the end of 2010, "the scandal broke into the open with the DOJ's criminal complaint against Mark Mazer and Scott Berger, among others, for their kickback schemes."  As Hsiung related, SAIC was sensitive to the implications of the criminal investigation and prosecutions at that time and consequently intensified its efforts to monitor the project:

> The DOJ's prosecution of Mr. Mazer and Mr. Berger was an enormous deal for us at SAIC and the CityTime project generally.  At SAIC, the company instituted an internal investigation.  Generally, I sensed an enormous amount of anxiety at the management level.  For example, the SAIC group president and even the CEO met with the SAIC employees at CityTime. The group president began coming to visit us on a regular basis.  This had never happened before.

296.    In or around mid-February 2011, Hsiung began providing information to the DOI regarding the CityTime project.  For example, on February 16, 2011, he sent an email to the DOI in which he listed contractors that billed through Technodyne, D.A. Solutions and other Technodyne subcontractors, "many if not all of which were involved in the misconduct that had or would later come to light," and "provided . . . information on some easy ways to prove that false time sheets had been submitted to the City."  On February 23, 2011, he sent information to the DOI concerning the organizational structure of the project, identifying "all the important managers and their immediate subordinates, including titles."

297.     At the same time, however, Hsiung was providing information to the SAIC Audit Committee regarding misconduct on the project, indicating in his declaration: "While I was speaking with DOI around this time, I also was reporting internally to SAIC's audit committee about the problems with the CityTime project."  As Hsiung noted, "[o]ne of [his] emails to the SAIC internal investigator began in the following way":

> As someone who has been with the Citytime project since its early days, here are my observations regarding the "patterns" of self-dealings at Citytime . . .[] my purpose is to unveil the "culture" at this project, where multiple persons in positions of power have both the opportunity and the financial incentive to use the project to further their own interests and the interests of their friends rather than that of the corporation and its client.  And I believe that, it is this pattern of self-dealing, replicating like a virus throughout the project, that has turned Citytime into such a fiasco for SAIC.

298.     As he further recounted: "My email continued by describing a large number of networks at the project, including that of Technodyne but also more subordinate networks, which followed a similar pattern.  I provided SAIC auditors with a list of a lot of names and made clear that I would be retaliated against if any one of those people found out."  Nevertheless, as far as Hsiung knew, "SAIC investigators and in-house counsel did nothing with this information . . . ."

299.     Subsequently, Hsiung continued to cooperate with the DOI and DOJ and advised them that "if they wanted to go after SAIC, they should look at certain relatively easy ways to show that it had made false submissions to the City."  According to Hsiung, "SAIC had always submitted the maximum hour limit set by the City without supporting documents."  Hsiung also explained that after NYC began asking for supporting documentation "by around 2009, when scrutiny on the project was increasing . . . at year's end there was a rush to accumulate hours to reach the maximum limit.  That is, SAIC still tried to reach the maximum hour limit by just running up the bills."

**5.     From Virtually the Inception of Denault's Involvement in the Project, SAIC Received Complaints About Ballooning Costs**

300.    Like the ongoing complaints that SAIC received regarding Denault's favoritism of Technodyne, SAIC received or otherwise was aware of complaints regarding the performance of the CityTime project virtually from the inception of Denault's hiring.  Standing alone, these complaints should have placed SAIC on notice that the ballooning cost of the project did not reflect a legitimate increase in the work associated with the project.

301.    In a February 19, 2003 letter to Group President Hughes, OPA Executive Director Valcich outlined a plethora of significant concerns regarding the rising cost of the CityTime project, consistent and increasing project delays, and the inadequacy of SAIC's performance.  For example, Valcich complained that:

(a)     "Instead of improving the schedule that the City had reluctantly accepted, SAIC extended the FISA and OPA implementation dates [for CityTime] by five months."

(b)     "SAIC's re-baselining of the project has turned into an attempt to renegotiate the project without involving the City.  The City has repeatedly voiced its objections to this approach and has been ignored."

(c)     "The City has repeatedly requested that SAIC involve the City in the development of the Schedule, the Work Control Plan, and the Deliverable Payment Schedule.  To date, this still has not happened."

(d)     "[T]he City's attempts to display a critical path displayed deliverables that were identified as critical to SAIC, not to the project."

(e)     "The Schedule SAIC provided . . . was developed without City participation and does not reflect the City's assumptions or interpretation of the Contract.  It incorporates wrong assumptions and misinterpretations of facts, events, and processes."

(f)     "With regard to the Schedule that was produced, it pushes the dates out even further and is unacceptable to the City."

(g)     "I must assume that this document [the schedule] has some value as a straw man within SAIC. The cost in ill will, damage to SAIC's credibility and reputation within the City, and reduction of expectations within SAIC's team are a high price to pay for this document."

(h)     "A certain level of professionalism and compliance with acceptable industry standard practices is expected of a contractor responsible for the execution of a $100M+ project. Instead the City is told that SAIC will test the system for performance / stress by transmitting a single transaction – this for a system that is to ultimately have 150,000 users on the system. If this doesn't question SAIC credibility, I'm not sure what will."

(i)     "The City agreed that the first phase of the pilot agencies would be just OPA and FISA. SAIC was to roll out these agencies by the end of the calendar year. But the City later discovered that the status of the builds had been misrepresented. Build 4A was nowhere near completion. This contrasted drastically with what had been represented to the City . . . . [and the] implementation has been delayed three times, totaling 11 months."

302.    Valcich also complained that SAIC's internal corporate reviews were delaying the project, and that it was "bogged down in the quagmire of SAIC's internal bureaucracy," as follows:

> Never was a "bottoms up review" requested by the City. From the City's limited view it was yet another of SAIC Corporate reviews. What I know about these never ending bottom up – top down reviews is that they are many and often. They are not shared with the City. The City can tell that they are going on because progress on the project seems to stall. We know when they are over because progress starts up again. I have complained about them ever since SAIC purchased the contract. These reviews appear to be conducted by whomever from Corporate has staff sitting around not doing anything. From the City's perspective their effect have been only to further delay the project and, of course, increase SAIC's costs.

303.    As Valcich explained, "[m]ost work orders to date are in draft form, requiring weeks of SAIC review by various Committees," and "SAIC has been late on virtually every deliverable.

The inability of SAIC to deliver on time has resulted repeatedly in wasted City resources." Further,

he complained of the Company's lack of commitment to quality and timely completing the project:

> SAIC has been guilty of producing deliverables far below acceptable standards. The City has found that SAIC's commitment to quality is almost non-existent and is reflected from the top down. This lack of commitment to quality permeates matters both great and small. It wastes a tremendous amount of time for my staff and is of much concern to us when it relates to important things, like the hierarchical report sort issue or the costing of hardware where prices have been off by 400%.

304.    Additionally, Valcich expressed frustration to understand why the Company would

engage in such delays, commenting:

> I do recognize that you are on a fixed price contract.  This is one of the reasons I am at a loss to understand why SAIC is opposed to implementing OPA and FISA earlier. It appears to the City that SAIC seems to think that this is a time and materials contract and hence SAIC could take as long as possible to finish an activity.

305.    Finally, Valcich noted that "the City does not agree with your portrayal of events as

outlined in your letter," indicating that he had "already addressed schedule and critical staffing issues

in separate letters."  Accordingly, OPA had expressed dissatisfaction with the project schedule, and

SAIC's staffing of the project, as early as 2003.

306.    Furthermore, as Leon testified, in 2004 and 2005 (among other times) he observed

that scheduling charts prepared by Denault, which were included in presentation materials for use at

IPR meetings, consistently set forth unreasonable schedules for the completion of the design and

developmental testing portion of the project.  As he testified, the schedules in the IPR review charts

"were slipping on a regular basis."  For example:

(a)    As of December 3, 2004, the presentation materials stated a completion date

for the design/development test of November 19, 2004 – *which had passed* – and a completion date

for user acceptance testing of December 20, 2004.  As Leon testified, however, user acceptance

testing was not complete by that date.

(b)   As of January 14, 2005, the presentation materials stated a completion date for the design/development test of February 4, 2005, and a completion date for user acceptance testing of March 4, 2005.  As Leon testified, however, testing was again not complete by those dates.

(c)   As of February 10, 2005, the presentation materials stated a completion date for the design/development test of March 11, 2005, and a completion date for user acceptance testing of April 8, 2005.  As Leon testified, however, testing was *again* not complete even by *those* dates.

307.   Yet, Leon testified that the testing dates continued to slip, which was consistent with the complaints expressed in Valcich's February 2003 letter – but flatly *inconsistent* with the presentation materials that those in attendance at the IPRs consistently received.

308.   Nevertheless, the high-level executives that attended the IPR meetings and received the presentation materials allowed the schedule to continue to slip under Denault's direction, as the project cost skyrocketed and the project went into the black for SAIC – all, despite the consistent complaints from Shangle, Preucil, and other SAIC employees staffed on the project.

309.   Further, as detailed herein, the OPA conducted an audit in or about July 2008 of certain timekeeping practices on the project.  As the December 2010 criminal complaint alleges, the OPA conducted the July 2008 audit "to determine whether consultants paid from a certain work order billed through the Lead Software Developer [*i.e.*, SAIC] contract submitted timesheets for services after they were terminated, and if the contractor and consultant received payments for such services . . . ."

310.   Specifically, in 9 out of 31 instances, the OPA found that "the consultant's last date of work on an approved timesheet was after the consultant had been terminated"; in most cases, "two or more weeks of false timesheets were submitted following a consultant's termination"; and "in one instance, ten weeks of false timesheets were submitted."  According to the December 2010 criminal

complaint, which quoted the audit report, the OPA concluded that "'[t]here are checks and balances (Manager's, CityTime Contract Management, and Contractor) according to the procedures for which this situation should not have occurred.'"

311.    Issues raised in the OPA's 2008 audit were again raised in March 2010.  In a March 26, 2010 article entitled "'Overbilled' city should get refund, CityTime should be probed, says Brooklyn pol Letitia James," *The New York Daily News* ("*Daily News*") reported that NYC Councilwoman Letitia James ("James") "want[ed] the city to get a refund from the high-paid consultants hired to work" on CityTime.  Specifically, the article quoted her as saying that "'[t]he city should get a partial refund because they were overbilled,'" and reported that she was "demanding an investigation into the infamous CityTime system."  As the article noted, "230 consultants earn an average of $400,000 a year for their work" and 11 "pulled in more than $600,000 annually . . . ."  James reportedly "vowed to press" law enforcement authorities, including the DOI, to investigate the project.

312.    According to a March 31, 2010 *Daily News* article, entitled "High time we probed CityTime payroll project 'disaster,' pol Letitia James says," James reportedly stated that "'[c]riminal statutes may have been violated,'" and "called on investigators to probe not only the consultants but also the city officials responsible for overseeing the contract."  In fact, she alluded to the submission of false timesheets on the project, stating: "'I've been told, based on an examination of the record, that there are some time sheets that may have been inaccurate and/or false.'"  The article quoted her as saying that Mayor Bloomberg should "'close the spigot until such time as there is a complete and full investigation.'"

313.    As of May 2010, concerns regarding CityTime – and SAIC's performance – remained at the forefront.  As Velazquez testified, she had concerns in May 2010 about approving the release

to SAIC of NYC's favorable March 2010 performance evaluation for the Company in the midst of increased scrutiny of the project.  Indeed, although the evaluation indicated that the CityTime system was then accommodating additional NYC employees, the project would not be complete until June 2011 – reportedly at a total cost to NYC of more than $700 million.

314.    Also in 2010, the Comptroller completed an audit of Spherion in connection with the CityTime project.  Specifically, in his public September 28, 2010 report, the Comptroller questioned OPA's efforts to monitor Spherion (NYC's quality assurance consultant), stating that the objective of the audit was "[t]o determine whether OPA, through Spherion, effectively monitored its agreement with the CityTime developer [*i.e.*, SAIC] and whether Spherion provided the oversight necessary to complete the CityTime project."  The audit was also conducted with at least some level of involvement by SAIC, insofar as the Comptroller "observed a CityTime weekly status meeting with OPA officials and the developer [*i.e.*, SAIC], and attended a demonstration of the system."

315.    Consequently, the evident focus of the audit/report was the astronomical cost of the project – and efforts to increase project oversight with the goal of stopping the cost from climbing. As the Comptroller concluded in his introductory letter to the report:

> The [Comptroller's] audit found that OPA mismanaged its quality assurance agreement with Spherion, which severely limited Spherion's ability to oversee the development of CityTime and may have resulted in significant increases to the cost and duration of the project.  Thus, the audit recommends that the OPA Board of Directors (Board) create an independent crisis management team to advise the Board on whether it is feasible to continue the CityTime project.

316.    Further, the Comptroller referenced Amendment No. 6 as an inflection point for the project (after which costs skyrocketed), noting: "[i]n 2005, OPA also relied on Spherion and its subcontractors to validate and estimate information used to justify a major escalation of the project at a juncture when CityTime could have been terminated or possibly rebid."  Additionally, the audit report referenced Valcich's February 19, 2003 letter, quoting that portion which stated that "'SAIC

has been guilty of producing deliverables far below acceptable standards.  The City has found that SAIC's commitment to quality is almost non-existent and is reflected from the top down.'"

317.    Accordingly, almost immediately after placing Denault in a management position on CityTime – and notwithstanding the fixed-price nature of the contract – the cost of the project began skyrocketing.  Moreover, when Amendment No. 6 was approved, the cost of the project increased substantially more.  At the very least, the complaints and scrutiny alleged, combined with access to internal information regarding the project, should have alerted SAIC and its management to the fact that rising costs on the project likely were not merely the result of legitimate contract work and that the Company was or would be exposed to material loss.

> **6.    Using D.A. Solutions and PrimeView to Provide Staffing Services on the Project Violated SAIC's Procurement Policies**

318.    The use of D.A. Solutions and PrimeView to provide staffing services on the project also violated SAIC's internal procurement policies, yet the Company nevertheless allowed Denault and Mazer to source candidates from them and failed to engage in reasonable efforts to prohibit him from doing so or otherwise adequately investigate the extent of their involvement in the project.

319.    In late-2004 or early-2005, Mazer suggested that SAIC hire D.A. Solutions to provide staffing support services, and SAIC held a meeting with Aronshtein (principal of D.A. Solutions), Mazer, Denault, Shangle, and Brian Fallon (Deputy Project Manager).  According to Shangle, SAIC had no prior experience with D.A. Solutions.

320.    To determine whether D.A. Solutions could legitimately provide staffing support, Shangle followed SAIC policy and requested business unit procurement director Hatfield to conduct "due diligence on D.A. Solutions for potentially bringing them on as a subcontractor to SAIC on the CityTime contract."  According to Shangle, this diligence consisted of a "background check" that

sought to "gather any information on past contracts and past customers," and, as noted, Company policy required due diligence on potential subcontractors.

321.    As Shangle confirmed, D.A. Solutions did not have a website, and Aronshtein did not provide a history of past projects on which his firm had provided staffing services, nor did he supply literature concerning the firm.  Moreover, although Aronshtein represented that D.A. Solutions had a VENDEX on file with NYC, as all companies doing material business with NYC must, it did not.

322.    As Shangle and Velazquez confirmed, contractors must undergo a detailed review process by NYC before being deemed responsible to contract with NYC.  As Velazquez indicated, this process includes, among other things: a VENDEX questionnaire that the contractor must complete truthfully or risk committing a criminal offense for willful misstatements; and other forms of due diligence that contracting agencies are responsible for conducting.  Consequently, the lack of a VENDEX for D.A. Solutions meant that the firm had not undergone NYC's extensive vetting process and that Aronshtein had lied during his meeting with Shangle about having done so.

323.    Not surprisingly, Hatfield's evaluation of D.A. Solutions failed to reveal information that could confirm the legitimacy of the firm or its ability to reliably provide staffing services. Accordingly, as Shangle testified, Hatfield recommended in early-February 2005 "that [SAIC] not enter into a subcontract with D.A. Solutions" based on "a lack of company history and a lack of information available on the company . . . ."

324.    As Shangle noted, Hatfield explained in an email to Denault "that he didn't think it was in the best interests of SAIC" to hire D.A. Solutions because SAIC "had staffing services companies . . . in [the] New York, New Jersey metropolitan area," and that "he was unable to obtain information on D.A. Solutions and didn't feel [D.A. Solutions] was an attractive alternative."  As

Hatfield asked: "[w]hy start another sham subcontract when there are several New York, New Jersey area approved SAIC temporary staffing agencies already in place (Rotator and Innovative)[?]"

325.    Later in 2005, however, Shangle learned that two consultant candidates had listed D.A. Solutions as their employer, despite the fact that SAIC's procurement department had rejected D.A. Solutions and it was not an authorized subcontractor.  After Shangle raised the issue, Denault claimed that the employer designations were a mistake and the candidates submitted forms listing Technodyne as their employer.  In response, Shangle raised the issue with SAIC's legal department.

326.    Yet, by 2010, D.A. Solutions had placed 109 consultants on CityTime.  Additionally, PrimeView became a staffing contractor to Technodyne, presumably also outside of the Company's procurement policies.

327.    As Blunt testified, Mazer purportedly insisted on adding D.A. Solutions as a staffing contractor, and in mid-2006 also insisted on adding PrimeView in a similar role.  After that point, if Blunt "had a vacancy or needed resumes, [she] would send an e-mail to both PrimeView and to [D.A. Solutions] to secure resumes . . . ."

328.    In September 2006, however, the process changed, and all resumes for positions were supposed to first go through SAIC and, more specifically, Denault.  As Denault wrote in an email to Blunt in or about late-September 2006: "Patricia, the authorized person with regards to filling these positions is me, so please forward [requirements] to me and I will forward resumes to you as they are gathered."

329.    Accordingly, even after Hatfield had communicated the procurement department's decision not to engage D.A. Solutions as a subcontractor, and Shangle had confronted Denault on the use of D.A. Solutions and reported the issue to SAIC's legal department, Denault openly positioned

himself – and SAIC – as the primary recipient for consultant resumes from D.A. Solutions and PrimeView, in violation of the Company's procurement policies.

330.    Consequently, SAIC management knew or should have known that D.A. Solutions was providing staffing on the project in violation of the SAIC's procurement policies.  In fact, the *Daily News* reported on December 16, 2010 that an OPA representative purportedly confirmed in January 2010 that D.A. Solutions was actively placing consultants on the project through SAIC, stating: "The city pays SAIC for the consultants provided by D.A. Solutions.  Over the course of the project, D.A. Solutions has provided 45-50 consultants."

**E.    Developments Occurring Immediately Before Filing the March 2011 Form 10-K also Implicated SAIC in the CityTime Fraud**

**1.    The December 2010 Criminal Complaint Implicated Denault, SAIC, and Staffing Contractors in the Overbilling Scheme**

331.    On December 15, 2010, the USAO and DOI announced criminal charges against Mazer, Berger, Aronshtein and Natanzon as perpetrators of the CityTime fraud (which was then publicly estimated at $80 million), and against S. Mazer and Medzon for laundering proceeds of the fraud for Mazer.  Mazer and Berger were consultants for Spherion, which OPA had hired to perform quality assurance services in connection with the project.  Aronshtein and Natanzon were principals of their own purported staffing firms – D.A. Solutions and PrimeView, respectively – which had subcontracted with Technodyne to perform consultant staffing services for the project.

332.    As the December 15, 2010 press release disclosed, the investigation was conducted in large part by the DOI, which represented NYC's interests in uncovering and addressing the fraud.  In fact, the allegations of the criminal complaint were derived nearly exclusively from the investigation conducted by the DOI, as the following statement from the USAO's investigator, who supported the allegations under oath, attests:

The information set forth below, except where specifically indicated, is based on my review of relevant evidence and analyses obtained or conducted by DOI and my discussions with DOI investigators who gathered and analyzed the evidence.

333.    Specifically, in the criminal complaint, dated December 14, 2010 and unsealed the following day, the Government alleged that Mazer and the other perpetrators of the fraud prepared and/or submitted fraudulently inflated time sheets for numerous consultants on the project and hired consultants that were unnecessary for the project. Although Mazer and Berger were consultants to Spherion, they represented OPA's interests on the project and misused their power to approve false timesheets. Aronshtein and Natanzon, via their staffing firms, referred consultants to Technodyne and falsified consultant timesheets.

334.    As alleged in the criminal complaint, Mazer was OPA's primary representative on the project, and he exercised his authority to approve increases in the scope of the project. Increases in the scope of the work not only benefited Mazer and Berger[4] – who regularly received kickbacks from Aronshtein and Natanzon for steering business to them, as alleged in the criminal complaint – but the increases also benefited SAIC, which served as the prime contractor on the ever-expanding project.

335.    In its role as the prime contractor, SAIC was responsible for submitting invoices and timesheets to NYC for payment, including for work performed by unnecessary consultants who were hired to further the fraud – or for work not performed at all. As the prime contractor, SAIC was also charged with obtaining the contract amendments described herein, and was a direct beneficiary of the increased billings permitted by those amendments and various work orders that expanded the scope of the project or otherwise increased the contract price.

---

[4]    Upon information and belief, Berger died on or about December 19, 2010.

336.     As shown by the December 14, 2010 criminal complaint, SAIC – not mentioned by name, but referred to as the "Lead Software Developer" – was implicated in the fraudulent scheme, despite the fact that neither SAIC nor any of its employees was then criminally charged, because the scheme involved obtaining additional work (and thus increasing costs and the proceeds of the fraud) through contract amendments and even work orders that exceeded the scope of the contract terms:

> In or about December 2003, the City agreed to a contract amendment with the Lead Software Developer, which had taken over the project in 2002, authorizing the expenditure of up to $114.6 million on the CityTime project.

> In or about 2005 and 2006, OPA began approving work orders for additional work, beyond the scope of the December 2003 contract amendment, reportedly required to be performed by the Lead Software Developer in order to enable the successful completion of the CityTime project.  In January and February 2006, the City agreed to contract amendments with the Lead Software Developer authorizing the expenditure of more than $100 million additional City funds, a total of $224.7 million, on the Lead Software Developer's responsibilities related to the CityTime project.

> Invoices for the CityTime project submitted by the Lead Software Developer indicate that the number of individuals for whom the Lead Software Developer billed hours purportedly worked on the CityTime project increased dramatically in 2005 and 2006 in connection with these new work orders and contract amendments. The size of the Lead Software Developer's bills to the City increased dramatically as well.  For example, in January 2005, the Lead Software Developer submitted a $255,772 bill to the City for work performed on the CityTime project.   In November 2006, by contrast, the Lead Software Developer submitted bills totaling over $5 million.

> This increased billing caused the dramatic increase in total contract payments to the Lead Software Developer described above.  Invoices reflect that, while the total billings by the Lead Software Developer did not reach $100 million until April 2006, four years after it began working on the project, it took only 13 more months for Lead Software Developer billings to reach $200 million. (in May 2007), and only 12 more months for billings to reach $300 million (in May 2008).  Over $300 million in additional bills have been submitted by the Lead Software Developer since May 2008.

337.     Building on these factual allegations, the criminal complaint also alleged that Mazer facilitated the scheme by: "help[ing to] shape and approve contract amendments and work orders that resulted in higher staffing levels on the CityTime project"; and "review[ing] and approv[ing]

- 102 -

contract extensions and work orders for the CityTime project, including extensions and works orders for work to be performed by the Lead Software Developer [SAIC]."  Accordingly, the criminal complaint alleged that contract amendments and work orders involving SAIC were integral to the scheme, because the ever-increasing and delayed work enabled SAIC to submit hundreds of millions of dollars in invoices to NYC for payment – resulting in payments to the Company (and, via SAIC, Technodyne and other subcontractors) and thereby facilitating the kickback scheme.

338.    Moreover, the criminal complaint alleged that Technodyne – not mentioned by name, but referred to as "Contactor-1" – was implicated in the fraud by virtue of its role in supplying consultants to SAIC; that Denault – not mentioned by name, but likely referred to as the "employee of the Lead Software Developer located in New York" – had communicated with Technodyne regarding the subcontract between SAIC and Technodyne; and that the Government had reviewed documents produced or generated by SAIC regarding its relationship with Technodyne:

> DOI learned from information maintained by VENDEX, from documents obtained from the Lead Software Developer, and from interviews with City employees, that an information technology contractor ("Contractor-1") served as a subcontractor to the Lead Software Developer for the project, and in that capacity provided consultants to the Lead Software Developer for use in completing tasks set forth in the new work orders and contract amendments.  These records reflect that, among other things, on January 9, 2006, Contractor-1 sent a facsimile from Contractor-1's offices in New Jersey to an employee of the Lead Software Developer located in New York, including a copy of the subcontract between the Lead Software Developer and Contractor-1.

339.    Furthermore, the criminal complaint alleged that SAIC had fraudulently submitted invoices to NYC for time billed by a consultant paid by D.A. Solutions (instead of the Company or Technodyne), despite the fact that D.A. Solutions was not registered with NYC's VENDEX system as an approved subcontractor on the project:

> In or about June 2010, DOI received information from a former consultant on the CityTime project ("Consultant-1"), whose time had been billed to the City by the Lead Software Developer.  Consultant-1 informed DOI that he/she was not paid by the Lead Software Developer or Contractor-1; instead, a company called "DA

Solutions, Inc." ("DAS") issued Consultant-1's paychecks.  Consultant-1 provided a copy of a paystub from DAS to DOI.  DOI determined that DAS was not listed in VENDEX as a subcontractor of the Lead Software Developer, nor was any contractual information concerning DAS's right to payment from the CityTime project available to DOI.

340.    And, the criminal complaint noted that the investigation, which was "still ongoing,"

covered the fraudulent submission of time records to NYC for payment for consultants who did not

work on the project and/or who were paid by D.A. Solutions or PrimeView (instead of SAIC or

Technodyne), as follows:

> Numerous CityTime consultants who were interviewed in connection with the investigation into false timesheets submitted on behalf of people who were not working on the CityTime project, described in greater detail below, state that they were employed by either DAS or Prime View, rather than by the Lead Software Developer or Contractor-1.

341.    In the Delaware case that Denault brought against SAIC to require it to advance his

legal fees, the Company acknowledged in its pre-trial brief that the fraudulent scheme involved

"second-tier subcontractors to SAIC" and that the defendants named in the criminal case "shared

some of the windfall revenue with Mazer and others," as the following description of the criminal

case included in the Company's brief demonstrates:

> The U.S. Attorney's Office in the Southern District of New York began a criminal investigation of the CityTime program in 2010. In December 2010, the U.S. Attorney's Office filed a criminal complaint against six people: an employee of a quality-assurance vendor the City hired (Mark Mazer), and principals (and their relatives) of staffing firms that provided staffing to the CityTime program as second-tier subcontractors to SAIC. The case was styled *United States v. Mazer, et al.*, Case No. l:l0-mj-02809-VA, filed December 14, 2010, S.D.N.Y. (continued as l:ll-cr-00121-GBD).

> The Government alleged that an extensive kickback scheme existed between these subcontractor entities, Mazer and his relatives. In a nutshell, the Government alleged that Mazer allowed the subcontractors to overbill the amount of actual work being performed on the program – and the subcontractors secretly shared some of the windfall revenue with Mazer and others.

342.     In its pre-trial brief in the Delaware proceeding, the Company also acknowledged that Denault – while serving as the Company's Program Manager for CityTime – "was responsible for negotiating with the City and subcontractors, and managing SAIC employees and subcontractors working on the program."

343.     Yet, as the December 14, 2010 criminal complaint alleges, the fraudulent scheme – only partially uncovered at that time, because the Government investigation was ongoing – revolved around, and was virtually entirely dependent upon, SAIC's submission of fraudulent billing records to NYC for payment.  As alleged therein, SAIC submitted for payment fraudulent time records from consultants during the pendency of the project, and received its portion of payments made by NYC, as the following excerpts indicate:

(a)     "Once the money was received from the City, the Lead Software Developer [SAIC] paid Contractor-1 [Technodyne] a portion of the money it obtained from the City. Contractor-1 would then issue checks to the Sub-Subcontractors [PrimeView and D.A. Solutions]."

(b)     "[T]he purpose of the fraud was to inflate the size of bills submitted to the City via the Sub-Subcontractors, Contractor-1 and the Lead Software Developer, in order to increase the amount of proceeds generated by the scheme."

344.     In fact, the USAO identified several instances in which SAIC had submitted false timesheets (approved by Mazer and/or Berger) from consultants, which increased the revenues received by the contractors and increased the project's cost to NYC, as follows:

(a)     "[T]he Lead Software Developer billed the City $163.47 for each hour of Consultant-1's time. Accordingly, the intended loss to the City for the 72 hours of Consultant-1's false time . . . equals $11,769.84. Both of the false timesheets signed by Consultant-1 were submitted

by the Lead Software Developer to the City in connection with Lead Software Developer's invoices seeking payment."

     (b)    "[I]n early 2007, the Lead Software Developer billed the City of New York $163.47 for each hour of Consultant-2's time. Accordingly, the intended loss to the City of New York for the 80 hours of Consultant-2's false time . . . equals $13,077.60."

     (c)    "The City was billed by the Lead Software Developer $123.13 for each hour of Consultant-3's time. Accordingly, the intended loss to the City for the 88 hours of Consultant-3's false time . . . equals $10,835.44.

     (d)    "[T]he Lead Software Developer billed the City $175 for each hour of Consultant-4's time. Accordingly, the intended loss to the City for the 80 hours of Consultant-4's false time . . . equals $14,000. Both of the false timesheets signed by Consultant-4 were submitted by the Lead Software Developer to the City for payment."

     (e)    Consultant-5 was hired in 2005 to perform work on CityTime at a rate of $45 per hour, which had increased to $73.15 per hour as of September 2010, when such consultant was terminated in connection with a phase-out of certain work.  "From 2005 through the end of 2007, the City was billed $124.43 per hour for Consultant-5's time. That rate increased to $156.41 per hour in 2008, and to $164.23 per hour in 2009. Between 2005 and 2009, the City of New York was billed more than $1.2 million for work performed by Consultant-5."  However, "[o]n at least six separate occasions between 2005 and 2009, Consultant-5 traveled overseas, for a total of more than 9 weeks of time away from his/her consulting job. On or after each of those occasions, false timesheets were submitted in Consultant-5's name reflecting that he/she had performed work when he/she was, in fact, overseas."  Accordingly, "[t]he total loss to the City for the more than 180 hours of Consultant-5's falsely billed time exceeds $25,000."

345.     As Bell later testified regarding the fraudulent scheme, NYC absorbed all of the costs of the kickbacks after Amendment No. 6 was ratified: "There was no risk for SAIC financially.  You do work, you bill by the hour, in a bundle, [and] the City pays it."

346.     Further, the December 14, 2010 criminal complaint described a July 2008 audit conducted by the OPA to determine whether falsified time records were submitted to NYC and paid in connection with the project.  As the following excerpt from the criminal complaint demonstrates, the result of the audit confirmed that fraudulent billing practices were regularly employed on the project and that SAIC had submitted false timesheets to NYC:

> In or about July 2008, OPA conducted an audit of paper records maintained in connection with the CityTime project to determine whether consultants paid from a certain work order billed through the Lead Software Developer contract submitted timesheets for services after they were terminated, and if the contractor and consultant received payments for such services (the "OPA Audit").  The audit examined the timesheets of 31 consultants who had been terminated in 2007.  Of those, there were nine instances – nearly one-third of the total – in which the consultant's last date of work on an approved timesheet was after the consultant had been terminated. In most of the instances identified by the OPA Audit, two or more weeks of false timesheets were submitted following a consultant's termination; in one instance, ten weeks of false timesheets were submitted. In total, the OPA Audit report found that more than 890 hours of time had been improperly submitted to the City for payment, not including the time submitted by Consultant-2.

347.     The result of the DOI's evaluation of the audit also confirmed that NYC suffered a significant loss as a result of the fraud, as the criminal complaint indicates that "the City was billed between $124.13 per hour and $255.81 per hour for the false time submitted," for a "total loss to the City" exceeding $145,000 (not including the fraudulent time associated with Consultant-2).

348.     Accordingly, although neither SAIC nor any of its direct employees were named as defendants in the December 14, 2010 criminal complaint, SAIC knew or reasonably should have known in December 2010 that there was a substantial possibility that its employees were implicated in the fraud and, by extension, that it faced the realistic prospect of exposure to liability for the fraud.

### 2. In December 2010, the Government Subpoenaed Denault and SAIC and SAIC Placed Denault on Administrative Leave

349.    As if the disclosure of charges against CityTime personnel in the December 14, 2010 criminal complaint was insufficient to apprise SAIC of the reasonable possibility and/or probability that it could face exposure for the fraud, the Company was also faced with a criminal investigation in December 2010 that involved the Company and, more specifically, Denault.  Additionally, other significant developments occurred in December 2010 that implicated other individuals and entities in the fraudulent scheme.

350.    For example, no later than December 15, 2010, the DOI served Denault with a federal grand jury subpoena, which he subsequently forwarded to SAIC, calling for the production of records and testimony involving the CityTime project.  Additionally, at or about the same time, SAIC received a federal grand jury subpoena calling for the Company's production of information concerning the project.

351.    As SAIC's in-house counsel, Michele Mintz Brown ("Brown"), testified at the trial of Denault's advancement proceeding in Delaware court: "we received a grand jury subpoena . . . for the production of documents and was [sic] in possession of the grand jury subpoena that Mr. Denault had received as well."  Further, as Bell testified at the criminal trial: "*before I knew Mr. Denault was subpoenaed*, I thought that the [criminal] investigation pertained to Mr. Mazer."  Thus, even Bell recognized that Denault's receipt of a subpoena in December 2010 implicated the CityTime project and the kickback scheme in which he and Denault were involved, and by mid-December 2010, SAIC likewise understood that the USAO and DOI were conducting an investigation of CityTime.

352.    Moreover, SAIC knew or reasonably should have known no later than mid-December 2010 – when it received a copy of the subpoena served on Denault *and* learned he was interviewed by the DOI – that he was targeted in the criminal investigation and proceeding.  In fact, Zanolin, the

DOI investigator who served the subpoena on Denault on behalf of the Government in connection with the joint DOI-USAO investigation, advised Denault of his right to have a lawyer present during questioning at an interview that occurred on or about December 15, 2010.  As Zanolin stated: "I wanted to make sure that he had the opportunity to have a lawyer if he chose."  Zanolin conducted the interview in the presence of two investigators, which also underscored its importance.  Yet, to obtain as much information as possible, Zanolin did not serve the subpoena on Denault until the end of the interview.

353.     The interview focused on aspects of the illicit overbilling and kickback scheme that involved Denault.  As Zanolin testified, Denault confirmed he: knew Technodyne's principal before joining the project; "recommended" Technodyne in 2003 to provide staff for the project; negotiated consultant rates directly with Technodyne; "found out that [Technodyne] had sourced that labor through two different companies," D.A. Solutions and PrimeView; and believed that the project was overstaffed at times, but did not object because it was in SAIC's best interests.  Zanolin also asked Denault whether he knew Aronshtein or had accepted anything of value from project contractors.  According to Zanolin, Denault "abruptly" ended the interview after he "looked at his phone and saw an article from the paper saying that there had been a series of arrests . . . ."  At that point, Zanolin served the subpoena on Denault.

354.     Because Denault was an SAIC employee and SAIC could presumably produce any information called for by the grand jury subpoenas (on Denault's behalf or otherwise), there was no reason to subpoena Denault personally or interview him unless he had information regarding the fraud that SAIC itself theoretically could not provide.  Indeed, SAIC presumably had control over materials and information that Denault sent, received or created during his employment with the

Company, and SAIC presumably also could have required him to provide information directly to the Company during the course of the criminal investigation.

355.    Further, the subpoenas and the interview constituted an inquiry or investigation of SAIC and Denault for VENDEX purposes, and SAIC – as the prime contractor – was presumably required to acknowledge that fact and update its VENDEX information accordingly.  According to the VENDEX Guide, "[a]n individual or entity has been investigated if there has been any inquiry by any prosecutorial, investigative or regulatory agency concerning such individual or entity or the activities and/or the business practices thereof."  An "inquiry" for VENDEX purposes includes, but is not limited to, the following:

(a)     "a subpoena requiring testimony [that] has been issued and/or received";

(b)     "a subpoena for the production of documents in a criminal proceeding or criminal investigation [that] has been issued and/or received";

(c)     "an appearance before a grand jury by the individual or any current or former representative of the entity or its affiliates [that] has been made or been sought"; and

(d)     "any questioning of an employee concerning the individual/entity, or the conduct of the individual/entity's . . . business which relates to the possible commission of any act or acts that could expose the individual [or] the entity . . . to either criminal or civil liability[.]"

356.    At a minimum, NYC could have suspended SAIC's involvement in the project and/or recovered amounts paid on the contract if the Company failed to update its VENDEX information to accurately reflect its and Denault's involvement in the investigation.  And, as discussed below, the State Comptroller confirmed in late-December 2010 that SAIC may not have updated its vendor information to reflect "information on the CityTime project" or address questions concerning, among other things: (i) its relationship with the individuals named in the criminal complaint; (ii) its role in

"the submission of the allegedly fraudulent invoices" to NYC; or (iii) its "culpability, if any, with respect to payments to its subcontractors based upon allegedly fraudulent invoices (which flowed to the individuals named in the criminal complaint) . . . ."

357.     Accordingly, Denault's receipt of a subpoena for the production of documents and testimony in December 2010, coupled with his interview, reasonably should have placed SAIC on notice that the USAO and DOI believed he was involved in the fraudulent scheme during the course of his employment on the CityTime project, and that SAIC was a subject of the investigation and/or otherwise exposed to potential liability of a criminal or civil nature.

358.     In fact, on December 21, 2010, shortly after receiving the subpoenas, SAIC removed Denault from the project and placed him on "administrative leave."  There simply would have been no need to remove Denault from the project if the Company did not associate his conduct with the fraudulent scheme implicated in the criminal case.  Put differently, SAIC would not have removed Denault unless it believed – or at least strongly suspected – that he was involved in wrongdoing pertaining to CityTime.

### 3.     By late December 2010, SAIC Began Formally Investigating the Fraud and Had Lost Contract Awards Arising from the Fallout

359.     Also in December 2010, shortly after receiving the grand jury subpoenas, SAIC engaged outside counsel at Cooley LLP to conduct an internal investigation concerning the fraud described in the criminal complaint that was unsealed on December 15, 2010.  As Brown explained:

> SAIC retained outside counsel to, one, assist us in responding to what was a very comprehensive request for production of documents as well as to embark on an internal investigation into the matter for which we retained outside counsel to really take the lead in conducting that investigation.

360.     As Brown further testified: "I became involved to really assist in handling the day-to-day responsibilities of the CityTime investigation once a criminal complaint was filed in December of 2010."  Indeed, she "became the point person, since then on a daily basis overseeing the internal

investigation and working with our outside counsel, who were [sic] actually conducting the investigation on our behalf."

361.    In fact, according to Denault's pre-trial brief in the Delaware case, SAIC's internal investigation was underway no later than December 19, 2010.[5] As Bell confirmed in testimony at the *Mazer* trial, SAIC "started collecting data" in late-December 2010 and completed its collection efforts by January 2011.

362.    As Bell further testified, these internal SAIC collection efforts – which he assisted – included conducting "forensic scans" of computer hard drives (including his own) and gathering email communications concerning the CityTime project.  He also facilitated the efforts of auditors "from corporate" in connection with the Company's internal investigation.  As detailed below, one facet of the internal investigation included a review of Denault's timekeeping practices (and possibly Bell's), which later resulted in the Company's decision to repay to NYC all of the amounts billed for Denault's time after the implementation of Amendment No. 6.

363.    Moreover, SAIC understood the implications of the charges asserted in December 2010, notwithstanding the fact that neither SAIC nor its employees was then named as a defendant in the criminal complaint.  As Brown testified, SAIC was well aware that "[a]gents of the City of New York and [the] SAIC second-tier subcontractors were alleged [in the December 14, 2010 criminal complaint] to have been involved with a kickback scheme and defrauding the City of New York."

---

[5]    According to a Joint Pre-Trial Stipulation and Order, prepared by SAIC and Denault and filed in the Delaware advancement proceeding, the Company's internal investigation was ongoing as early as September 2010.  In SAIC's portion of that filing, the Company represented, in part, that "[Brown] and others had [conversations] with [Denault] in September 2010.  These communications were conducted as part of an internal investigation conducted by outside counsel at the direction of [SAIC's] General Counsel to provide legal advice to the Company."  Separately, Yu testified that the DOI's forensic audit commenced in the fall of 2010.  Consequently, SAIC's internal investigation and the DOI's criminal investigation both could have commenced before December 2010.

364.   Furthermore, to the extent that SAIC could not previously connect the dots between the conduct alleged in the criminal complaint and its potential liability or culpability for the fraud, it certainly could do so when the State Comptroller communicated his rejection of a contract award to the Company on December 21, 2010.

365.   Specifically, in a December 21, 2010 letter to the NYC Transit Authority (governed by the Metropolitan Transportation Authority), the State Comptroller rejected the award to SAIC of a contract valued at $118 million *specifically* because of allegations raised in the December 14, 2010 criminal complaint concerning CityTime.  As the State Comptroller explained in the letter:

> The reason for this Office's disapproval is a recent and potentially significant vendor responsibility issue, namely whether there is any SAIC involvement in the CityTime consultant scandal where consultant fraud and money laundering charges were recently announced by the United States Attorney's Office and, which on December 14, 2010, resulted in a federal criminal complaint against individuals (not employed by SAIC) who allegedly arranged for fraudulent payments from New York City. While SAIC and its employees are not at this time accused of criminal wrongdoing, the exact nature of SAIC's involvement in this matter remains unresolved and requires additional review and assessment by your office. This responsibility issue is especially significant given the size of the current proposed contract ($118 million), and is heightened by the other allegations, among other things, of mismanagement and cost overruns by SAIC on the CityTime contract.

366.   Moreover, the State Comptroller indicated that the information provided regarding SAIC's qualifications as a responsible contractor and its performance on the CityTime project required independent verification, because certain of the information was provided by Bondy, a former Spherion consultant on the project (and friend of Mazer's) who then served as the Executive Director of OPA.  As the State Comptroller stated:

> Mr. Bondy is alleged to be a long-time associate of one of the consultants who is named in the criminal complaint. According to press reports, Mr. Bondy has since been suspended without pay by New York City.  In light of the circumstances, you will need to find an independent source to verify SAIC's performance on the CityTime project.

367.    Yet, the State Comptroller also concluded that the information that had been supplied regarding SAIC was incomplete, because it did not address SAIC's performance on CityTime, cost overruns associated with CityTime, or SAIC's involvement in the conduct alleged in the December 2010 criminal complaint.  In support of his conclusion, the State Comptroller specifically referenced "SAIC's Vendor Responsibility Questionnaire, dated February 23, 2010, and a memo to the president of the New York City Transit Authority identifying Significant Adverse Information (SAI) dated October 14, 2010" – neither of which "included information on the CityTime project."

368.    Accordingly, the State Comptroller advised that he could not approve the contract, and indicated that even if adequate documentation could be provided to support a finding that SAIC "is a responsible vendor," he would likely "require more detailed information on other SAIC vendor responsibility issues."  As the State Comptroller wrote, "[a]ny contract resubmission would require, at a minimum, a written assessment of the following items," all of which concerned SAIC's involvement in CityTime and the prospect that the Company was involved in the fraud committed on that project:

(a)    "The relationship between SAIC and the six individuals named m the criminal complaint";

(b)    "SAIC's role, if any, in the submission of allegedly fraudulent invoices to New York City";

(c)    "SAIC's culpability, if any, with respect to payments to its subcontractor based upon allegedly fraudulent invoices (which ultimately flowed to the individuals named in the criminal complaint)";

(d)    "The relationship between SAIC and Office of Payroll Administration Executive Director Joel Bondy";

(e)    "An MTA Inspector General opinion on SAIC vendor responsibility";

(f)    "An ***independent*** assessment of SAIC's role in the cost overruns associated with the CityTime project" (emphasis in original);

(g)    "The controls the Authority has in place to prevent similar overruns and fraud from occurring on this contract";

(h)    "Whether SAIC will employ consulting firms, subcontractors and sub-subcontractors on this MTA project and, if so, the identities of each"; and

(i)    "Roles any of the key individuals associated with the proposed contract may have had in the CityTime project[.]"

369.    Furthermore, the State Comptroller indicated that if the contract were resubmitted, he would require "an updated Vendor Responsibility Questionnaire for SAIC and a new responsibility determination," as well as "documentation" convening the process that would be employed to vet subcontractors for the prospective contract.  Reportedly, the State Comptroller's rejection constituted the first time that the State Comptroller's Office exercised the right to reject certain contracts worth $1 million or more since the New York State Legislature authorized that power in 2009.

370.    The same day, December 21, 2012, the State Comptroller also issued a press release regarding the rejection of the $118 million contract with SAIC.  The press release, entitled "DiNapoli Rejects SAIC Contract; Cites CityTime Scandal," attributed the rejection to SAIC's role in CityTime and the possibility that SAIC was connected to the fraudulent scheme, as follows:

> "SAIC's role in the CityTime scandal in New York City remains unclear," DiNapoli said. "There are indictments and very serious concerns about vendors involved on that project. In short, there are too many unanswered questions and too many public dollars at risk for this contract to go forward. New York can't afford another scandal like CityTime. I won't let the Transit Authority put $118 million on the table without the right kind of protections."
>
> DiNapoli's office sent a rejection letter to the Transit Authority citing "a recent and potentially significant vendor responsibility issue, namely whether there is any SAIC

involvement in the CityTime consultant scandal where consultant fraud and money laundering charges were recently announced by the United States Attorney's Office."

DiNapoli said allegations of mismanagement and cost overruns by SAIC on the CityTime contract heightened his office's concerns.

371. The next day, on December 22, 2010, the Mayor's Office rejected the award to SAIC of a contract with the NYC Department of Sanitation valued at $40 million. The rejection followed vocal criticism by the NYC Comptroller of SAIC's management and performance of CityTime, and the rising costs associated with the project.

### 4. By January 2011, SAIC had Agreed to Advance Defense Costs to Denault and Mayor Bloomberg Linked SAIC to the Fraud

372. Almost immediately after receiving the grand jury subpoenas, SAIC agreed to advance Denault's legal fees in connection with the criminal proceeding – despite the fact that he was not named as a criminal defendant and the case was then pending against *non*-SAIC personnel on the CityTime project. SAIC recommended that Denault retain Barry Bohrer, then of Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., to represent him in connection with the criminal proceedings; on SAIC's advice, Denault retained the lawyer.

373. In fact, on December 22, 2010 – the day after SAIC placed Denault on administrative leave (and the same day that NYC rejected the sanitation contract awarded to the Company) – the Company sent a letter agreement to him, with the name and docket number of the criminal case in the subject line, agreeing to advance his legal fees in the criminal proceedings. According to the judge who presided over the trial in the Delaware advancement matter, Brown, who prepared and signed the letter on behalf of the Company, wrote in the first paragraph, in sum and substance:

> I understand that you have retained Barry Bohrer . . . to represent you in connection with a grand jury investigation in the U.S. District Court for the Southern District of New York in the above-referenced matter.

374.    In turn, according to the judge, the third paragraph of the letter provided, in sum and substance: "SAIC hereby agrees to advance to you the legal fees you will reasonably incur in having Mr. Bohrer represent you in this matter . . . ."  As SAIC noted in its pre-trial brief in the Delaware advancement proceeding, "[t]he matter is defined [in the letter] as '*United States v. Mark Mazer, et al*. (S.D.N.Y. 10-2809).'"

375.    Based on the express language of the letter, the Delaware judge concluded that SAIC had evidently agreed to advance Denault's legal fees for the entirety of the criminal case, not simply in connection with the grand jury investigation.

376.    Accordingly, as of December 22, 2010 – the date of SAIC's letter – SAIC knew that Denault was implicated – and, indeed, targeted – in the criminal proceeding, notwithstanding the fact that he was not yet named as a defendant therein.

377.    Yet, Denault was not the only manager of CityTime suspended from the project in December 2010: Bondy, who served as Executive Director of OPA, was suspended and removed from the project in mid-December 2010 amidst the revelation of criminal charges associated with the illicit kickback and overbilling scheme plaguing the project.

378.    Specifically, on December 16, 2010, the Mayor's Office announced that the NYC Comptroller and Mayor, who jointly oversaw the OPA, suspended Bondy "without pay effective immediately, pending further developments in the investigation into allegations of fraud involving the CityTime project."  Additionally, the Comptroller announced that he had suspended all payments to Spherion "until the City conducts a comprehensive review of subcontracting, consultant billing and recordkeeping practices."  And, the Comptroller and Mayor transferred responsibility for the CityTime project to FISA under the direct oversight of the Deputy Mayor and in partnership with the Comptroller.

379.     In a statement included in the press release, the Mayor confirmed that the criminal investigation was ongoing and that a "thorough forensic audit" of the project was taking place, as follows:

> The Comptroller's Office, with assistance from the Bloomberg Administration, will work with the Office of the U.S. Attorney for the Southern District of New York and the City's Department of Investigation on a thorough forensic audit of the CityTime project to determine whether any additional dollars were improperly paid and will seek to maximize recovery of any taxpayer dollars that were improperly paid.

380.     Separately, the *Daily News* reported on December 20, 2010 that Mayor Bloomberg had reiterated the steps that NYC was taking to clean up the project, indicating that SAIC's "future role" on the project was unclear and confirming that the forensic audit (mentioned above) was intended to "evaluate all payments . . . made in relation to this project, with a goal of recouping any funds that are outside of the DOJ-DOI investigation." Specifically, Mayor Bloomberg represented, in pertinent part, the following:

> And going forward we've taken some steps to ensure this doesn't happen again. As you know, we suspended Joel Bondy without pay pending a further investigation. We've transferred responsibility for the project from the Office of Payroll Administration to the city's Financial Information Services Agency. We've determined, we're determining what future role SAIC can have on the project and which SAIC employees can have a role in it. We're reviewing potential options for a forensic auditor to evaluate all payments made in relationship to this, in relation to this project, *with a goal of recouping any funds that are outside of the DOJ-DOI investigation*. [Emphasis added.]

381.     When Mayor Bloomberg made that statement, the criminal case publicly involved allegations of criminal misconduct against only non-SAIC personnel, who were accused of directly perpetrating the kickback scheme for proceeds of approximately $80 million.

382.     These statements, coupled with the other developments alleged above, unequivocally confirmed to SAIC that it had serious exposure to loss relating to CityTime – and, more specifically, *that NYC was gathering evidence in support of claims to recoup funds paid to SAIC on the project*, to the extent that the criminal investigation had not yet resulted in reimbursement to NYC. In fact,

as Yu testified, the DOI had already begun conducting a forensic audit of financial and other records regarding the CityTime project as of the fall of 2010.

383.     Not surprisingly, on December 23, 2010, seven days after his suspension without pay and amidst the building furor over the CityTime scheme, Bondy resigned.  Shortly thereafter, Mayor Bloomberg reportedly stated publicly that he "would assume" Bondy was under investigation by law enforcement authorities.

384.     These developments in mid-to-late December 2010 – Bondy's suspension/resignation, a moratorium on payments to Spherion, a review of subcontracting and billing practices (pertaining to Spherion or otherwise), a transfer of project responsibility to another agency, a forensic audit of CityTime, and various public statements regarding NYC's evaluation and pursuit of claims – should have confirmed to SAIC management that the misconduct identified in the December 2010 criminal complaint was by no means confined to the individuals named therein and that the Company was exposed to loss.  Yet, as detailed below, SAIC failed to make any disclosure in its public filings regarding the CityTime debacle until June 2011.

### 5.     In January 2011, Bell Resigned During SAIC's Investigation into Corporate Timekeeping and Billing Practices on CityTime

385.     In the wake of allegations of the submission of false timesheets and the receipt of kickbacks by non-SAIC personnel on the project, the receipt of subpoenas by SAIC and Denault concerning CityTime, and other developments occurring in December 2010, Bell resigned from SAIC on January 24, 2011.  Because Bell had served as Chief Systems Engineer for CityTime in SAIC's New York office, was hired by Denault, and acted as Denault's right-hand man on the project, Bell's unexpected resignation should have alerted the Company in January 2011 that he might have *some* involvement in the extensive fraudulent scheme perpetrated against NYC.

386.     Moreover, as Bell testified, SAIC interviewed him on January 24, 2011 – the very day he resigned.  According to Bell, after he tendered his resignation earlier that day, he attended an hour-long meeting with Brown and a lawyer from Cooley LLP at the law firm's offices at The Grace Building, in New York City, during which they asked questions about CityTime and purportedly transcribed the interview.

387.     As the *Daily News* reported on February 11, 2011 regarding Bell's departure, "[the Company] ousted systems engineer Carl Bell after an internal review found he approved timesheets for a highly paid CityTime consultant for years even though the consultant did no work on the project . . . ."  As the *Daily News* further reported: "The consultant whose timesheets Bell approved is said to be a key executive at Technodyne, one of several SAIC subcontractors on the project."

388.     Because Bell left SAIC on January 24, 2011 (with his separation effective as of February 1, 2011), the fair inference arising from these facts is that he was forced out in connection with the Company's internal investigation relating to Denault and CityTime.  Further, as detailed below, Bell subsequently received two subpoenas in connection with the criminal investigation, was interviewed by the DOI, had additional communications with the Company and its outside counsel regarding CityTime, and was reportedly associated with the CityTime fraud as of February 2011.

### 6.     Developments in February 2011 Also Implicated SAIC, Denault, Technodyne, and Other Staffing Contractors in the Fraud

389.     Based on all of the developments occurring in December 2010 and shortly thereafter, SAIC knew or reasonably should have known that it was implicated in the fraudulent scheme at the heart of the criminal complaint and that Denault and Bell likely had committed improprieties in connection with the CityTime project for which the Company could be responsible.

390.     As detailed above, these developments included, among other things: the disclosure of the criminal complaint against Mazer and others regarding the submission of false time records

(that SAIC had submitted to NYC for payment); the grand jury subpoenas served on SAIC and Denault; SAIC's recognition that Denault required legal representation *in* the criminal case; the Company's internal investigation of misconduct on the project (including Denault's and Bell's timekeeping or approval practices); SAIC's decision to remove Denault from the project and place him on "administrative leave"; Bondy's suspension and virtually immediate resignation; and, perhaps most critically, Mayor Bloomberg's shot across the bow at SAIC, with regard to "recouping any funds" that were publically "outside of the DOJ-DOI investigation."

391.   Additionally, shortly after the December 2010 developments, Bell resigned from SAIC in the midst of its internal investigation and the Company's internal audit team completed evaluating Denault's timekeeping practices – and, at that time, presumably concluded that Denault had committed improprieties in connection with CityTime.  Yet additional developments in February 2011 also implicated SAIC, Denault, Bell, Technodyne and others in the improper overbilling practices that plagued CityTime.

392.   On February 6, 2011, the *Daily News* reported that a week earlier, SAIC had declined to renew a consulting contract with Salvatore Salamone ("Salamone"), who served as SAIC's liaison with NYC in connection with the CityTime project, amidst the unfolding CityTime scandal. Specifically, the article reported that "[w]hile CityTime's cost was rising at an alarming pace and the embezzlement scheme was secretly unfolding, Salamone was getting $773,000 as SAIC's key liaison to the city on CityTime."  As the article further reported: "the Department of Investigation is looking at what role Salamone played in the CityTime fiasco, in which eight consultants have been charged with stealing $80 million."

393.   Only three or four days later, on or about February 9 or 10, 2011, investigators from the DOI interviewed Bell regarding his involvement in CityTime.  At that time, Bell purportedly

explained that he had resigned from SAIC because he disagreed with Cooley LLP over the methods it had directed him to use to gather information for the Company's internal investigation.

394.    On February 10, 2011, the USAO and DOI jointly issued a press release announcing the filing of an Indictment charging Mazer, Aronshtein, S. Mazer, Medzon and Makovetskaya "in connection with fraud, kickback, and money laundering schemes" involving CityTime.  The press release also disclosed that Natanzon "pled guilty on February 8, 2010, to a criminal Information arising out of his role in criminal conduct in connection with the CityTime project."

395.    Like the December 2010 criminal complaint, the February 10, 2011 Indictment also alleged a course of conduct that had at its core: (i) the submission of falsified time records by SAIC, as the prime contractor, to NYC for payment; and (ii) the implementation of contract amendments and work orders that increased the amount of work and often exceeded the scope of the contract or resulted in the performance of unnecessary work, and therefore increased the proceeds of the fraud.

396.    For example, with respect to the submission of false or otherwise fraudulently inflated timesheets and requests for payment, the February 2011 Indictment alleged, among other things, that Mazer, who was OPA's chief project representative with authority to act on behalf of NYC:

(a)    "defrauded the City . . . by approving for payment timesheets of consultants that he knew had been fired or were on leave. Those payments increased the revenue generated by the Sub-Subcontractors, and consequently, the size of the kickbacks . . . ."

(b)    "fraudulently caused consultants hired by the Sub-Subcontractors to be paid by the City even while they were on leave or after they had been fired, even though he knew that the Sub-Subcontractors were not permitted to bill the City for consultants' severance or leave."

(c)      "fraudulently approved timesheets seeking payment by the City for hours not actually worked by consultants. Revenues for these fraudulent timesheets were routed through the Sub-Subcontractors, and a substantial portion of those revenues were kicked back to [him]."

397.      Moreover, with respect to the approval of contract amendments, work orders and/or unnecessary work, the February 2011 Indictment alleged, among other things, that Mazer:

(a)      "recommended, and was among the individuals who approved on behalf of the City, contract amendments for the software development vendor hired by the City to develop CityTime (the 'Lead Software Developer') [*i.e.*, SAIC] that contributed to the dramatic increase in the cost of the project, and that called for the City to hire dozens of new consultants to perform the work called for by the contract amendments."

(b)      "used his power and influence to cause many consultants, including many of the consultants hired as a result of the contract amendments he recommended and/or approved, to be hired by a subcontractor on the Citytime [sic] project ('Subcontractor-1') [*i.e.*, Technodyne] through two staffing companies, D.A. Solutions, Inc. ("DAS") and Prime View, Inc. ("Prime View") (collectively, the 'Sub-Subcontractors')."

(c)      "exposed the City to the risk of financial loss . . . by developing and recommending approval for contract amendments calling for large increases in expenditures on the CityTime project, including expenditures that flowed to the Sub-Subcontractors . . . ."

(d)      "was also responsible for hiring and supervising many of the consultants hired through the Sub-Subcontractors as a result of the contract amendments. At least some of the staffing increases recommended and implemented by [him] were not necessary for the successful completion of the CityTime project, but instead served as a vehicle for [him] to increase his proceeds from the criminal scheme."

398.    On February 11, 2011, as noted above, Bell learned that the *Daily News* had reported that he was fired from SAIC in connection with timekeeping improprieties.  According to the article, the Company fired him "after an internal review found he approved timesheets for a highly paid CityTime consultant for years even though the consultant did not work on the project . . . ."  The article further reported that the consultant was "a key executive at Technodyne, one of several SAIC subcontractors on the project."  Additionally, the article reported that Bell was "the third major figure on the CityTime project SAIC has ousted in recent weeks," noting that Denault "was relieved of his responsibilities" and "Salamone, a former city technology official who worked for a decade as a CityTime consultant, was shown the door."

399.    Moreover, the article reported that Natanzon had pled guilty in connection with the kickback scheme and was "cooperating with investigators," and it indicated that the development "can't be good news" for SAIC and Technodyne notwithstanding the fact that they had not been accused of wrongdoing:

> Prosecutors have not accused anyone from Technodyne or SAIC, one of the country's biggest defense contractors, of wrongdoing.
>
> But it can't be good news for those companies that Victor Natanzon, one of the six arrested in December, pleaded guilty this week in the $80 million fraud and is cooperating with investigators, as is another co-conspirator identified in Thursday's indictment only as "CC-1."
>
> The fraud revolved around bogus consultant timesheets, and Natanzon's firm, Prime View, got $21 million from Technodyne as part of the SAIC contract to supply consultants.
>
> Much of that money ended up as kickbacks to the mastermind of the ring, former city employee Mark Mazer. Ironically, Mazer was being paid by the city to keep an eye on the other consultants.
>
> Prosecutors have spent weeks poring over records of all the firms involved. They are trying to figure out how so much taxpayer money was stolen without anyone in charge catching the theft.

- 124 -

> SAIC, a defense giant with scores of government contracts across the country, is
> clearly worried. The company dispatched a special team from its Virginia
> headquarters to review what happened here. It's dismissing any CityTime manager
> who can't satisfactorily explain their actions.

400.    Also on February 11, 2011, after Bell read the *Daily News* article, he participated in a

call with Brown and a Cooley LLP lawyer regarding his involvement in CityTime – this time, to

assist him in identifying and retaining an outside lawyer to represent him.   Accordingly, SAIC

clearly appreciated the gravity of his situation.  Later that day, according to Bell, the DOI served two

grand jury subpoenas on him: the first, directed to him; and the second, directed to 3C Enterprises (a

company he had formed).  As Bell testified, the subpoenas related to potential violations of the

Racketeer Influenced and Corrupt Organizations Act and sought information concerning, among

other things, "a whole bunch of lists of names and companies" and 3C Enterprises.  Bell provided

SAIC with a copy of one or both of the subpoenas, upon information and belief.

401.    Approximately one week later, SAIC again acknowledged the gravity of Bell's

situation – and its implications for the Company – when it confirmed in writing, on February 21,

2011, that it would cover his legal fees.  The letter agreement, which Brown had signed (with a copy

to Cooley LLP), was virtually identical to the letter that Denault had received from SAIC in

December 2010.  Specifically, the letter listed "*United States v. Mark Mazer, et al.* (S.D.N.Y. 10-

2809)" in the subject line, indicated that Bell had retained a lawyer "to represent [him] in connection

with a grand jury investigation in the U.S. District Court for the Southern District of New York in

the above-referenced matter," and stated that SAIC would "advance" his legal fees.  On or about

February 26, 2011, Bell signed and returned the letter agreement to SAIC.

402.    Likewise, according to the Joint Pre-Trial Stipulation and Order filed in the Delaware

advancement proceeding, "no substantive communications" took place between Denault and SAIC

regarding his entitlement to advancement between December 22, 2010 (the date of SAIC's letter

agreement) and February 28, 2011 (the date that Denault returned a signed copy of the agreement to SAIC).  Accordingly, SAIC's understanding of Denault's right to advancement of his legal fees during the rest of the criminal proceeding remained intact even as of February 2011, notwithstanding the fact that – like Bell – he was not yet named as a defendant therein.

**F.    Developments Occurring between March and June 2011 Explicitly Confirmed SAIC's Involvement in the Fraudulent Kickback and Overbilling Scheme**

        **1.    By March 2011, SAIC had Confirmed that Denault had Engaged in Timekeeping Misconduct and Overbilling**

403.    On March 25, 2011, SAIC filed the March 2011 Form 10-K, which made no mention of trends, events or uncertainties under Item 303 or loss contingencies under ASC 450.  Yet at least one significant aspect of SAIC's internal investigation – reviewing Denault's timekeeping practices, and the veracity of his time records – concluded in March 2011.  By that time, SAIC had completed its examination of his time records and prepared an internal report of findings of its internal auditors.

404.    Specifically, Robert Birdsong ("Birdsong"), an internal auditor at SAIC for nearly 30 years, was responsible for investigating the appropriateness of Denault's timekeeping practices – as the Company's inside and outside counsel continued to conduct an investigation concerning broader wrongdoing in connection with the CityTime project.

405.    As SAIC represented in its pre-trial brief in the Delaware advancement proceeding: "One of [Birdsong's] primary responsibilities for over 20 years has been investigating and auditing employee compliance with SAIC's written timekeeping policies."  At the time of SAIC's internal investigation, Birdsong was the head of the Company's internal audit group.

406.    During the advancement trial in Delaware, SAIC's counsel expressly admitted that the Company had sufficient suspicion between December 2010 and March 2011 that Denault had committed wrongdoing to examine his timekeeping practices on the CityTime project.  Specifically, SAIC's counsel represented, in pertinent part, as follows:

The business of SAIC is working for the government and mostly billing them on an hourly basis. And whenever there is a suspicion or a suggestion that there are perhaps false time charges or incorrect time charges, Mr. Birdsong's group of 30 or so auditors go out into the field and conduct these time charging audits. There was a suggestion that there might be a need to do that with regard to Mr. Denault. Miss Brown, who is in-house lawyer, asked Mr. Birdsong to conduct that investigation.

407.    In connection with the investigation, SAIC's audit team conducted 48 interviews and prepared interview reports and memoranda regarding its findings.  On or about March 9, 2011, the results of the team's findings regarding Denault's improper timekeeping practices were included in memoranda with the subject line "Gerard Denault's Time Charging Review."

408.    This aspect of the investigation directly resulted in SAIC's voluntary agreement in May 2011 to refund to NYC nearly $2.5 million, which represented all amounts billed for Denault's time after Amendment No. 6 to the CityTime contract.  This aspect of the investigation also resulted in SAIC's decision to terminate Denault on May 23, 2011.

409.    In a May 23, 2011 letter to NYC's FISA, Rick Reynolds, SAIC Senior Vice President and the Deputy Business Unit General Manager involved in CityTime, explained the following (with footnotes omitted) regarding the investigation and Denault's inappropriate time-charging:

As you know Mr. Gerard Denault was formerly the project manager for Science Applications International Corporation ("SAIC") on the CityTime project. He has been on administrative leave since December 21, 2010 and has not been associated with the project since that date.

SAIC has determined that Mr. Denault violated SAIC's policies and standards with respect to his timekeeping practices while working on CityTime. He routinely recorded set hours each day rather than the actual hours that he worked as we require. Accurate employee timekeeping practices are of paramount importance to SAIC. Timekeeping is regarded as a matter of ethics at SAIC and *all* employees receive extensive training on ethical practices on time entry. Each employee must certify that his/her timekeeping records are entirely accurate. Given this breach in company policy and ethical practices, SAIC has terminated Mr. Denault.

Mr. Denault performed extensive work on CityTime, but because he did not precisely record the hours he worked as SAIC policy requires, SAIC cannot accurately calculate the amount that should have been billed to the City for his work during the fixed price level of effort ("FPLOE") phase of the project. Therefore, consistent with

SAIC's ethical practices and to demonstrate our good faith in dealing with the City, SAIC will reimburse the City for all of Mr. Denault's billed services during the FPLOE phase. This will amount to $2,470,522.

410.    Additionally, SAIC advised in the May 23, 2011 letter that it was "continuing to cooperate" with the criminal investigation of CityTime, and that it had apprised the authorities of the Company's determination to terminate Denault and to refund certain amounts paid by NYC for his purported services, as follows:

We felt it was important to demonstrate our commitment to responsible contracting by informing the City of Mr. Denault's termination and by reimbursing the City for the full value of his services during the FPLOE phase. In addition, we are continuing to cooperate fully with the U.S. Attorney's office with respect to issues arising out of CityTime and they have been advised of the decision to terminate Mr. Denault.

411.    Furthermore, to ensure that neither investors nor others knew about SAIC's decision to terminate Denault, the Company requested FISA to "keep the details of Mr. Denault's termination confidential" and requested "confidential treatment" of the May 23, 2011 letter to ensure that NYC would not produce it in response to a request for production under the New York State Freedom of Information Law.

412.    According to its 2010 code of conduct, which remained in place and/or substantially similar during Denault's involvement in CityTime upon information and belief, SAIC expressly acknowledged that time-charging improprieties "could constitute a violation of federal law and subject the Company and its employees to serious fines and penalties."  Specifically, under the heading "Timecharging (SC-2)," the code provided as follows:

Employees are personally responsible for ensuring that their labor costs are properly recorded.  This means maintaining an accurate, daily record of time spent by task and preparing a timesheet for each week.  Inaccuracies in such records could constitute a violation of federal law and subject the Company and its employees to serious fines and penalties.  Managers also have an obligation to review their employees' timecards for accuracy and to examine questionable entries.

413.    Thus, by March 2011, SAIC investigation had confirmed that Denault had committed timekeeping improprieties – findings that SAIC relayed to FISA two months later, in May 2011.

### 2.    The May 2011 Criminal Complaint Against Denault Confirmed Information that SAIC Already Knew by March 2011

414.    On May 27, 2011, the USAO and DOI jointly issued a press release announcing the unsealing of a criminal complaint filed against Denault.  The press release stated, in pertinent part, that Denault "recommended that SAIC hire Technodyne, and he subsequently sought and received payment from the City for the ballooning costs of the work that SAIC and its subcontractors, including Technodyne, were purportedly providing on CityTime."  The press release also indicated that "he knowingly approved requests to the City for payments to SAIC, Technodyne, and other entities that exceeded the value of the actual work being performed."  Consequently, this description confirms that the allegations against Denault matched up squarely with those revealed in December 2010 and February 2011 against Mazer and other direct perpetrators of the illicit scheme.

415.    As the May 26, 2011 criminal complaint against Denault evidences, the crux of the charges involved a factual predicate similar to that underlying the charges against Mazer, except that Denault worked for SAIC (instead of NYC/Spherion) and the allegations involving him reflected the other side of the same coin.  For example, the May 2011 criminal complaint indicated that Denault had significant responsibility to act on SAIC's behalf, much like Mazer's extensive authority to act on behalf of OPA and NYC:

> [F]or the past several years until his suspension, DENAULT has served as SAIC's senior executive responsible for the conduct of the CityTime project. In that capacity, DENAULT was responsible for, among other things, submitting bills to the City seeking payment for work purportedly performed by its employees and subcontractors on the CityTime project, developing proposed CityTime work orders and contract amendments seeking additional work to be performed by SAIC, or additional equipment to be purchased by SAIC, and overseeing the development and implementation of CityTime in the various City agencies. DENAULT was also responsible for, among other things, selecting and overseeing subcontractors hired by SAIC to assist with the CityTime project.

416.    Moreover, with respect to the submission of false or otherwise fraudulently inflated timesheets and requests for payment, the May 2011 criminal complaint alleged, among other things, that Denault:

(a)     "on behalf of SAIC and subcontractors including Technodyne, sought and received payment from the City for the ballooning costs of the work that SAIC and its subcontractors, including Technodyne, were purportedly providing on the CityTime project."

(b)     "knowingly approved requests to the City for payments to SAIC, Technodyne, and Sub-Subcontractors paying kickbacks to Mark Mazer, that exceeded the value of the actual work being performed."

(c)     "worked with others to defraud the City into overpaying for the CityTime project so that . . . he could increase the amount and duration of concealed kickbacks paid to him by an SAIC subcontractor . . . ."

(d)     "falsely certified the accuracy of the timesheets he was submitting to the City for billing purposes when he knew, for example, that no work was done to support the bills of consultants on multiple occasions."

417.    Further, with respect to the approval of contract amendments, work orders and/or unnecessary work, the May 2011 criminal complaint alleged, among other things (including certain of the same allegations above, which are not repeated), that Denault:

(a)     "falsely represented to the City on multiple occasions, using emails among other forms of interstate wire communications, that change orders or contract amendments authorizing increased staffing on the CityTime project, or increased funding to SAIC, were necessary for the project's success."

(b)     "worked with co-conspirators . . . to contribute to overstaffing, over-billing, and delays in the completion of the CityTime project, and to otherwise expose the City to the risk of loss of money or property, through deceptive means."

(c)     told consultants "to continue billing the City for full-time work on the CityTime project" for "lengthy periods of time when there was nothing for them to do . . . ."

(d)     "admitted, in sum and substance, that there were periods of time where the CityTime project was overstaffed," but "said he never objected because it was in his company's interest to have more staff on the project."

418.    Additionally, the May 2011 criminal complaint alleged that Denault "recommended that SAIC hire Technodyne," and that "[a]s SAIC's billings on the CityTime project went up, SAIC's payments to Technodyne went up" – "[i]ncreas[ing] particularly dramatically in or about 2006 and 2007 as the CityTime contract to SAIC was extended and additional funds were allocated to the project by the City."

419.    Of course, facts known internally by the Company for years long ago confirmed that Denault was funneling work to Technodyne solely for the purpose of increasing project billings. Aside from the strong motive to receive kickbacks from such billings, the proliferation of work on the project resulted in "promotions [for Denault that] were based on the amount of revenue . . . generated from the CityTime project, and the profitability of the project," according to the May 2011 criminal complaint.

420.    Accordingly, developments between March and June 2011 clearly implicated SAIC in improprieties associated with the illicit kickback and overbilling scheme involving CityTime and confirmed information within SAIC's possession months earlier, such that management could conclude SAIC was likely embroiled in and faced liability for the scandal.  Yet they remained silent.

### 3.     The June 2011 Indictment Confirmed that the Charges Against Mazer, Denault and Others Were Inextricably Intertwined

421.    As detailed herein, the allegations of the December 2010 criminal complaint and the February 2011 Indictment (which named Mazer and others), and the May 2011 criminal complaint (which named Denault), evidenced a unified scheme to defraud NYC in connection with CityTime. Nevertheless, the June 2011 Superseding Indictment – which levied charges against Mazer, Denault and others – plainly confirmed that the kickback schemes perpetrated by Mazer and Denault were interconnected.  For example, the June 2011 Superseding Indictment alleged, among other things:

(a)     "The individuals primarily responsible for the CityTime Project – exploiting their authority and influence over OPA, the primary contractor (SAIC), the primary subcontractor (Technodyne), and the sub-subcontractors (DAS and Prime View) – collaborated to overbill the City and otherwise defraud the City in order to illegally enrich themselves."

(b)     Mazer and Denault "agreed to make material misrepresentations and material omissions to the City in order to cause the City to spend significantly more money than necessary on CityTime in order to increase their illicit profits."

(c)     Mazer and Denault "defrauded the City into: (1) hiring consultants not needed to complete the project; (2) inflating the rates charged for work performed by certain consultants; and (3) inflating the hours worked by certain consultants."

(d)     Mazer and Denault "advocated for an amendment to SAIC's CityTime contract," which converted it "from a 'fixed price' contract, in which SAIC bore the responsibility of absorbing cost overruns, to a 'fixed price level of effort' contract, so that the City, and not SAIC, would largely become responsible for future cost overruns."

(e)     Mazer and Denault "recommended that the 2006 contract amendment . . . was necessary to the successful completion of CityTime and was in the City's interest."

(f)     Mazer "approved requests for payment submitted to the City for work allegedly performed by consultants working for DAS and Prime View when . . . the consultants had been fired, and/or the consultants were reporting more hours of work than they had actually performed."

(g)     Denault: "(1) approve[d] contract amendments and work orders calling for large increases in expenditures on the CityTime project devoted to the hiring of additional consultants, even though many of the staffing increases were not necessary for the successful completion of the project; (2) cause[d] the vast majority of new consultants to be hired through TECHNODYNE; (3) cause[d] the hiring of consultants at billing rates that were too high for their levels of skills and experience; and (4) artificially slow[ed] and delay[ed] the deployment and implementation of the project."

422.     Yet, like the allegations and charges asserted in the criminal proceeding previously, the allegations and charges contained in the June 2011 Superseding Indictment did not allege the perpetration of an elaborate fraud on the CityTime project, *per se*.  Rather, it alleged an elaborate effort on the part of the criminal defendants to secrete the kickbacks and illicit profits they reaped from the overbilling scheme itself, by using foreign shell companies and other means.

423.     Accordingly, SAIC had the means to determine that it faced significant exposure to loss as a result of the fraudulent conduct perpetrated against NYC in connection with the CityTime project, as alleged in the December 2010 criminal complaint, February 2011 Indictment, May 2011 criminal complaint, and June 2011 Superseding Indictment.

**G.**     **In Exchange for SAIC's Acceptance of Responsibility for its Role in the Fraud, the USAO Deferred the Prosecution of a Charge of Conspiracy to Defraud NYC**

424.     On March 8, 2012, SAIC entered into the DPA, which, among other things, required SAIC to pay hundreds of millions of dollars to the Government in disgorgement of its profits and reimbursement for NYC.  Specifically, the DPA required SAIC to:

(a)     pay nearly $500.4 million, comprised of: (i) $370.4 million as restitution to NYC; and (ii) $130 million as a penalty to the Government (of which $96 million was remitted to NYC);

(b)     release a claim as against NYC for payment of $40 million in receivables allegedly due and owing on the CityTime project;

(c)     retain an independent monitor, selected by the USAO, for three years, with authority to make recommendations on SAIC's policies/practices;

(d)     implement and maintain a permanent compliance office and an education and training program "relating to the laws, regulations and ethics governing the work of SAIC," including "subcontracting practices";

(e)     cooperate with the USAO's investigation of the CityTime fraud;

(f)     accept the SOR and, in doing so, expressly admit that, through its managerial employees and others, it had defrauded NYC;

(g)     waive indictment by a grand jury and consent to the filing of an Information charging it with conspiracy to defraud NYC by engaging in the "overt act" of inducing NYC to adopt Amendment No. 6.

425.     In turn, the USAO agreed not to prosecute the conspiracy charge alleged in the Information if, after three years, SAIC remained in compliance with the terms and conditions of the

DPA. Accordingly, by agreeing to the DPA, SAIC staved off prosecution for its involvement in the extensive CityTime fraud.

426.    Yet, in a March 14, 2012 press release jointly issued by the USAO and DOI, which announced SAIC's entry into the DPA under the subheading "Largest Known Single Recovery in a State or Municipal Contract Fraud Case," U.S. Attorney Bharara and DOI Commissioner Rose Gill Hearn acknowledged SAIC's role in and culpability for the fraud, as follows:

> Manhattan U.S. Attorney Preet Bharara said: "For seven years, fraudsters working on CityTime had a field day at the City's expense. Today, the people of New York City have more than a half billion reasons to celebrate, and corporations that deal with the City have more than a half billion reasons to do so honestly. This investigation revealed that SAIC managers responsible for CityTime placed profit ahead of principle, time and again. A half billion dollars is a staggering sum, but it is a sum commensurate with the staggering scale of the crimes and misconduct we uncovered, and it is an amount that makes the City whole."

> DOI Commissioner Rose Gill Hearn said: "This half-billion-dollar payment reflects a stunning fraud against the City and a powerful case that exposed it. As the prime vendor, SAIC's responsibility was to deliver the CityTime project efficiently and honestly. But two high-level company officials, among others, were charged with lining their pockets at the City's expense while SAIC did nothing to stop them. One official has pleaded guilty, and today we are gratified that the company admits its responsibility. The criminal investigation by DOI with the U.S. Attorney's Office for the Southern District of New York has produced this unprecedented financial recovery for the taxpayers of New York City. It is a good day for the City and its eight million residents."

427.    As the press release further indicates, SAIC "terminated the employment of managers who directly supervised Denault and CityTime." At a minimum, those managers were Alderson, Dube and Lord.

428.    Moreover, in the SOR, SAIC admits that it defrauded NYC and discloses how the scheme was conducted. The SOR states, in pertinent part, as follows:

> The "CityTime" Project ("CityTime," or the "Project") was an initiative by the City of New York (the "City") to modernize its timekeeping and payroll systems across all City agencies. In 2000, SAIC became the lead contractor on CityTime, which at the time had a contract value of approximately $73 million. In 2003, SAIC appointed Gerard Denault, who had been hired by SAIC in 2002, to serve as Program Manager

- 135 -

of the Project, and Carl Bell to serve as Chief Systems Engineer. Shortly thereafter, SAIC, at the behest of Denault, hired Technodyne LLC ("Technodyne") as a "single source" subcontractor to provide staffing for the Project. In <u>United States v. Mark Mazer et al.</u>, S2 11 Cr. 121 (S.D.N.Y.), it is alleged that Denault and Bell conspired with others to defraud the City and personally received millions of dollars in kickbacks from Technodyne in exchange for steering business on the CityTime project to Technodyne, and Technodyne in turn served as a vehicle for the payment of tens of millions of dollars of additional kickbacks to other individuals.

429.    In the SOR, SAIC also admits that in 2005 it received an anonymous ethics complaint concerning alleged kickback activity on the CityTime contract and that the Company failed to properly investigate the complaint.  The SOR states, in pertinent part, as follows:

In 2005, a whistleblower within SAIC filed an anonymous ethics complaint with the Company alleging that Technodyne was receiving preferential treatment on the CityTime project, and that the only explanation for the conduct was that Denault had to be receiving kickbacks from Technodyne. SAIC failed to properly investigate the complaint and did not notify the City that a complaint had been made. The complaint also was not brought to the attention of SAIC's Board of Directors. At the time of the whistleblower complaint, SAIC had paid Technodyne approximately $17 million in connection with CityTime; by 2011, SAIC had paid Technodyne approximately $325 million.

430.    In the SOR, SAIC further admits that Amendment No. 6 significantly increased the profitability of the CityTime contract for SAIC.  The SOR states, in pertinent part, as follows:

In 2006, the City and SAIC entered into a contract amendment ("Amendment 6") that, among other things, had the effect of transferring the risk of future cost overruns and any expansion of the Project from SAIC to the City. Following the execution of Amendment 6, which was being negotiated at the time the ethics complaint was made, SAIC, under the direction of Denault, staffed the Project with hundreds of consultants hired by Technodyne, and the cost of the Project expanded dramatically, from approximately $115 million in 2005 to approximately $620 million in 2011. In addition, while SAIC was losing millions of dollars on the Project as of the end of 2005, by 2010, when it was close to delivering a working system to the City, SAIC estimated that it would make a profit of $60 million on the Project.

431.    In the SOR, SAIC accepted responsibility for the illegal conduct and admitted that SAIC defrauded NYC, stating, in pertinent part, as follows:

SAIC accepts responsibility for the illegal conduct alleged against Denault and admitted by Bell during the course of the CityTime project. The Company acknowledges that the conduct and managerial failures described herein contributed

to the ability of Denault and Bell to commit their alleged crimes against the City, and that the City was defrauded by SAIC as a result.

In addition to the Company's failure to properly investigate the 2005 ethics complaint, management employees responsible for directly overseeing Denault and the Company's performance of the CityTime contract failed to adequately supervise his activities and to control the costs of the Project. Among other things, they either failed to perceive or ignored that Denault, through intimidation and threats of retaliation or termination, created a hostile atmosphere in SAIC's New York office in which employees were afraid to confront him or bring their ethical or legal concerns to his supervisors. In those instances in which SAIC employees on the Project expressed concerns to Denault's supervisors about the possibility that he had a corrupt relationship with Technodyne, those managers reacted with inappropriate skepticism, shifted the burden to the employees to prove their assertions, and failed to pass on the concerns to the proper Company personnel for investigation.

Some SAIC managers failed to perceive or ignored significant and pervasive irregularities within the SAIC-Technodyne relationship, including, among other things, the relative size of the "single source" subcontract, Denault's refusal to staff positions with SAIC employees rather than Technodyne employees, and his refusal to put the subcontract out for competitive bid. Finally, those responsible for directly managing the Project failed to enforce the Company's procurement policies in ways that allowed the irregular Technodyne relationship to continue and undermined the Company's own procurement personnel in the performance of their duties, thereby enabling Denault to continue his alleged illegal activities.

432.    The SOR also attributed the Company's failure to investigate the billing irregularities to a desire to maximize the financial success of the project.  The SOR stated, in pertinent part, as follows:

SAIC's failures resulted, in part, from an overemphasis on the financial and operational success of the CityTime project by those assigned to manage the Project, at the expense of the Company's own ethics, human resources and procurement policies. In order to assure the success of the Project, some managers supervising Denault and the Project disregarded warning signs of possible corruption, and tolerated Denault's improper handling and supervision of the CityTime contract and SAIC's New York office. As a result, SAIC failed to take actions that might have detected, disrupted or curtailed the charged conspiracies, allowing the City to be victimized repeatedly and systematically for more than seven years.

433.    These admissions, as well as SAIC's disgorgement and the remedial measures it was forced to implement, strongly support an inference that the Company and its management team knew of and/or recklessly disregarded the systemic fraud that afflicted the CityTime project for years.

**H.      CEO Havenstein, Who Brokered the DPA, Acknowledged that Management Knew of SAIC's Involvement in the CityTime Fraud by January 2011**

434.     In 2014, former SAIC CEO Havenstein announced his campaign as the Republican candidate for Governor of New Hampshire.  In response to criticism about Havenstein's tenure at SAIC levied by Democrats who opposed his candidacy, Havenstein and/or his campaign issued a release entitled "The Truth About Walt Havenstein and SAIC," which explicitly acknowledged that he and other members of Company management knew of SAIC's involvement in the CityTime fraud – and supposedly attempted to address it – no later than January 2011.

435.     Quoted in the document, Havenstein campaign spokesman Henry Goodwin stated that Havenstein became aware of problems regarding the CityTime project, and opened an investigation, shortly after taking the reigns as Company CEO in September 2009:

> Shortly after arriving at SAIC, Walt discovered that he had inherited a very serious situation.  As soon as he suspected wrongdoing on the part of employees, Walt immediately took action to fix the problem: he hired a new General Counsel and began an internal investigation.

436.     Specifically, the release includes a timeline concerning Havenstein's tenure as CEO and the actions the Company took to address the CityTime scandal after his arrival, including, in pertinent part, the following:

> **September 21, 2009** – Walt Havenstein becomes CEO of SAIC. [*SAIC Press Release September 21 2009*]
>
> **June 7[,] 2010** – Walt appoints new General Counsel, Vince Maffeo (previous GC stays on as Secretary to the Board). [*SAIC Press Release, June 7 2010*]
>
> **June 2010** – Walt Havenstein initiates internal investigation into CityTime contract, to be directed by Vince Maffeo.
>
> **June 2010** – SAIC's internal investigation shows that Federal authorities are also looking into the contract.
>
> **July 2010** – Initial findings of the internal investigation placed CityTime project manager, Gerard Denault, under suspicion of misconduct (though there was not

enough evidence to put him on administrative leave until Federal prosecutors filed charges).

**December 15, 2010** – Federal prosecutors in Manhattan announce first fraud and money laundering charges related to CityTime case. [*US Attorney Southern District of New York Press Release, December 15 2010*]

**December 15 – December 21[,] 2010** – Fraud and money laundering charges examined by SAIC attorneys and Walt Havenstein.

**December 21, 2010** – As a result of reviewing the Federal charges, Walt Havenstein places Gerard Denault on administrative leave. (Denault was not immediately fired, because he denied the allegations: company policy allowed him due process.) [*SAIC letter to Financial Information Services Agency, May 23 2011*]

**January 2011** – SAIC forms a Special Committee of the Board of Directors to oversee the company's response to CityTime. SAIC also hires an independent company, Guidepost Solutions, to undertake its own review and monitor the efforts made by the company to respond to the matter. [*Washington Business Journal, October 24 2011*]

**January 2011** – Carl Bell admits to Federal charges. Walt Havenstein fires him. [*New York Daily News, February 11 2011*]

437.    Accordingly, the release indicates that Havenstein hired Vince Maffeo as SAIC's General Counsel in June 2010 "[a]s soon as he suspected wrongdoing on the part of employees," and immediately commenced an internal investigation thereafter.  By June 2010, Havenstein concluded that "Federal authorities [we]re also looking into the contract," and by July 2010, the Company made "initial findings" placing Denault "under suspicion of misconduct . . . ."

438.    Then, "[a]s a result of reviewing the Federal charges" in December 2010, Havenstein evidently concluded that Denault was implicated in the CityTime scandal and "place[d] [him] on administrative leave."  And, in January 2011, "SAIC form[ed] a Special Committee of the Board of Directors to oversee the company's response to CityTime"; "hire[d] an independent company . . . to undertake its own review"; and purportedly fired Bell after he "admit[ted] to Federal charges."

- 139 -

439.    Subsequently, Havenstein purportedly brokered the DPA, terminated three employees suspected of placing profits over propriety, and almost immediately resigned.

440.    These admissions, coupled with the sequence of events described in the Havenstein release, corroborate the other allegations herein, which strongly support an inference that Havenstein and other members of management knew of SAIC's involvement in the CityTime fraud no later than January 2011 – months before the filing of the March 2011 Form 10-K.

## I.    The Evidence Confirms that SAIC Knew it Was Implicated in the CityTime Fraud by March 25, 2011

441.    As the evidence described herein confirms, SAIC knew or reasonably should have known during the performance of the CityTime project – and, in any event, no later than March 25, 2011, when SAIC filed its March 2011 Form 10-K – that, among other things:

(a)    employees had made ethics and other complaints about Denault, alleging that he must have been receiving kickbacks from Technodyne;

(b)    employees had complained about unusual billing practices on the project and the inability to deliver a working product, and some had been retaliated against for complaining;

(c)    complaining employees and contractors consistently singled-out Denault and Bell as supervisors at SAIC who were responsible for retaliating against complainants;

(d)    Denault's personal links to Technodyne and various other subcontractors, such as D.A. Solutions, were exposed;

(e)    NYC had persistently complained about the performance of the project and its ballooning costs;

(f)    Technodyne's sole-source subcontract violated SAIC's internal policies, yet SAIC continued to renew the subcontract without putting it up for competitive bidding;

(g)    Technodyne was receiving the substantial majority of revenue on the project;

(h)     the project was predominately staffed with non-SAIC employees, in violation of corporate hiring and recruitment policies;

(i)     time records were consistently inflated and/or otherwise fraudulently prepared and submitted by SAIC to NYC for payment; and

(j)     the rates that Technodyne charged for hiring consultants were unusually high and unreasonable.

442.    Thus, by March 25, 2011, SAIC and its management team knew that the Company was directly implicated in the CityTime fraud and overbilling scheme at the core of the criminal investigations and prosecutions.

**J.     SAIC Was Required to Disclose Not Only that It Was Defrauding NYC, But Also the Impact of the Scheme on the Company's Business**

443.    The March 2011 Form 10-K failed to disclose material information required to be disclosed therein pursuant to controlling SEC rules and regulations.

444.    The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC.  SEC Regulation S-K requires that every Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303.  The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

445.    Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or

expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

446.    Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

447.    SAIC violated the affirmative disclosure duties imposed by Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, among other things, the following material information in the March 2011 Form 10-K during the Class Period:  (i) that SAIC had overbilled NYC hundreds of millions of dollars on CityTime over a multi-year period; and (ii) that SAIC's overbilling practices subjected it to numerous undisclosed risks, including monetary risks and reputational risks, particularly because government agencies are SAIC's primary customers and any harm to its reputation and/or relationships with such agencies would adversely affect its current business, as well as its future revenues and growth prospects.

448.    The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (iii) "unusual or infrequent events or transactions or []

significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

## K.    SAIC's Fraudulent Financial Reporting

449.    SAIC represented in its March 2011 Form 10-K that its financial statements, and its related financial disclosures, were presented in conformity with GAAP.  These representations were materially false and misleading when made because, in violation of GAAP, SAIC knowingly or recklessly issued financial statements and financial disclosures during the Class Period that: (i) materially inflated the Company's income by improperly delaying the reversal of more than $400 million in revenue that was the product of fraudulent and illegal conduct on the CityTime contact; and/or (ii) failed to disclose appropriate loss contingencies on the CityTime contract.

450.    GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  In June 2009, FASB established the Codification as the source of authoritative accounting principles applied by nongovernmental entities in the preparation of financial statements in conformity with GAAP. The Codification did not change GAAP.

451.    Compliance with GAAP is a fundamental obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).  Moreover, management is responsible for the accuracy and integrity of the financial statements.

452.    ASC 450, *Contingencies*, governs the disclosure and accrual of contingencies.[6] Pursuant to ASC 450-10-20 (Glossary), a "contingency" is defined as:

---

[6]    ASC 450, which replaced SFAS No. 5 in June 2009, is substantially similar, if not identical, to SFAS No. 5 in form and substance.

An existing condition, situation, or set of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur.

453.    ASC 450-10-20 similarly defines the term "loss contingency," as follows:

An existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur. The term loss is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses.

454.    ASC 450-20-25-2 requires the accrual of a loss contingency by a charge against income if: (a) "[i]nformation available before the financial statements are issued or are available to be issued . . . indicates that it is probable [*i.e.*, likely]" a contingent liability or potential loss has been incurred; and (b) "[t]he amount of loss can be reasonably estimated."  Under ASC 450-20-25-5, "when the condition in paragraph 450-20-25-2(a) is met with respect to a particular loss contingency and the reasonable estimate of the loss is a range, the condition in paragraph 450-20-25-2(b) is met and an amount shall be accrued for the loss."

455.    By contrast, if both conditions are not met, ASC 450-20-50-3 requires "[d]isclosure of the contingency . . . if there is at least a reasonable possibility [*i.e.*, a greater-than-slight chance] that a loss or an additional loss may have been incurred . . . ."

456.    Furthermore, ASC 450-20-6 provides the following guidance regarding disclosure of an unasserted claim or assessment:

Disclosure is not required of a loss contingency involving an unasserted claim or assessment *if there has been no manifestation by a potential claimant of an awareness of a possible claim* or assessment unless both of the following conditions are met:

a.      It is considered probable that a claim will be asserted.

b.      There is a reasonable possibility that the outcome will be unfavorable.

457.    Therefore, "[t]he 'probability' standard applies in lieu of the 'reasonable possibility' standard *only if* the loss contingency arises from 'an unasserted claim or assessment when *there has been no manifestation* by a potential claimant of an awareness of a possible claim or assessment.'" *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (quoting SFAS No. 5, ¶10, which is the functional equivalent of ASC 450-20-6).

458.    Accordingly, given that possible claims and assessments are sources of significant potential liability for a company, ASC 450 requires disclosure of a loss contingency involving an *unasserted* claim or assessment when there is a manifestation by a potential claimant of awareness of a possible claim or assessment.  And even where there is *no* manifestation by a potential claimant of awareness of a possible claim or assessment, disclosure is required if it is *probable* that a claim will be asserted and there is a *reasonable possibility* that the outcome will be unfavorable.

459.    The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. §210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, *except that* "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

460.    In addition, with respect to contract termination and related litigation contingencies, GAAP, in Section 3.46 of the American Institute of Certified Public Accountant's Audit and Accounting Guide for Federal Government Contractors, provides:

> Significant uncertainties may exist about the recoverability of costs in a termination claim, particularly in cases of termination for default.  Such termination may create additional uncertainties regarding possible liabilities for damages or excess reprocurement costs.  As required by paragraphs 8 through 10 of FASB Statement No. 5, a determination should be made of the probability that a loss has been incurred

and whether an amount can be estimated.  Based on this determination, such liabilities should be recorded or disclosed.

461.    Consistent with the foregoing GAAP standards, the Company disclosed the following in its March 2011 Form 10-K regarding its accounting policies:

> The Company provides for anticipated losses on contracts by recording an expense during the period in which the losses are determined.

462.    As detailed herein, SAIC's management knew or recklessly ignored during the Class Period that there was more than a slight chance that the Company would have to reverse hundreds of millions of dollars of previously recognized and reported revenue on the CityTime contract, and/or that the Government or NYC, which had manifested awareness of a claim before and during the Class Period, would assert a claim against SAIC associated based on misconduct associated with the CityTime contract.  Nonetheless, in violation of GAAP, management caused SAIC to issue financial statements in the March 2011 Form 10-K that failed to disclose such loss contingency.

463.    Indeed, as the Second Circuit Court of Appeals held in evaluating a prior version of these allegations: "the 'reasonable possibility' standard applies in view of the PSAC's allegation that by March 2011 the City had manifested an awareness of a possible, sizeable claim against SAIC." *SAIC*, 818 F.3d at 93.  As the Second Circuit reasoned:

> By the time SAIC filed that 10-K, the PSAC alleges, the CityTime criminal investigation was as focused on SAIC as it was on SAIC's individual employees; the December 2010 criminal complaint against individuals involved in the CityTime project alluded to SAIC's improper actions; Denault had been interviewed by prosecutors, and both SAIC and Denault received a grand jury subpoena for the production of documents related to the CityTime project; Mayor Bloomberg announced a reevaluation of SAIC's role in the CityTime project, including a full review of all payments the City had made to SAIC; and SAIC agreed to pay Denault's and Bell's legal fees associated with any criminal proceedings. Moreover, the PSAC alleged that by March 9, 2011, when SAIC received the results of its internal investigation about possible fraud, SAIC was aware not only of Denault's wrongdoing but also its own potential liability to the City. [*SAIC*, 818 F.3d at 93-94]

464.    Accordingly, SAIC knowingly and/or recklessly violated GAAP and its publicly-disclosed accounting policies "by failing to disclose a loss contingency in its March 2011 [Form] 10-K arising from the City's manifest awareness of a possible material claim against SAIC." *SAIC*, 818 F.3d at 94.  The Company may have also failed to timely and properly accrue losses associated with its recognition and reporting of more than $400 million dollars in revenue during the Class Period, despite that such revenue was the product of fraudulent and illegal conduct on the CityTime contract.

465.    The prospect that SAIC might have to reverse or disgorge all or a substantial portion of the revenue it recorded on the project had serious implications for the Company, because the reversal or disgorgement of such revenue was reasonably likely to have a material impact on SAIC's financial results.

466.    Not only were enormous amounts of revenue at stake – hundreds of millions of dollars, earned over the course of at least seven years as the overbilling scheme was ongoing – but the possibility existed that the Company would have to reverse or disgorge all of that revenue immediately (perhaps in a single quarter) or in a relatively short period of time.  The reversal or disgorgement of this revenue would have a dramatic impact on SAIC's operating results.

467.    The following chart, compiled from consolidated financial information contained in the Company's SEC filings from 2007 through 2011, sets forth key financial metrics for the fiscal years (ending January 31) and a portion of the period during which the illicit overbilling scheme was perpetrated (dollars in millions):

| Metric | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Net Income | $390 | $416 | $452 | $497 | $618 |
| Total Cash Flows (Operations) | $704 | $345 | $583 | $620 | $737 |
| Operating Income | $572 | $673 | $776 | $867 | $958 |
| Cash & Cash Equivalents | $1,113 | 1,096 | $936 | $861 | $1,367 |
| Revenues | $8,060 | $8,926 | $10,070 | $10,846 | $11,117 |

468.    Additionally, the following charts, compiled from consolidated financial information contained in the Company's March 2011 Form 10-K (filed March 25, 2011), set forth key financial metrics for each fiscal quarter of 2010 and 2011, when the kickback and overbilling scheme was publicly unraveling (dollars in millions):

| 2010 Fiscal Quarters | | | | |
|---|---|---|---|---|
| Metric | Q1-2010 | Q2-2010 | Q3-2010 | Q4-2010 |
| Net Income | $116 | $123 | $135 | $123 |
| Operating Income | $204 | $221 | $233 | $209 |
| Revenues | $2,649 | $2,749 | $2,765 | $2,683 |

| 2011 Fiscal Quarters | | | | |
|---|---|---|---|---|
| Metric | Q1-2011 | Q2-2011 | Q3-2011 | Q4-2011 |
| Net Income | $125 | $189 | $172 | $132 |
| Operating Income | $230 | $273 | $258 | $220 |
| Revenues | $2,688 | $2,794 | $2,869 | $2,769 |

469.    After the end of the Class Period, SAIC's financial statements included in its Form 10-Q for the quarter ended October 31, 2011 disclosed that the Company reversed $52 million in revenue on the CityTime *and* that, while no legal claim had yet formally been asserted against SAIC, additional losses on the CityTime contract were reasonably possible, stating, in pertinent part, as follows:

> The Company believes that a loss related to the outcome of the CityTime investigations is probable.  Based on developments relating to the CityTime investigations, the Company now estimates that its loss will be at least $232 million and *has recorded a loss provision of that amount as of October 31, 2011, consisting of a $52 million reduction in revenue* and a $180 million charge to selling, general and administrative expenses.  *An additional loss is reasonably possible*, but an estimate of the maximum amount of such loss currently cannot be estimated given that no legal proceedings have been filed against the Company and the investigations are ongoing and involve complex matters with third parties outside the control of the Company. [Emphasis added.]

470.    Two quarters later, SAIC reported $500 million in additional losses on the CityTime contract, including the reversal of $410 million in revenue.

471.    As alleged herein, in connection with resolving criminal charges and NYC's civil claims, SAIC entered into the DPA, which, among other things, required it to pay $500.4 million and forgo approximately $40 million in receivables purportedly owed by NYC on the CityTime project.

472.    The aggregate value of these monetary concessions – approximately $540.4 million – exceeded the Company's net income in fiscal years 2007, 2008, 2009 and 2010, and nearly exceeded net income in fiscal year 2011.  The aggregate value of these monetary concessions also constituted a significant percentage of the Company's revenues (among other financial metrics), amounting to 6.7% for fiscal year 2007, 6.05% for fiscal year 2008, 5.4% in fiscal year 2009, and nearly 5% for each of fiscal years 2010 and 2011.  On a quarterly basis, the monetary impact of these amounts would be significantly more pronounced.

**L.    The Filing of the 2011 March Form 10-K and Subsequent Developments**

473.    The Class Period begins on March 25, 2011.  On that date, SAIC filed with the SEC the March 2011 Form 10-K, which covered the Company's fiscal year ended January 31, 2011 and was signed by Sopp and Havenstein.

474.    The March 2011 Form 10-K represented that the Company' financial statements contained therein for the year ended January 31, 2011 were presented in conformity with GAAP, stating, in pertinent part, as follows:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting periods. Management evaluates these estimates and assumptions on an on-going basis.  Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

475.    As indicated above, the March 2011 Form 10-K failed to disclose the information required by ASC 450, and the Company's financial statements, as a result, were not prepared in conformity with GAAP.  Nor did the March 2011 Form 10-K disclose the information required by

- 149 -

Item 303, confirming that the filing was also not prepared in accordance with the SEC regulations governing its preparation.

476.    On June 2, 2011, SAIC issued a press release announcing its financial results for its 2012 first quarter, the period ended April 30, 2011.  The press release stated that the USAO and the NYC Department of Investigation had announced that they were "conducting investigations relating to the CityTime contract," and referred investors to a Form 8-K filed with the SEC that day.

477.    In the June 2, 2011 Form 8-K, SAIC made the following representations concerning the CityTime contract and the criminal investigations:

> Since 2000, the Company has performed under a systems development and implementation contract relating to an automated time and attendance and workforce management system (CityTime) for certain agencies of the City of New York (City). The Company has billed approximately $635 million under the contract through May 31, 2011. During fiscal 2011, the Company and the City entered into a contract amendment that provided for, among other things, modified performance requirements for the Company to complete the contract. The Company believes it has substantially completed its performance obligations under the amended contract and has outstanding receivables of approximately $40 million as of May 31, 2011, reflecting the amount owed by the City to the Company under the terms of the amended contract and prior amendments to the contract.

> In the course of conducting an internal investigation of the CityTime program, the Company discovered that it could not validate all of the time recorded to the contract by its CityTime program manager. As a consequence, the Company could not determine the extent to which any time may have been incorrectly overbilled to the City for this employee. The Company then informed the City on May 23, 2011 that it had terminated the employment of this employee and offered to voluntarily refund approximately $2.5 million, representing all of this employee's time directly billed to the City. The Company recorded a liability of approximately $2.5 million as of April 30, 2011, associated with its offer to refund this amount.

> The U.S. Attorney's Office for the Southern District of New York is conducting a criminal investigation relating to the CityTime program. In December 2010, the U.S. Attorney's Office filed a criminal complaint against six individuals who were employees of the quality assurance vendor that was under a direct contract with the New York City Office of Payroll Administration, or were principals of staffing firms that provided staff to the CityTime program as second-tier subcontractors to the Company, or were otherwise relatives of those individuals.  On February 10, 2011, a federal grand jury indicted four of the individuals and added another individual defendant. On May 27, 2011, a criminal complaint was filed against the former

Company employee whose time charges were subject to the refund offer. The complaint alleges that this former employee conspired to defraud the City into extending the duration of and overpaying for the CityTime project and personally received kickbacks totaling $5.6 million. It also alleges that he defrauded the Company by depriving it of his honest services, and charges him with money laundering to conceal proceeds of the fraudulent schemes. The Company is continuing to cooperate with the U.S. Attorney's investigation but cannot predict its outcome.

Statements have been issued from the City's Office of the Mayor and Office of the Comptroller indicating that the City's Department of Investigation would conduct a more extensive investigation regarding the CityTime contract, and that the City would withhold payment of amounts owing to the Company until the investigation was complete. In addition, these statements have also indicated that the City intends to pursue the recovery of costs associated with the CityTime program that the City's investigation reveals were improperly charged to the City. ***The City has not filed any claim against the Company or otherwise requested reimbursement or return of payments previously made to the Company and the Company has not recorded any liabilities relating to this contract other than the approximately $2.5 million it offered to refund.*** However, there is a reasonable possibility of additional exposure to loss that is not currently estimable if there is an adverse outcome. An adverse outcome of any of these investigations may result in non-payment of amounts owed to the Company, a demand for reimbursement of other amounts previously received by the Company under the contract, claims for additional damages, and/or fines and penalties, which could have a material adverse effect on the Company's consolidated financial position, results of operations and cash flows.  [Emphasis added.]

478.    Also on June 2, 2011, SAIC held a conference call with analysts and investors to discuss the Company's operations and earnings.  During the call, Havenstein made statements about the CityTime contract and the pending investigations.  Specifically, he stated the following:

Now I will turn to the topic of our CityTime contract with the city of New York. SAIC is the prime contractor under the CityTime program to provide a custom fully automated workforce management system. The system is now essentially complete, supporting more than 163,000 city employees and nearly 7 departments and agencies – excuse me, 70 departments and agencies.

As you may have seen in news reports, SAIC's former program manager for the CityTime program has been charged by the U.S. Attorney for the Southern District of New York with conspiring to defraud the city and SAIC by receiving illegal kickbacks from the program for his own personal gain.

We provided a description on the status of the CityTime situation as an exhibit to the 8-K we filed today with our earnings release. We obviously are taking this matter very seriously. The individual who is the subject of the charges had been on

mandatory administrative leave from SAIC since December when it was announced that certain non-SAIC individuals working on the CityTime program were arrested, and the U.S. Attorney's investigation was made public.

Since then the Company has discovered that it could not validate all the time recorded to the contract by this CityTime program manager. SAIC terminated his employment as of May 23. We have offered to voluntarily refund to the city approximately $2.5 million, representing all this employee's time that was directly billed to the city. Shortly thereafter the charges against the former program manager were filed. We had not been aware of these charges prior to that time.

The U.S. Attorney's investigation is ongoing, and we are cooperating with that investigation. The city of New York is also conducting an investigation regarding the contract. At this time the company does not know the full extent or scope of these investigations, and cannot predict their outcomes.

The city has stated that it intends to pursue the recovery of any CityTime related costs that were improperly charged to the city. But it has not yet filed any claims against the Company or requested reimbursement of payments previously made to the Company.

The alleged behavior of our former employee is counter to everything we stand for and work to achieve every day. We will continue to cooperate in these investigations and act appropriately with the city in connection with this matter.

We understand your interest in the situation, and for that reason we have included a detailed statement in our 8-K filing along with our press release. But there is really nothing else we can add at this point, given the fact that the investigations are still ongoing. So we ask you to respect the fact that we cannot say anymore on this subject at this time.

479.    On June 3, 2011, SAIC filed its Form 10-Q for the quarter ended April 30, 2011 (the "2012 Q1 Form 10-Q") with the SEC, which was signed by Sopp.  The 2011 Q1 Form 10-Q included SAIC's financial statements for the quarter ended April 30, 2011, which were represented to have been presented in conformity with GAAP (and contained a similar representation to that set forth in the March 2011 Form 10-K).  The 2012 Q1 Form 10-Q also repeated the representations contained in the June 2, 2011 Form 8-K concerning CityTime and the criminal investigations.  Yet the statements in the 2012 Q1 Form 10-Q:

(a)      downplayed SAIC's liability and reasonably anticipated losses associated with the fraud perpetrated in connection with the CityTime project, by assuring investors that NYC "has not filed any claim against the Company" or made any requests for reimbursement, and, further, that SAIC had "not recorded any liabilities relating to this contract other than the approximately $2.5 million it offered to refund"; and

(b)      represented that SAIC's "additional exposure to loss" was "not currently estimable," notwithstanding the fact that the Company knew or should have known the extent to which its earnings under the CityTime contract were "exposed to loss."

480.    In response to this news, the price of SAIC's common stock declined from $17.21 per share on June 2, 2011 to $16.76 per share on June 3, 2011 on heavy volume of more than 3.4 million shares traded – nearly double the trading volume of the previous day.

481.    On June 29, 2011, Mayor Bloomberg wrote a letter to SAIC, requested that SAIC reimburse NYC for approximately $600 million paid to the Company for CityTime and the cost of investigating and remediating the CityTime program.  On July 1, 2011, SAIC filed with the SEC a Form 8-K with an attached copy of Mayor Bloomberg's June 29, 2011 letter.

482.    On August 31, 2011, SAIC issued a press release announcing its financial results for its 2012 second quarter, the period ended July 31, 2011.  For the quarter, SAIC reported an approximate 6% decline in revenue and a 23% decline in operating margin.

483.    Following SAIC's 2012 fiscal second quarter earnings announcement, members of management held a conference call with analysts and investors wherein they disclosed that SAIC's revenues were, in part, adversely impacted by the "wind[ing] down" of the CityTime contract and that, while the Company could not quantify the amount, it believed that it was "probable" that it would have to make restitution to NYC for wrongful conduct on CityTime.  The revelation that

- 153 -

SAIC would likely incur a loss on CityTime was significant because, pursuant to applicable accounting rules, it served as an express acknowledgement that SAIC would incur a charge against its earnings for the wrongful conduct alleged herein involving the CityTime project.

484.    In response to this adverse information, the price of SAIC common stock plummeted nearly 14%, from $15.00 per share on August 31, 2011 to $12.97 on September 1, 2011, on heavy trading volume, as the artificial inflation came out of the stock price and the price continued to decline in concert with the emergence of details concerning SAIC's fraudulent scheme and the financial impact the revelation of the fraud would have on the Company.  Indeed, analysts noted that the risks associated with the CityTime-related investigations posed significant issues for the Company, its current business, and its prospects going forward.

485.    On October 3, 2011, SAIC issued a press release announcing that Havenstein would retire as CEO effective June 15, 2012, citing unidentified "personal reasons."  As detailed below, however, his term as CEO would end even sooner.

486.    Subsequently, on October 24, 2011, SAIC filed a Form 8-K with the SEC in which it announced the termination of Alderson and two other executives in connection with the Company's efforts to address the CityTime scandal.  In an October 24, 2011 employee memorandum attached to the Form 8-K, Havenstein characterized SAIC's conduct in connection with the CityTime project as "criminal" and acknowledged that it undermined the Company's purported "outstanding reputation for integrity and strong ethical business practices."  In addition, the memorandum linked these fired executives to the "failures of management with respect to the CityTime program" that allowed the fraud to occur.  The memorandum stated, in pertinent part, as follows:

> After a comprehensive review of the CityTime program, including a review of management performance, the Board of Directors and I have decided that certain management changes are essential going forward. The Board and I have concluded that there were failures of management with respect to the CityTime program.

Consequently, Deborah Alderson, Defense Solutions Group President, John Lord, Deputy Group President and Peter Dube, General Manager of the Enterprise and Mission Solutions Business Unit, have been removed from their positions and are no longer with the company. While we are aware of no evidence that these individuals had any personal involvement in the fraud uncovered in the CityTime program, and while each has made valuable contributions to SAIC, we must maintain the highest standards for all of our employees and for our industry, beginning with our management team. Management must ensure that ethics and compliance come before profit on every project in this company, and employees must be confident that any concerns they express to their supervisors about ethics or compliance will receive immediate and serious attention. Managers and employees alike should understand that those who are privileged to lead in our company will be held accountable.

487.     And, at the end of the memorandum, Havenstein reminded employees that on June 9, 2011, he had "asked each of you to rededicate yourselves to ethical conduct.  That still remains the key to our future."  If SAIC's employees had acted ethically and appropriate during the duration of the CityTime project, Havenstein obviously would have had no need to terminate three management-level employees or remind other employees to "rededicate [themselves] to ethical conduct."

488.     On December 6, 2011, SAIC issued a press release announcing its financial results for the third quarter of fiscal year 2012.  The Company reported that its "results for quarter were significantly impacted by a $232 million loss provision taken by the Company" relating to CityTime.  Havenstein commented on the announcement, stating, in pertinent part, as follows:

Our actions taken in the third quarter in connection with the CityTime situation, including taking the loss provision, were significant and appropriate. . . .

489.     On February 21, 2012, SAIC announced that Havenstein would step down as CEO on March 1, 2012, more than three months earlier than initially anticipated (given the October 3, 2011 announcement that he would retire effective June 15, 2012).

490.     Finally, on March 14, 2012, SAIC announced that it had entered into the DPA with the USAO, pursuant to which it agreed to pay nearly $500.4 million to the U.S. Government, comprised of $370.4 million in restitution that will be paid to NYC by the Government and a $130 million penalty.  SAIC also agreed to forfeit $40 million in unpaid bills that were invoiced to NYC.

491.    Under the DPA, SAIC agreed, among other things, to retain an independent monitor, selected by the USAO after consultation with the Company, who will periodically report to the USAO and have broad authority to monitor and make recommendations on a number of the Company's policies and practices.  And, in connection with its entry into the DPA, SAIC agreed to the SOR, pursuant to which it agreed to take responsibility for the perpetration of the fraud by its employees.

## M.    Additional Scienter Allegations

492.    As alleged herein, SAIC acted with scienter in that it knew, or recklessly disregarded, that the March 2011 Form 10-K was materially false and misleading in the absence of disclosure required by Item 303 and ASC 450.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the senior executives described herein.

493.    SAIC's scienter is underscored by the Sarbanes-Oxley mandated certifications of Dahlberg and Sopp, in which they acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about SAIC was made known to them and that SAIC's disclosure related controls were operating effectively.

494.    SAIC's scienter is further established by the reckless and/or conscious disregard of numerous red flags occurring before and during the Class Period that exposed key aspects of the fraudulent scheme to the Company's senior-level executives and other insiders.  These red flags should have prompted an earlier effort to investigate and address the wrongdoing alleged herein and to make adequate disclosure to investors concerning the scheme and its ramifications on SAIC's business and operations.

495.    The glaring nature of these red flags, and SAIC's disregard of them, are detailed in an

April 21, 2012 article by *The Washington Post* columnist Steven Pearlstein, entitled "How could

SAIC miss this?"  The article states, in pertinent part, as follows:

> What is fascinating about the CityTime debacle is how many times SAIC was
> warned about irregularities and potential fraud without ever doing anything about it.
>
> There was the February 2003 letter from Richard Valcich, director of New York's
> Office of Payroll Administration, complaining that SAIC was constantly rewriting
> plans, requirements and schedules without consulting the city, demonstrating a
> certain lack of conformity with acceptable industry practices. One tell-tale sign:
> Hardware purchases had been marked up 400 percent.
>
> Then there was the 2005 letter from an anonymous whistleblower alleging that a
> subcontractor was receiving such preferential treatment, including a large no-bid
> contract that violated company policy, that the only explanation was that SAIC
> project manager Gerard Denault was receiving kickbacks. Higher-ups failed to
> investigate, failed to notify the customer and failed to inform the board of directors.
>
> A few years later came another flurry of complaints from SAIC employees who
> ignored Denault's threats and went to his superiors to raise their concerns about
> irregularities with the CityTime contract. Their pleas were met with skepticism and
> they were told no further action would be taken unless they could deliver some proof
> of wrongdoing.

496.    Moreover, the article explains how "it took the power of the government subpoena

and threat of prosecution" to force SAIC to acknowledge these red flags – and the fraud.  The article

states, in pertinent part, as follows:

> In the CityTime case, it took the power of the government subpoena and threat of
> prosecution to finally crack what turned out to be an elaborate kickback conspiracy.
> The key players were: Mark Mazer, a consultant hired by the city to help manage the
> contract; from SAIC, Denault, the project director, and Carl Bell, the chief engineer;
> and Reddy and Padma Allen, owners of TechnoDyne, a small subcontracting firm in
> Teaneck, N.J.
>
> According to the Justice Department, the conspirators were able to overcharge the
> city by hiring consultants that were not needed, inflating their hours and their hourly
> rates. Then dummy corporations and bank accounts were set up here and in India to
> launder the inflated payments and recycle the kickbacks to the conspirators.

Even without uncovering the details of the kickback scheme, however, there were plenty of warning signs for anyone with even a passing familiarity with the government contracting business, which includes almost everyone at SAIC.

Mazer and Denault were widely known to be longtime friends and associates who had most recently worked for the same consulting firm – not exactly the sort of relationship you want between a government contract officer and the lead contractor.

Shortly after SAIC took over the contract, the two arranged for it to be changed from a "fixed-price" contract that was losing money to a "fixed-price level of effort" contract that allowed the project's ever-escalating costs to be passed on to the city – an odd concession from the city, which got nothing in return.

Most significantly, the vast majority of the work on the CityTime project was done not by SAIC employees but by employees and consultants at TechnoDyne under a no-bid, single-source subcontract that violated SAIC's procedures, doubled the number of people working on the project and generated billing rates that ran as high as $160 an hour.

The $450 million it received from SAIC between 2003 and 2010 constituted almost all of TechnoDyne's revenue, with a significant portion of that sub-subcontracted to firms with little or no other revenue.

497.    And, the article explains the steps that SAIC took to recently address the egregious

scheme, stating, in pertinent part, as follows:

A year ago company officials were publicly denying that there were any problems at all with its contract to build a new timecard system for New York City, which by then was so late and so over budget that "CityTime" had become a frequent target for the New York tabloids and political embarrassment for Mayor Michael Bloomberg.

It was just last June that SAIC executives and directors first informed shareholders that there might be a little $2.5 million overbilling problem with the contract and that federal prosecutors had brought criminal charges against six employees of an SAIC subcontractor. Shareholders had to read deep into Note 9 of that quarterly report to learn that there might be "a reasonable possibility of additional exposure to loss that is not currently estimable" that "could have a material adverse impact" on the company's finances.

It was just six months ago that SAIC got around to firing the three executives who were supposed to oversee the New York operations and letting shareholders know that the board of directors had formed a special committee and hired a couple of law firms to get to the bottom of things.

And it was a month ago that SAIC, acknowledging its responsibility in failing to detect a bribery and kickback conspiracy going on right under its corporate nose, agreed to repay the city $500 million of the $635 million it had received for the

completed CityTime system. The settlement will allow SAIC to avoid criminal prosecution and the almost certain debarment from government contracting work that would follow.

498.     As detailed herein, the facts referenced in the article were substantiated in material part by the evidence developed during the criminal trial.

499.     Moreover, in his October 24, 2011 employee memorandum (attached to the October 24, 2011 Form 8-K), Havenstein acknowledged management's awareness – and disregard – of red flags raised by the Company's own employees, when he "thank[ed] those SAIC employees who raised concerns about CityTime at various points."

500.     However, perhaps the most compelling evidence of scienter are the admissions that SAIC made in the SOR (detailed herein), in which the Company purported to take responsibility for the fact that its senior-level management consciously or recklessly disregarded telltale signs of fraud during the implementation of the CityTime project.  In his 2014 campaign release, Havenstein also acknowledged that management was aware of SAIC's involvement in and exposure to the CityTime fraud no later than January 2011.

501.     Furthermore, senior executives of SAIC were motivated to turn a blind eye to the CityTime fraud because a substantial portion of their compensation was based on the Company's financial performance.  For example, in the Company's April 29, 2010 definitive proxy statement, filed with the SEC on Schedule 14A, SAIC disclosed that the Compensation Committee of the Board believes that "[a] substantial portion of the total compensation received by our executive officers should be directly tied to and contingent upon our performance as a whole and the performance of operating units under their management."  Accordingly, key components of compensation for senior executives are cash-based incentive awards, which "vary in amount depending upon performance against predetermined goals and objective for the fiscal year, to encourage achievement of annual financial and operating goals . . . ."

502.   In fact, 80% of the amount of the cash-based incentive awards is tied to the financial

performance of the Company and/or the particular business group (as appropriate), as the April 29,

2010 definitive proxy statement provides:

> [O]ur performance (or a combination of company and group performance for
> executive officers with operational responsibilities) determines 80% of the amount of
> any cash incentive awards to be paid upon completion of the fiscal year.  Amounts
> are principally determined based upon the company's or group's achievement of
> financial and operating objectives set at the beginning of the fiscal year.

503.   Thus, 80% of the amount of cash-based incentive awards: (i) for the CEO, CFO and

other corporate-level executives, was determined by reference to consolidated financial information;

and (ii) for Group Presidents, was determined by reference to the financial results of their respective

Groups (40% weighting) and consolidated financial information (40% weighting).

504.   Both before and during the Class Period, cash-based incentive awards (also known as

non-equity incentive plan compensation) comprised a significant portion of the total compensation

of SAIC's senior executives – and sometimes exceeded their annual salaries.  The following chart,

prepared from SAIC's SEC filings (based on publicly available information), shows salary, cash-

based incentive awards, total compensation (which includes the value of stock and option awards),

and cash-based awards as a percentage of total compensation, for Dahlberg, Havenstein, Sopp and

Alderson:

| Executive | Year | Salary | Cash Awards | Total Compensation | % |
|---|---|---|---|---|---|
| Dahlberg | 2010 | $1,000,000 | $1,444,500 | $4,816,156 | 30% |
|  | 2009 | $1,000,000 | $1,469,610 | $5,825,955 | 25.2% |
|  | 2008 | $1,000,000 | $1,050,000 | $5,559,770 | 18.9% |
|  | 2007 | $1,000,000 | $1,325,000 | $6,991,966 | 18.6% |
| Havenstein | 2011 | $1,000,000 | $1,077,750 | $5,153,040 | 20.9% |
|  | 2010 | $346,154 | $1,250,000 | $8,053,810 | 15.5% |
| Sopp | 2011 | $566,923 | $520,000 | $2,208,820 | 23.5% |
|  | 2010 | $547,115 | $560,000 | $2,254,035 | 24.8% |
|  | 2009 | $521,154 | $550,000 | $2,240,929 | 24.5% |
|  | 2008 | $508,654 | $400,000 | $2,095,942 | 19.1% |
|  | 2007 | $474,000 | $440,000 | $1,265,123 | 34.8% |
| Alderson | 2011 | $497,116 | $445,000 | $1,879,479 | 23.7% |
|  | 2010 | $479,519 | $512,000 | $1,949,510 | 26.3% |
|  | 2009 | $431,154 | $485,000 | $1,766,316 | 27.5% |

| Executive | Year | Salary | Cash Awards | Total Compensation | % |
|---|---|---|---|---|---|
| | 2008 | $409,038 | $370,000 | $1,667,491 | 22.2% |

505. Moreover, Denault's compensation increased in tandem with his promotions and the skyrocketing cost of the CityTime project, and he reported certain illicit remuneration associated with the kickback scheme as income from a shell entity named MKG Consulting. As the following chart shows, Denault's salary and the illicit income he reported increased dramatically in 2006, when CEO Dahlberg had approved Amendment No. 6 for the second time and it went into effect:

| Year | SAIC Income | MKG Consulting Income |
|---|---|---|
| 2004 | $192,868 | $90,000 |
| 2005 | $193,735 | $07,752 |
| 2006 | $409,411 | $172,306 |
| 2007 | $405,269 | $268,098 |
| 2008 | $514,454 | $989,467 |
| 2009 | $588,327 | $0 |
| 2010 | $644,819 | $887,890 |
| **Total:** | **$2,948,883** | **$5,662,196** |

506. Consequently, SAIC's financial performance – based, in part, on revenue generated from the CityTime project – was critical to executive compensation at SAIC, and maximizing profit from the project (even at NYC's expense) served as a powerful incentive to consciously and/or recklessly disregard the increasing cost of the project and other telltale signs of the fraud even for those who did not directly engage in the underlying kickback and overbilling scheme.

507. Additionally, senior executives at SAIC were predisposed to disregard the CityTime fraud in order to allow themselves and other high-level Company officers and insiders to sell shares of their personally-held SAIC common stock at inflated prices, yielding proceeds of approximately $33.9 million before the Class Period – while SAIC's involvement in the CityTime fraud remained concealed from investors – as the following chart demonstrates:

| Filer Name | Title | Direct/ Indirect | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Alderson, Deborah H. | Officer/Defendant | D | 13-Sep-2010 | 103,297 | $15.16 | $1,565,983 |
| Alderson, Deborah H. | Officer/Defendant | D | 28-Dec-2010 | 111,121 | $15.81 | $1,756,823 |
| | | | | 214,418 | | $3,322,806 |

| Filer Name | Title | Direct/ Indirect | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Craver, Joseph W III | Officer | D | 16-Jun-2008 | 1,500 | $20.80 | $31,200 |
| Craver, Joseph W III | Officer | D | 16-Jun-2008 | 1,900 | $20.81 | $39,539 |
| Craver, Joseph W III | Officer | D | 16-Jun-2008 | 3,000 | $20.76 | $62,280 |
| Craver, Joseph W III | Officer | D | 16-Jun-2008 | 5,300 | $20.77 | $110,081 |
| Craver, Joseph W III | Officer | D | 16-Jun-2008 | 9,500 | $20.75 | $197,125 |
| Craver, Joseph W III | Officer | D | 16-Jun-2008 | 5,300 | $20.78 | $110,134 |
| Craver, Joseph W III | Officer | D | 16-Jun-2008 | 2,135 | $20.82 | $44,451 |
| Craver, Joseph W III | Officer | D | 16-Jun-2008 | 1,700 | $20.79 | $35,343 |
| Craver, Joseph W III | Officer | D | 09-Jun-2009 | 1,600 | $18.24 | $29,184 |
| Craver, Joseph W III | Officer | D | 09-Jun-2009 | 2,000 | $18.29 | $36,580 |
| Craver, Joseph W III | Officer | D | 09-Jun-2009 | 1,500 | $18.21 | $27,315 |
| Craver, Joseph W III | Officer | D | 09-Jun-2009 | 1,100 | $18.27 | $20,097 |
| Craver, Joseph W III | Officer | D | 09-Jun-2009 | 2,000 | $18.23 | $36,460 |
| Craver, Joseph W III | Officer | D | 09-Jun-2009 | 6,800 | $18.26 | $124,168 |
| Craver, Joseph W III | Officer | D | 09-Jun-2009 | 21,800 | $18.25 | $397,850 |
| Craver, Joseph W III | Officer | D | 09-Jun-2009 | 3,200 | $18.28 | $58,496 |
| Craver, Joseph W III | Officer | D | 17-Dec-2009 | 41,694 | $19.45 | $810,948 |
| Craver, Joseph W III | Officer | D | 22-Sep-2010 | 11,000 | $15.91 | $175,010 |
| Craver, Joseph W III | Officer | D | 30-Dec-2010 | 41,280 | $15.96 | $658,829 |
| | | | | 164,309 | | $3,005,090 |
| | | | | | | |
| Demisch, Wolfgang H. | Director | D | 25-Jun-2007 | 32,000 | $17.80 | $569,600 |
| Demisch, Wolfgang H. | Director | D | 25-Jun-2007 | 2,700 | $17.83 | $48,141 |
| Demisch, Wolfgang H. | Director | D | 25-Jun-2007 | 1,200 | $17.85 | $21,420 |
| Demisch, Wolfgang H. | Director | D | 25-Jun-2007 | 100 | $17.84 | $1,784 |
| Demisch, Wolfgang H. | Director | D | 25-Jun-2007 | 600 | $17.82 | $10,692 |
| Demisch, Wolfgang H. | Director | D | 25-Jun-2007 | 3,400 | $17.81 | $60,554 |
| Demisch, Wolfgang H. | Director | D | 26-Jun-2007 | 400 | $17.51 | $7,004 |
| Demisch, Wolfgang H. | Director | D | 26-Jun-2007 | 1,200 | $17.54 | $21,048 |
| Demisch, Wolfgang H. | Director | D | 26-Jun-2007 | 1,418 | $17.56 | $24,900 |
| Demisch, Wolfgang H. | Director | D | 26-Jun-2007 | 2,600 | $17.55 | $45,630 |
| Demisch, Wolfgang H. | Director | D | 26-Jun-2007 | 400 | $17.53 | $7,012 |
| Demisch, Wolfgang H. | Director | D | 26-Jun-2007 | 7,100 | $17.52 | $124,392 |
| Demisch, Wolfgang H. | Director | D | 26-Jun-2007 | 1,500 | $17.50 | $26,250 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 600 | $20.98 | $12,588 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 700 | $21.08 | $14,756 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 1,100 | $21.01 | $23,111 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 1,700 | $21.09 | $35,853 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 2,200 | $21.07 | $46,354 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 13,600 | $21.00 | $285,600 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 6,500 | $21.12 | $137,280 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 5,900 | $21.06 | $124,254 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 4,800 | $20.99 | $100,752 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 3,400 | $21.02 | $71,468 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 3,000 | $21.04 | $63,120 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 2,400 | $21.05 | $50,520 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 2,100 | $21.11 | $44,331 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 1,200 | $21.03 | $25,236 |
| Demisch, Wolfgang H. | Director | D | 12-Jun-2008 | 800 | $20.97 | $16,776 |

| Filer Name | Title | Direct/ Indirect | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Demisch, Wolfgang H. | Director | D | 22-Dec-2008 | 200 | $18.85 | $3,770 |
| Demisch, Wolfgang H. | Director | D | 22-Dec-2008 | 23,345 | $18.80 | $438,886 |
| Demisch, Wolfgang H. | Director | D | 22-Dec-2008 | 3,000 | $18.81 | $56,430 |
| Demisch, Wolfgang H. | Director | D | 22-Dec-2008 | 1,200 | $18.84 | $22,608 |
| Demisch, Wolfgang H. | Director | D | 22-Dec-2008 | 1,600 | $18.87 | $30,192 |
| Demisch, Wolfgang H. | Director | D | 22-Dec-2008 | 1,600 | $18.83 | $30,128 |
| Demisch, Wolfgang H. | Director | D | 22-Dec-2008 | 1,900 | $18.82 | $35,758 |
| Demisch, Wolfgang H. | Director | D | 22-Dec-2008 | 1,300 | $19.00 | $24,700 |
| | | | | 138,763 | | $2,662,898 |
| | | | | | | |
| Drummond, Jere A. | Director | D | 01-Oct-2008 | 35,999 | $20.05 | $721,780 |
| Drummond, Jere A. | Director | D | 07-Jan-2010 | 26,627 | $19.08 | $508,043 |
| Drummond, Jere A. | Director | D | 13-Jan-2010 | 9,373 | $18.91 | $177,243 |
| Drummond, Jere A. | Director | D | 07-Jan-2011 | 30,084 | $16.06 | $483,149 |
| Drummond, Jere A. | Director | D | 11-Jan-2011 | 2,916 | $16.14 | $47,064 |
| | | | | 104,999 | | $1,937,280 |
| | | | | | | |
| Fisher, Steven P. | Officer/Treasurer | D | 18-Jun-2007 | 9,660 | $17.99 | $173,783 |
| Fisher, Steven P. | Officer/Treasurer | I | 18-Jun-2007 | 11,692 | $17.99 | $210,339 |
| Fisher, Steven P. | Officer/Treasurer | D | 28-Sep-2007 | 1,000 | $19.18 | $19,180 |
| Fisher, Steven P. | Officer/Treasurer | I | 28-Sep-2007 | 3,600 | $19.20 | $69,120 |
| Fisher, Steven P. | Officer/Treasurer | D | 28-Sep-2007 | 550 | $19.16 | $10,538 |
| Fisher, Steven P. | Officer/Treasurer | I | 28-Sep-2007 | 650 | $19.19 | $12,474 |
| Fisher, Steven P. | Officer/Treasurer | I | 28-Sep-2007 | 1,200 | $19.15 | $22,980 |
| Fisher, Steven P. | Officer/Treasurer | D | 28-Sep-2007 | 3,600 | $19.20 | $69,120 |
| Fisher, Steven P. | Officer/Treasurer | I | 28-Sep-2007 | 550 | $19.16 | $10,538 |
| Fisher, Steven P. | Officer/Treasurer | I | 28-Sep-2007 | 1,000 | $19.18 | $19,180 |
| Fisher, Steven P. | Officer/Treasurer | D | 28-Sep-2007 | 650 | $19.19 | $12,474 |
| Fisher, Steven P. | Officer/Treasurer | D | 28-Sep-2007 | 1,200 | $19.15 | $22,980 |
| Fisher, Steven P. | Officer/Treasurer | I | 21-Dec-2007 | 7,688 | $20.19 | $155,221 |
| Fisher, Steven P. | Officer/Treasurer | I | 21-Dec-2007 | 300 | $20.18 | $6,054 |
| Fisher, Steven P. | Officer/Treasurer | I | 21-Dec-2007 | 300 | $20.20 | $6,060 |
| Fisher, Steven P. | Officer/Treasurer | D | 21-Dec-2007 | 1,000 | $20.18 | $20,180 |
| Fisher, Steven P. | Officer/Treasurer | D | 21-Dec-2007 | 6,490 | $20.19 | $131,033 |
| | | | | 51,130 | | $971,253 |
| | | | | | | |
| Hamre, John J. | Director | D | 10-Jan-2011 | 30,084 | $16.06 | $483,149 |
| | | | | | | |
| Hartley, John R. | Officer | D | 15-Jun-2007 | 8,900 | $18.24 | $162,336 |
| Hartley, John R. | Officer | D | 11-Oct-2007 | 100 | $19.99 | $1,999 |
| Hartley, John R. | Officer | D | 11-Oct-2007 | 700 | $19.98 | $13,986 |
| Hartley, John R. | Officer | D | 11-Oct-2007 | 5,123 | $20.00 | $102,460 |
| Hartley, John R. | Officer | D | 05-Jan-2010 | 12,730 | $19.11 | $243,270 |
| Hartley, John R. | Officer | D | 04-Oct-2010 | 33,834 | $16.03 | $542,359 |
| Hartley, John R. | Officer | D | 04-Jan-2011 | 36,967 | $16.04 | $592,951 |
| | | | | 98,354 | | $1,659,361 |
| | | | | | | |
| James, Deborah L. | Officer | D | 04-Jan-2011 | 27,383 | $16.04 | $439,223 |

| Filer Name | Title | Direct/ Indirect | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Jones, Anita K. | Director | D | 26-Jun-2007 | 5,500 | $17.50 | $96,250 |
| Jones, Anita K. | Director | D | 26-Jun-2007 | 11,400 | $17.80 | $202,920 |
| Jones, Anita K. | Director | D | 26-Jun-2007 | 200 | $17.81 | $3,562 |
| Jones, Anita K. | Director | D | 26-Jun-2007 | 200 | $17.82 | $3,564 |
| Jones, Anita K. | Director | D | 26-Jun-2007 | 200 | $17.84 | $3,568 |
| Jones, Anita K. | Director | D | 26-Jun-2007 | 1,145 | $17.85 | $20,438 |
| Jones, Anita K. | Director | D | 26-Jun-2007 | 16,807 | $18.00 | $302,526 |
| Jones, Anita K. | Director | D | 02-Oct-2007 | 11,534 | $19.15 | $220,876 |
| Jones, Anita K. | Director | D | 11-Jun-2008 | 2,200 | $21.11 | $46,442 |
| Jones, Anita K. | Director | D | 11-Jun-2008 | 3,000 | $21.10 | $63,300 |
| Jones, Anita K. | Director | D | 07-Oct-2008 | 100 | $19.13 | $1,913 |
| Jones, Anita K. | Director | D | 07-Oct-2008 | 300 | $19.11 | $5,733 |
| Jones, Anita K. | Director | D | 07-Oct-2008 | 900 | $19.14 | $17,226 |
| Jones, Anita K. | Director | D | 07-Oct-2008 | 3,700 | $19.10 | $70,670 |
| Jones, Anita K. | Director | D | 08-Jan-2010 | 26,570 | $19.09 | $507,221 |
| Jones, Anita K. | Director | D | 13-Jan-2010 | 5,270 | $18.75 | $98,813 |
| Jones, Anita K. | Director | D | 12-Jul-2010 | 6,070 | $16.87 | $102,401 |
| Jones, Anita K. | Director | D | 06-Jan-2011 | 6,250 | $16.06 | $100,375 |
| Jones, Anita K. | Director | D | 06-Jan-2011 | 30,084 | $16.06 | $483,149 |
| | | | | 95,978 | | $1,718,119 |
| | | | | | | |
| Keenan, Brian F. | Officer | D | 22-Dec-2010 | 27,905 | $15.74 | $439,225 |
| | | | | | | |
| Koontz, Charles F. | Officer | D | 30-Dec-2009 | 10,228 | $19.03 | $194,639 |
| | | | | | | |
| Kraemer, Harry M. J. Jr. | Director | D | 07-Jan-2011 | 30,084 | $16.06 | $483,149 |
| | | | | | | |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 500 | $20.91 | $10,455 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 900 | $20.93 | $18,837 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 1,400 | $20.90 | $29,260 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 2,200 | $20.89 | $45,958 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 2,700 | $20.96 | $56,592 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 6,500 | $20.97 | $136,305 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 5,600 | $20.87 | $116,872 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 5,600 | $20.92 | $117,152 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 4,500 | $20.94 | $94,230 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 4,400 | $20.88 | $91,872 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 3,500 | $20.82 | $72,870 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 3,500 | $20.83 | $72,905 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 2,800 | $20.86 | $58,408 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 2,600 | $20.95 | $54,470 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 1,600 | $20.81 | $33,296 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 1,200 | $20.85 | $25,020 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 300 | $20.84 | $6,252 |
| Punaro, Arnold L. | Officer | I | 06-Jun-2008 | 200 | $20.80 | $4,160 |
| Punaro, Arnold L. | Officer | D | 14-Oct-2009 | 10,000 | $18.25 | $182,500 |
| Punaro, Arnold L. | Officer | D | 15-Dec-2009 | 76,520 | $19.25 | $1,473,010 |
| Punaro, Arnold L. | Officer | D | 16-Dec-2009 | 19,000 | $19.44 | $369,360 |
| Punaro, Arnold L. | Officer | D | 14-Jan-2010 | 20,000 | $19.00 | $380,000 |

| Filer Name | Title | Direct/ Indirect | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| | | | | 175,520 | | $3,449,784 |
| | | | | | | |
| Sanderson, Edward J. Jr. | Director | D | 11-Jan-2010 | 26,612 | $19.06 | $507,225 |
| Sanderson, Edward J. Jr. | Director | D | 07-Jan-2011 | 30,084 | $16.06 | $483,149 |
| | | | | 56,696 | | $990,374 |
| | | | | | | |
| Scott, Douglas E. | General Counsel | D | 14-Jul-2008 | 200 | $20.51 | $4,102 |
| Scott, Douglas E. | General Counsel | D | 14-Jul-2008 | 8,000 | $20.52 | $164,160 |
| Scott, Douglas E. | General Counsel | D | 14-Jul-2008 | 8,000 | $20.56 | $164,480 |
| Scott, Douglas E. | General Counsel | D | 14-Jul-2008 | 7,000 | $20.55 | $143,850 |
| Scott, Douglas E. | General Counsel | D | 14-Jul-2008 | 5,600 | $20.50 | $114,800 |
| Scott, Douglas E. | General Counsel | D | 14-Jul-2008 | 21,200 | $20.50 | $434,600 |
| Scott, Douglas E. | General Counsel | D | 21-Dec-2009 | 86,043 | $18.85 | $1,621,911 |
| Scott, Douglas E. | General Counsel | D | 11-Jan-2010 | 50,000 | $19.00 | $950,000 |
| | | | | 186,043 | | $3,597,903 |
| | | | | | | |
| Shea, K. Stuart | Officer | D | 07-Jan-2009 | 500 | $19.69 | $9,845 |
| Shea, K. Stuart | Officer | D | 07-Jan-2009 | 3,000 | $19.71 | $59,130 |
| Shea, K. Stuart | Officer | D | 20-Sep-2010 | 11,113 | $15.62 | $173,585 |
| Shea, K. Stuart | Officer | D | 05-Jan-2011 | 33,024 | $15.96 | $527,063 |
| | | | | 47,637 | | $769,623 |
| | | | | | | |
| Sopp, Mark W. | CFO/Defendant | D | 17-Sep-2010 | 90,328 | $15.69 | $1,417,246 |
| | | | | | | |
| Walkush, J.P. | Officer | D | 28-Sep-2007 | 1,508 | $19.04 | $28,712 |
| Walkush, J.P. | Officer | D | 28-Sep-2007 | 3,300 | $19.03 | $62,799 |
| Walkush, J.P. | Officer | D | 28-Sep-2007 | 1,000 | $19.02 | $19,020 |
| Walkush, J.P. | Officer | D | 28-Sep-2007 | 600 | $19.01 | $11,406 |
| Walkush, J.P. | Officer | D | 28-Sep-2007 | 69,000 | $19.00 | $1,311,000 |
| Walkush, J.P. | Officer | D | 28-Sep-2007 | 300 | $19.07 | $5,721 |
| Walkush, J.P. | Officer | D | 28-Sep-2007 | 500 | $19.06 | $9,530 |
| Walkush, J.P. | Officer | D | 28-Sep-2007 | 6,100 | $19.05 | $116,205 |
| Walkush, J.P. | Officer | I | 05-Oct-2007 | 2,504 | $19.29 | $48,302 |
| Walkush, J.P. | Officer | I | 05-Oct-2007 | 1,000 | $19.28 | $19,280 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 4,700 | $19.04 | $89,488 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 13,800 | $19.00 | $262,200 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 13,700 | $19.03 | $260,711 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 10,143 | $19.01 | $192,818 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 4,800 | $19.02 | $91,296 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 4,700 | $19.10 | $89,770 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 300 | $19.12 | $5,736 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 1,000 | $19.06 | $19,060 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 1,400 | $19.07 | $26,698 |
| Walkush, J.P. | Officer | D | 18-Dec-2008 | 3,800 | $19.11 | $72,618 |
| Walkush, J.P. | Officer | D | 29-Dec-2009 | 56,319 | $19.20 | $1,081,325 |
| Walkush, J.P. | Officer | D | 05-Jan-2010 | 28,287 | $19.11 | $540,565 |
| Walkush, J.P. | Officer | I | 13-Jan-2010 | 22,007 | $18.97 | $417,473 |
| | | | | 250,768 | | $4,781,733 |

| Filer Name | Title | Direct/ Indirect | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Young, A. Thomas | Director | D | 08-Oct-2007 | 5,700 | $19.28 | $109,896 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 400 | $19.26 | $7,704 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 1,300 | $19.23 | $24,999 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 3,000 | $19.20 | $57,600 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 2,900 | $19.18 | $55,622 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 5,700 | $19.15 | $109,155 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 300 | $19.27 | $5,781 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 100 | $19.17 | $1,917 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 200 | $19.19 | $3,838 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 200 | $19.21 | $3,842 |
| Young, A. Thomas | Director | D | 08-Oct-2007 | 200 | $19.24 | $3,848 |
| Young, A. Thomas | Director | D | 11-Jan-2010 | 26,612 | $19.06 | $507,225 |
| Young, A. Thomas | Director | D | 11-Jan-2010 | 10,000 | $19.04 | $190,400 |
| Young, A. Thomas | Director | D | 03-Jan-2011 | 30,461 | $15.86 | $483,111 |
|  |  |  |  | 87,073 |  | $1,564,938 |
|  |  |  | Total: | 1,887,700 |  | $33,887,792 |

## N.    Loss Causation/Economic Loss

508.    The market for SAIC common stock was open, well-developed and efficient at all relevant times.  During the Class Period, SAIC engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SAIC common stock and operated as a fraud on Class Period purchasers of SAIC common stock, by failing to disclose and misrepresenting adverse facts detailed herein.  As a result of these materially false and misleading statements and failures to disclose, SAIC common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired SAIC common stock, relying upon the integrity of the market price of SAIC common stock and market information relating to SAIC, and have been damaged thereby.

509.    When the misrepresentations and fraudulent conduct were exposed to the market, the price of SAIC common stock fell precipitously as the artificial inflation came out, causing economic loss to investors who had purchased SAIC common stock during the Class Period.  Accordingly, as a

result of their purchases of SAIC common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

510.    The decline in the price of SAIC common stock after the corrective disclosures came to light was a direct result of the nature and extent of the fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in SAIC common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the fraudulent conduct.  The economic loss suffered by Plaintiffs and the other Class members was a direct result of the fraudulent scheme to artificially inflate the price of SAIC common stock and the subsequent decline in the value of SAIC common stock when the prior misrepresentations and other fraudulent conduct were revealed.

511.    Moreover, the exposure of the fraud has detrimentally impacted SAIC's business, prospects and common stock price, as its reputation and ethical integrity were sullied as a result of the extensive fraud associated with the CityTime project.  Indeed, although it was reported that SAIC might continue to receive certain work from the federal government, it was believed that state governments would cease hiring the Company as a result of the CityTime fraud.

512.    In fact, in December 2010, the State Comptroller rejected a $118 million contract between the NYC Transit Authority and SAIC based on cost overruns associated with the CityTime project – the first such rejection since 2009, when the New York State Legislature granted the discretion to the Comptroller to review such contracts.  And, shortly thereafter, NYC rejected a $40 million contract with SAIC.

513.    Further, as of August 2012, the Company was still experiencing adverse business developments as a result of the fraud's exposure.  For example, in an August 21, 2012 Form 8-K,

SAIC reported that it had entered into an administrative agreement with the U.S. Army on behalf of all agencies of the U.S. Government, pursuant to which the Company "agreed, among other things, to maintain a contractor responsibility program having the specific elements described in the administrative agreement, including retaining a monitor and providing certain reports to the Army," over a five-year period (unless terminated after the satisfactory completion of SAIC's obligations for three years). Contractor Integrity Solutions, LLC, which the USAO appointed to serve as the monitor as part of SAIC's settlement of the CityTime matter, was also charged with monitoring the Company under the administrative agreement.

### O.    Applicability of Presumption of Reliance and Fraud on the Market Doctrine

514.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted against SAIC are predicated upon omissions of material fact for which there was a duty to disclose.

515.    In the alternative, or in addition, Plaintiffs are entitled to a presumption of reliance on SAIC's material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because SAIC common stock traded in an efficient market during the Class Period for at least the following reasons:

(a)    SAIC common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)    as a regulated issuer, the Company filed periodic public reports with the SEC and the NYSE;

(c)    SAIC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     SAIC was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

516.    As a result of the foregoing, the market for SAIC common stock promptly digested current information regarding SAIC from publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of SAIC common stock during the Class Period suffered similar injury through their purchase of SAIC common stock at artificially inflated prices and a presumption of reliance applies.

**P.     No Safe Harbor**

517.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, SAIC is liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of SAIC who knew that those statements were false when made.

## VIII.   CLASS ACTION ALLEGATIONS

518.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of SAIC between March 25, 2011 and June 2, 2011, inclusive, and who were damaged thereby

(the "Class").  Excluded from the Class are SAIC, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which they have or had a controlling interest.[7]

519.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SAIC common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by SAIC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

520.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the wrongful conduct complained of herein.

521.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

522.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by the acts as alleged herein;

(b)      whether statements made by or on behalf of SAIC to the investing public during the Class Period misrepresented material facts about the business and operations of SAIC;

---

[7]      As noted above, Plaintiffs end the Class Period on June 2, 2011 pursuant to this Court's September 23, 2016 Order, but do not believe that is the appropriate end date of the Class Period and reserve all rights to challenge that interlocutory ruling at the appropriate time and in the appropriate manner.  Additionally, Plaintiffs' motion for reconsideration and/or certification of an interlocutory appeal remains pending before the Court, and will not likely be resolved before October 31, 2016, the date by which the Court directed the filing of this pleading in the September 23, 2016 Order.

(c)     whether the price of SAIC common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

523.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.     COUNT

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

524.     Plaintiffs repeat and reallege each allegation set forth above as if set forth herein.

525.     During the Class Period, SAIC disseminated, at a minimum, the materially false and misleading March 2011 Form 10-K, which its executives knew or deliberately disregarded was false and misleading.  In so doing, SAIC: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon purchasers of SAIC common stock during the Class Period.

526.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SAIC common stock.  Plaintiffs and the Class would not have purchased SAIC common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the fraud alleged.

527.     As a direct and proximate result of such conduct, Plaintiffs and other Class members suffered damages in connection with their purchases of common stock during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against SAIC for all damages sustained as a result of the wrongdoing alleged herein, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## X.      JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  October 31, 2016   ROBBINS GELLER RUDMAN
             & DOWD LLP
           SAMUEL H. RUDMAN
           JOSEPH RUSSELLO

                */s/ Samuel H. Rudman*
             SAMUEL H. RUDMAN

           58 South Service Road, Suite 200
           Melville, NY  11747
           Telephone:  631/367-7100
           631/367-1173 (fax)
           srudman@rgrdlaw.com
           jrussello@rgrdlaw.com

           *Lead Counsel and Attorneys for Plaintiffs*

# EXHIBIT A

## TIMELINE OF RELEVANT EVENTS

| Date | Description |
|---|---|
| July 2000 | SAIC assumes CityTime contract from previous prime contractor; the contract was initially budgeted to cost $63 million to complete. |
| October 14, 2002 | SAIC hires Denault as Deputy Program Manager for CityTime project. |
| November 2002 | Amendment No. 4 to the contract becomes effective, increasing the cost of CityTime to approximately $100 million. |
| Early 2003 | SAIC writes down nearly $28 million in losses on the CityTime project (representing an approximately 25% loss for SAIC on the contract). |
| February 19, 2003 | Richard Valcich (Executive Director of the OPA) sends letter to Mark Hughes (Group President responsible for CityTime) complaining about SAIC's performance and costs. |
| June 30, 2003 | Denault signs sole-source justification form for Technodyne. |
| December 2003 | Amendment No. 5 to the contract becomes effective, increasing the cost of CityTime to approximately $115 million. |
| September 1, 2004 | SAIC promotes Denault to Program Manager for CityTime project. |
| December 3, 2004 | Presentation materials for in-process review meeting state that the completion date for the design/development test was November 19, 2004 (a date which had already passed) and for the user acceptance testing was December 20, 2004. |
| Late 2004/Early 2005 | Mark Mazer (Spherion consultant to OPA) suggests that SAIC hire D.A. Solutions to provide staffing support services. |
| January 14, 2005 | Presentation materials for in-process review meeting state that the completion date for the design/development test was February 4, 2005 and for the user acceptance testing was March 4, 2005. |
| January 15, 2005 | SAIC promotes Denault to Senior Program Manager for CityTime and Vice President. |
| January 2005 | Kenneth Dahlberg (SAIC's CEO) reviews and approves Amendment No. 6 to the contract. |
| February 10, 2005 | Presentation materials for in-process review meeting state that the completion date for the design/development test was March 11, 2005 and for the user acceptance testing was April 8, 2005. |
| March 14, 2005 | Marco Leon (SAIC's Quality Assistance Manager) makes anonymous ethics complaint to SAIC about Denault receiving kickbacks. |
| April 2005 | Dahlberg (CEO) again reviews and approves Amendment No. 6 to the contract. |
| Late 2005 | SAIC reorganizes reporting hierarchy for CityTime, making it one of the only projects to report directly to a Group at SAIC, instead of a Business Unit. |
| December 29, 2005 | Denault signs a second sole-source justification form for Technodyne. |
| February 3, 2006 | Amendment No. 6 to the contract becomes effective, changing contract from fixed price to fixed price level of effort, which has the effect of transferring cost overruns to NYC. |
| February 13, 2006 | Amendment No. 7 to the contract is approved, increasing the cost of CityTime to approximately $225 million (a 96.1% increase from Amendment No. 6). |
| April 11, 2007 | SAIC issues press release, announcing its financial results for its 2007 fourth quarter and year end, the periods ended January 31, 2007. |

| Date | Description |
|------|-------------|
| April 12, 2007 | SAIC files its Form 10-K with the SEC for the year ended January 31, 2007, which was certified by Dahlberg (CEO) and Mark Sopp (SAIC's CFO). |
| June 6, 2007 | SAIC issues press release, announcing its financial results for its 2008 first quarter, the period ended April 30, 2007. |
| June 7, 2007 | SAIC files its Form 10-Q for the quarter ended April 30, 2007, certified by Sopp (CFO). |
| June 14, 2007 | Amendment No. 8 to the contract is approved, increasing the cost of CityTime to approximately $349 million (a 55.3% increase from Amendment No. 7). |
| September 6, 2007 | SAIC issues press release, announcing its financial results for its 2008 second quarter, the period ended July 31, 2007. |
| September 7, 2007 | SAIC files its Form 10-Q for the quarter ended July 31, 2007, certified by Sopp (CFO). |
| October 1, 2007 | Deborah Alderson (SAIC's Group President) presents at Jefferies Technology Conference. |
| October 9, 2007 | Dahlberg (CEO), Sopp (CFO), and Alderson (Group President) present at Institutional Investor Conference. |
| December 10, 2007 | SAIC issues press release, announcing its financial results for its 2008 third quarter, the period ended October 31, 2007. |
| December 11, 2007 | SAIC files its Form 10-Q for the quarter ended October 31, 2007, certified by Sopp (CFO). |
| March 3, 2008 | Sopp (CFO) presents at Morgan Stanley Technology Conference. |
| March 25, 2008 | SAIC issues press release, announcing its financial results for its 2008 fourth quarter and year end, the periods ended January 31, 2008. |
| March 28, 2008 | SAIC files its Form 10-K with the SEC for the year ended January 31, 2008, certified by Dahlberg (CEO) and Sopp (CFO). |
| May 29, 2008 | Amendment No. 9 to the contract is approved, increasing the cost of CityTime to approximately $489 million (a 40.2% increase from Amendment No. 8). |
| June 3, 2008 | SAIC issues press release, announcing its financial results for its 2009 first quarter, the period ended April 30, 2008. |
| June 4, 2008 | SAIC files its Form 10-Q for the quarter ended April 30, 2008, certified by Sopp (CFO). |
| June 18, 2008 | Dahlberg (CEO) presents at William Blair Annual Growth Stock Conference. |
| July 2008 | NYC Comptroller conducts an audit of timekeeping practices on CityTime. OPA conducts audit of six months' worth of SAIC's time sheets to determine extent of timekeeping discrepancies and concludes timesheets were submitted for time not worked. |
| September 3, 2008 | SAIC issues press release, announcing its financial results for its 2009 second quarter, the period ended July 31, 2008. |
| September 4, 2008 | SAIC files its Form 10-Q for the quarter ended July 31, 2008, certified by Sopp (CFO). |
| October 15, 2008 | Dahlberg (CEO), Sopp (CFO), and Alderson (Group President) present at Institutional Investor Conference. |
| December 9, 2008 | SAIC issues press release, announcing its financial results for its 2009 third quarter, the period ended October 31, 2008. |
| December 10, 2008 | SAIC files its Form 10-Q for the quarter ended October 31, 2008, certified by Sopp (CFO). |
| January 2009 | SAIC promotes Denault to Operations Manager for CityTime project. |

| Date | Description |
|------|-------------|
| March 25, 2009 | SAIC issues press release, announcing its financial results for its 2009 fourth quarter and year end, the periods ended January 31, 2009. |
| March 30, 2009 | SAIC files its Form 10-K with the SEC for the year ended January 31, 2009, certified by Dahlberg (CEO) and Sopp (CFO). |
| June 3, 2009 | SAIC issues press release, announcing its financial results for its 2010 first quarter, the period ended April 30, 2009. |
| June 4, 2009 | SAIC files its Form 10-Q for the quarter ended April 30, 2009, certified by Sopp (CFO). |
| June 23, 2009 | SAIC announces Dahlberg would be leaving his position as CEO on September 20, 2009, but that he would continue to act as Chairman of the Board through June 2010. |
| June 30, 2009 | Amendment No. 10 to the contract is approved, increasing the cost of CityTime to approximately $628 million (a 28.5% increase from Amendment No. 9). |
| September 2, 2009 | SAIC issues press release, announcing its financial results for its 2010 second quarter, the period ended July 31, 2009. |
| September 3, 2009 | SAIC files its Form 10-Q for the quarter ended July 31, 2009, certified by Sopp (CFO). |
| September 21, 2009 | Walter Havenstein becomes CEO of SAIC and a member of its Board. |
| October 14, 2009 | Dahlberg (SAIC's Chairman), Havenstein (CEO), Sopp (CFO), and Alderson (Group President) present at Institutional Investor Conference. |
| December 8, 2009 | SAIC issues press release, announcing its financial results for its 2010 third quarter, the period ended October 31, 2009. |
| December 9, 2009 | SAIC files its Form 10-Q for the quarter ended October 31, 2009, certified by Sopp (CFO). |
| May 2009 | SAIC promotes Denault to Vice President for Operations. |
| June 11, 2009 | Dahlberg (SAIC's Chairman) presents at William Blair Annual Growth Stock Conference. |
| February 11, 2010 | Carl Bell (Chief Systems Engineer) receives two grand jury subpoenas concerning CityTime project. <br><br> SAIC agrees to advance Bell's legal fees in connection with related criminal matter. |
| March 26, 2010 | *Daily News* article reports demand by NYC Councilwoman Letitia James for a refund from SAIC for overbilling and a DOI investigation into CityTime. |
| March 30, 2010 | SAIC issues press release, announcing its financial results for its 2010 fourth quarter and year end, the periods ended January 31, 2010. |
| March 31, 2010 | *Daily News* article reports comments from NYC Councilwoman James concerning possible criminal activity on CityTime project, including the submission of false timesheets. |
| April 1, 2010 | SAIC files its Form 10-K with the SEC for the year ended January 31, 2010, which was certified by Dahlberg (SAIC's Chairman) and Sopp (CFO). |
| April 8, 2010 | Presentation materials for in-process review meeting shows that Technodyne was receiving or stood to receive 74% of the revenue generated from CityTime. |
| June 3, 2010 | SAIC issues press release, announcing its financial results for its 2011 first quarter, the period ended April 30, 2010. |
| June 4, 2010 | SAIC files its Form 10-Q for the quarter ended April 30, 2010, certified by Sopp (CFO). |
| June 13, 2010 | Denault speaks on SAIC's behalf to *Crain's New York Business* concerning the increasing cost of CityTime project. |

- 175 -

| Date | Description |
|------|-------------|
| Fall 2010 | DOI begins conducting forensic audit of financial information regarding the project. |
| September 2010 | SAIC possibly commences internal investigation and questions Denault about timekeeping. |
| September 1, 2010 | SAIC issues press release, announcing its financial results for its 2011 second quarter, the period ended July 31, 2010. |
| September 3, 2010 | SAIC files its Form 10-Q for the quarter ended July 31, 2010, certified by Sopp (CFO). |
| September 28, 2010 | NYC Comptroller releases report concerning audit of Spherion and aspects of CityTime. |
| October 13, 2010 | Havenstein (CEO), Sopp (CFO), and Alderson (Group President) present at Institutional Investor Conference. |
| October 28, 2010 | Amendment No. 11 to the contract is approved, increasing the cost of CityTime to approximately $660 million (a 5.1% increase from Amendment No. 10). |
| November 9, 2010 | Sopp (CFO) and Alderson (Group President) present at Wells Fargo Securities Technology, Media, and Telecom Conference. |
| December 2010 | SAIC receives grand jury subpoena(s) calling for production of information on CityTime.<br><br>SAIC hires law firm Cooley LLP to assist in conducting internal investigation (which commenced no later than December 17, 2010). |
| December 8, 2010 | SAIC issues press release, announcing its financial results for its 2011 third quarter, the period ended October 31, 2010. |
| December 9, 2010 | SAIC files its Form 10-Q for the quarter ended October 31, 2010, certified by Sopp (CFO). |
| December 15, 2010 | USAO and DOI issue press release regarding the filing of the criminal complaint.<br><br>Peter Zanolin (Inspector General of DOI) interviews Denault and serves a federal grand jury subpoena on him calling for production of records and testimony involving CityTime. |
| December 16, 2010 | *Daily News* article reports that D.A. Solutions was placing consultants on CityTime (even though Robert Hatfield (SAIC's Business Unit Procurement Director) had recommended that SAIC not use D.A. Solutions as a subcontractor).<br><br>Mayor's Office announces that Joel Bondy (Executive Director of OPA) was suspended and removed from CityTime project.<br><br>NYC Comptroller announces suspension of payments to Spherion pending investigation.<br><br>Mayor's Office and NYC Comptroller transfer responsibility for CityTime to NYC's Financial Information Services Agency (FISA). |
| December 20, 2010 | *Daily News* article reports that Mayor Bloomberg questioned SAIC's future on CityTime and will conduct a forensic audit to recoup any funds outside of criminal investigation. |
| December 21, 2010 | SAIC removes Denault from CityTime and places him on administrative leave.<br><br>State Comptroller sends letter to NYC Transit Authority rejecting $118 million contract award to SAIC because of allegations raised in criminal case concerning CityTime. |
| December 22, 2010 | State Comptroller announces rejection of $118 million contract award to SAIC, attributing rejection to SAIC's role in CityTime and the possibility that SAIC was connected to fraud.<br><br>Mayor's Office rejects $40 million contract award to SAIC due to CityTime.<br><br>SAIC recommends an attorney to Denault and sends letter to him confirming that it will advance his legal fees in *Mazer*, even though he is not named as a defendant therein. |
| December 23, 2010 | Bondy (Executive Director of OPA) resigns from OPA. |

- 176 -

| Date | Description |
|------|-------------|
| Late December 2011 | SAIC finishes collecting data from internal investigation. |
| January 24, 2011 | Bell (Chief Systems Engineer) resigns from SAIC, and Brown (SAIC's in-house counsel) and Cooley LLP conduct an hour-long interview with Bell concerning CityTime. |
| February 6, 2011 | *Daily News* reports that, a week earlier, SAIC declined to renew a consulting contract with Salvatore Salamone (SAIC's liaison with NYC on the CityTime project). |
| February 8, 2011 | Victor Natanzon (Principal of staffing firm PrimeView) pleads guilty to criminal charges stemming from CityTime. |
| February 9, 2011 | Havenstein (SAIC CEO) presents at Cowen and Company Aerospace/Defense Conference.<br><br>DOI interviews Bell (Chief Systems Engineer) regarding his involvement in CityTime. |
| February 10, 2011 | USAO and DOI issue press release announcing the filing of indictment charging Mark Mazer (Spherion consultant to OPA), Dmitry Aronshtein (Principal of staffing firm D.A. Solutions), S. Mazer, Medzon, and Makovetskaya (family members of Mark Mazer) in connection with CityTime fraud. |
| February 11, 2011 | *Daily News* article reports that SAIC fired Bell (Chief Systems Engineer) after an internal review uncovered his approval of timesheets for consultant who did no work on the project.<br><br>Bell participates in call with SAIC's in-house (Brown) and outside (Cooley LLP) counsel.<br><br>Bell receives two grand jury subpoenas (one to him, the other to a company he had formed, 3C Enterprises), concerning potential criminal violations. |
| February 21, 2011 | SAIC sends Bell (Chief Systems Engineer) a letter confirming that it would cover his legal costs in connection with *Mazer*, even though he is not named as a defendant therein. |
| February 26, 2011 | Denault returns signed copy of legal representation agreement to SAIC. |
| Early March 2011 | SAIC concludes internal investigation involving Denault's improper time keeping. |
| March 9, 2011 | Robert Birdsong's (Head of SAIC's internal audit group) audit team issues memorandum concerning the results of SAIC's internal investigation of Denault's timekeeping practices. |
| March 23, 2011 | SAIC issues press release, announcing its financial results for its 2011 fourth quarter and year end, the periods ended January 31, 2011. |
| March 25, 2011 | SAIC files its Form 10-K with the SEC for the fiscal year ended January 31, 2011, certified by Dahlberg (CEO) and Sopp (CFO). |
| April 27, 2011 | SAIC files its annual proxy statement on Schedule 14A with the SEC. |
| May 23, 2011 | SAIC terminates Denault.<br><br>SAIC advises FISA that Denault is fired and offers to refund nearly $2.5 million to NYC for Denault's time after Amendment No. 6. |
| May 26, 2011 | Denault is arrested on criminal charges relating to CityTime. |
| May 27, 2011 | USAO and DOI jointly issue press release, announcing the unsealing of the criminal complaint filed against Denault. |
| June 2, 2011 | SAIC issues press release, announcing results for its 2010 first quarter, the period ended April 30, 2011, and disclosing $40 million in receivables on CityTime as of May 31, 2011.<br><br>SAIC conducts conference call with analysts and investor, suggesting that SAIC's exposure is limited to $2.5 million. |

| Date | Description |
|---|---|
| June 3, 2011 | SAIC files its Form 10-Q for the quarter ended April 30, 2011, certified by Sopp (CFO). |
| | SAIC stock price drops from $17.21 per share on June 2, 2011 to $16.76 per share. |
| June 20, 2011 | USAO issues press release announcing unsealing of superseding indictment, which added Denault and Technodyne as defendants, and unsealing of Bell's guilty plea. |
| June 29, 2011 | Mayor Bloomberg sends SAIC letter formally demanding return of $600 million. |
| July 1, 2011 | SAIC issues press release, attaching a copy of Mayor Bloomberg's June 29, 2011 letter. |
| Mid 2011 | CityTime is competed and operational for a total cost of more than $700 million |
| August 31, 2011 | SAIC issues press release, announcing its financial results for its 2012 second quarter, the period ended July 31, 2011, and reporting declines in revenue and operating margin. |
| | SAIC conducts conference call with analysts and investors disclosing "wind[ing] down" of CityTime project and that paying restitution for fraud was "probable." |
| September 1, 2011 | SAIC stock price drops nearly 14% in response to the August 31, 2011 announcement. |
| October 3, 2011 | SAIC announces Havenstein will retire as CEO on June 15, 2012 for "personal reasons." |
| October 24, 2011 | SAIC announces termination of Alderson (Group President), John Lord (Deputy Group President), and Peter Dube (General Manager of Enterprise and Mission Solution Business Unit) for failure to properly supervise and/or manage CityTime project. |
| December 6, 2011 | SAIC issues press release, announcing its financial results for its 2012 third quarter, the period ended October 31, 2011, and reporting that results were significantly impacted by a $232 million loss provision taken by the Company relating to CityTime. |
| February 21, 2012 | SAIC announces Havenstein will accelerate his retirement as CEO to March 1, 2012. |
| March 14, 2012 | USAO and DOI issue press release announcing entry into Deferred Prosecution Agreement with SAIC; SAIC issues press release, announcing same. |
| | Under DPA, SAIC agrees to, *inter alia*, pay nearly $500.4 million and forfeit $40 million in unpaid receivable that remained outstanding and unpaid by NYC. |
| October 15, 2013 | Denault, Mazer, and Aronshtein go to trial in *Mazer*. |
| November 22, 2013 | Trial in *Mazer* concludes with guilty verdicts for Denault, Mazer, and Aronshtein. |